IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| JESSE PIERCE and MICHAEL PIERCE, on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No.: 3:13-cv-00641-CCS<br>) |
| WYNDHAM VACATION RESORTS, INC., and WYNDHAM VACATION OWNERSHIP, INC., | )<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CERTAIN HIGHLY COMPENSATED EMPLOYEES**

Defendants, pursuant to Federal Rule of Civil Procedure 56, submit this Memorandum of Law in Support of their Motion for Summary Judgment as to Certain Highly Compensated Employees.

**I.**

**SUMMARY OF ARGUMENT**

The named Plaintiffs, and other opt-in plaintiffs, are exempt from the overtime provisions of the FLSA because they fall within the Highly Compensated Employee exemption in that they earned more than $100,000.00 annually and customarily and regularly performed one or more executive or administrative duties. 29 C.F.R 541.601(a).[1] Jesse Pierce, Michael Pierce, Sr., R.

---

[1] 29 CFR § 541.601 was included within the regulations to be amended effective December 1, 2016 pursuant to the Department of Labor's "Final Rule." Because the maximum relevant time period here is October 21, 2010 through October 31, 2013 (the "recovery period"), amendment of 29 CFR § 541.601 effective December 1, 2016 is moot. Accordingly, this Motion is based on the language of 29 CFR § 541.601 effective during the relevant time period.

1

Craig Thrift, and Thomas Garrett were highly compensated employees who trained other sales representatives, directed their activities, closed sales for them, and/or otherwise performed one or more executive or administrative functions. The regulations, and at least one district court case directly on point, support a finding that these plaintiffs are compensated on a fee basis and that they otherwise meet the exemption's requirements.

## II.

## LAW AND ARGUMENT

**A. The named Plaintiffs and other opt-in plaintiffs are exempt from the overtime provisions of the FLSA because they earned more than $100,000.00 annually and customarily and regularly performed one or more executive or administrative duties. 29 C.F.R 541.601(a).**

During the relevant time period, an employee whose total annual compensation was at least $100,000.00, or a proportionate amount for shorter periods of time, and who customarily and regularly performed one or more executive, administrative or professional duties is exempt from the overtime provisions of the FLSA. The relevant regulations provided as follows:

> **§ 541.601 Highly Compensated Employees**.
>
> (a) An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs <u>any one or more</u> of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part.
>
> (b) (1) "Total annual compensation" must include at least $455 per week paid on a salary <u>or fee basis</u>. Total annual compensation may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period. . . .
>
> (2) If an employee's total annual compensation does not total at least the minimum amount established in paragraph (a) of this section by the last pay

---

Defendants maintain that Plaintiffs are unable to show a willful violation of the FLSA and, therefore, a two-year statute of limitations is applicable, rather than the three years sought by Plaintiffs. In any event, the dispute is moot for purposes of this motion because the named plaintiffs and other opt-in plaintiffs are exempt highly compensated employees, as this motion will demonstrate.

> period of the 52-week period, the employer may, during the last pay period or within one month after the end of the 52-week period, make one final payment sufficient to achieve the required level. For example, an employee may earn $80,000 in base salary, and the employer may anticipate based upon past sales that the employee also will earn $20,000 in commissions. However, due to poor sales in the final quarter of the year, the employee actually only earns $10,000 in commissions. In this situation, the employer may within one month after the end of the year make a payment of at least $10,000 to the employee. Any such final payment made after the end of the 52-week period may count only toward the prior year's total annual compensation and not toward the total annual compensation in the year it was paid. If the employer fails to make such a payment, the employee does not qualify as a highly compensated employee, but may still qualify as exempt under subparts B, C or D of this part.
>
> . . .
>
> (c) <u>A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties</u>. Thus, a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part. <u>An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption</u> under § 541.100.
>
> (d) This section applies only to employees whose primary duty includes performing office or non-manual work. . . .

29 CFR § 541.601 (emphasis added).

The Department of Labor's publication *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, <u>Federal Register</u>, Vol. 69, No. 79, April 23, 2004, at 22122, (hereinafter "The 2004 Comments") discusses the history of the FLSA and its implementing regulations and also explains the rationale for the 2004 amendments to the regulations that are relevant to the applicable time period. In reviewing the Highly Compensated Employee exemption ("HCE exemption"), and determining that a short-cut duties test was warranted, the Department stated:

3

>The rationale for a highly compensated test was set forth in the 1949 Weiss Report and is still valid today:
>
>>The experience of the Divisions has shown that in the categories of employees under consideration the higher the salaries paid the more likely the employees are to meet all the requirements of the exemption, and the less productive are the hours of inspection time spent in analysis of the duties performed. <u>At the higher salary levels in such classes of employment, the employees have almost invariably been found to meet all of the other requirements of the regulations for exemption. In the rare instances when these employees do not meet all the other requirements of the regulations, a determination that such employees are exempt would not defeat the objectives of section 13(a)(1) of the act</u>. The evidence supported the experience of the Divisions, and indicated that a short-cut test of exemption along the lines suggested above would facilitate the administration of the regulations without defeating the purposes of section 13(a)(1).

2004 Comments, FR at p. 22173 (emphasis added).

With the 2004 amendments to the FLSA's implementing regulations, the Department created the HCE exemption with the language applicable to the relevant time period. At the time the Department was considering the 2004 amendments to the regulations, the annual earnings requirement to be considered an exempt administrative, executive, or professional employee was only $13,000. The Department recognized that this number was inadequate to be considered highly-compensated in the current economy and discussed its rationale for setting the total annual compensation requirement at $100,000. The proposed rule would have raised the annual earnings requirement to $65,000 from $13,000, but, after receipt and consideration of many comments from labor and industry, opted to set the required earnings at $100,000 annually, over 50% more than what had been proposed. In arriving at the $100,000 figure, the Department took great pains to analyze the number of employees expected to be affected by changes to the minimum compensation level required for the exemption. The Department included a chart which shows that hourly employees making at least $100,000 per year were in the top 0.3% of

4

all hourly employees. *2004 Comments*, FR p. 22170, Table 5. Those earning $130k or more constituted the top 0.2% of all full time hourly workers. The chart only goes up to $130K. *2004 Comments*, FR p. 22170, Table 5. The Department stated:

> Employees earning $100,000 or more per year are at the very top of today's economic ladder, and setting the highly compensated test at this salary level provides the Department with the confidence that, in the words of the Weiss Report: "in the rare instances when these employees do not meet all other requirements of the regulations, a determination that such employees are exempt would not defeat the objectives of section 13(a)(1) of the Act."

*2004 Comments*, FR p. 22174.

### 1. The named plaintiffs and other opt-in plaintiffs had annual compensation of more than $100,000 per year.

In the case of the named Plaintiffs and other opt-in plaintiffs, their extremely high annual compensation places them literally "off the chart" which the Department considered when considering the exemption. Specifically, Named Plaintiff Jesse Pierce had annual compensation of $906,457.34 in 2010, and his "lowest" annual compensation during the recovery period was $671,945.03 in 2013. (Statement of Undisputed Facts ("SOF") 3).[2] Opt-In Plaintiff Craig Thrift had annual compensation of $852,234.99 in 2012, and his "lowest" annual compensation during the recovery period was $299,658.55 in 2011. (SOF 5). Named Plaintiff Michael Pierce, Sr. was also "off the chart" with annual compensation of $299,208.43 in 2010, and his "lowest" annual compensation during the recovery period of $241,373.97 in 2011 (SOF 4). Finally, Opt-In Plaintiff Thomas Garrett had "off the chart" annual compensation of $474,288.62 in 2013, as well as his "lowest" annual compensation during the recovery period of $194,259.36 in 2011. (SOF 6).

---

[2] Citations to Defendants' Statement of Undisputed Facts ("SOF") filed contemporaneously with this Motion refer to the stated fact and supporting evidence from the record.

### 2. The regulations and at least one district court case directly on point support a finding that Plaintiffs are compensated on a fee basis.

In addition to the requirement for a total annual compensation of $100,000, the exemption as effective during the relevant time period requires that compensation "include at least $455 per week paid on a salary <u>or fee basis</u>. Total annual compensation may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period." 29 C.F.R § 541.601(b)(1). Wyndham Sales Representatives are not paid a salary, but they are paid on a fee basis. During the relevant time period, the fee basis regulation provided as follows:

> **§ 541.605 Fee basis**.
>
> **(a)** Administrative and professional employees may be paid on a fee basis, rather than on a salary basis. <u>An employee will be considered to be paid on a "fee basis" within the meaning of these regulations if the employee is paid an agreed sum for a single job regardless of the time required for its completion</u>. These payments resemble piecework payments with the important distinction that generally a "fee" is paid for the kind of job that is unique rather than for a series of jobs repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis.
>
> **(b)** To determine whether the fee payment meets the minimum amount of salary required for exemption under these regulations, the amount paid to the employee will be tested by determining the time worked on the job and whether the fee payment is at a rate that would amount to at least $455 per week if the employee worked 40 hours. Thus, an artist paid $250 for a picture that took 20 hours to complete meets the minimum salary requirement for exemption since earnings at this rate would yield the artist $500 if 40 hours were worked.

29 C.F.R. § 541.605 (emphasis added).

Commission-based Wyndham sales representatives are paid on a "fee basis" because they are "paid an agreed sum for a single job regardless of the time required for its completion," the "single job" being a completed sale and the "agreed sum" being the agreed upon commission

structure. The number of hours or days worked have no bearing on the amount of the fee paid and thus that element of the regulation is also satisfied. Each sale is unique in that the sales representative has to exercise his or her judgment in what approach to take with each individual customer, how to create a package that fits with the customer's vacation habits and budget, and how to craft a deal that works for the customer and is profitable for the company. In addition, commissions vary widely depending on numerous factors such as number of points purchased, amount of down payment, sales record of the individual sales representative, location of home resort, etc.

There are very few cases interpreting the fee basis regulation and, of those cases, only one could be found that deals with the question of whether a commission is also a fee. In *Herr v. McCormick Grain-The Heiman Company, Inc.,* 1994 U.S. Dist. LEXIS 14352; 2 Wage & Hour Cas. (BNA) 717 (D. Kan. Sept. 13, 1994), the plaintiff was a grain trader who earned commissions for brokering grain transactions. In determining that plaintiff was an exempt administrative employee, the court analyzed whether plaintiff was paid on a salary or fee basis at a rate of no less than $250.00 per week (under an older version of the regulation, which is identical to the regulation effective during the relevant time period save for the weekly dollar amount). The court equated a completed sale with a single "job," and held that commission paid to the plaintiff was a "fee":

> Here, the plaintiff, as a grain merchandiser, conducted a series of sales that were repeated an indefinite number of times during the year. By the same token, however, he was paid an agreed sum – 20% commission of the profits earned – for a single job – each sale. The Code of Federal Regulations (Code) does not address commission as a form of compensation. Nonetheless, based upon how the merchandiser is paid on the strength of each sale, <u>this court is satisfied the definition of fee encompasses commissions</u>. <u>For the purpose of this case, the court finds the plaintiff's compensation on a commission basis fits squarely within the definition of fee found at § 541.313(b).</u>

*Id.* at *10 (emphasis added).

Like the plaintiff in *McCormick Grain*, Wyndham sales representatives are paid an agreed sum, e.g. 6%, for a single job – each sale. The actual amount of commission paid, while based on an agreed commission and bonus structure, was unique to each sale and varied widely depending upon the number of points the sales representative was able to sell each individual customer. The example cited in the regulations of an artist commissioned to paint a picture and being paid on a fee basis is also an apt analogy because there is definitely an art to selling timeshares. Each customer is unique and each sales opportunity requires a unique approach. Each sale is unique and does not lend itself to simple repetition – otherwise every sales representative would be equally successful which is clearly not the case given the wide range of earnings of the named and opt-in plaintiffs.

The top 26 sales representatives who have opted-in to the class in Tennessee averaged over $100k annually, while the top 10 averaged $376,870 over the relevant recovery period. (Exhibit 1 to Declaration of Mandi Benson attached as Exhibit A to SOF). Named Plaintiff Jesse Pierce averaged $767,911 over the relevant recovery period, with a high of $906,457 in 2010. (SOF 3). Paying overtime to someone who makes that kind of money is absurd, and it would be doubly absurd to rely on a supposed distinction between a "fee" and a "commission" to find that a true "one-percenter" is non-exempt. The regulations and at least one district court case support a finding that a commission may also be considered a fee and Defendants could find no authority to the contrary.

> **3. Employees paid on a fee basis need not receive a weekly "guarantee," and, in fact, the concept of a weekly "guarantee" is not compatible with payment on a fee basis.**

Defendants anticipate that Plaintiffs will argue that the exemption is not met because

Plaintiffs were not "guaranteed" a set weekly amount of earnings.  <u>There is no explicit requirement in the regulations that employees paid on a fee basis be guaranteed a weekly amount—indeed the word "guarantee" is absent from the regulation</u>.  Moreover, the entire concept of payment on a fee basis is antithetical to the requirement of a weekly "guarantee" since it cannot be known whether the $455 per week requirement has been met until *after* the job has been completed and the number of work hours required for completion is known.  The regulations require a look-back approach to determine whether the $455 per week requirement has been satisfied, and, per the explicit text of the applicable regulation, earnings of less than $455 in a week can still meet the exemption.

The example given in the regulations is of an artist paid a fee for painting a picture.  "[A]n artist paid $250 for a picture that took 20 hours to complete meets the minimum salary requirement for exemption since earnings at this rate would yield the artist $500 if 40 hours were worked."  Through this example, the regulations contemplate a situation where an employee earns less than $455 during a given week, but can still qualify for the exemption.  The artist was only promised $250 to complete the painting and yet the exemption was met.

It is true that the 2004 Comments frequently speak of a $455 per week "guarantee" to the employee, but invariably this presumes that the employee is being paid on a salary basis.  Similarly, cases dealing with the highly compensated employee exemption, or indeed any of the white collar exemptions, frequently quote the requirement that the employee be paid on a "salary or fee basis," and then proceed to discuss the $455 per week "guarantee," again because the cases typically involve an employee paid on a salary basis.[3]  Nowhere in the actual regulations is

---

[3] The word "guarantee" is often mentioned in the context of determining whether the employer makes impermissible deductions that may cause a failure of the salary basis test and, thus, loss of the exemption.  Impermissible deductions would include, for example, a deduction for working less than 40 hours in a week.  Defendant submits

9

the word "guarantee" used with respect to the $455 per week requirement and, in fact, the regulations impliedly recognize that <u>the concept of payment on a fee basis runs contrary to any kind of weekly guarantee</u>. Payment on a fee basis cannot be equated to a guarantee because the regulations specifically state that the fee must not be related to hours worked. It is only retroactively, after the job is completed, that you look back to see if the fee paid, after considering the number of hours required to complete the job, works out to at least $455 per (40 hour) week on a pro rata basis.

To further illustrate that the concept of a "guarantee" is antithetical to payment on a fee basis, consider the following hypothetical: What if the artist in the example given in the regulations took 80 hours over a two-week period to complete the painting and was paid an agreed sum of $1000.00 for the work? Under the regulations, in order to determine whether the $455 per week requirement had been met, you would look back at the number of hours required to complete the painting to determine whether the $1000.00 agreed sum was sufficient to satisfy the $455 per week requirement, assuming a 40 hour work week. 29 C.F.R. § 541.605(b). In our hypothetical situation, the $1000 was earned over the period of two 40-hour works weeks, thus $1000 ÷ 2 weeks = $500 per week, exceeding the $455 per week requirement. This is true despite the fact that the artist would not have received any pay for the first week because the painting was not complete at that point.

Wyndham sales representatives are compensated on a commission basis. A typical commission is 6% of the sale price. If a sales representative achieves certain sales thresholds, she can be entitled to receive, as a bonus, an additional 1% to 9% on all sales for the month.

---

that with sales representatives paid on a commission/fee basis, there are no impermissible deductions, and therefore the sales representative's pay is "guaranteed" in that sense.

Depo. of Jesse Pierce p. 39.[4] Commissions vary based on the number of points sold and can range from a few hundred dollars to thousands of dollars. A commission could be earned in a few hours, or a sales representative could work many hours before making a sale and earning a commission. The case of a Wyndham sales representative who worked for two weeks before making a sale would be analyzed in the same manner as the example in the regulations, and the payment of a single large commission could easily meet the exemption's requirement. With regard to the named Plaintiffs who received as much as $38,000 in commissions/fees in a single week, the exemption is easily met.

### 4. Plaintiffs and other Opt-In Plaintiffs customarily and regularly performed one or more executive duties.

To qualify for the highly compensated employee exemption under the simplified duties test, the employee must customarily and regularly perform <u>any one or more</u> of the exempt duties or responsibilities of an executive, administrative or professional employee. 29 C.F.R § 541.601(a). As previously discussed, the Department of Labor justified the use of this simplified duties test because the salary was set high enough that less than 1% of all full-time hourly workers earned $100,000 annually and it believed "virtually every salaried 'white collar' employee with a total annual compensation of $100,000 would satisfy any duties test." *2004 Comments*, FR at 22174.

Here, the named plaintiffs and other opt-in plaintiffs customarily and regularly performed one or more of the exempt duties or responsibilities of executive employees described in the language of 29 C.F.R. § 541.100 effective during the relevant time period:

**§ 541.100 General rule for executive employees.**

**(a)** The term "employee employed in a bona fide executive capacity" in

---

[4] Cited excerpts from the transcript of the deposition of Jesse Pierce are attached as Exhibit B to Defendants' Statement of Undisputed Facts filed contemporaneously with this Motion.

section 13(a)(1) of the Act shall mean any employee: (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities; (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) Who customarily and regularly directs the work of two or more other employees; and (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

The term "management" as used in the applicable regulation is defined by 29 C.F.R. § 541.102:

**§ 541.102 Management.**

Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

Named plaintiffs Jesse Pierce and Michael Pierce, Sr., as well as opt-in plaintiffs Craig Thrift and Thomas Garrett, customarily and regularly performed one or more of the executive exemption duties by managing a team of sales representatives, conducting sales training, and directing the actions of two or more employees.

### a. Named plaintiff Jesse Pierce customarily and regularly performed one or more of the executive exemption duties.

Jesse Pierce's own deposition testimony and emails establish that he customarily and regularly directed the work of two or more other employees, managed a team of employees

12

(including training them), and provided input about hiring and firing of other employees. For example, with regard to directing the work of two or more other employees, Jesse Pierce testified that he would select sales representatives from his team and direct them to take sales tours on his behalf. Specifically, he testified "whenever we were [given] a prospect for a tour . . . we could pick a runner or another term they used was a hooker to go up to the room and hook the people down to take that, and we would split the commissions." (SOF 10). He expanded on his use of judgment in directing the work of two or more other employees by testifying that "[f]or the first year and a half . . . I would just go down the line and whoever is available to take the tour. . . . [later] I felt like there would be better seasoned people to do a better job of doing that. Be more proficient at that." (SOF 11). An email from Jesse Pierce also demonstrates that he customarily and regularly directed the work of other employees, including "pulling" them from tasks when he wrote "I literally had to pull REP A off a table from pitching rental." (SOF 16). Jesse Pierce demonstrated his pride in his management duties and responsibilities when he wrote "I have been in timeshare a long time and I know management of people. - - Take care of the reps and then they will take care of us." (SOF 18).

Jesse Pierce also managed a team of sales representatives, including training and mentoring them. *See*, 29 C.F.R. § 541.102 ("'management' includes . . . training of employees."). Regarding training of employees, Jesse Pierce testified: "Well, not only did I mentor my team, I mentored anybody on anybody else's team that needed it." Q: "You were training them? A: "Correct." He was 100% convinced that his training was a significant event in the lives of the sales representatives he was training. (SOF 13). Other examples of Jesse Pierce's own words stating that he managed and trained a team of sales representatives include: stating in an email that he had "been a huge help and mentor to so many people that you have

13

promoted to leadership . . . I am in charge of mentoring at least 6 reps." (SOF 15); and, testifying that his training included showing the sales representatives he was mentoring how to close sales, directing the sales representatives to hook the tour, and "anything related to training and getting part of the sale. . ." (SOF 14).

Jesse Pierce also made recommendations concerning the hiring and firing of other employees. For example, in an email sent to his Manager, Andy Payne, and to Senior Director of Sales, John Geissberger, dated December 30, 2012, Jesse Pierce provided the names of ten (10) sales representatives and stated, "This is what I need my team to look like." (SOF 12). With regard to firing, he sent an email regarding underperforming sales representatives to John Geissberger, dated August 26, 2013, in which he told Mr. Geissberger, the Senior Director of Sales, "[I]t's time for us to get rid of the trash bud." (SOF 17).

### b. Opt-in plaintiff Craig Thrift customarily and regularly performed one or more executive duties during the recovery period.

Opt-in plaintiff Craig Thrift also clearly testified about is direction of two or more other employees when he stated that he "was pretty much running the whole team within four months of working there." (SOF 25). Thrift also testified that employees would come to him seeking permission to leave. (SOF 30). He testified that he would direct other employees regarding sales tours and that most of the time it was in his discretion who received the tours. (SOF 22). The people he chose to receive tours had more opportunities to make money. (SOF 23).

Thrift was also clear about his executive exemption duty of managing through training. (*See*, 29 C.F.R. § 541.102). He testified regarding his "team" of 8-12 front-enders that he would train (or mentor). (SOF 21). Thrift also testified that he "got a lot of those folks . . . [trained] up to the ability to close transactions." (SOF 24).

14

Finally, Thrift's testimony demonstrates that his recommendations regarding hiring, advancement and promotion were given substantial weight. He testified that he could request who he wanted on his team. (SOF 26, 27). In fact, he selected and paid another employee to handle job responsibilities he directed because "[c]onsidering the amount of money" he was making per month, what he paid the other employee "was a pittance." (SOF 29).

### c. Opt-in plaintiff Thomas Garrett customarily and regularly performed one or more executive duties during the recovery period.

Thomas Garrett testified that he was engaged in management through training because he he performed all types of training, both formal and on-the-job, regarding "how to bring people out of the unit and so on, how to get the deal down, how to finish the deal, everything." He would sit around a table and conduct a training class with a group of sales representatives almost weekly, and he would also perform one-on-one training. (SOF 33). Garrett also testified that he would direct the work of two or more employees in that he would decide who to give sales tours to based on who had the best skills and that there were some employees he would not assign sales tours to because he did not believe their skills were good enough. (SOF 32). Finally, Garrett testified that as a "back-ender," he "controlled the team." (SOF 34).

### d. Named plaintiff Michael Pierce, Sr. customarily and regularly performed one or more of the executive exemption duties.

Named plaintiff Michael Pierce, Sr. also testified that he engaged in management of other employees through training in both the Nashville and Smokies locations. Pierce testified that when he was at the Nashville location, he did a lot of training of new salespeople, usually in his office: "- - Sometimes it was one. Sometimes it was more than one. Sometimes it was the whole team." "- - Sometimes I was required to hold the sales training for the morning." (SOF 36). He also testified that he trained Frontline sales representatives when he was at the Smokies location.

(SOF 37).  When asked if he could recall who he had trained, Michael Pierce, Sr. replied, "At some point I'm sure I had a hand in training everybody. - - Because, I mean, I trained in morning meetings."  (SOF 38).  Finally, he testified in his deposition that he was a mentor, which meant he was closing deals and teaching newer sales representatives how to close deals.  (SOF 39).

> **5. Other Opt-In Plaintiffs are likely exempt under the highly compensated employee exemption, but Defendants have not been allowed to develop proof through their depositions.**

Thirty-eight (38) of the 167 Named and Opt-In Plaintiffs earned greater than $100,000.00 annually in one or more years during the recovery period.  (SOF 7).  Additionally, twenty-one (21) opt-in plaintiffs may qualify as exempt highly compensated employees during some years because, although they worked less than a full calendar year, their earnings were such that on a pro-rata basis their earnings were sufficient to meet the $100,000 annual threshold.  (SOF 8).

Based on the deposition testimony of named plaintiffs Jesse Pierce and Michael Pierce, Sr. and opt-in plaintiffs Craig Thrift and Thomas Garrett discussed above, Defendants contend that deposing the remaining opt-in plaintiffs who meet the annual compensation requirement would demonstrate that many other opt-in plaintiffs also fully qualify for the highly compensated employee exemption.  However, to date, Defendants have not been permitted to depose all of those opt-in plaintiffs.

Plaintiffs filed their Notice of Sample Representatives on November 28, 2016.  (Doc. No. 211).  Defendants filed their Notice Regarding Sample Representatives on December 5, 2016 taking the position that the use of any sample of employees in this case is inappropriate.  (Doc. No. 212).  The Court subsequently ordered that "limiting discovery to Plaintiffs' representative sampling appears to be fair and proportional to the needs of the case . . ."  (Doc. No. 215, p. 4 of 6).  To date, Defendants have been limited to taking the depositions of a just a subset of Plaintiffs' purported representative sample.  (*See e.g.*, Memorandum in Support of Defendants'

Motion to Take Depositions of Remaining Undeposed Opt-In Plaintiffs in Representative Sample – Doc. No. 231).

Because Defendants have not been permitted to take the depositions of all opt-in plaintiffs who may qualify for the highly compensated employee exemption in order to develop the proof necessary to support a motion for summary judgment as to those plaintiffs, Defendants are limited to moving for summary judgment as to named plaintiffs Jesse Pierce and Michael Pierce, Sr. and opt-in plaintiffs Craig Thrift and Thomas Garrett by way of the instant motion. Defendants reserve the right to move for summary judgment on the basis of the highly compensated employee exemption as to other opt-in plaintiffs if Defendants are allowed the opportunity to take the necessary depositions to support such motion(s).

## III.

## CONCLUSION

Named plaintiffs Jesse Pierce and Michael Pierce, Sr., and opt-in plaintiffs Craig Thrift and Thomas Garrett had annual income greater than $100,000 every year during the Recovery Period (2010 – 2013). Additionally, Jesse Pierce, Michael Pierce, Sr., Craig Thrift, and Thomas Garrett all customarily and regularly performed one or more of the executive exemption duties. Pursuant to 29 C.F.R. § 541.601 in effect during the relevant time period, Jesse Pierce, Michael Pierce, Sr., Craig Thrift, and Thomas Garrett qualify for the highly compensated employee exemption and are exempt from the overtime provisions of the Fair Labor Standards Act. Accordingly, Defendants are entitled to summary judgment and dismissal of the claims asserted by Jesse Pierce, Michael Pierce, Sr., Craig Thrift, and Thomas Garrett.[5]

---

[5] As noted above, many other opt-in plaintiffs had the threshold income to qualify for the highly compensated employee exemption, but Defendants have not been allowed to take the depositions of all of those opt-in plaintiffs in order to develop proof necessary to support a motion for summary judgment as to those opt-in plaintiffs.

Respectfully submitted,

s/ Craig A. Cowart
Colby S. Morgan, Jr. (TN Bar No. 005556)
O. John Norris, III (TN Bar No. 017504)
Craig A. Cowart (TN Bar No. 017316)
JACKSON LEWIS P.C.
999 Shady Grove Rd., Suite 110
Memphis, TN 38120
Telephone: (901) 462-2600
Facsimile: (901) 462-2626
Email: norrisj@jacksonlewis.com
colby.morgan@jacksonlewis.com
craig.cowart@jacksonlewis.com

William J. Anthony *(Admitted Pro Hac Vice)*
JACKSON LEWIS P.C.
18 Corporate Woods Blvd, 3rd Floor
Albany, NY 12211
Telephone: (518) 649-9643
Facsimile: (518) 427-5956
Email: AnthonyW@jacksonlewis.com

Paul DeCamp *(Admitted Pro Hac Vice)*
JACKSON LEWIS P.C.
10701 Parkridge Blvd., Suite 300
Reston, VA 20191
Telephone: (703) 483-8305
Email: DeCampP@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

---

Defendants should be allowed to take the depositions of those opt-in plaintiffs and reserve the right to move for summary judgment as to those opt-in plaintiffs following the opportunity to take the remaining depositions and develop the necessary proof to establish their coverage by the highly compensated employee exemption.

# CERTIFICATE OF SERVICE

I hereby certify that I have this 5th day of May, 2017, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send an electronic notification of such filing to the following:

>Martin D. Holmes (TN Bar No. 012122)
>Darrell L. West (TN Bar No. 005962)
>DICKINSON WRIGHT PLLC
>424 Church Street, Suite 1401
>Nashville, TN 37219
>Telephone: (615) 244-6538
>Facsimile: (615) 256-8386
>Email: mdholmes@dickinsonwright.com
>       dwest@dickinsonwright.com
>
>Sherry D.O. Taylor # P62288
>500 Woodward Avenue, Suite 4000
>Detroit, MI 4822
>Telephone: (313) 223-3500
>Email: soneal@dickinsonwright.com
>
>*ATTORNEYS FOR PLAINTIFFS*
>*Opt-in Plaintiffs and Collective Class*

>s/ Craig A. Cowart
>Craig A. Cowart (TN Bar No. 017316)
>*Counsel for Defendants*

4811-3778-2583, v. 1