**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| JESSE PIERCE and MICHAEL PIERCE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WYNDHAM VACATION RESORTS, INC., and WYNDHAM VACATION OWNERSHIP, INC.,<br><br>Defendants. | CASE NO. 3:13-cv-641<br><br>District Judge: Pamela L. Reeves<br>Magistrate Judge: C. Clifford Shirley, Jr.<br><br>COLLECTIVE ACTION COMPLAINT FOR VIOLATIONS OF THE FAIR LABOR STANDARDS ACT OF 1938 |

**STATEMENT OF UNDISPUTED FACTS SUPPORTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1. Wyndham Vacation Resorts, Inc. (then known as Fairfield Resorts)(hereinafter "Fairfield") began operations in approximately 1966, initially as a residential development company. Throughout the years, Fairfield developed several resort properties, from which it sold lots, free-standing homes and condominiums. Included in the properties developed by Fairfield are the four (4) Tennessee properties at issue in this lawsuit. Some of Fairfield's properties were condominiums only. *Declaration of David Nelon ("Nelon Decl."),* ¶ *4.*

2. In approximately 1979, Fairfield started selling fixed-week timeshares for condominiums and free-standing homes (if available at a particular property), in addition to the sale of lots, free-standing homes and condominiums. Some properties, for example Fairfield Williamsburg, sold fixed-week timeshares only. *Nelon Decl.,* ¶ *5.*

3. Historically, Defendants' Sales Representatives have sold a combination of lots, free-

standing homes, condominiums and fixed-week timeshares at Defendants' properties, including the four (4) Tennessee resorts at issue in this lawsuit. Each of these involved deeded interests in real property, including fixed-week timeshares. Previously, with fixed-week timeshares, individuals purchased an undivided interest in a piece of real property (either a condominium or free-standing home), consisting of a fixed week during the year to which the individuals could use it. The price for the fixed week varied depending on the piece of property and the week which was purchased. *Id.,* ¶ *8*.

4. Each sale of a lot, free-standing home and fixed week timeshare involved a real estate closing and the individuals were given a warranty deed as part of the sale, which was recorded in the county where the property was located. *Id.,* ¶ *9.*

5. In approximately 1991, Defendants implemented a "points" system, in which Defendants assigned a symbolic "point value" to fixed weeks. Although referred to as "points," individuals were and are still purchasing an undivided interest in real property, and the sales were and are consummated by a real estate closing. Thereafter, and throughout the Recovery Period, all "points" were tied to a specific piece of real estate. *Id.,* ¶ *10.*

6. Although it is commonly stated that individuals are purchasing "points" that they then own, this is technically incorrect. Instead, each year there is a symbolic allocation of points to all owners which is representative of each owner's share of the undivided interest in the real property that they own. By way of example, each condominium unit at all of Defendants' resorts is a piece of real property, which is backed by a deed. For each unit, Defendants assign a point value for that unit for each week of the year. The value is determined by factors such as the week of the year (as some parts of the year are considered more preferable to others) and the resort where the unit is located.

So each unit is assigned a point value for each of the 52 weeks in a year. *Id., ¶¶ 11-12*.

7. All points have to be tied to a particular unit for a particular week of the year so that each week at each unit is, in turn, tied to an undivided interest in real property. This is why individuals are not truly purchasing "points," but instead are purchasing an undivided interest in deeded real property. *Id., ¶ 13*.

8. In the early to mid-2000s, Defendants created a program, now called ClubWyndham Access, which would enable an owner to stay at any Wyndham resort. To accomplish this, deeds are placed in a trust which essentially creates a "pool" of real properties where the owners can stay during their timeshare week. Thus, under the points system, owners were and are not limited to a fixed week at a particular piece of property (such as a condominium in the Smoky Mountains), but can use points to gain access to various Wyndham resorts. *Id., ¶ 14*.

9. In approximately 1994, Fairfield developed the Discovery Program. The Discovery Program can be best described as a lease to purchase real estate agreement. In the Discovery Program, points tied to a specific piece of real property are "borrowed" and sold to the customer, who is essentially leasing the points for a year with the option to apply monies paid for the leased points to the purchase of a Wyndham ownership interest. *Id., ¶ 15*.

10. The job duties and responsibilities of all Sales Representatives at Defendants' four (4) Tennessee resorts during the Recovery Period were and are the same – to sell real estate to prospective owners and existing owners. *Id., ¶ 16*.

11. Front Line Sales Representatives attempt to make sales to prospective owners who have received a free or discounted stay at a Wyndham resort property, or who have visited a resort as part of some other promotion through Wyndham's marketing department. In exchange for receiving

a free or discounted stay at a Wyndham property, or some other promotion, the prospective owner agrees to attend a meeting at Wyndham's office, where the Front Line Sales Representatives pitch Wyndham's timeshare program and attempt to make a sale. If successful, a real estate purchase agreement is drafted and the closing occurs, almost always on the same day of the sale. At the closing conducted by a Quality Assurance Representative, the buyers are routinely asked the question – "You know that you are buying a piece of real estate?" The Quality Assurance Representative goes through the closing paperwork as well, including discussions about the purchase price, down payment and monthly payment. *Id., ¶ 16.*

12. In-House Sales Representatives attempt to sell additional real estate to existing owners, thereby increasing the individual or couple's ownership interest in Wyndham properties. Typically, these individuals are solicited by Sales Representatives to attend a meeting at Wyndham's office, where the In-House Sales Representative attempts to convince the existing owners to increase their ownership interest. If a sale is made, a real estate purchase agreement is drafted and the closing occurs, almost always on the same day of the sale. The same procedure occurs with the Quality Assurance Representative discussed in the preceding paragraph. *Id., ¶ 17.*

13. Templates of contracts actually used by Defendants at the four (4) Tennessee properties are attached as an exhibit to the Declaration of David Nelon. *Nelon Decl., Ex. 1.*

14. If a Front Line or In-House Sales Representative is unsuccessful in making a sale to a prospective owner, the prospective owner is referred to a Discovery Sales Representative, who attempts to sell the prospective owner a Discovery Program package, which as discussed above, is essentially a lease to purchase real estate agreement. If successful, a purchase agreement is drafted and executed on the same day of the sale. *Id., ¶ 18.*

15. Defendants were also defendants in *Reynolds v. Wyndham Vacation Resorts, Inc.,* No. 4:14-CV-2261-PMD, 2016 WL 362620 (D.S.C. Jan. 29, 2016), *motion to certify for interlocutory appeal denied*, No. 4:14-CV-2261-PMD, 2016 WL 2347428 (D.S.C. May 4, 2016), *appeal to Fourth Circuit Court of Appeals dismissed voluntarily* (July 29, 2016).

16. In *Reynolds*, the court ruled that Defendants were not retail or service establishments and the retail or service establishment exemption under 29 U.S.C. § 207(i) did not apply to Defendants' sales representatives.

Respectfully submitted,

DICKINSON WRIGHT PLLC
By: /s/ Martin D. Holmes
Martin D. Holmes, # 012122
Darrell L. West, # 005962
Fifth Third Center, Suite 1401
424 Church Street
Nashville, TN 37219
Phone: (615) 244-6538
Facsimile: (844) 670-6009
mdholmes@dickinsonwright.com
dwest@dickinsonwright.com

Sherry D. O'Neal, # P62288
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
Phone: (313) 223-3500
Facsimile: (844) 670-6009
soneal@dickinsonwright.com

*Attorneys for Plaintiffs and Opt-in Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2017, a true and correct copy of the foregoing has been served on the following individuals consenting to electronic service by operation of the Court's electronic filing system:

O. John Norris, III
Craig Cowart
Colby S. Morgan, Jr.
JACKSON LEWIS LLP
999 Shady Grove Rd., Suite 110
Memphis, TN 38120
norrisj@jacksonlewis.com
craig.cowart@jacksonlewis.com
morganc@jacksonlewis.com

William J. Anthony
JACKSON LEWIS LLP
18 Corporate Woods Boulevard
Albany, NY 12211
anthonyw@jacksonlewis.com

Paul DeCamp
JACKSON LEWIS LLP
10701 Parkridge Blvd., Suite 300
Reston, VA 20191
decampp@jacksonlewis.com

/s/ Martin D. Holmes
Martin D. Holmes