## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | | |
|---|---|---|
| JESSE PIERCE and MICHAEL PIERCE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No.: 3:13-cv-00641-CCS |
| WYNDHAM VACATION RESORTS, INC., and WYNDHAM VACATION OWNERSHIP, INC., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' TRIAL BRIEF

### I.  CASE OVERVIEW

#### A.  Procedural Status

This Fair Labor Standards Act case was filed on October 23, 2013. Plaintiffs are commissioned timeshare Sales Representatives who claim that they routinely worked more than 40 hours per week, but that they were not paid overtime pay for hours worked in excess of 40. The case was conditionally certified as a collective action on August 21, 2014 (Doc. No. 84) with the Court stating:

> This case shall be conditionally certified as a collective action for current and former, non-exempt, commission-paid: (1) Frontline Sales Representatives, (2) In-House Sales Representatives; and (3) Discovery Sales Representatives – who were employed in Wyndham's Tennessee Resorts between October 21, 2010 and October 31, 2013.

After litigating over the contents of the proposed class notice, the Court entered an order on June 1, 2015 and notices were sent to 832 putative Plaintiffs. Overall, one hundred eighty-eight

(188) Sales Representatives opted into the litigation. In the interim, at various times, ten (10) have opted out of the lawsuit, and an additional nineteen (19) were dismissed as a result of being time barred, not having been in a qualifying position (for example, managers), or having failed to properly disclose their claim in bankruptcy. In addition, three (3) Opt-In Plaintiffs have consented to the Court's striking their consents, and one (1) other is pending dismissal under Defendants' Motion to Strike Consent Forms of Plaintiffs Lisa Brown, Robert Bryant West, Ed Langston, and Jeremy Saine Or, In The Alternative, To Compel Depositions (Doc. No. 316). At present, one hundred fifty-nine (159) Plaintiffs remain in the case, including the four (4) pending dismissals.

The trial of this matter currently is set on October 10, 2017. The parties disagree with respect to the amount of time it will take to try this case. Plaintiffs estimate fifteen (15) days, which Defendants view as unrealistic given the number of "will call" witnesses on Plaintiffs' Rule 26(a)(3)(A)(i) Pretrial Witness Disclosures (Doc. No. 313). Defendants estimate that the trial of this matter will last *at least* twenty-one (21) days.

The following motions currently are pending before the Court:

- Defendants' Motion for Summary Judgment as to Certain Highly Compensated Employees (Doc. No. 236);
- Defendants' Motion to Prohibit Plaintiffs from Introducing Expert Testimony and Expert Report in Evidence (Doc. No. 218);
- Defendants' Motion to Decertify the Conditionally Certified Collective Action (Doc. No. 279);
- Defendants' Daubert Motion to Exclude Expert Testimony of Dr. Dwight D. Steward (Doc. No. 283);
- Plaintiffs' Motion to Compel Production of Contracts and Motion for Sanctions (Doc. No. 287);
- Defendants' Motion in Limine No. 1 To Exclude Expert Report and Testimony of Dr. Dwight D. Steward (Doc. No. 322);
- Defendants' Motion in Limine No. 2 To Exclude Evidence of Lisa Brown, Robert Bryant West, Ed Langston, and Jeremy Saine (Doc. No. 324);
- Defendants' Motion in Limine No. 3 To Exclude Evidence Relating to Time-Barred Claims (Doc. No. 327);

- Defendants' Motion in Limine No. 4 To Exclude Testimony of Michael Pierce, Sr., Thomas Garrett, James Shannon Abbott, Twila Higgins, Bryan Tesh, Jeff Cross, Richard Rang, and Brett Williamson (Doc. No. 330);
- Defendants' Motion in Limine No. 5 Precluding Plaintiffs From Proceeding With the Collective Action and From Offering Representative Testimony (Doc. No. 332); and
- Defendants' Motion to Strike the Consent Forms of Brown, Langston, Saine and West (Doc. No. 316).

### B.     Statement of Relevant Facts

#### 1.     The Business.

Wyndham is a leading provider of family destination vacations. Customers purchase timeshares which are converted to vacation "points" that may be used for vacations at Wyndham's resorts and other Wyndham locations. Wyndham's Tennessee operations span four Wyndham properties. The "Smoky Mountains" region includes two properties in Sevierville—Wyndham Smoky Mountains ("The Crossing") and Wyndham Vacation Resort Great Smokies Lodge ("The Lodge"). The Wyndham Nashville and the Wyndham Resort at Fairfield Glade are the other Tennessee properties.

#### 2.     Sub-Groups of Sales Representatives.

The class of Plaintiffs is a combination of three separate groups of sales employees who have different duties and functions. Wyndham's sales positions are termed Front-Line Sales Representatives, In-House Sales Representatives, and Discovery Sales Representatives. These employees make presentations to different segments of potential customers to sell Wyndham's vacation packages. As discussed below, the In-House Sales Representatives are further segmented into the subgroups, "Front Enders" and "Back Enders." These subgroups are also sometimes respectively referred to as "Hookers" and "Closers."

3

### (a)    Front-Line Sales Representative

Front-Line Representatives sell timeshares to individuals who do not currently own a Wyndham timeshare. The Front-Line Representatives work in a sales center where potential purchasers are scheduled by the marketing staff in "tour waves." These Front-Line Representatives take guests on tours of the resort and exercise discretion regarding which amenities to highlight and the most effective selling techniques for the specific guest. The length of a "tour" varies depending on the individual Sales Representative, the individual guest, and whether or not a sale is made.

### (b)    In-House Representatives[1]

In-House Representatives sell upgraded vacation packages to Wyndham timeshare owners, guests of owners and "discovery guests." The In-House Representatives' meetings with the potential customers are scheduled by the administrative marketing staff. The In-House Representatives drop off a welcome gift and marketing survey at the owner's suite and encourage the customer to visit the sales office. This initial visit can last from 15 minutes to an hour or more. Alternatively, the In-House Representative may meet the customer in the lobby for a pre-scheduled tour. In such case, following the tour, the Representative offers to take the customer to the sales center for a presentation. If a guest declines to buy, the tour is shorter than if the customer buys a package, completes the required paperwork, and closes the deal.

Within the classification of In-House Representative, additional informal and unofficial terms denoting typical job assignments have been adopted. The system was originally designed for the Sales Representative who made the initial contact to also close or attempt to close the deal.

---

[1]    During a sales career, a representative may work in one or more of the three capacities. For these Plaintiffs, about 64% of the total time on average was spent as an In-House Sales Representative.

But this evolved to further specialization based on the In-House Sales Representatives' respective talents. The terms "Front-Ender," and sometimes "Hooker" or "Setter," are used to describe individuals who are better at the initial sales talk, while those who come in later and excel at closing the deal are known as "Back-Enders" or "Closers." These varying roles have significance for this litigation in that Back-Enders, such as named Plaintiff Jesse Pierce, tend to work longer hours and make significantly greater amounts because they remain on premises closing multiple deals. Other Sales Representatives, who have not made a sale, end their work day earlier, work significantly less than eight hours a day, and far less than forty hours in the work week.

### (c)     Discovery Representatives

Discovery Representatives are different than Front-Line or In-House Representatives in that they sell trial vacation packages to customers who have declined to purchase a timeshare. When the guest declines, the Discovery Representative presents the guest with a guest experience survey. While conducting the survey, the Discovery Representative offers a "discovery package," which is a trial one-time opportunity to use a timeshare. Discovery Representatives do not work in "tour waves" or otherwise conduct property tours. A Discovery sales pitch can be as short as 5-10 minutes or as long as 45-60 minutes in the event a sale is made. Like Front Enders, it would be a rare case in which a Discovery Sales Representative would work overtime.

### 3.     Hourly Recoverable Draw.

In-House, Front-Line, and Discovery Representatives receive a "recoverable draw," which is an amount equal to at least the minimum wage for every hour worked by the Sales Representatives in a given week plus applicable overtime for hours over 40. The draw is paid weekly and is an advance against future commissions. If the Sales Representative does not earn enough in commissions to pay back the advanced draw, the remaining amount of the advance is

5

considered a "draw balance" that will be carried forward from pay period to pay period for an indefinite amount of time until the draw balance is fully recovered or until the employee's employment is terminated. The company does not seek to recover the negative draw balance after separation of the sales employee. The draw system ensures Sales Representatives are compensated at least the minimum wage and overtime for all hours reported.

In addition to the hourly draw, pursuant to 29 C.F.R. §§ 778.118, -.119 (Commission Paid on a Work Week Basis), Sales Representatives receive commissions on sales which, together with bonuses, represent the bulk of a Sales Representative's total compensation. The amount of commission varies based upon the location worked, the product sold, the dollar value of the sale, the position held by the Sales Representative, the level of involvement the Representative had in each particular sale, and the overall sales productivity of the Representative.[2] For example, during most of the class period, a Sales Representative who closes deals earns commissions at a different rate than a Sales Representative who initiated contact with the customer but did not close the sale.

If a sales contract was written during a week in which overtime hours were worked, the Sales Representative will receive additional pay taking commissions into account. The amount of overtime commission is determined by recalculating the Representative's regular rate for each individual contract attributable to the applicable pay period. To determine the overtime rate for a given sale under the regulation, the amount of commission received on a sale is divided by the total number of hours worked during the week in which the sale was made to calculate the regular rate, and then multiplied by 0.5. That amount is then multiplied by the number of hours worked in excess of 40 for that week in order to determine the overtime commission due for that contract.

---

[2]     There are no challenges in this lawsuit as to how commissions were calculated and no claims for commissions not properly paid.

For example, if a $600 commission is earned during a week in which 45 hours were worked, the calculation is as follows:

Overtime rate = ($600 ÷ 45 hrs)[3] x 0.5 = $6.66
Overtime pay = $6.66 x 5 hrs = $33.33
Total Commission including overtime = $600 + $33.33 = $633.33

This process is repeated for each contract written during a week in which overtime hours were worked.

### 4. Wyndham's Timekeeping and Overtime Policies.

Wyndham maintains written timekeeping and overtime policies which are, in turn, communicated to and available to Sales Representatives. Its policies are found in Wyndham's Employee Handbook, in standalone polices which employees acknowledge receiving by their signature, on the company's "WebConnect site," in its "Rules of Engagement" policy, and in its Standards of Performance Agreement. Newly hired Sales Representatives are trained on these policies and practices.

Wyndham's written policies on timekeeping and overtime unequivocally state that "**under no circumstances should an employee begin work before clocking in**" and "**the Company is required to and will pay employees for all hours worked**." Moreover, the policy provides that "**if an employee is working but not at the work site, they are expected to notify their manager in writing . . . of any hours worked**." The policies define work to include "**performing project assignments, checking company related email or voice mail, receiving inbound or making outbound telephone calls with owners, guests or other employees regarding work-related issues after work hours are considered time worked. This type of work requires submission**

---

[3]    A regular rate of $13.33.

**of a Timekeeping record**." Wyndham also informs employees that consistent with its timekeeping and overtime policies, "**all overtime, approved or unapproved, must be paid**."

          **5.**      **Timekeeping.**

Wyndham uses an electronic timekeeping system ("Wyntime") to track employee hours of work. Each location has at least one Wyntime clock where the Sales Representatives are required to punch in and punch out. However, many in the sales force apparently did not consider themselves, or like to be thought of as, hourly employees. Commissions were the primary source of their income, and the hourly rate was of no importance to them. As a result, many Sales Representatives blatantly ignored the requirement to punch in and punch out. To correct the problem, the Company required managers to monitor employees who did not enter punch times to correct the errors.

If a Sales Representative, either intentionally or unintentionally, fails to punch in or out on a particular day or the Sales Representative notices that the time recorded is incorrect, the Sales Representative can inform his or her manager of the discrepancy and complete a Missed/Change Punch Notification Form ("Missed Punch Form") to correct the inaccurate time entry. A manager may also initiate completion of a Missed Punch Form in these circumstances. When a Missed Punch Form is completed and signed by both the Sales Representative and his/her manager, the Sales Representative's Wyntime record is corrected to reflect the hours worked identified in the Missed Punch Form.

8

## II.     DISCUSSION

**A.     Defendants' Timekeeping and Overtime Policies Comply with the FLSA and Plaintiffs' Allegations of Isolated Deviations From Those Policies Are Not Class-Wide in Nature.**

If this action remains a collective action and the Court permits, over Defendants' objections, to allow Plaintiffs to proceed with representative proof, Plaintiffs must still prove not only that the individuals who testify were aggrieved, but also that those individuals' experiences are representative of the experiences of the individuals who have not testified.

Plaintiffs cannot do this by pointing to Defendants' timekeeping and overtime policies because those policies <u>comply</u> with the FLSA.  Rather, Plaintiffs are attempting to prove that informal practices, rather than the formal policies, governed at each of the four locations for the duration of the recovery period.  The testimony of Plaintiffs themselves refutes this theory.  Moreover, as the Court will hear, the testimony of the Opt-In Plaintiffs is internally inconsistent, contrary to uncontested documents, and widely different than other testifying individuals.  In addition to the sheer number of divergent theories, there are even discrepancies between Opt-In Plaintiffs who worked for a common manager.

Ultimately, Plaintiffs' varied and suspect stories likely will prompt a renewed decertification motion during and after trial and prompt the Court to reject the notion that Defendants violated the law at all locations, at all times, and for the duration of the recovery period. As the Supreme Court stated in *Tyson Foods*:

> Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked.

*Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1048-49 (2017).  Thus, the sample proposed by Plaintiffs, which is statistically inadequate and fails to account for the various theories of liability

Case 3:13-cv-00641-DCP   Document 346   Filed 09/18/17   Page 9 of 20   PageID #: 7441

for employees working at different locations under different supervisors is exactly the sort of representative evidence that fails to establish class-wide liability. Drawing inferences from such nominally representative evidence is neither reasonable nor just.

Nevertheless, each Plaintiff still must prove: (1) that he or she worked off-the-clock in a particular workweek, (2) that Defendants suffered or permitted this work, and (3) that such work was not *de minimis*. Plaintiffs must also demonstrate the amount of time spent working off-the-clock each week. If a Plaintiff can make this showing, Plaintiffs can prove liability in that particular workweek <u>only</u> if the additional time would result in overtime that week. As noted below, most of the Plaintiffs have admitted that they do not know how much time they worked off-the-clock in any particular workweek, instead providing from memory an "average" number of hours worked both on- and off-the-clock. As set forth in more detail below, these "averages" are not reasonable.

## B. Plaintiffs' Overtime Estimates Are Not Reasonable.

Even if Plaintiffs were able to establish that they worked off-the-clock and that the additional time resulted in overtime, their claims still fail because their estimated "averages" of hours worked each week are not reasonable.

Plaintiffs claim in their initial pleadings that all Plaintiffs routinely worked 20 hours of overtime per week is simply false. Representatives who make few sales do not work long hours. If a sale occurs, the process may take several hours. If no sale occurs, which is what happens the vast majority of the time, the process generally takes just a couple hours. With the exception of the small minority of representatives who were "Back-Enders," it was unusual for a representative to see more than two "tours" (*i.e.* customers) in a day. Unsuccessful representatives might see

only one tour in a day, especially in the slow season. Further, Front Line Sales Representatives have relativity fixed hours and would have significantly less opportunity to work any overtime.

Plaintiffs estimate variously that their overtime ranged from 5 to 10 hours, to 20-25 overtime hours per week. That those claims are exaggerated is easily seen by looking at the hours clocked by Plaintiffs who were still employed after the suit was filed. Named Plaintiff Jesse Pierce has conceded those hours are accurate. Pierce, for example, averaged roughly six (6) hours of overtime per week after the suit was filed, not the 25 he claims to have worked. Notably, Jesse Pierce was a Back-Ender and highly successful, two things that put him at the top for time worked. Thus, far from everyone routinely working 20 hours of overtime a week, it virtually never happened and the average of even the top rep was less than 1/3 of that.

As noted above, Named Plaintiff Jesse Pierce, who continued working after the lawsuit was filed, concedes that his hours were accurate after October 23, 2013. The evidence will show that the average number of overtime hours incurred by twenty-four Plaintiffs for six months after the lawsuit was filed (October 24, 2013 through April 24, 2014) varied from a low of .37 hours (in respect to low earning sales people) to a high of 3.88 hours (in respect to high earning salespeople) for each week worked. And, of the twenty-four, fourteen incurred an average of less than 1 hour of overtime per week. The evidence also will show that there was little difference in the number of tours taken before and after the lawsuit was filed. There was not, therefore, a slowdown in work such as would account for the difference in recorded overtime and Plaintiffs' wildly exaggerated claims of overtime worked.

Not all Plaintiffs would have worked (nor could have worked) the same number of hours. Nor would it be reasonable to expect that all Plaintiffs worked overtime every week they worked. During the class period, over 90 managers were involved in managing the 159 remaining Plaintiffs.

Many managers will testify that they attempted to maintain appropriate time records, chasing Sales Representatives down to fill out omitted time entries, but often the Sales Representatives refused to cooperate. Some managers will testify that the Sales Representatives had their own reasons for not properly accounting for time. For example, the chances of earning large commissions by working longer hours made insignificant, in their minds, any disadvantage to not properly account for their overtime. Others simply found it undesirable to have their draws deducted from commission checks. In addition, some Sales Representatives perceived that the Company would be forced to increase the number of Sales Representatives if too much overtime was incurred, thus increasing competition among Sales Representatives for the available customers. That is, the pie would be sliced into too many pieces, reducing each Sales Representative's opportunities for making sales.

A problem for purposes of litigating this case is that it is impossible to apply a formula across the board that would have any rational basis. In donning and doffing cases, for example, it is a comparatively simple matter to add an average time of 12 minutes per day to each employee's time to cover the work associated with preparation. Similarly, in cases alleging unpaid lunch breaks, there would be, for example, a 30 minute cap on unpaid time. But here, the class of Plaintiffs is so disparate, and their work hours so unique, that this case does not lend itself well to collective treatment, particularly in the case of the In-House Sales Representative.

Moreover, the actual amount of earnings earned by each Plaintiff was highly individualized. Plaintiff Jesse Pierce averaged over $700,000.00 per year in commissions for each of the years at issue. This reflects the results of many closing and meetings with customers and, thus, opportunities to work overtime. His situation, and that of other high-earning Back-Enders, cannot be fairly compared to a Sales Representative who made few sales and made less than

Case 3:13-cv-00641-DCP   Document 346   Filed 09/18/17   Page 12 of 20   PageID #: 7444

$30,000.00 per year. In sum, many Sales Representatives would, due to lack of success or lack of a need to work hard, have worked fewer hours and thus have fewer opportunities for overtime.

Making the issue more complex is that since closing was considered something of a specialty, a small group of sales people at each of the four locations became closing specialists. It was highly advantageous to have such a skill since a Closer could work several closing tables almost simultaneously and receive a slice of the pie from each deal. Nearly all of the sales people who earned in excess of $150,000 annually were "Back -Enders" or "Closers" and represent a relatively small portion of the Plaintiffs. The Back-Enders also often assigned work to others and provided other Sales Representatives training on sales techniques.

It is unlikely that most of the Plaintiffs worked overtime hours throughout the year. In fact, many of the Plaintiffs consistently worked no overtime. Notably, during slow time, January and February, Sales Representatives were encouraged to take vacation time and/or had their hours scaled-back as the number of visits by customers eased.

In addition, the relative success or lack of success in sales drives the actual number of hours worked. If you did not convince the customers to come to the sales room, then you would have a short day, since there would be no follow-up sales meeting or closings.

It is likely many individuals worked no overtime, since they simply did not generate sales or closings and were employed only a short time. The vast majority of the class were not successful sales people and, because of that, worked few hours, never approaching overtime. Moreover, Defendants expect to present testimony of former opt-in Plaintiffs who became skeptical of the lawsuit.

## C. Defendants' Method of Calculating Overtime Pay is Proper.

### 1. Proper calculation of the "regular rate".

The applicable provision of the controlling regulations, 29 C.F.R. § 778.118, provides that

when (as here) commission is paid weekly, "it is added to the employee's other earnings for that

workweek … and the total is divided by the total number of hours worked in the workweek to

obtain the employee's regular hourly rate for the particular workweek. The employee must then be

paid extra compensation at *one-half of that rate* for each hour worked in excess of the applicable

maximum hours standard." (Emphasis added).[4]

For example, if a given Plaintiff worked 60 hours in one workweek and was paid $10,000,

inclusive of commissions for that week, the correct regular rate of pay for that employee would be

calculated using 60 as a divisor, not 40. The correct regular hourly rate of pay would thus be

---

[4]   The regulation verbatim states as follows:

§778.118   Commission paid on a workweek basis.

When the commission is paid on a weekly basis, it is added to the employee's other earnings for that workweek (except overtime premiums and other payments excluded as provided in section 7(e) of the Act), and the total is divided by the total number of hours worked in the workweek to obtain the employee's regular hourly rate for the particular workweek. The employee must then be paid extra compensation at one-half of that rate for each hour worked in excess of the applicable maximum hours standard. (Emphasis added).

§ 778.119 Deferred commission payments -- general rules.

If the calculation and payment of the commission cannot be completed until sometime after the regular pay day for the workweek, the employer may disregard the commission in computing the regular hourly rate until the amount of commission can be ascertained. Until that is done he may pay compensation for overtime at a rate not less than one and one-half times the hourly rate paid the employee, exclusive of the commission. When the commission can be computed and paid, additional overtime compensation due by reason of the inclusion of the commission in the employee's regular rate must also be paid. To compute this additional overtime compensation, it is necessary, as a general rule, that the commission be apportioned back over the workweeks of the period during which it was earned. The employee must then receive additional overtime compensation for each week during the period in which he worked in excess of the applicable maximum hours standard. The additional compensation for that workweek must be not less than one-half of the increase in the hourly rate of pay attributable to the commission for that week multiplied by the number of hours worked in excess of the applicable maximum hours standard in that workweek.

$166.66 per hour, not $250. *See, e.g.*, *Kaiser v. At the Beach, Inc.*, No. 08-CV-586-TCK-FHM, 2011 U.S. Dist. LEXIS 149857, at *62-63, *67-68 (N.D. Okla. Dec. 28, 2011) (one-half time under 29 C.F.R. § 778.118 is calculated in the same manner as § 778.110—by including bonus/commission and dividing the total by the total hours worked in a given week, rather than 40).

### 2. Proper valuation of overtime hours is 0.5, not 1.5, times the regular rate.

Plaintiffs apparently erroneously contend that, for each hour they worked beyond 40 hours per week, they are entitled to an additional one-and-one-half times that rate. To the contrary, 29 C.F.R. § 778.118 states that "[t]he employee must then be paid extra compensation at one-half of that rate" for each hour worked in excess of 40 – not one-and-one-half of that rate. As illustrated by the examples in *Kaiser* and *Kornbau v. Frito Lay N. Am., Inc.*, compensation for all hours worked (including alleged "overtime" hours) constitutes payment for all time worked. Under 29 C.F.R. § 778.118, commissioned employees then receive an additional half-time for all overtime hours worked, not an additional "time and a half." This is because Plaintiffs would have already been paid regular time for "all hours worked," leaving only "and a half." *Kornbau v. Frito Lay N. Am., Inc.*, No. 4:11CV02630, 2012 U.S. Dist. LEXIS 123629 (N.D. Ohio Aug. 30, 2012) (finding that Frito Lay's policy of using the half-time method complied with 28 C.F.R. § 778.118—Frito Lay added commissions to employees' other earnings and divided it by the total hours worked to obtain the regular rate of pay, and then adding half of the regular rate for each hour of overtime).

The Middle District of Tennessee also recently gave the following example of the appropriate calculations which further clarifies the issue:

> An example of the required calculation is instructive. Assume an individual who earns $10 per hour racks up $120 in commissions during a two-week pay period in which she works 88 hours. Her total compensation is the total of her regular compensation and her overtime compensation. Her regular

compensation is her straight-time pay (88 hours at $10 per hour, or $880) plus her commissions ($120), which here amounts to $1000. To calculate her overtime compensation, however, her employer must first figure out her regular rate of pay, which is her regular compensation ($1000), divided by the total hours she worked during the period (88 hours); thus, her regular rate of pay is $11.36 per hour. Her overtime compensation is half of her regular rate of pay ($11.36 x 0.5, or $5.68) multiplied by the overtime-eligible hours she worked (8 hours), which amounts to $45.44. Adding her regular compensation ($1000) and her overtime compensation ($45.44), her total compensation for the pay period is $1045.44.

*Thompson v. Direct Gen. Consumer Prods.*, 2014 U.S. Dist. LEXIS 28912, at *8-9 (M.D. Tenn. Mar. 5, 2015) (emphasis added). *See also Kornbau*, 2012 U.S. Dist. LEXIS 123629, at *16-21 (Section 778.118 authorizes use of the half-time method in calculating overtime; "To hold otherwise would be to read more complexity into § 778.118 than is indicated by a plain reading."); *Buckley v. Hoofnagle*, 2008 U.S. Dist. LEXIS 77700, 2008 WL 4459047, at *3 (M.D. Fla. Oct. 3, 2008) ("The employee's overtime compensation is one-half the wage rate as calculated above for each hour of overtime worked in the workweek"); *Kaiser*, 2011 U.S. Dist. LEXIS 149857, at *67-68 ("When the commission is paid on a weekly basis, it is added to the employee's other earnings for that workweek . . . , and the total is divided by the total number of hours worked in the workweek to obtain the employee's regular hourly rate for the particular workweek. The employee must then be paid extra compensation at one-half of that rate for each hour worked in excess of the applicable maximum hours standard.") 29 C.F.R. § 778.118); *Kornexl v. Bailey*, 2006 U.S. Dist. LEXIS 32754 (M.D. Fla. May 24, 2006) ("For employees paid by job rate, day rate, piece work or commissions, the total compensation earned during a work week should be divided by the total hours worked.")

One half of the resulting hourly rate is owed for each hour of overtime. 29 C.F.R. §§ 778.111, -.112, -.118); *Dunlop v. Martin Brick Co.*, 1981 U.S. Dist. LEXIS 16861, at *9-10 (N.D. Tex. Sept. 30, 1981) ("The employee's total compensation for the workweek, which includes

all earnings, whether some by piece work and some by other means; divided by his hours worked equals his regular rate of pay.")  *Walling v. Harnischfeger Corp.*, 325 U.S. 427 (1944); *Walling v. Helmerich & Payne*, 323 U.S. 37 (1944); 29 C.F.R. § 778.118).

In sum, there is no recognized theory that would require commission overtime to be paid at 150% of a regular rate calculated on the basis of a 40 hour week when the claimed hours exceed that.

### D. Plaintiffs' Attorneys' Fees Must Take Into Account Appropriate Factors.

If Plaintiffs prevail, any claim for attorneys' fees must take into account appropriate factors.  The Sixth Circuit uses the lodestar method of calculating attorney fees.  *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 43 (6th Cir. 1990); *Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005); *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005).  This method multiplies the number of hours reasonably expended by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Plaintiffs, however, are not guaranteed a recovery of attorney fees by being a prevailing party.  Rather, prevailing party status is a "statutory threshold" that makes a fee award permissible.  *Texas State Teachers Ass'n*, 489 U.S. at 789 (citing *Hensley v. Eckerhart*, 461 U.S. at 433).  Once a party has been determined to be a prevailing party, the court must use its discretion to determine whether a fee award is appropriate, and if so, in what amount.  *Id*. at 789-90.  The main concern is whether the fee is reasonable, not producing a windfall for lawyers.  *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).

Plaintiffs have the burden to establish the reasonableness of both hours expended and rates charged. *Hensley*, 461 U.S. at 433.  The initial fee calculation should exclude hours that were not "reasonably expended" because they are "excessive, redundant, or otherwise unnecessary."

Case 3:13-cv-00641-DCP   Document 346   Filed 09/18/17   Page 17 of 20   PageID #: 7449

Moreover, an award of attorney fees can be reduced for raising unsupported claims that prolong litigation and prevent negotiations. *Rodriguez v. Super Shine & Detailing, Inc.*, 2012 U.S. Dist. LEXIS 80214, at *18 (S.D. Fla. June 11, 2012). In *Powell v. Carey Int'l, Inc.*, 547 F. Supp. 2d 1281, 1286, 1288 (S.D. Fla, 2008), the court reduced plaintiff's attorney fees by 67 percent, in part due to plaintiff's counsel's "unrealistic and legally unsupported damage calculations" that "precluded pursuit of settlement, unnecessarily prolonged litigation and increased costs." *Id.* In this case, Plaintiffs' insistence on an improper model for calculating back pay has unnecessarily prolonged the proceedings and was a significant impediment to early resolution. Plaintiffs' counsel has repeatedly stated that the case has an eight figure value. When requested prior to the first mediation for authority for their 1.5 overtime model, they simply stone walled. Such a refusal to discuss such a basic topic, of course, results in protracted litigation and the improperly inflated claim of fees for Plaintiffs' counsel.

In addition, twenty-nine (29) opt-in Plaintiffs have already withdrawn or were dismissed, and another four (4) are pending dismissal. This would seemingly require a discounting of fees by 18%.

Additionally, Plaintiffs have shown a pattern of filing motions and contesting motions filed by Defendants, to no avail. Consequently, any fee award entered in their favor should be reduced by any amounts attributable to those unsuccessful proceedings. *See Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 13 (S.D.N.Y. 2015) (Line-items in counsel's records attributable to an unsuccessful motion to certify reduced the award accordingly); *Custodio v Am. Chain Link & Constr., Inc.*, 2011 U.S. Dist. LEXIS 158497, at *12-13 (S.D.N.Y. Jan. 13, 2014) (deducting 25.75 hours from the lodestar calculation in light of "the attorneys 'time for the unsuccessful class certification motion").

Plaintiffs cannot recover attorneys' fees for motions, opposition to Defendants' motions, and other proceedings in which they were ultimately unsuccessful. For example, Plaintiffs' motion to compel defendants to produce audio tape recordings of their October 17, 2013 meeting and attempts to prohibit the use of those tapes as evidence was denied by the court as not well taken, allowing Defendants to use the tapes for evidentiary purposes. As another example, key provisions of Plaintiffs' proposed notice to the class were rejected by the Court, while key portions of Defendants' version of the notice to the class were accepted by the Court. Plaintiffs' objections to the Magistrate Judge's rulings on the form of notice to the class were overruled. Defendants' version of the notice to the class was sustained in its material aspects. Such extensive motion practice as to the form of notice to the class was unnecessary.

For all of these reasons, the Court should make substantial across the board discounts on any attorneys' fees claimed.

Respectfully submitted,


s/ O. John Norris, III
O. John Norris, III (TN Bar No. 017504)
Craig A. Cowart (TN Bar No. 017316)
Colby S. Morgan, Jr. (TN Bar No. 005556)
JACKSON LEWIS P.C.
999 Shady Grove Rd., Suite 110
Memphis, TN 38120
Telephone: (901) 462-2600
Facsimile: (901) 462-2626
Email: norrisj@jacksonlewis.com
        colby.morgan@jacksonlewis.com
        craig.cowart@jacksonlewis.com

William J. Anthony *(Admitted Pro Hac Vice)*
JACKSON LEWIS P.C.
18 Corporate Woods Blvd, 3rd Floor
Albany, NY 12211
Telephone: (518) 649-9643
Facsimile: (518) 427-5956
Email: AnthonyW@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 18th day of September, 2017, filed the foregoing document using the Court's CM/ECF filing system, which will automatically send e-mail notification of such filing to the following individuals of record:

Martin D. Holmes (TN Bar No. 012122)
Darrell L. West (TN Bar No. 005962)
DICKINSON WRIGHT PLLC
424 Church Street, Suite 800
Nashville, TN 37219
Email: mdholmes@dickinsonwright.com
        dwest@dickinsonwright.com

Sherry D. Oneal # P62288
500 Woodward Avenue, Suite 4000
Detroit, MI 4822
Email: soneal@dickinsonwright.com

*ATTORNEYS FOR PLAINTIFFS*
*Opt-in Plaintiffs and Collective Class*


s/ O. John Norris, III
*Counsel for Defendants*

4817-6786-7472, v. 1