UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JESSE PIERCE and MICHAEL PIERCE,       )
on behalf of themselves and all others )
similarly situated,                    )
                                       )
                 Plaintiffs,           )
                                       )
v.                                     )        No. 3:13-CV-641-CCS
                                       )
WYNDHAM VACATION RESORTS, INC., and    )
WYNDHAM VACATION OWNERSHIP, INC.,      )
                                       )
                 Defendants.           )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment [Doc. 193].

Now before the Court is the Defendants' Motion to Decertify the Conditionally Certified

Collective Action [Doc. 279]. The Plaintiffs filed a Response [Doc. 298], and the Defendants filed

a Reply [Doc. 307]. During a status conference with the parties on August 7, 2017, the parties

stated that a hearing on the Motion was not necessary. The Motion is now ripe for adjudication.

Accordingly, for the reasons stated below, the Court finds the Defendants' Motion [**Doc. 279**] not

well-taken, and it is **DENIED.**

## I.      BACKGROUND

By way of background, the Defendants (collectively, "Wyndham" or "Defendants")

provide family destination vacations. [Doc. 60-1 at ¶ 3]. Customers purchase points that may be

used for vacations at Wyndham resorts or other locations. [*Id.*]. Wyndham employs three groups

of Sales Representatives: (1) Front-Line Representatives, (2) In-House Sales Representatives, and (3) Discovery Sales Representatives. [*Id.* at ¶¶ 4-5]. Further, relevant to the instant action, Wyndham's Tennessee operations span four Wyndham properties. [*Id.* at ¶ 12]. The Smoky Mountain Region includes two properties located in Sevierville: The Crossing and The Lodge. [*Id.*]. The Wyndham Nashville and the Wyndham Resort at Fairfield Glade ("The Glade") comprise the other Tennessee region. [*Id.*].

The Complaint in this matter was filed on October 23, 2013. [Doc. 1]. The Complaint alleges that certain Sales Representatives who worked at the Defendants' offices worked off the clock and were not paid for working in excess of 40 hours in a work week. [*Id.* at ¶ 2]. The Complaint alleges that the Defendants willfully violated the Fair Labor Standards Act ("FLSA"). [*Id.* at ¶ 3]. The action was conditionally certified on August 21, 2014. [Doc. 84]. Specifically, the collective action was defined as follows: Current and former non-exempt, commission-paid: (1) Front-Line Sales Representatives, (2) In-House Sales Representatives, (3) Discovery Sales Representatives, who were employed in the Defendants' Tennessee Resorts between October 21, 2010, to October 31, 2013.

After the District Judge conditionally certified this action, the parties spent several months disputing over the proposed notice and opt-in form. The District Judge entered an Order with respect to the appropriate notice and opt-in form on June 1, 2015. [Doc. 125]. Subsequently, on May 31, 2016, the parties consented to the undersigned for all further proceedings. [Doc. 193]. The undersigned set a scheduling conference, but it was continued so that the parties could participate in mediation. [Doc. 197]. The mediation was unsuccessful, and the Court conducted a scheduling conference with the parties on September 15, 2016. [Doc. 202]. During the scheduling conference, the parties stated that they had agreed to allow the Defendants an additional

twenty-four (24) depositions. [Doc. 203]. The Court also set a hearing to address sample representation and allowed the parties to file briefs regarding the appropriate sample representation. [*Id.*].

At the hearing, the Plaintiffs proposed a sample representation of two groups: (1) opt-in Plaintiffs who worked as Sales Representatives at one of Defendants' four Tennessee resorts for more than six months (Group 1); and (2) opt-ins Plaintiffs who worked as Sales Representatives at one of the Defendants' four Tennessee resorts for less than six months (Group 2). Through random sampling, Group 1 consisted of 35 Plaintiffs (out of 139 opt-in Plaintiffs), and Group 2 constituted of 13 Plaintiffs (out of 25 opt-in Plaintiffs). Thus, both groups represent 25% and 50%, respectively. At the hearing, the Defendants argued that there should not be any sample representation in this case. The Defendants continued that they should be permitted to take each and every Plaintiffs' deposition. After hearing from both parties, the Court limited discovery to the Plaintiffs' representative sampling because it appeared to be "fair and proportional to the needs to the case" and would "minimize the burden of Plaintiffs and their counsel while still allowing the Defendants an opportunity to depose these alleged representative Plaintiffs to determine the similarity and ability to serve as representatives and/or to determine if there is any basis to their various defenses." [Doc. 215]. The Court continued:

> Once the parties complete discovery of the representative Plaintiffs, if the Defendants contend that either the Plaintiffs' claims or the Defendants' defenses are too distinct or too individualized to permit this subset of representative Plaintiffs to be used to establish a collective class action and/or liability and/or damages, then Defendants may move for either additional discovery beyond the representative list and/or try to establish class decertification.

[Doc. 215]. Later, and because the Defendants had earlier agreed with the Plaintiffs to take only twenty-four additional depositions, the Defendants moved the Court to allow them to depose the

remaining members in the Plaintiffs' sample representation. The Court granted [Doc. 254] the Defendants' request.

The Defendants have now moved for decertification.

## II.    POSITIONS OF THE PARTIES

The Defendants argue [Doc. 279] that this case cannot be tried as a collective action, citing the Supreme Court's decision in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.—, 136 S. Ct. 1036 (2016) (hereinafter, "*Tyson*") and because the Plaintiffs cannot establish that they are similarly situated.    With respect to the former argument, the Defendants assert that *Tyson* compels decertification. The Defendants argue that pursuant to *Tyson,* the Plaintiffs must present evidence that is both the same across the class and sufficient to prove the individual claim of each employee in an individual lawsuit.    Further, the Defendants contend that with respect to "so-called representative testimony," it must be admissible under the Federal Rules of Evidence.    The Defendants assert that the Plaintiffs' purported representative sample is statistically inadequate. Further, the Defendants submit that the Plaintiffs cannot satisfy *Tyson*'s requirements that the "so-called representative evidence" must be sufficient to prove the claims of each of the 167 employees in individual lawsuits.[1]  Finally, the Defendants assert that the Plaintiffs cannot show that they are similarly situated under the stricter standard to be applied by the Court at this stage of the litigation.

The Plaintiffs respond [Doc. 298] that Sixth Circuit precedent supports this action being tried as a collective action. Further, the Plaintiffs state that decertification is unwarranted because the evidentiary record overwhelmingly confirms that the Plaintiffs are similarly situated. The Plaintiffs explain that they are similarly situated in their factual and employment settings and that

---

[1] The Court observes that after the Defendants filed their Motion, several Plaintiffs have agreed to have their consent form stricken. At the pretrial conference on September 25, 2017, the parties stated that there were approximately 156 Plaintiffs in this action.

the Defendants' defenses are assertable on a collective basis.  In addition, the Plaintiffs contend that fairness and procedural considerations favor proceeding collectively.  Finally, the Plaintiffs argue that the Defendants mischaracterize *Tyson*, they erroneously rely on inapplicable Rule 23 standards, and they ignore the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).

The Defendants filed a Reply [Doc. 307], stating that Sixth Circuit case law does not compel a denial of the Motion to Decertify.  The Defendants contend that the cases cited in the Plaintiffs' Response are both factually and procedurally inapposite to this case.  The Defendants argue  that the Plaintiffs are not similarly situated in their factual and employment settings.  In addition, the Defendants assert that their defenses require an individualized inquiry and that procedural and fairness considerations weigh in favor of decertification.  Finally, the Defendants reply that they have not mischaracterized *Tyson* and that they did not ignore the decision in *Mt. Clemens*.

## III.    ANALYSIS

The Court has considered both parties' positions, and the Court finds the Defendants' request for decertification not well-taken for the reasons further explained below.  The Court will begin with an overview of the FLSA and then turn to the Defendants' arguments for decertification.

### A.    Overview of the FLSA

The FLSA directs that an employee or employees may bring an action "against any employer (including a public agency) in any Federal or State court of competent jurisdiction . . . for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  However, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such

action is brought." 29 U.S.C. § 216(b).

A plaintiff alleging a FLSA violation can bring a representative action for similarly situated persons if the plaintiffs meet two requirements: "1) the plaintiffs must actually be similarly situated, and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." *Comer v. Wal–Mart Stores, Inc.,* 454 F.3d 544, 545 (6th Cir. 2006) (citations omitted). An FLSA representative action is called a collective action and is different from a class action brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, in that it utilizes an opt-in mechanism rather than the opt-out mechanism employed under Rule 23. *See id.* Further, the FLSA "similarly situated" standard is less stringent than the predominance inquiry typically applicable to class certification disputes under Rule 23(b). *O'Brien v. Ed Donnelly Enters., Inc.,* 575 F.3d 567, 584 (6th Cir. 2009), *abrogated on other grounds by* Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016).

Proceeding as a collective action furthers several important policy goals. First, the collective action "allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 170 (1989). Second, "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Id.*

In an FLSA action, "[t]he district court may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit." *Id.* at 169. Typically, courts have utilized a two-phase process in determining whether the proposed plaintiffs are similarly situated. The first phase takes place at the beginning of discovery, and the second phase occurs after opt-in forms have been disbursed and returned and discovery has been completed. *See Comer,* 454 F.3d at 547.

The instant case is at the second stage, which courts apply a "stricter standard." *See id.* Named plaintiffs "bear the burden of showing that the opt-in plaintiffs are similarly situated to the[m]." *O'Brien,* 575 F.3d at 584 (citation omitted). The second stage follows discovery, so the Court "has much more information on which to base its decision" and "examine[s] more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer,* 454 F.3d at 547 (citation and internal quotation marks omitted). To avoid decertification, the named plaintiffs must introduce "substantial evidence" that the opt-in plaintiffs are similarly situated." *Frye v. Baptist Mem'l Hosp.*, No. CIV. 07-2708, 2010 WL 3862591, at *2 (W.D. Tenn. Sept. 27, 2010) (citations omitted). At the second stage, "the question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected. *Id.* at *3.

With the above guidance, the Court turns to the issues in this case. The Defendants assert that the Supreme Court's ruling in *Tyson* compels decertification and that the Plaintiffs cannot proceed with their representative sample. In addition, the Defendants argue that the Plaintiffs are not similarly situated. The Court will first address *Tyson* and whether the Plaintiffs may proceed with a representative sample and then turn to whether the Plaintiffs are similarly situated.

### B. *Tyson* Decision

The Defendants primarily rely on *Tyson,* stating that it precludes any representative testimony in this case. The Court will first address the Supreme Court's ruling in *Tyson* and then turn to Defendants' specific arguments regarding representative testimony.

In *Tyson*, the respondents were employees at Tyson Foods' pork processing plant. 136 S.Ct. at 1042. The respondents alleged that Tyson Foods ("Tyson") did not pay some employees for donning and doffing and did not record the time each employee spent donning and doffing. *Id.*

The respondents sought class certification over their state law claims pursuant to Federal Rule of Civil Procedure 23. With respect to their FLSA claims, they sought certification as a collective action under 29 U.S.C. § 216. *Id.* "Since the employees' claims relate only to overtime, each employee had to show he or she worked more than 40 hours a week, inclusive of time spent donning and doffing, in order to recover." *Id.* at 1043. The employees relied on representative evidence, which included employee testimony, video recordings of donning and doffing at the plant, and a study performed by an industrial relations expert, Dr. Mericle. *Id.* Dr. Mericle conducted 744 videotaped observations and analyzed how long various donning and doffing activities took. *Id.* He then averaged the time taken and produced estimates of the time it took to don and doff for each department. *Id.* Another expert, Dr. Fox, was able to take certain time records and estimate the amount of uncompensated work each employee did by using Dr. Mericle's estimated averages of donning and doffing time. *Id.* The district court submitted both issues of liability and damages to the jury, and the jury rendered a verdict for respondents. *Id.* at 1044. The Eighth Circuit Court of Appeals affirmed. *Id.* at 1045.

Before addressing the merits, the Supreme Court noted that the parties did not "dispute that the standard for certifying a collective action under the FLSA is no more stringent than the standard for certifying a class under the Federal Rules of Civil Procedure." *Id.* The Supreme Court stated that its opinion assumed, without deciding, that such was correct and stated that for purposes of the instant action, if certification was proper, then certification of the collective action was also proper. *Id.* The Supreme Court continued that in order to be entitled to recovery, each employee must prove that the amount of time spent donning and doffing, when added to his or her regular hours, amounted to more than forty hours in a week. *Id.* Petitioner argued that such inquiries into individual work time predominate over the common questions. *Id.* Respondents countered that

these individual inquiries are unnecessary because it can be assumed each employee donned and doffed for the same average amount of time observed in Dr. Mericle's sample. The Supreme Court stated that whether Respondents' "inference is permissible becomes the central dispute in this case." *Id.* at 1046.

The Supreme Court agreed with the Respondents, stating, "A representative or statistical sample, like all evidence, is a means to establish or defend against liability. Its permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Id.* The Supreme Court explicitly declined to establish general rules governing the use of statistical evidence or representative evidence in all class-action cases. *Id.* The Supreme Court continued, "In a case where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of the class. To so hold would ignore the Rules Enabling Act's pellucid instruction that use of the class device cannot "abridge . . . any substantive right." 28 U.S.C. § 2072(b). Further, the Court reasoned:

> In this suit, as in *Mt. Clemens*, respondents sought to introduce a representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records. If the employees had proceeded with 3,344 individual lawsuits, each employee likely would have had to introduce Mericle's study to prove the hours he or she worked. Rather than absolving the employees from proving individual injury, the representative evidence here was a permissible means of making that very showing.

*Id.* at 1047.

The Defendants assert that *Tyson* compels decertification because the Plaintiff's use of representative evidence in this case. The Defendants emphasize that in *Tyson*, the Supreme Court stated that "*[e]ach employee* must prove that he actually had unpaid time that resulted in unpaid overtime, and must prove the amount of his or her allege unpaid time." [Doc. 280 at 12] (emphasis

in Defendants' Memorandum). The Court disagrees with the Defendants that *Tyson* compels decertification here. The question in each case, which the Defendants acknowledge, is whether the representative or statistical sample is truly reliable in proving or disproving the elements of the relevant cause of action. *Tyson*, 136 S. Ct. 1036; *see also O'Brien*, 575 F.3d 585 ("Furthermore, it is possible that representative testimony from a subset of plaintiffs could be used to facilitate the presentation of proof of FLSA violations, when such proof would ordinarily be individualized.").

The Defendants continue that pursuant to *Tyson*, each employee must first prove he or she worked unpaid overtime, when he or she did so, in each week across the years in question. In addition, the Defendants explain that each Plaintiff must show (1) the alleged uncompensated activity constituted "work" within the meaning of the FLSA; (2) that the supervisors or managers were aware of the unpaid work activities; (3) the unpaid work did not constitute a noncompensable preliminary or postliminary activity; (4) the alleged uncompensated activities, for each workday, were not de minimis; (5) the weekly determination of the number of uncompensated minutes and that when added to compensated minutes, exceeded forty hours; (6) and the number of minutes per day he/she worked off the clock to establish damages. The Defendants appear to take the position that each opt-in Plaintiff must testify in order to establish the above and that representative testimony is inappropriate.

The Court finds that the Defendants' arguments are inconsistent with the Sixth Circuit's recent decision in *Monroe* v. *FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017). As explained in *Monroe*, "In FLSA cases, the use of representative testimony to establish class-wide liability has long been accepted." *Id.* at 408. The court continued, "Our sister circuits overwhelmingly recognize the propriety of using representative testimony to establish a pattern of violations that include similarly situated employees who did not testify." *Id.* The court concluded, "In the face

of these consistent precedents, many with fact patterns similar to this case, FTS and UniTek point

to no case categorically disapproving of representative testimony to prove employer liability to

those in the collective action who do not testify." *Id.* at 409.

With respect to damages in a collective action, courts have also allowed representative

testimony. *See id.* at 411 (explaining that the "testimony of fairly representative employees may

be the basis for an award of back wages to nontestifying employees") (quoting *U.S. Dep't of Labor*

*v. Cole Enters., Inc.*, 62 F3d 775, 781 (6th Cir. 1995)); *Baden-Winterwood v. Life Time Fitness*

*Inc.*, 729 F. Supp. 2d 965, 989-92 (S.D. Ohio 2010); *Takacs v. Hahn Automotive Corp.*, No. C-3-

95-404, 1999 WL 33127976, at *1-3 (S.D. Ohio Jan. 25, 1999). If an employer fails to keep

accurate time records, the employees' burden to prove damages is relaxed. *Monroe,* 860 F.3d at

399 (citing *Mt. Clemens*, 328 U.S. at 687). Specifically, the Plaintiffs' burden was articulated in

*Mt. Clemens*, in which the Supreme Court stated:

> When the employer has kept proper and accurate records the
> employee may easily discharge his burden by securing the
> production of those records. But where the employer's records are
> inaccurate or inadequate and the employee cannot offer convincing
> substitutes a more difficult problem arises. The solution, however,
> is not to penalize the employee by denying him any recovery on the
> ground that he is unable to prove the precise extent of
> uncompensated work. Such a result would place a premium on an
> employer's failure to keep proper records in conformity with his
> statutory duty; it would allow the employer to keep the benefits of
> an employee's labors without paying due compensation as
> contemplated by the Fair Labor Standards Act. In such a situation
> we hold that an employee has carried out his burden if he proves that
> he has in fact performed work for which he was improperly
> compensated and if he produces sufficient evidence to show the
> amount and extent of that work as a matter of just and reasonable
> inference. The burden then shifts to the employer to come forward
> with evidence of the precise amount of work performed or with
> evidence to negative the reasonableness of the inference to be drawn
> from the employee's evidence. If the employer fails to produce such
> evidence, the court may then award damages to the employee, even
> though the result be only approximate.

*Mt. Clemens*, 328 U.S. at 687–88; *see also Morgan v. Family Dollar Store, Inc.*, 551 F.3d 1233 (11th Cir. 2008) ("If anything, the *Mt. Clemens* line of cases affirms the general rule that not all employees have to testify to prove overtime violations.").

The Defendants continue that the Plaintiffs cannot make any showing in this case that the evidence they plan to offer is statistically adequate without admissible expert testimony. In analyzing *Tyson*, however, the Sixth Circuit recently observed:

> According to FTS, and UniTeK, the failure of TFS Technicians to present a statistical expert and study was a failure that should have ended the litigation or prohibited FTS Technicians' reliance on the testimony of 17 technicians. *Tyson* does not impose such a requirement. The Court's statement about statistical adequacy was made in the context of the admissible of representative evidence. . . . FTS and UniTek do not challenge the admissibility of the testimony of the 17 technicians, but rather the sufficiency of FTS Technicians' representative evidence. And, significantly, *Tyson* did not discuss expert statistical studies because they are the *only* way a plaintiff may prove an FLSA claim, but because those plaintiffs offered such a study—along with employee testimony and video recordings. For our purposes when assessing the sufficiency of the evidence, the only issue we must squarely decide is whether there was legally sufficient evidence—representative, direct, circumstantial, in person, by deposition or otherwise,—to produce a reliable and just verdict. . . . As will be shown below, FTS Technicians presented more than sufficient evidence from representative technicians along with good old-fashioned direct evidence, which included six managers and supervisors and documentary proof containing timesheets and payroll records.

*Monroe*, 860 F.3d at 401 (quotation marks omitted).

The Defendants argue that the Plaintiffs' purported representative sample is statistically inadequate. The Defendants continue that the Plaintiffs do not have any admissible proof that the testimony of their lay witnesses would be statistically adequate to constitute representative evidence. The Defendants state that the Plaintiffs' so-called representative evidence must be sufficient to prove the claims on each of the 167 employees in individual lawsuits.

As noted above, courts have consistently allowed the use of representative testimony in establishing liability and damages in FSLA collective actions. The Defendants continue that the Plaintiffs "apparently intend to offer the testimony of some undetermined and cherry-picked number of Plaintiffs from two purportedly randomly selected Samplings Groups of their own creation." [Doc. 280 at 20]. The Defendants assert that the Plaintiffs' exclusive reliance on anecdotal testimony makes it impossible for the Court to decide liability or damages because the Plaintiffs cannot introduce enough samples to be accurately extrapolated to the entire class. The Defendants add that the sample must also be randomly selected from the entire population.

As explained below, the Court finds that the Plaintiffs are similarly situated and that they may proceed as a collective action. *See Monroe*, 860 F.3d at 409 ("As *Morgan* highlights, the collective-action framework presumes that similarly situated employees are representative of each other and have the ability to proceed to trial collectively."). Determining whether the Plaintiffs have actually presented representative testimony of liability and damages of the collective action is reserved for trial. By way of illustration, another court was faced with a similar situation. *Takacs*, 1999 WL 33127976, at *1-3. In *Takacs*, the parties disagreed as to whether the plaintiffs could prove damages in a FLSA action with the testimony of four to six members, along with other documents and affidavits from nontestifying plaintiffs. *Id.* at *1. The defendants did not "challenge the general proposition that damages in FLSA cases may be proved with evidence from representative testimony," but rather, the defendants argued that at least one plaintiff from each location at which plaintiffs were employed must testify. *Id.* The court concluded, "Without having heard the [p]laintiffs' evidence, it is not possible to determine whether the four to six of them who will testify will be fairly representative." *Id.* at *3. The court stated that if the plaintiffs propose to prove damages for all of them by using the testimony of only a few, "the law does not

prohibit them from attempting to do so." *Id.* The court continued that the plaintiffs "bear the risk [of] failing to establish that the testifying employees are fairly representative." *Id.* The court noted that "there is no magic formula for the number or percentage of plaintiffs who must testify." *Id.* at *2. The court reasoned, "Our focus is not on the numbers in isolation but on whether the district court could reasonably conclude that there was 'sufficient evidence to show the amount and extent of ... [uncompensated] work as a matter of just and reasonable inference.'" *Id.* (quoting *Mt. Clemens,* 328 U.S. at 690-91); *see also Baden-Winterwood*, 729 F. Supp. 2d at 997 ("[T]he question before this Court, is, therefore, whether the two testifying plaintiffs from each job category are fairly representative of those who did not testify so that the Court can reasonably conclude that there was sufficient evidence to show the amount and extent of uncompensated work as a matter of just and reasonable inference."). Accordingly, while the Court presumes that the similarly situated employees are representative of each other and have the ability to proceed to trial collectively, the question of whether the testifying Plaintiffs have presented fairly representative evidence is a question reserved for trial, after the Court has reviewed such evidence.

Finally, the Defendants argue that Federal Rule of Evidence 602 requires witnesses to have personal knowledge. The Defendants state that testifying Plaintiffs cannot testify from personal knowledge about the work actually performed off the clock and the amount of time worked off the clock for each nontestifying Plaintiff. The Defendants assert that almost all the Plaintiffs that were deposed admitted that they do not have personal knowledge of each other's working hours.

First, the Court finds the Defendants' objection premature as this issue can be raised at trial. Second, there is evidence in the record that employees had knowledge of other employees' hours. *See* [Doc. 280-7 at 15] ("Deposition of Russell Cooper") (stating that he could provide an approximate number of hours other sales representatives worked but that he could not provide a

definite number of hours). Further, the Defendants' argument that the testifying Plaintiffs must provide the amount of time worked off the clock places an impermissible burden on the Plaintiffs that the Sixth Circuit has cautioned against. *See Monroe*, 860 F.3d at 412 ("Disapproving of an estimated-average approach simply due to lack of complete accuracy would ignore the central tenant of *Mt. Clemens*—an inaccuracy in damages should not bar recovery for violations of the FLSA or penalize employees for an employer's failure to keep adequate records."); *see also Baden-Winterwood*, 729 F. Supp. 2d at 989 ("This standard would, therefore, require dismissal with prejudice of the nontestifying plaintiffs because none of the testifying witnesses had first-hand knowledge of the amount of hours the nontestifying witnesses worked. This Court disagrees."). Accordingly, the Court finds the Defendants' arguments not well-taken.

### C. Similarly Situated

As mentioned above, the Sixth Circuit has applied a three-factor test to determine whether Plaintiffs are similarly situated. *O'Brien*, 575 F.3d at 584. Specifically, the Court is to analyze the (1) factual and employment settings of the individual plaintiffs, (2) the different defenses to which the plaintiffs may be subject to on an individual basis, and (3) the degree of fairness and procedural impact of certifying the action as a collective action. "Similarly situated" does not mean that the plaintiffs must be "identically situated." *Monroe*, 860 F.3d at 402. Instead, the "the FLSA is a remedial statute that should be broadly construed." *Id.* As noted above, whether plaintiffs are similarly situated is a less stringent standard than a Rule 23 analysis. *O'Brien*, 575 F.3d 584-85.

The Court will now analyze the three *O'Brien* factors as they apply in this case.

### 1. Factual and Employment Settings

The first factor directs courts to examine the Plaintiffs' "job duties, geographic locations,

employer supervision, and compensation." *O'Brien*, 575 F.3d at 402.

The Defendants argue that this factor weighs in their favor. The Defendants assert that the Plaintiffs worked at four different locations, they worked in three different sales representatives' positions, they arrived at work and left work at different times, they clocked in and out during the day at different times, and they worked different amounts of hours. In addition, the Defendants assert that the length of sales tours varies from Plaintiff to Plaintiff, the pay varies significantly, the amount of overtime that the Plaintiffs actually recorded varies significantly, and that the Plaintiffs allege to have worked off the clock at different times (i.e., before their first tour, after their last tour, in between tours, and while on tour).

The Court finds that this factor weighs in favor of certification. The Defendants emphasize limited differences, which really amount to job titles, amount of compensation, hours worked, and locations. With respect to job titles, the opt-in Plaintiffs have different titles (i.e., Front-Line Sales Representative, In-House Sales Representative, and Discovery Sales Representative), but as indicated in the deposition of Dortha Justice-Spilman, the former Regional Director of Human Resources, all of the different titles were sales representatives, who were employed to make sales. [Doc. 298-1 at 3-5]. Further, the former Director of Sales and Marketing for the Great Smokies Lodge, Kyle Smith, explains, "Front line and in house sell timeshares, discovery sells one-year trial membership." [*Id.* at 8]; *see also* [*Id.* at 12] (Deposition of John Geissburger, the former Senior Director of Sales) (explaining that all three types of sales representatives' duties were to sell vacation ownerships). All the Plaintiffs were Sales Representatives, employed to make sales, although to different customers: (1) Front-Line Sales Representatives sell to individuals who do not currently have a timeshare; (2) In-House Sales Representatives sell to individuals who already own a timeshare; and (3) Discovery Sales Representatives sell trial packages. *See* [*Id.* at 14]

(Deposition of Matt Chodak, the current Vice President of Sales and Marketing) (explaining the same). The Defendants acknowledge in their Memorandum that Front Line Sales Representatives sell to the general public; In-House Sales Representatives sell to current owners; and Discovery Sales Representatives sell trial packages to individuals who have declined to purchase a deeded timeshare from a Front-Line or In-House Representative. [Doc. 280 at 8-9]. In summary, each Plaintiff was a Sales Representative, but the clientele was different. Accordingly, the Court finds the different titles within the Sales Representatives are not grounds to decertify this action.

Further, the Defendants assert that the Plaintiffs worked at different locations. The Court finds that the different locations in this case do not prohibit the Plaintiffs from proceeding as a collective action. Here, the hierarchy of management was similar at the locations. For instance, Kyle Smith testified as follows:

> A sales rep reported to a sales manager. A sales manager reported to a senior manager. A senior manager reported to the director of sales. A director of sales reported to the vice president. And then the vice president reported to the area president. Above that it went to, the – the area vice president reported to the executive vice president over that area. And then the executive vice president report to, I forget the exact title, but the guy over all sales and marketing company-wide. And then he reported to the CEO of the company.

[Doc. 298-3 at 6]; *see also* [*Id.* at 3] (Deposition of Dortha Justice-Spilman) (explaining a similar hierarchy, except at the Smokies that was an elevated manager due to the high volume of sales).

The Defendants also highlight testimony regarding pay differences. *See* [Doc. 134] (Declaration of Mandi Benson). While the Court acknowledges the pay differences, the Court also notes that such pay differences are not attributed to a different compensation method. Instead, all Plaintiffs were paid using the same method (i.e., commissions). For instance, Kyle Smith testified that during January 1, 2009, to December 31, 2013, the Sales Representatives would receive commissions only in the event of a successful sale and that if they were not successful in making

a sale, the Sales Representatives' only compensation would be the hourly rate. [Doc. 298-2 at 6-7]. Mr. Smith further explained, "[Y]ou cannot limit it to that week. So draw is 100 percent draw, so if I go a month and a half without a sale and then I finally start getting sales, everything from the beginning is recoverable on your hourly, not just for that week." [*Id.* at 7]. Because the Plaintiffs were paid using the same method, the Court finds that the difference in the amount of compensation earned by the Plaintiffs is not a ground to decertify.

The Defendants further argue that the hours worked and the hours recorded vary from each opt-in Plaintiff. The Defendants point to several deponents that testified they worked different hours and arrived and departed at different hours. *See* [Doc. 280-3 at 12] (Deposition of Kisa Abbott) (stating that Wyndham expected employees to arrive at 8:30 a.m. but that she typically left anywhere from 5:00 p.m. to 8:00 p.m.); [*Id.* at 12] (Deposition of Craig Carson) (stating that all sales representatives came to work at 8:00 but left at different times depending on whether there was an appointment with a potential purchasers); [*Id.* at 17] (Deposition of Danny Chappell) (stating that everyone had to be there for the sales meeting in the morning but "other than that, there was no typical day" and that he arrived at 8:15); [*Id.* at 20-21] (Deposition of Russell Cooper) (arrived at 8:30 a.m. and left at different times); *see generally* [*Id.* at 1-3] (Summary of Deponents' Testimony).

The Court finds that while hours varied, such differences are insignificant because the Plaintiffs' claims are unified by common theories of Defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct. *See O'Brien*, 575 F3d at 585 (explaining that plaintiffs are similarly situated where their claims are "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct"). Here, the Plaintiffs have testified that they worked overtime, *see*

[Doc. 298-4 at 1-3], that the managers would not let them stay on the clock after 40 hours, although they continued working, *see* [Doc. 298-5 at 1-4], and that if they did stay on the clock after 40 hours, the time would be adjusted, *see* [Doc. 298-6 at 1-2], or that time was adjusted to reflect breaks that were not taken. [*Id.*]. The Plaintiffs have, therefore, identified the methods in which the Defendants allegedly violated the FLSA: requiring them to work off the clock, denying them overtime, and altering time records. *See Monroe*, 860 F.3d at 403 and *O'Brien*, 575 F.3d at 572-73.

The Court acknowledges that how the Defendants' allegedly performed the above violations varied. *Compare* [Doc. 298-5 at 7] (Deposition of Kisa Abbott) (testifying that a manager told her to not clock in and out); [*Id.* at 28] (Deposition of James Campbell) (testifying that his managers said that if he did not clock out, he could not take the tour); [*Id.* at 41-42] (Deposition of Alana Cheij) (discussing clocking out for lunch, although she was still working) [*Id.* at 46-47] (Deposition of Russell Cooper) (discussing "shaved time" and that his manager would clock him out or put in a break here or there to ensure that the records reflected no overtime because it was not allowed). However, as the Sixth Circuit in *Monroe* explained:

> The dissent asserts that FTS Technicians allege "distinct" violations of the FLSA and "define the company-wide 'policy' at such a lofty level of generality that it encompasses *multiple* policies." (Dis. at 418.) The definition of similarly situated does not descend to such a level of granularity. The Supreme Court has warned against such a "narrow, grudging" interpretation of the FLSA and has instructed courts to remember its "remedial and humanitarian" purpose, as have our own cases. *See Tenn. Coal, Iron & R.R. Co.*, 321 U.S. at 597, 64 S.Ct. 698; *Keller*, 781 F.3d at 806; *Herman*, 308 F.3d at 585. Many FLSA cases do focus on a single action, such as the donning and doffing cases that the dissent's reasoning would suggest is the only situation where representative proof would work. But neither the statutory language nor the purposes of FLSA collective actions require a violating policy to be implemented by a singular method. The dissent cites no Sixth Circuit case that would compel employees to bring a separate collective action (or worse, separate individual

actions) for unreported work required by an employer before clocking in, and another for work required after clocking out, and another for work required during lunch, and yet another for the employer's alteration of its employees' timesheets. Such a narrow interpretation snubs the purpose of FLSA collective actions.

But FTS Technicians' claims do not depend on "lawyer talk"; they are based on abundant evidence in the record of employer mandated work off the clock. That an employer uses more than one method to implement a company-wide work "off-the-clock" policy does not prevent employees from being similarly situated for purposes of FLSA protection. This is not a new concept to our court or to other courts. In accordance with *O'Brien*, we have approved damages awards to FLSA classes alleging that employers used multiple means to undercompensate for overtime.

*Monroe*, 860 F.3d at 403. Accordingly, the Court finds that the Plaintiffs' factual and employment settings support certification.

### 2. Individualized Defenses

The Defendants assert that there are "a number of individualized defenses with facts unique to each Plaintiff or applicable only to certain Plaintiffs." [Doc. 280 at 32]. The Defendants state that whether down time is compensable is an individualized defense that depends on the circumstances. The Defendants cite to two Plaintiffs' depositions stating that they clocked out during the day between tours. In addition, the Defendants cite two other Plaintiffs' depositions, stating that "[t]hey also testified to engaging in a variety of activities while clocked out including eating, leaving the site, training, and listening to other sales pitches." [Doc. 280 at 33]. The Defendants also explain that Jesse Peirce was accused of taking inappropriate photographs, but he said he was playing a video game. The Defendants state that either way, such time was not compensable. The Plaintiffs respond that the Defendants' Amended Answer predominately asserts class-wide defenses.

"Several circuits, including our own, hold that individualized defenses alone do not warrant

decertification where sufficient common issues or job traits otherwise permit collective litigation."

*Monroe*, 860 F.3d at 404. Furthermore, one court has already considered whether the defense of downtime favors decertification. *See Bitner v. Wyndham Vacation Resorts, Inc.*, No. 13-CV-451, 2016 WL 7480428, 14 (W.D. Wis. Dec. 29, 2016). In *Bitner*, the court stated as follows:

> [T]here is nothing particularly unique or individualized to the question whether Discovery Sales Representatives were entitled to compensation during downtime between meetings with customers. On the contrary, this is just a subset of the class issue that the court has already certified—i.e., was an unofficial policy adopted that required Discovery Sales Representatives to wait for the next potential customer.

*Id.* Further, the Defendants only point to three Plaintiffs that were clocked out and were not engaged in work activities, in support of their defense. The Court is not going to decertify this action based on three Plaintiffs. Moreover, similar to the testimony in *Bitner*, there is evidence in the record that the Plaintiffs were not allowed to leave when expecting a tour. [Doc. 298-5 at 175] (Deposition of Roy Neuenschwander) ("Yeah, I was told to clock out when I wasn't on tour but I wasn't allowed to leave."). Accordingly, the Court finds the Defendants' argument not well-taken.

### 3. Degree of Fairness and Procedural Impact

The Defendants argue that failing to decertify the conditionally certified collective action will unfairly and prejudicially require the Defendants to prepare for and present 167 different trials simultaneously. The Defendants assert that given the wide variety of individual issues raised by the Plaintiffs' claims and the individualized nature of the defenses, fairness and procedural considerations dictate that this case should not proceed as a collective action.

The Plaintiffs respond that the claims presented here can be adjudicated far more efficiently in a single collective proceeding than in 159 individualized trials in which evidence of the same

violations would be presented over and over again. The Plaintiffs state that Defendants' rights must be balanced with the Plaintiffs rights to have their day in Court, many of whom would not be able to bear the costs of an individual suit. Further, the Plaintiffs argue that proceeding in a collective manner comports to the remedial and humanitarian purposes of the FLSA.

The Court agrees with the Plaintiffs. Here, there are approximately 156 Plaintiffs alleging a common, FLSA violating policy (i.e., working off the clock and time sheets being altered so as to not accrue overtime), and "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact." *Monroe,* 860 F.3d at 405 (quoting *Hoffman-La Roche, Inc.*, 493 U.S. at 170). As stated in *Wilks v. Pep Boys*, "Congress, in seeking to allow plaintiffs to vindicate their rights under the FLSA, provided them with the opportunity to do so collectively when appropriate." No. 3:02-0837, 2006 WL 2821700, at *8 (M.D. Tenn. Sept. 26, 2006), *aff'd*, 278 F. App'x 488 (6th Cir. 2008). Accordingly, the Court finds that the "decision to allow the plaintiffs to proceed collectively is in line with Congress's determination that defendants will not always have the opportunity to pursue individual defenses against FLSA plaintiffs but, instead, must collectively defend a suit that is so pursued." *See id.*

IV.    **CONCLUSION**

Accordingly, for the reasons stated above, the Defendants' Motion to Decertify the Conditionally Certified Collective Action [**Doc. 279**] is **DENIED**. This action shall proceed on October 10, 2017, as a collective action.

       **IT IS SO ORDERED.**

                              ENTER:

                              _____ s/ C. Clifford Shirley, Jr. _____
                              United States Magistrate Judge