UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JESSE PIERCE and MICHAEL PIERCE, | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:13-CV-641-CCS |
| | ) | |
| WYNDHAM VACATION RESORTS, INC., and | ) | |
| WYNDHAM VACATION OWNERSHIP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 193].

This matter came before the Court on October 10, 2017, for a bench trial, which continued through October 27, 2017. After the bench trial, Defendants filed a Motion for Partial Findings and Conclusions Regarding Representative Evidence [Doc. 403]. Plaintiffs filed a Response [Doc. 407] in opposition to the Motion, and Defendants filed a Reply [Doc. 412]. Further, both parties filed their Proposed Findings of Fact and Conclusions of Law [Docs. 417, 418], and Responses thereto [Docs. 420, 422, 424, 425], which the Court has considered. Accordingly, for the reasons further explained below, the Court **DENIES** Defendants' Motion [**Doc. 403**] and will enter a decision in favor of Plaintiffs.

# I.    BACKGROUND

The Court has repeatedly summarized the background of this case.  The Court, however, finds the background information helpful in its decision and will again summarize the history of this matter.

By way of background, Defendants (collectively, "Wyndham" or "Defendants") provide family destination vacations.  Customers purchase points that may be used for vacations at Wyndham resorts or other locations.  Wyndham employs three groups of sales representatives: (1) Front-Line Sales Representatives, (2) In-House Sales Representatives, and (3) Discovery Sales Representatives.  Wyndham's Tennessee operations span to four Wyndham properties. The Smoky Mountain Region includes two properties located in Sevierville: the Crossing and the Lodge.  The Wyndham Nashville ("Nashville") and the Wyndham Resort at Fairfield Glade ("Glade") comprise the other Tennessee region.

The Complaint in this matter was filed on October 23, 2013.  [Doc. 1].  The Complaint alleges that certain sales representatives who worked at Defendants' offices worked off the clock and were not paid for working in excess of forty hours in a work week.  [*Id.* at ¶ 2].  The Complaint alleges that Defendants willfully violated the Fair Labor Standards Act ("FLSA").  [*Id.* at ¶ 3]. The action was conditionally certified on August 21, 2014.  [Doc. 84].  Specifically, the collective action was defined as follows: Current and former non-exempt, commission-paid: (1) Front-Line Sales Representatives, (2) In-House Sales Representatives, (3) Discovery Sales Representatives, who were employed at Defendants' Tennessee Resorts between October 21, 2010, to October 31, 2013.

After the District Judge conditionally certified this action, the parties spent several months disputing over the proposed notice and opt-in form.  The District Judge entered an Order with

respect to the appropriate notice and opt-in form on June 1, 2015. [Doc. 125]. Subsequently, on May 31, 2016, the parties consented to the undersigned for all further proceedings. [Doc. 193]. The undersigned set a scheduling conference, but it was continued so that the parties could participate in mediation. [Doc. 197]. The mediation was unsuccessful, and the Court conducted a scheduling conference with the parties on September 15, 2016. [Doc. 203]. During the scheduling conference, the parties stated that they had agreed to allow Defendants an additional twenty-four (24) depositions. [*Id.*]. The Court also set a hearing to address sample representation and allowed the parties to file briefs regarding the appropriate sample representation. [*Id.*].

At the hearing, Plaintiffs proposed a sample representation of two groups: (1) opt-in Plaintiffs who worked as sales representatives at one of Defendants' four Tennessee resorts for more than six months (Group 1); and (2) opt-ins Plaintiffs who worked as sales representatives at one of the Defendants' four Tennessee resorts for less than six months (Group 2). [Doc. 215]. Through random sampling, Group 1 consisted of 35 representative Plaintiffs (out of 139 opt-in Plaintiffs), and Group 2 consisted of 13 Plaintiffs (out of 25 opt-in Plaintiffs). [*Id.*]. Thus, both groups represented 25% and 50% of each group, respectively. [*Id.*]. At the hearing, Defendants argued that there should not be any sample representation in this case. [*Id.*]. Defendants continued that they should be permitted to take each and every Plaintiffs' deposition. [*Id.*]. After hearing from both parties, the Court limited discovery to the Plaintiffs' representative sampling because it appeared to be "fair and proportional to the needs to the case" and would "minimize the burden of Plaintiffs and their counsel while still allowing the Defendants an opportunity to depose these alleged representative Plaintiffs to determine the similarity and ability to serve as representatives and/or to determine if there is any basis to their various defenses." [*Id.*]. The Court continued:

> Once the parties complete discovery of the representative Plaintiffs,
> if the Defendants contend that either the Plaintiffs' claims or the

> Defendants' defenses are too distinct or too individualized to permit this subset of representative Plaintiffs to be used to establish a collective class action and/or liability and/or damages, then Defendants may move for either additional discovery beyond the representative list and/or try to establish class decertification.

[*Id.*]. Later, and because Defendants had earlier agreed with the Plaintiffs to take only twenty-four additional depositions, Defendants moved the Court to allow them to depose the remaining members in the Plaintiffs' sample representation. The Court granted [Doc. 254] Defendants' request.

On June 30, 2017, Defendants moved for decertification, which this Court denied [Doc. 362] on October 3, 2017.[1] In its decision, the Court analyzed the three-factor test outlined in *O'Brien v. Ed Donnelly Enters. Inc.*, 575 F.3d 567, 584 (6th Cir. 2009), *abrogated on other grounds by* Campbell-Ewald Co., v. Gomez, 136 S. Ct. 663 (2016), and found that Plaintiffs were similarly situated to proceed to trial as a collective action. [Doc. 362]. With respect to Defendants' arguments that the representative proof in this case was inadequate, the Court held that Plaintiffs met their burden to proceed as a collective action but whether Plaintiffs had actually presented representative testimony of liability and damages of the collective action was reserved for trial. [*Id.* at 12].

As mentioned above, the case proceeded as a bench trial on October 10, 2017, and continued through October 27, 2017. The Court will summarize the testimony below.

## II. EVIDENCE

Plaintiffs presented live testimony of twenty-six witnesses. In addition, they submitted the deposition testimony of five Plaintiffs and four defense witnesses. [Doc. 414-1]. They also submitted depositions of rebuttal witnesses. [Doc. 416]. Defendants presented live testimony of

---

[1] The Court notes that it granted both parties additional time to brief the motion. [Docs. 226, 257, 282, and 301].

nine witnesses.  They also designated thirty-two depositions.  [Doc. 351].    The Court will summarize the live testimony below.[2]

## A.    Plaintiffs' Evidence

Due to the volume of the testimony and the number of exhibits submitted at trial, the Court will not separately summarize each individual witnesses' testimony.  The Court will only separately summarize the testimony of a few witnesses, such as the managers, who provided background information.  The Court will then summarize the remaining testimony collectively by location.

### 1.    Kristen Creson

Kristen Creson ("Creson") testified that she was employed with Fairfield in 1999 and stayed with Fairfield until it was purchased by Wyndham in 2000 or 2002.  [Doc. 378 at 11].  While employed with Wyndham, she worked in several positions, including positions in accounts payable, contract processing, and quality assurance.  [*Id.* at 12].  In addition, she worked as an inventory analyst in Orlando, Florida.  [*Id.* at 14].

Creson testified that in January 2004, she began working as the administration manager at Wyndham's Nashville location.  [*Id.* at 16].  This change in position was a promotion.  [*Id.*]  She testified that she was responsible for everything, such as building maintenance, accounts payable and receivables, and payroll.  [*Id.* at 16-17].  She was the highest level of authority with respect to administration.  [*Id.* at 17].  She worked as the administration manager in Nashville from January 2004 through May 2013.  [*Id.* at 19].  She testified that she left her position because Wyndham

---

[2] Although the Court has reviewed the parties' deposition designations, the Court will not summarize the depositions.  The Court will discuss the deposition designations in section III to the extent that they are relevant to the Court's analysis.

asked her to leave, explaining that Wyndham was tired of her complaining about payroll issues, which turned out to be the issues in this case.  [*Id.* at 20].

She explained the hierarchy in Nashville with respect to sales:  site vice president, site director of sales, sales managers and then sales representatives.  [*Id.* at 21-22].  She stated that prior to January 2009, sales representatives were classified as exempt.  [*Id.* at 26].  In January 2009, Wyndham reclassified its sales representatives, companywide, as overtime eligible (i.e., non-exempt).  [*Id.*].  She believed this change was a result of a lawsuit that was filed in Las Vegas.  [*Id.*].  She explained that in January 2009, Wyndham changed its compensation plan, wherein sales representatives received an hourly pay, plus overtime, in addition to commission.  [*Id.* at 26-27].  The hourly pay was minimum wage.  [*Id.* at 28].  The minimum wage pay and the overtime pay on the minimum wage was "recoverable" by Wyndham.  [*Id.* at 29-30].  The overtime pay on commissions, however, was "not recoverable" by Wyndham.  [*Id.*].  Creson stated that she noticed in the financial documents a new line item shortly after January 2009, which was called "non-recoverable overtime pay."  [*Id.* at 30].  Management did not know what the new line item meant, but it was Creson's job to determine its meaning.  [*Id.* at 30-31].  She was able to determine that this new line item was non-recoverable overtime commission pay.  [*Id.* at 31].  Creson explained that "recoverable" means that Wyndham takes the minimum wage overtime pay back out of the sales representatives' commissions and that "non-recoverable" means that Wyndham does not take the overtime pay back out of sales representatives' commissions, and it would go directly to the employees in addition to their commissions.  [*Id.* at 32].

Creson stated that upper management, including the site vice president, the director of sales, and the director of marketing expressed concerns of having to pay overtime to sales representatives because it adversely affected the net operating income.  [*Id.* at 41-42].  Overtime

pay affected upper management's compensation plan because the compensation plan included a component for a net operating income bonus. [*Id.* at 42]. Creson testified that the better bottom-line performance at a site equaled a higher compensation for upper management. [*Id.* at 42]. In order to handle this new overtime pay, Creson testified that upper management in Nashville instructed everyone that sales representatives could not receive overtime and that they had to manage their hours. [*Id.* at 46-47]. She explained that upper management included the site Vice President, Dave LaBelle, and the Directors of Sales, Jerry Prosise and Mike Carneal. [*Id.* at 48]. Creson continued that when the classification of sales representatives was changed from exempt to non-exempt, she was told to "doctor" timecards to show less than forty hours, and thus no overtime worked, on the time records. [*Id.* at 34].

The sales managers were also told that sales representatives could not receive overtime. Sales representatives were instructed to clock in while they were with customers but to clock out if they were not with customers, despite continuing to work. [*Id.* at 49, 51]. Sales representatives were instructed to show under forty hours per week. [*Id.* at 51]. Creson stated that sales representatives had hectic days, so Dave LaBelle and Jerry Prosise told Creson it was her job to ensure that sales representatives showed less than forty hours on the time records. [*Id.* at 52]. She was instructed to, and did, use WynTime to "doctor" time cards in order to ensure Sales Representatives showed less than forty hours on their time records. [*Id.*]. She stated that in Nashville, it was her responsibility and her staff's responsibility to "doctor" time. [*Id.* at 59]. She explained that she used WynTime on a daily basis to input lunches on timecards and to clock sales representatives out early. [*Id.*]. She stated that she was instructed to, and did, whatever was necessary to keep sales representatives' time records showing under forty hours per week. [*Id.* at 59-60]. She testified that she did not know whether sales representatives actually took a lunch

break and that with respect to her edits, 90% of them were done to keep sales representatives' hours under forty and were not made as legitimate time edits. [*Id.* at 60].

Creson testified that each month, she attended meetings with the site vice president and all other department heads, such as site marketing, administration, resort management, human resources, training director, and the quality assurance director. [*Id.* at 32-33]. Sometimes, the area Vice President, Dave LaBelle, would also attend the meetings.[3] [*Id.* at 33]. During these meetings, each department head briefed issues and accomplishments. [*Id.*]. Creson stated that she brought timecards with her to these meetings to make it a point to them that she needed signatures for the corrections. [*Id.* at 33-34]. She testified that the timecards she brought to the meetings had been doctored and that she brought them to show examples of missing signatures. [*Id.* at 34]. She testified that she refused to make timecard "corrections" without the sales representatives' signatures. [*Id.*]. She stated that she wanted the help of the site managers to obtain the sales representatives' signatures. [*Id.* at 34-35].

Creson testified that she grew tired of being the middle man. [*Id.* at 61]. She explained that she became the middle man because when she attempted to obtain signatures on the edited timecards from the sales representatives, they stated that the edited time was not correct. [*Id.*]. She directed them to talk to their sales manager. [*Id.*]. Creson testified that she eventually transferred the doctoring/editing of time records to sales managers because sales representatives were not part of her staff and sales managers should have been editing the time. [*Id.*].

She testified that everyone knew this (*i.e.,* altering timecards) was happening at every level because she sent emails on Tuesdays, Wednesdays, and Thursdays. [*Id.* at 52]. She began sending

---

[3] Creson testified that Dave LaBelle was promoted to area Vice President and that as area Vice President, he was responsible for all Tennessee resorts (Nashville, Glade, and the Smokies). [Doc. 378 at 44]. He was also responsible for the overall performance of the Tennessee sites as the area Vice President.

emails because sales representatives and sales managers did not care about details, and she was tired of cleaning up their mess. [*Id.* at 53]. She explained that on Tuesdays, she identified the sales representatives who (1) had thirty-two hours or more, (2) had missing "punches," or (3) worked more than five hours per day without a recorded break. [*Id.*].[4] She put their names in an email that she sent to the site vice president, the site In-House and Front-Line Sales Representatives, the sales managers, and to her corporate counterparts, Corey Miller and Mellissa Camper, the regional administrative directors. [*Id.* at 53-54]. She sent these emails so that the sales managers would be aware of the issues with the timecards and they could then doctor/edit the timecards identified. [*Id.* at 54]. The subject line of the emails were "WynTime/payroll/employee information for the week." [*Id.*]. She testified that she sent these emails for years. [*Id.*]. She continued that Miller and Camper never called or inquired about the emails. [*Id.* at 57].

Creson testified that the emails were important because time was of the essence since sales managers could make changes in WynTime during the current pay period. [*Id.* at 62]. Once the pay period closed, however, sales managers did not have access to make WynTime changes, and she would have to do it for them. [*Id.*]. She stated that the pay period closed Friday at 8 a.m., eastern standard time, despite Nashville being located in central time zone. [*Id.*]. If the managers failed to reduce hours, then Creson made the edits. [*Id.*]. She tried to avoid having to make the edits by sending the emails (discussed above) while the pay period was still active. [*Id.*]. She continued that the managers' edits were similar to the edits she made, including edits showing three hour lunches or showing that a sales representative left early, such as 1:00 p.m. [*Id.* at 63]. She stated that some managers would get lazy and just put 9 a.m. to 5 p.m., or the exact same start

---

[4] The Court notes that during the trial the word, "punches," was used to describe entering the time worked in the time clock.

and end time, to the minute every day and testified, "You can't get any lazier than that." [*Id.* at 63-64]. She continued that they (managers and herself) had no choice but to edit sales representatives' time. [*Id.* at 64]. She explained that the site vice president and the director of sales instructed her and the sales managers to edit sales representatives' time. [*Id.* at 65].

Creson further testified that she did not like falsifying timesheets and that she expressed her concerns to Dave LaBelle because she had a good working relationship with him. [*Id.* at 65-66]. She also expressed concerns to Miller and Camper and to Dottie Justice (who was either the area Human Resource Officer or the regional Human Resource Officer). [*Id.* at 66]. She recalled telling Justice that falsifying timesheets was a "lawsuit waiting to happen." [*Id.*]. She also expressed her concern during the sales meetings and testified that she viewed as the "squeaky wheel." [*Id.*]. Creson stated that when she complained to LaBelle, Prosise, or Justice, "their response was to blow [her] off." [*Id.*]. Creson was told the sales representatives needed to "manage" their time and time records and if they cannot, Creson was to "help" them. [*Id.* at 66-67].

Creson also testified that she attended business unit meetings, where she would meet with her counterparts from other resorts at Corporate in Orlando, Florida. [*Id.* at 67]. She continued that after one meeting, a few individuals went to dinner, including Pam Borger, the Administrative Director in South Florida; Judy Warren, the Administrative Director in Orlando; Amanda Pedigo, the Administrative Director at the Glade; and Donna Parton, the Administrative Director at the Smokies. [*Id.* at 68-69]. Creson explained that during dinner, they discussed as follows:

> We all had our own individual policies of how we doctored the time and how we went about getting signatures and covering our tails. So we just started bouncing ideas off of each other, who did what, how they did it, and who they assigned it to. Because we didn't have time as admin directors to do it all the time, so we had to have assistants that did some of our legwork for us.

[*Id.* at 71].  Creson explained, "We all shared what we were doing."  [*Id.*].

Defendants did not cross examine Creson, and thus, did not challenge Creson's testimony on a single point.  Nor did Defendants call Dave LaBelle, Corey Miller, Mellissa Camper, Dottie Justice (or any of the individuals that she had dinner with in Florida) as witnesses to rebut her accusatory testimony regarding their knowledge and instructions as to "doctoring" time sheets of the sales representatives.

## 2.    Testimony of David Nelon

David Nelon ("Nelon") worked as a manager and as an In-House Sales Representative at the Crossing during the Recovery Period.

Nelon testified that he began working for Fairfield Communities, Inc., in July 1980. [Doc. 375 at 85-86].  Nelon stated that Fairfield Communities, Inc., changed its name to Fairfield Resorts, which then became part of Syndic Corporation.  [*Id.* at 87].  Syndic Corporation split into four companies that eventually became Wyndham.  [*Id.* at 87-88].  He retired from Wyndham in April 2014.  [*Id.* at 88].  Throughout his years employed with Wyndham, he worked at various locations, including Lake Lure, North Carolina, and the two locations in Sevierville, Tennessee.  [*Id.* at 91, 99].  Nelon testified that he did very well at Wyndham, citing his status as a "Legend," which means he was given extra benefits by the company, including invitations to attend President's Trips as a top sales representative.  [*Id.* at 99-102].

In 2009, Nelon testified that he left Lake Lure, North Carolina, and went to work at the Smoky Mountains.  [*Id.* at 123].  He noted that he had worked long hours at Lake Lure, but more at the Crossing because it was "a machine."  [*Id.* at 108].  He described the three different types of Sales Representatives: (1) Front-Line Sales Representatives; (2) In-House Sales Representatives; and (3) Discovery Sales Representatives.  [*Id.* at 117-118].  He continued that it was the same

selling process with all three positions: meet with customers, close, and follow-up. [*Id.* at 119, 122]. In-House Sales Representatives attempted to sell to people who already owned timeshares. [*Id.* at 118]. Front-Line Sales Representatives attempted to sell to people who did not already own a timeshare. [*Id.* at 118, 120]. Discovery Sales Representatives attempted to sell a discovery package to people who had declined an offer from the In-House Sales Representative or the Front-Line Sales Representative. [*Id.* at 118]

Nelon continued that regarding the Recovery Period (October 21, 2010, to October 31, 2013), he was employed from October 21, 2010, to July 19, 2012, he was employed as a manager at Wyndham. [*Id.* at 140]. He was employed as an In-House Sales Representative from July 19, 2012, to October 31, 2013. [*Id.* at 178].

Nelon testified that Wyndham began requiring employees to clock in and out "roughly" at the end of 2009, while he was still employed at Lake Lure. [*Id.* at 126]. When Wyndham began using the time clock, Wyndham instructed him to clock in when he arrived, clock out within six hours, and then clock back in and out during the day. [*Id.* at 126-127]. Even though sales representatives did not take breaks, they were required to show a break on their timecard. [*Id.* at 127]. When explaining why breaks were not taken, Nelon testified that timeshare sales are different than many other businesses "because you're running and gunning, as they say in the office, all day long." [*Id.* at 128]. Nelon testified that there was no time for a break. [*Id.*]. Nelon testified that taking lunch breaks did not start until sometime after 2013 and that immediately after the instant lawsuit, several changes were made, including not providing customers with the sales representatives' cell phone numbers. [*Id.* at 128-29].

Nelon testified that as a manager he had to ensure that sales representatives' timecards reflected a break before six hours and ensure that timecards did not show more than forty hours

worked.  [*Id.* at 130-31].    With respect to breaks, Nelon testified that he would log in to the computer and review his sales representatives' hours, and if anyone had more than six hours, he would adjust the time to show a break.  [*Id.*]  He testified that no one ever mentioned that sales representatives could receive overtime and that "[e]verybody would have been clocked in and clocked out and we wouldn't be here today if we knew that there was overtime."  [*Id.* at 131].  He testified that he adjusted his sales representatives' hours as required every Thursday before the timecards were turned in on Friday mornings.  [Id.]. He testified that no one ever explained that sales representatives were legally entitled to overtime based upon commission rates for all hours worked over forty.  [*Id.* at 133].   He testified that as a manager, it was his responsibility to ensure that the time records of the sales representatives stayed under forty hours and that the actual number of hours actually worked were not reflected on the time sheets because they "had no relevance."  [*Id.* at 134].  He continued that the sales representatives who he supervised were all actually working in excess of forty hours per week but that he was instructed by management to adjust their timecards and to do so by Thursday night.  [*Id.*].    Accordingly, their actual time worked was not reflected on their timesheets.

Nelon testified that the sales representatives had a hard time remembering to clock in and out because there was no incentive to do so.  [*Id.* at 140-41].   He stated that he was not sure how it worked at other locations, but he received emails on occasion from Amanda Hill, the commissions analyst, asking him to obtain a sales representative's signature on the WynTime sheet, which showed that the hours had been altered.  [*Id.* at 141, 48].  He explained that the company did not care about the actual break time as long as the timecards reflected a break.  [*Id.* at 141-42].  In addition, he stated that corporate did not care about the time of arrival reflected on a timecard, as long as there was some arrival time reflected.  [*Id.*].  He stated, "They explained it

was about liability." [*Id.* at 142]. He continued that there was simply no attempt to be accurate. [*Id.* at 179].

Nelon testified that all managers had access to WynTime, the computer program used to document hours. [*Id.* at 141, 143]. As an example of how hours were altered, Nelon identified an email from Amanda Hill requesting Jim Acee's and John Geissberger's approval to insert breaks for sales representatives' timecards that showed more than six hours a day. [*Id.* at 147, Ex. 930]. With respect to Jesse Pierce, there were no hours on his timecard, so Hill requested permission to alter his timecard to show that he worked from 8 a.m. to 5 p.m. for five days. [*Id.* at 149, Ex. 930]. Geissberger responded within seven minutes, stating, "Approved." [*Id.* at 156, Ex. 930]. Nelon stated that this is an example of similar emails that he received from Hill. [*Id.* at 155]. He stated that Geissberger was the Director of Sales for In-House Sales Representatives and that Jim Acee was the Director of Sales for Front-Line Sales Representatives. [*Id.* at 155, 157-158]. In addition, Nelon testified that the sales representatives identified in the email did not usually take lunch breaks and that he (Nelon) did not confirm with the sales representatives that the alterations to their timecards were correct. [*Id.* at 150-52, 156].

Nelon explained that it was the sales representatives' responsibility to clock in and out sometime during the day and to make sure that they reflected a break on their timecards. [*Id.* at 153]. It was the managers' responsibility to double-check the sales representatives' timecards and that it was Amanda Hill's responsibility to double-check the managers to ensure that the timecards were completed before Thursday. [*Id.*]. Nelon stated that with respect to employees who needed a lunch break, Hill usually just inserted a break for those sales representatives from 11:00 a.m., to 11:30 a.m., and that she adjusted other timecards to reflect an arrival time of 8:00 a.m., and a departure time at 1:00 p.m. [*Id.*]. After the changes were made, Nelon stated that he was required

to obtain the specific sales representative's signature on a Missed/Changed Punch Notification Form ("Punch Form") and that the Punch Form was then placed into a binder. [*Id.* at 163]. A Punch Form shows the date and the time that was changed and an "explanation" or reason for the change. [*Id.*]. Nelon testified that, normally, the explanation provided on the Punch Form was "forgot." [*Id.*] The explanation on the Punch Form was usually completed by the manager, and the explanation provided was normally fictitious. [*Id.*]. Nelon testified to receiving a number of emails from Hill, wherein Hill adjusted time cards and instructed him to obtain the sales representative's signature on the Punch Form. [*Id.* at 159-68, Ex. 976]. Nelon continued that the sales representatives' time as reflected in the company's records is "all bogus." [*Id.* at 168].

Nelon testified that Geissberger instructed him to make sure that breaks were reflected in WynTime and sales representatives' hours shown were no more than forty in WynTime. [*Id.* at 170-71]. Geissberger stated that the company was no longer going to pay overtime. [*Id.*]. Other managers said the same, including Larry Whaley and Lisa Jarvis, who were both senior managers. [*Id.* at 172-74]. Nelon testified that he was constantly changing time records. [*Id.* at 177]. He continued that all managers "were taught to do the same by the same people in the same way." [*Id.* at 178]. He clarified that as a manager, he was aware that sales representatives' time records did not accurately reflect the time that they actually worked and that he did not think it mattered since "they were not going to get paid on it or compensated or benefited by it at all." [*Id.* at 180]. Nelon stated that for example, with respect to Ronald Banks, he (Nelon) clocked him in at 5:00 p.m., and then realized that he (Banks) was close to forty hours, so he clocked Banks out at 5:12 p.m. [*Id.* at 216-17. [Ex. 1619A]. Nelon continued that it was his specific responsibility as Banks's supervisor to alter his time. [*Id.* at 217]. Nelon testified to other examples of altering time cards, similar to the above alterations. [*Id.* at 218-228, Ex. 1619B, 1619C, 1622A, 1622B]. For instance,

on Terry McGlothin's Punch Form, [Ex. 1622A], the reason provided was, "Forgot was too busy!" Nelon stated that this meant that McGlothin was on a table or out on a tour, working. [*Id.* at 226]. The other Punch Form for Terry McGlothin, [Ex. 1622], stated, "Busy." [*Id.*, Ex. 1622B]. Nelon clocked out sales representatives, even though he knew that at that time they were still working. [*Id.* at 218-223].

Nelon testified that Terry McGlothin was on his team. [*Id.* at 259]. Nelon stated that there was a situation with McGlothin not having insurance coverage for a medical issue. [*Id.*]. Apparently, this was due to his time records not showing enough hours worked to qualify for coverage. [*Id. at* 259-61]. John Geissberger spoke with the managers and the employees and stated, "Look, make sure, when you clock in and out—we've got to make sure that you're having at least 30 hours show upon the clock." [*Id.*]. Nelon stated that John Geissberger sent him an email on July 19, 2013, stating as follows:

> You are responsible for doing you[r] wyntime clocking in and out, as well as keeping up with how many hours you have each week. You must have an average of 30 hours a week or 1250 hours in a 12 month time frame, if you have less then that you would not have full support of the wyndham programs. Please respon[d] to this email.

[Ex. 658]. Nelon responded, "I will keep track," and testified that Geissberger was aware that sales representatives were working many hours and that the clocking in and out was fictitious. [*Id.* at 258-59]. He explained that Geissberger was explaining in this email, "If you want to keep your insurance, you better show up on that clock—at least 30 hours that show up on the clock." [*Id.* at 260].

Nelon testified that the hours on his own timecards were not accurate and that he worked more hours than they reflected. [*Id.* at 375 at 182-83, Ex. 387]. In addition, he testified that the hours on his earnings statements were also incorrect. [*Id.* at 187-88, Ex. 60]. When asked whether

Wyndham's time records during the Recovery Period, which reflected Nelon averaged 29.4 hours per week, were accurate, Nelon testified that the average was incorrect. [*Id.* at 202-03, Ex. 3245]. He continued that during his time at Wyndham, a senior manager or the director of sales reviewed different policies and that he had to acknowledge that they reviewed the policies with him [*Id.* at 205]. Nelon testified that there were many times that he was instructed to sign a document or face disciplinary action. [*Id.* at 206].

As mentioned above, Nelon was also an In-House Sales Representative during the Recovery Period. [*Id.* at 118]. He stated that every day the managers and the sales representatives had a meeting. [*Id.* at 175]. In addition, part of his duties as an In-House Sales Representative was to "run tours." [*Id.* at 108-110]. A "tour" simply refers to visiting a unit and attempting to arrange an appointment with the timeshare owner at the office. [*Id.* at 110-11]. Nelon testified that it would take approximately an hour to two hours for each tour. [*Id.* at 109]. Tour sheets, which included the owner's name, room number and account number, were distributed in the morning. [*Id.* at 110]. Before taking a tour, Nelon testified that he reviewed the owner's timeshare history to give him an idea of the vacations that the owner likes to take and whether the owner was losing any points. [*Id.* at 112]. He also obtained a packet that the marketers put together, brochures of activities in the area, and a gift Wyndham provided. [*Id.*]. The goal of the tour is to schedule an appointment to come back to the office. [*Id.* at 113].[5] The length of tours varied from twenty minutes to several hours. [*Id.*]. A meeting with the owners in the unit is called "setting the hook." [*Id.*]. Nelon testified that he conducted three to four tours per day. [*Id.* at 246]. He stated that once an appointment was set, a sales representative received another tour or if the

---

[5] The follow-up appointment was commonly referred to as a "continuance."

appointment was immediately after the visit to the unit, the sales representative would continue with the appointment.  [*Id.* at 238].

Nelon testified that tours were set in waves, which meant that the marketers scheduled the tours at different times.   [*Id.* at 249].  In between tours, sales representatives continued working, such as making telephone calls, preparing for the next day, and discussing work with other sales representatives.  [*Id.* at 249-50].  The ideal situation is for a sales representative to conduct a tour in the morning and schedule an appointment with that customer and then come back to the office for an appointment that was set from the previous day.  [*Id.*].

With respect to closing a contract, Nelon testified that when a contract was entered into the system, the paperwork would be put into a stack for the quality assurance department.  [*Id.* at 253].  The quality assurance officer would review the paperwork for approximately thirty minutes and then met with the customers with the sales representative present.  [*Id.*].  Once the customer signed the paperwork, the quality assurance officer took the paperwork to the contracts department to make copies.  [*Id.* at 254].  The quality assurance officer came back to the office to answer questions about ownership and then the sales representative escorted customers back to the office area. [*Id.*].  The sales representative also escorted the customer to his/her car and later completed a follow-up sheet.  [*Id.* at 255].   Nelon testified that back-enders and front-enders were both required to stay and close the deal.  [*Id.* at 258].[6]  Nelon identified an email dated July 11, 2012, from John Geissberger to Nelon and several other individuals that stated as follows:

> All,
>
> I have said this over and over both reps must stay for the closing!
> Any rep that is not on site at the time of the closing will be on

---

[6] The Court notes that sometimes two sales representatives closed a deal: front-enders and back-enders.  Front-enders worked with the customers in the beginning of the process, and back-enders assisted front-enders on closing the deals.

overage all day on their next work day with a coaching note in their file!

Any manger letting this happen will get a coaching note as well.

End of story.

[*Id.*, Ex. 1046].

Nelon testified that the closing process on average took approximately an hour and fifteen minutes. [*Id.* at 255]. Nelon further testified that there were times that he was not clocked in during a closing. [*Id.* at 255-56, Ex. 3236].[7] With respect to Exhibit 3236, Nelon testified that the entries in blue describe situations that he or his manager clocked him out before the closing of the contract was completed. [*Id.* at 256-57]. He stated that the yellow entries indicate that he was not clocked in. [*Id.* at 252]. The red entries indicate situations where he closed a contract but he did not clock in at all that day. [*Id.* at 255].

Nelon stated that during the Recovery Period as a sales representative, he worked approximately fifty to sixty hours per week, which did not include the time that he spent working away from the premises. [*Id.* at 228-29]. For instance, he was required to follow up with owners or present owners with a certificate for an extra week's vacation. [*Id.* at 229, 232-33]. He also participated in platinum appreciation weekends, wherein Wyndham would invite existing owners to the resort. [*Id.* at 230]. He stated that all sales representatives were required to send letters to customers and provide customers with their personal cell phone number so that customers could contact them after hours. [*Id.* at 232]. Nelon further identified an email dated January 17, 2012, that he sent to Matthew Chodak, the senior Sales Manager and Nelon's supervisor. [*Id.* at 234-36, Ex. 1024]. The email is entitled, "Commitment Meeting," and Nelon explained that they had a

---

[7] The Court observes that Exhibit 3236 was used for a majority of Plaintiffs' testimony.

meeting to discuss the plans for the year. [*Id.* at 234]. The email states, "Every night do your home work," which Nelon stated means to send letters and call owners every night. [*Id.* at 236].

Nelon also testified that sales representatives would participate in nightline. [*Id.* at 237-38]. He explained that typically many owners check in after 4:00 p.m. [*Id.* at 237]. When owners checked in, a marketer would let the owner know that a sales representative would visit the unit in thirty minutes to an hour to check on the unit and answer questions about his/her ownership. [*Id.*]. The sales representative was given a tour sheet with the owner's information, and the sales representative visited the unit to attempt to schedule an appointment with the owner. [*Id.*]. Sales representatives attempted to schedule these appointments immediately after visiting the unit or the following day. [*Id.* at 238]. The sales representative tried to schedule the appointment at times that the sales representative did not have a tour or if a sales representative was working with a back-ender, the sales representative would try to schedule the appointment when the back-ender was also free. [*Id.*].

Nelon testified that he usually began his workday at 7:30 a.m., and stopped his workday at roughly between 5:30 p.m. and 8:30 p.m. [*Id.* at 239]. He continued, however, that there were occasions where he went home but continued working. [*Id.*]. He testified that he spent roughly twelve hours per week making telephone calls, writing letters, and participating in party appreciation weekends and nightline. [*Id.* at 249-50]. The average number of hours that he testified to above did not include these additional twelve hours. [*Id.* at 240]. He explained that he arrived at that estimate by calculating his arrival time at 7:30 a.m., and his departure time, which was normally 5:30 p.m., to 8:30 p.m., on a daily basis. [*Id.* at 241]. He stated that his wife quit cooking supper because they never were able to eat together. [*Id.*].

Nelon testified that sales seemed to slow down in January but the amount of time and effort put into making a sale and following up on sales did not change at all. [*Id.* at 243]. Nelon stated that in January and February, sales representatives reviewed old tour sheets and called owners using their notes from the tour sheets. [*Id.* at 243-44]. In addition, sales representatives participated in road shows where they visited restaurants and hotels and invited owners back to the hotels and restaurants. [*Id.* at 244]. Finally, Nelon testified that a day involving tours, telephone calls, and follow-ups was a typical workday for all the sales representatives that he worked with and that he supervised. [*Id.* at 261].

On cross examination, Nelon testified that sales representatives thought it was a waste of time to clock in and out because Wyndham recouped the hourly wage that sales representatives received. [*Id.* at 263-64]. He stated that he never told sales representative that someone else could clock them in and out. [*Id.* at 268]. He continued that no one complained that his/her time was not recorded correctly. [*Id.*]. In addition, he identified a few of his earning statements wherein he was paid overtime. [*Id.* at 284, Ex. 60]. Further, Nelon testified that he signed several documents, including the Salesperson Agreement, the Business Principles, Employee Policy Handbook, Timekeeping and Overtime Policy. [Doc. 377 at 12-16, Ex. 4023A-C, 4035]. In addition, Nelon identified his W2 statements, reflecting the amounts that he earned at Wyndham during the Recovery Period. [*Id.* at 18, Ex. 4037].

The Court notes that Nelon's testimony regarding John Geissberger, Amanda Hill, Lisa Jarvis, and Larry Whaley was not impeached, nor were these individuals ever called witnesses by Defendants.

### 3. Testimony of Jeff Cross

Jeff Cross ("Cross") testified that he worked as a manager and as a sales representative at the Glade. Cross stated that he currently works for Wyndham as a Senior Sales Associate at the Glade. [Doc. 383 at 150]. He began working for Wyndham in the 1980s when the company was named Fairfield. [*Id.*]. He left the company "for a while" and came back in April 2007. [*Id.*]. He testified to the following dates of employment with Wyndham, along with his positions:

- May 2010 to August 2010, he was an In-House Sales Manager;

- August 2010 to September 2011, he was the Senior Sales Manager;

- September 2011 to August 2012, he was a selling manager; and

- August 2012 to January 2013, he was a Senior Sales Representative.

[*Id.* at 151-52]. He took a leave of absence in January 2013 and came back in April 2013 as a Senior Sales Representative, which is his current position. [*Id.* at 152]. As the In-House Sales Manager, his duty was to manage the team of representatives and to drive revenue for the site. [*Id.* at 153]. As the Senior Sales Manager, he was in charge of all the sales managers, making sure that they managed the teams and drove the results on the sales floor. [*Id.*] He testified that the senior sales manager position is the equivalent of the director of sales position at the other locations. During that time, he supervised In-House, Discovery, and Front-Line Sales Managers. [*Id.*].

Cross testified that in 2009, when Wyndham began using a time clock, he was an In-House Sales Representative. [*Id.* at 156]. He testified that managers instructed the sales representatives that their timecard must reflect a lunch break, regardless whether a lunch break was taken. [*Id.*] In addition, managers stated that sales representatives could not be clocked in while they were not on tour and that no one could receive over forty hours. [*Id.*]. Management told sales representatives the above during sales meetings every morning. [*Id.* at 157]. With respect to how

sales representatives were paid, Cross testified that they were told by management that they would be paid a minimum wage upon clocking in, which had to be paid back. [*Id.*]. He testified, "Obviously, the more time you spent on the clock, the more money you had to pay back." [*Id.*]. They were never told overtime would be paid on commissions. [*Id.*]. He continued that he was instructed to clock out and continue working by managers. [*Id.* at 158].

Cross testified that when he was a manager, he was instructed, and thus instructed his sales representatives, to clock out and continue working. [*Id.* at 159]. He instructed them to clock out while they were not on tour, even though they were not allowed to leave the site and they continued working on other matters. [*Id.*]. When asked why he instructed his sales representatives to clock out and continue working, he testified, "Because we were told – and I was told – to tell them that they had to pay that money back. And the fact that it was affecting bonus hurdles, it affected the bottom line, the profit of that site, the NOI, it was a chain reaction to everything." [*Id.* at 159-60].

Cross continued that as a manager, he received daily emails from Camille Combs, the Human Resource Representative for the Glade. [*Id.* at 160-61]. The emails included information regarding sales representatives' timecard entries, including whether they were missing a punch, whether they were approaching thirty-two hours, or whether they had made a sale while they were not clocked in. [*Id.* at 161]. Cross stated that if a sales representative was approaching 32 to 38 hours, he/she was instructed to clock out and continue working. [*Id.*]. Combs sent these emails to the in-house manager, the front-line manager, the discovery manager, and the senior manager. [*Id.*]. If there was no senior manager, she sent the email to the director of sales. [*Id.* at 162]. She also sent the email to the site vice president, who was Pat Burk at the time and then later Mike Carneal. [*Id.* at 161-62]. Cross testified that he heard conversations between Combs and Carneal about altering sales representatives' time in the computer instructing her that no one gets overtime

and to keep the time under forty hours. [*Id.* at 162]. Cross testified that he did not complain about working off the clock because he understood that overtime would just be paid back in commissions. [*Id.* at 165]. He stated that he would not have worked off the clock if he would have known that was entitled to overtime on commission. [*Id.* at 165-66].

Cross continued that overtime greatly affected the bottom-line profit, which in turn affected each manager's bonus hurdle and the vice president's, the senior vice president's, and the area vice president's pay. [*Id.* at 167]. Cross stated that he heard Vice President Mike Carneal and the area supervisor at that time, Dave LaBelle, discuss how overtime incurred would affect the profit of the site. [*Id.* at 168].

Cross testified that his hours reflected on his earnings statements were a joke. [*Id.* at 183, Ex. 1682, 1685, 1687]. Cross testified that he consistently worked seventy plus hours in a workweek during the Recovery Period. [*Id.* at 168]. He stated that he typically arrived at work at 7:00 a.m., and worked ten to twelve hours. [*Id.* at 169]. He continued that when Mike Carneal became Vice President, he (Carneal) had an "all in all day" policy, meaning that every sales representative was there all the time. [*Id.*]. In addition, at the Glade, sales representatives participated in "late night," which means that they visited units when guests checked in about 5:00 p.m. [*Id.* at 170]. Cross testified that the sales representative tried to "hook" the guest to come straight back to the office or the next morning. [*Id.*]. Cross stated that "late night" typically ran until 9:00 p.m. [*Id.*]. In addition, Cross stated that the sales representatives consistently worked "six-ones," meaning a sales representative worked six days and was off one day. [*Id.* at 171]. Cross continued that he personally worked six and seven days per week all the time, once working three weeks straight without a day off. [*Id.*]

Cross testified that he worked on his days off and that he would work "continuances" on his days off. [*Id.* at 172-73]. He explained that a "continuance" means when a sales representative is able to schedule a sales presentation with the customer after visiting with the customer in his/her unit. [*Id.* at 173]. He also came in on his days off to work his hero tour. [*Id.*].[8] In addition, Cross testified that he also performed work when he got home, such as making telephone calls. [*Id.*]. He further testified that there was an off season at the Glade from January to February but that he did not work less hours. [*Id.* at 175-76]. He explained that he did not work fewer hours because he participated in dinner parties and party weekends and Wyndham did not replace people who "fall by the wayside" until the first of March. [*Id.* at 176]. He also traveled during this time for road shows to other states, which were week long trips. [*Id.* at 176-77].

On cross examination, Cross acknowledged that he was paid overtime on several occasions when some cards "got through" and he was on the clock for over forty hours. [*Id.* at 190-92, Ex. 1687]. In addition, Cross acknowledged that one Punch Form reflected sixty-three hours of work. [*Id.* at 198, Ex. 4654A]. Cross further acknowledged that he signed several Wyndham documents, including Salesperson Agreements, Business Principles, Employee Policy Handbook, Timekeeping and Overtime Policy, and the Standards of Performance Agreement, Sales Representative. [*Id.* at 192-93, Ex. 4649A-G]. Cross also testified that he signed the Ownership iPad Acknowledgment, which states that he was required to obtain prior authorization from his manager before using the iPad for work-related activities to work from home or to work overtime hours. [*Id.* at 194-95, Ex. 4649G]. Finally, Cross identified his earnings as reflected on his W2 statements from 2012 to 2013. [*Id.* at 195, Ex. 4655A].

---

[8] The Court learned that a "hero tour" means that a sales representative made a sale the previous day and is the first sales representative to receive a tour the following day.

The Court notes that Cross's testimony regarding Camille Combs, Mike Carneal, Dave LaBelle was not impeached, nor were they ever called as witnesses by Defendants.

### 4.     Other Testimony

The Court will now turn to the non-managerial testimony. Although the testimony did not vary by location, the Court finds the most logical way to summarize the voluminous testimony is to do so by location.

Plaintiffs presented live testimony of twenty-five Plaintiffs.[9] Out of those twenty-five Plaintiffs, two Plaintiffs worked in Nashville: Michael Pierce, Sr., and Alana Cheij.[10] Further, three Plaintiffs worked at the Glade: Jeff Cross, Danny Chappell, and Jimmy Dixon.[11] The remaining Plaintiffs worked at either the Crossing, the Lodge, or both: James Abbott, Kisa Abbott, Claudia Bogardus, James Campbell, Danny Chappell, Russ Cooper, Brenda Davis, James Dodson, Belinda Drew, Thomas Garrett, Lee Johnson, Perry Magee, David Nelon, Jesse Pierce, Michael Pierce, Sr., Tony Siler, Rebecca Slone, Bobby Stallings, Bryan Tesh, Craig Thrift, and Angela Woods.

### a.     Nashville

As mentioned above, Alana Cheij ("Cheij") and Michael Pierce, Sr., ("Pierce, Sr.") worked at the Nashville location during the Recovery Period. Because Pierce, Sr., worked primarily at the Crossing, the Court will not include his testimony in this section. Cheij's testimony is summarized as follows:

---

[9] The only non-party witness that Plaintiffs called was Kristen Creson.

[10] The Court observes that during the Recovery Period, Michael Pierce, Sr., worked for only a few months in Nashville and primarily worked at the Crossing.

[11] The Court observes that Danny Chappell only worked for a few months at the Glade (April 2013 to September 2013) and worked primarily at the Crossing during the Recovery Period.

Cheij was hired in the Spring of 2011 and worked as a Front-Line Sales Representative for a few months and then became an In-House Sales Representative. [Doc. 376 at 59]. She testified that the jobs were similar but as an In-House Sales Representative, she sold to people who already owned timeshares. [*Id.* at 64]. Cheij testified that she was told she was not permitted to be on the clock for over forty hours. [*Id.* at 61-62]. Cheij stated that it was her In-House Sales Managers, Eric Florek and Twila Higgins, told her not to clock in for more than forty hours a week. [*Id.* at 63-65]. Cheij continued that Florek made it very clear that sales representatives were not allowed to be "clocked in" for over forty hours but "not that we weren't to work over 40 hours." [*Id.* at 63]. She was told there was no overtime policy. [*Id.* at 62]. She testified sales representatives were verbally reprimanded if they went over forty hours. [*Id.* at 82]. Cheij testified to a number of ways that Wyndham implemented this policy. For example, she was required to reflect lunch breaks on her timecard, despite not taking a lunch break. [*Id.* at 65]. She was also instructed by her managers if she was getting to close to 40 hours, to clock out and not to clock in during certain times or events, such as in between tours, dinner parties, or nightline. [*Id.* at 69-85]. She was told by Florek that she was required to stay at work, on the property, even if clocked out. [*Id.* at 83]. Cheij explained that in between tours, she performed other responsibilities, such as referrals, checking on other customers, answering e-mails, or waiting for the next tour. [*Id.* at 85]. She further testified that her work hours were reduced by her managers on the computer and that she was required to complete Punch Forms when her managers changed her hours. [*Id.* at 80]. With respect the Punch Forms and timecards, Cheij testified that they do not accurately reflect her actual hours at work and that she did not recognize her signature on a few of the Punch Forms and timecards. [*Id.* at 99-100; Ex. 1905]. In addition, she stated that her managers brought her blank Punch Forms for her to sign. [*Id.* at 91-92]. Cheij testified that she was not aware that she was

entitled to overtime pay that could not be recouped.  [*Id.* at 80].  Further, she testified that her timecards do not accurately reflect her hours.  [*Id.* at 91].

Cheij testified that she conducted "tours," which simply means a sales presentation.  A tour could last several hours.  Cheij continued that after she completed a tour, the customer would either purchase or decline to purchase.  [*Id.* at 72].  If the person wanted to purchase, she would write-up the proposal.  [*Id.*].  The contracts department would then type the real estate contract, which could take a while because there was a significant amount of paperwork.  [*Id.* at 72-73].  In addition, the sales representative had to wait his/her turn for the contract to be printed.  [*Id.* at 73].  After the contract was printed, the sales representative waited on the quality assurance department.  [*Id.*].  The quality assurance department actually conducted the real estate closing and facilitated the signing of all the paperwork.  [*Id.*].  The quality assurance officer and the sales representative discussed background information and the reasons why the customers decided to purchase.  [*Id.*].  The customers then met with the quality assurance officer and the sales representative to sign all the closing documents.  [*Id.* at 73-74].  Once all the paperwork was signed, the sales representative provided copies to the customers and walked them to their vehicle.  [*Id.* at 74].

Cheij testified that she was required to stay through the closing in case the customer had any questions.  The time it took to close a contract varied from two hours to four or five hours.  She stated that it depended on how many other sales were occurring, meaning that the contracts department or quality assurance department were really busy.  She stated that each day was different, but on average, she had about four tours per day.  She testified that she closed contracts while not clocked in.  [*Id.* at 110, Ex. 3236].  In one example, Cheij closed five contracts, despite her timecard reflecting that she was not clocked in the entire day.  [Ex. 3236].

Cheij testified that she also participated in dinner parties, which were simply sales presentations that occur over dinner. [*Id.* at 84]. Sometimes she would not clock in for dinner parties. [*Id.*]. Cheij testified that her managers, Florek or Higgins, instructed her to not clock in and that dinner parties lasted approximately four hours. [*Id.* at 83-84].

Further, Cheij testified that she also participated in nightlines. Nightlines occur when sales representatives were assigned a tour when a guest checked in to the resort. Nightlines generally began at 4:00 p.m., and concluded when guests stopped arriving at the resort, approximately 9:00 p.m. or 10:00 p.m. Cheij worked nightlines about one or two times per week.

Cheij also participated in party weekends. Cheij explained that party weekends were special promotions where Wyndham invited people to stay at the resort for free in exchange for attending a sales presentation. [*Id.* at 67]. Cheij explained that these occurred one or two times per month. [*Id.*].

Cheij testified that she worked between five to six days per week both as a Front-Line Sales Representative and as an In-House Sales Representative. [*Id.* at 69]. She testified that she had one day off but often she came in on her days off as well. [*Id.* at 70]. For example, Cheij explained that she came in on her day off if a sales presentation from the previous day was continued, but if she was close to forty hours she did not record her time. [*Id.*]. She stated that guests were there to enjoy their vacation, so sometimes they had plans and they would return the next day to finish the sales presentation. [*Id.*].

In addition, Cheij testified that she worked from home. [*Id.* at 86-87]. Cheij explained that she received telephone calls and emails from customers with questions or concerns. [*Id.* at 87]. Cheij explained that her managers knew that she worked from home because she discussed her work with them the next day. [*Id.* at 88]. She did not record the time that she spent performing

work at home because it was her understanding that she was not supposed to record that time.  [*Id.* at 88-89].  Cheij stated that she averaged about fifty-five hours per week but that average did not include the time that she performed work at home.  [*Id.* at 88].  She further stated that she received about four to five telephone calls each week and that they would last from thirty minutes to an hour.  [*Id.* at 87].  In addition, she spent a couple of hours each week responding to emails.  [*Id.* at 87-88].  It was her understanding that she was not supposed to record the time worked at home.  [*Id.* at 88-89].

Cheij testified that she complained about working off the clock.  [*Id.* at 104].  She scheduled a meeting with human resources, but the meeting never took place.  Instead, she was called to meet with Dennis Moore, the Director of Sales.  [*Id.* at 106].  Jonas Weather, the Director of Quality Assurance, was also in attendance, along with the human resource officer.  [*Id.* at 107-08].  During the meeting, Cheij stated that she was working all these hours and not getting paid for it.  [*Id.* at 107].  She testified that no one responded to her statement.  [*Id.*].  She requested that she be transferred to the quality assurance department, and she was permitted to transfer.  [*Id.* at 108-09].  She stated that when she worked with the quality assurance department, she was paid hourly because she no longer received commissions.  [*Id.* at 109].  Cheij resigned from the company when she moved to Florida.  [*Id.* at 111].

On cross examination, Cheij acknowledged that during her deposition, she could not recall the amount of time she spent working from home and the number of tours she took each day.  [*Id.* at 116].  In addition, she acknowledged that during her deposition, she testified she clocked out to take a lunch break once or twice a week during her employment.  [*Id.* at 117].  Cheij testified that there were numerous times that she was paid overtime.  [*Id.*].  Cheij also acknowledged her signature on several Wyndham documents, including a Salesperson Agreement, Business

Principles, Standards of Performance, Timekeeping and Overtime Policy Acknowledgment, the Employee Policy Handbook Acknowledgment Form. [*Id.* at 124, 133-36, Ex. 3484A, 3494, 3501, 3496, 3497]. Finally, Cheij identified her earnings as reflected on her W2 statements for 2011 and 2012. [*Id.* at 136-37, Ex. 3490].

The Court notes that Cheij's testimony regarding Eric Florek, Twila Higgins, Dennis Moore, and Jonas Weather was not impeached, nor were they called as witnesses by Defendant.

**b.    Glade**

Three Plaintiffs testified that they worked at the Glade during the Recovery Period: Danny Chappell, Jimmy Dixon, and Jeff Cross. The Court has summarized Jeff Cross's testimony above and will not repeat it herein. With respect to Chappell, he worked primarily at the Crossing and only a few months (April 2013 to September 2013) at the Glade. Therefore, the Court will only summarize Dixon's testimony below.[12]

Dixon testified that he initially worked as a Front-Line Sales Representative at the Glade but later became an In-House Sales Representative. Sales representatives were paid an hourly rate and a commission, but the hourly pay was recouped once a sale was made. [Doc. 386 at 10-11]. He stated that overtime pay was also recouped. [*Id.*]. Dixon testified that he was told to manage his hours to ensure that his hours were forty or less during the workweek. [*Id.* at 11-12]. He was never told that he was legally entitled to overtime pay. [*Id.*]. He testified that, to the contrary, during the first few weeks as a sales representative, he accumulated overtime, but the human resource representative and his team manager told him that Wyndham does not pay overtime. [*Id.*

---

[12] The Court observes that the testimony of Danny Chappell, Jimmy Dixon, and Jeff Cross was consistent, especially with respect to not being allowed to record over forty hours despite working more than forty hours and that sales managers altered their timecards to show less than forty hours.

at 12].  He continued that they adjusted his time so that it would not reflect overtime.  [*Id.*].  His Sales Manager was Jeff Hughes and the Human Resource Representative was Camille Combs. [*Id.*].[13]

Dixon continued that as a Front-Line Sales Representative, the last tour began at 2:00 p.m., and that as an In-House Sales Representative, the last tour began at 3:00 p.m.  [*Id.* at 13].  Hughes instructed Dixon to clock out if Dixon was not on tour.  [*Id.*].  Hughes also directed Dixon to clock out but continue working.  [*Id.* at 14].  He testified that neither his timecards, nor his earnings statements, accurately reflected the actual number of hours worked each week at Wyndham.  [*Id.* at 17-18, Ex. 1701, Ex. 1699, Ex. 1703].  He continued that they do not accurately reflect his actual hours because team managers helped monitor the time to make sure sales representatives did not exceed forty hours per week.  [*Id.* at 18].  Team managers instructed sales representatives to clock out and to stay on site while waiting for the next tour.  [*Id.*].

Dixon testified that Punch Forms were given to sales representatives to make adjustments to their timecards.  [*Id.* at 19].  Dixon testified, "For example, if we were supposed to be taking lunch, say from 11:30 to noon and we were on a table running a tour, we would work through that. And then sometimes before the end of the pay period, Combs would bring the documents to our team managers and we would sign the adjustments to keep our time under its appropriate level." [*Id.* at 19-20].  He stated that the adjustments had to be made by Combs or the team manager.  [*Id.* at 20].  The explanation on the Punch Form usually stated, "I forgot," but that was not an accurate explanation.  [*Id.* at 21].  Punch Forms were used to get time under forty hours.  [*Id.*].

Dixon testified that he averaged fifty-five hours per week and that he worked five to seven days per week.  [*Id.* at 22].  Dixon stated that once a sale was closed, he was required to follow-

---

[13] Chappell testified that Jeff Hughes was his manager when he worked at the Glade.  [Doc. 383 at 32].

up with the client by letters, postcards, or telephone calls. [*Id.* at 24]. Sales representatives were required to stay on site during closings and were required to walk the client to his/her car. [*Id.* at 24-25]. Dixon stated that he closed contracts while he was not clocked in. [*Id.* at 25, Ex. 3236].

Dixon testified that he participated in nightlines, which was when a sales representative was assigned a guest when the guest checked in. [*Id.* at 26]. He testified that nightlines began at 4:00 p.m., or 5:00 p.m., and he participated in nightlines about three times per month. [*Id.* at 26-27]. He also participated in dinner parties two or three times a month. [*Id.* at 28]. During a dinner party, he met his clients for dinner at one of the restaurants on-site and then the next morning, he met them for breakfast and a sales presentation. [*Id.* at 27]. In addition, he participated in road shows, wherein he traveled over the Midwest and the North. [*Id.* at 28]. He participated in road shows during the second week in December but came back for Christmas. [*Id.*]. He left again after the first of the year and traveled until mid-January. [*Id.*]. He did not clock in for nightline or for dinner parties. [*Id.* at 28-29]. With respect to road shows, there were manual timesheets, but everyone recorded the same time because the manager controlled the timesheet. [*Id.* at 29]. He continued that the sales representatives recorded the same time and that at the end of the trip, it was presented to the sales representatives for their signature. [*Id.*]. The timecards, however, were not accurate. [*Id.*].

Dixon continued that there was an off-season from mid- December to mid-January but that it did not affect his hours because he participated in roadshows. [*Id.* at 30]. He further testified that he worked from home, sending follow-up letters or cards and making telephone calls. [*Id.* at 31-32]. He stated that it was not uncommon to perform work from home and that he on average, he spent thirteen hours performing work from home. [*Id.* at 32-33]. The hours worked from home were not included in the fifty-five hours per week that he testified to above. [*Id.* at 33]. Dixon

was ultimately terminated when he drank after a dinner party and did not pass a breathalyzer that his site manager administered to him. [*Id.* at 33-35].

On cross examination, Dixon stated that he did not keep a journal of his hours. [*Id.* at 44]. In addition, he stated that he could not recall the minimum number of hours that he worked in a week. [*Id.* at 45]. He testified that several of his earnings statements reflected overtime, ranging from 15 minutes to 5.25 hours. [*Id.* at 45-54, Ex. 1699]. He continued that he may have received that overtime pay in a pay period but that if he made a sale, it was later recovered. [*Id.* at 49]. He testified that he signed the following documents: Salesperson Agreement (Non-California); Wyndham Vacation Ownership Employee Policy Handbook Acknowledgement Form; Business Principles Acknowledgement Form; Wyndham Vacation Ownership Timekeeping and Overtime Policy Acknowledgment; Wyndham Vacation Ownership Standards of Performing Agreement, Sales Representative; and Notices of Corrective Action. [*Id.* at 54-56, Ex. 3598A-H]. Finally, he testified that the Notices of Corrective Action relate to his failure to meet the minimum standards for Wyndham's volume per guest requirements. [*Id.* at 59].

The Court observes that Defendants did not call either Jeff Hughes or Camille Combs as witnesses to rebut any of Dixon's testimony.

### c.  Lodge

There were three Plaintiffs who stated that they worked exclusively at the Lodge during the Recovery Period: Lee Johnson, Tony Siler, and Angela Woods. Johnson worked as an In-House Sales Representative; Siler worked as a Front-Line Sales Representative; and Woods worked as a Front-Line Sales Representative.[14] Siler is still employed by Wyndham. [Doc. 377 at 37].

---

[14] The Court observes that Woods's employment with Wyndham was brief and that she only worked from May 2013 to July 2013.

Siler testified that in 2009, employees began clocking in and out and that Wyndham started paying its employees minimum wage and commissions but that Wyndham recovered the minimum wage. [Doc. 377 at 39-40]. He stated that he was told not to get overtime because it was something they would have to pay back. [*Id.* at 40-41]. All three Plaintiffs testified that they were not allowed to reflect over forty hours on their timecards, despite working more than forty hours each week. [Docs. 377 at 41; 378 at 125; 383 at 13]. Siler testified that all three of his managers, Jackie Wallace, David Bill and Bryce Berkompas, stated that no one could clock in for more than forty hours and that Wallace was "paranoid" about overtime. [Doc. 377 at 51-52]. In addition, all three Plaintiffs testified that they were not made aware that they were entitled to overtime for hours worked over forty. [Docs. 377 at 39-40; 378 at 128; 383 at 15]. Woods testified that her manager, Connie McGlothin, told her to clock out in between tours and to clock in while on a tour. [Doc. 383 at 12]. Woods stated that while she was clocked out, she shadowed other sales representatives or trained on the computer. [*Id.*]. Siler testified that sometimes managers instructed him to clock out while he was still talking to customers and that it was like a code, "Hey, get a lunch break in." [Doc. 377 at 52].

In addition, all three Plaintiffs testified that they signed Punch Forms. Woods testified that she does not believe the adjustments on the Punch Forms were accurate because her manager, Connie McGlothin, used the Punch Forms to adjust her time to under forty hours. [Doc. 383 at 13]. She also stated that she never initiated such changes. [*Id.*]. Johnson testified that he never initiated the changes on the Punch Forms and that most of the time, his managers wrote the explanation and that he just initialed. [Doc. 378 at 135-36]. He stated that the Punch Forms were usually signed on Wednesdays or Thursdays because time had to be approved on Thursday before the deadline. [*Id.* at 138]. Johnson continued that he signed Punch Forms that were blank. [*Id.*].

Siler also testified that he signed blank Punch Forms. [Doc. 377 at 55]. He explained that he never provided an explanation for the changes and that his managers always wrote the explanation for him. [*Id.*]; *see also* [Ex. 1993E].

Johnson testified that his time detail [Ex. 1837] does not accurately reflect the number of hours that he worked and that he worked much more than what was reflected in the time detail and that there were significant gaps in the time detail. [Doc. 378 at 134]. For example, he explained that he rarely worked five hours per day and that there are many days on his time detail that reflect only five hours per day. [*Id.*]. With respect to the changes made on his timecards, Johnson testified that many of the initials or signatures were not his. [*Id.* at 139-41, Ex. 2149A-C]. He also testified that he closed contracts on days that his time detail reflected zero hours. [*Id.* at 143-51, Ex. 1836A-F].

Siler testified that the hours reflected on his earnings statements [Ex. 497] do not represent the hours that he actually worked. [Doc. 377 at 56-58]. He testified that, for example, it was simple math that a sales representative could not work six days in the summer and only reflect seventeen hours per week. [*Id.* at 58]. He stated that he may have worked twenty hours per week in January and February but not in the other months. [*Id.* at 59]. He explained that in January and February, there were not as many tours, unless it was a holiday, such as Martin Luther King, Jr., Day or Valentine's Day. [*Id.*]. He stated that a number of the signatures and/or initials on the Punch Forms were not his. [*Id.* at 64-69, Ex. 1993A-H].[15] He also testified that he closed contracts when he was not on the clock. [*Id.* at 108]; *see also* [Ex. 3236].

Woods testified that neither the time detail, nor her earnings statements, reflected the hours that she worked. [Doc. 383 at 17-19, Ex. 1827, 1825]. She explained that she did not want to

---

[15] Siler testified that the initials on Exhibit 1993G were his but not the signature. [Doc. 377 at 68].

complain about not recording all her hours because she did not want to lose her job and that she was unsure if anyone else had complained. [Doc. 383 at 19]. She stated that she did not want to be the only person who complained. [*Id.*].

With respect to the average number of hours worked, Woods testified that she worked at least fifty hours or more each week, Johnson testified that he worked at least sixty hours per week, and Siler testified that he worked on average, fifty to sixty hours per week. [Docs. 377 at 59; 378 at 130, 383 at 16]. Siler continued that in January and February, his average was probably twenty to thirty hours per week, unless it was a holiday weekend. [Doc. 377 at 59]. He stated that his pay checks would have been correct in January and February. [*Id.* at 83].

Siler testified that sales representatives participated in a morning meeting, which typically started at 8:00 a.m. [Doc. 377 at 43]. Siler testified that tours came in waves: 8:30 a.m., 10:30 a.m., and 3:00 p.m. [*Id.* at 43-46]. He stated that tours typically lasted two hours, unless the customer agreed to purchase. [*Id.* at 46]. He continued that it may take a significant amount of time to close a contract, depending on whether the contracts department was busy. [*Id.* at 48]. After the contract was typed, the customer met with the quality assurance department, which took about thirty to fifty minutes. [*Id.*]. Siler testified that he stayed on the property during the closing in case the customer had a question and that he walked his customers out. [*Id.* at 50]. He stated that the average time to close a contract was about an hour and fifteen minutes. [*Id.* at 48]. Siler testified that he was scheduled five days a week but that in October and on holidays, he typically worked "six ones," meaning six days of work and one day off. [*Id.* at 51]. He also stated that if a sales representative received a sale from the previous day, he/she was expected to work the following day, even if it was his/her day off. [*Id.*].[16]

---

[16] As previously noted, *see infra* note 8, a "hero tour" means that the sales representative was the first to receive a tour because he/she made a sale the previous day.

Johnson and Siler both testified that they participated in party weekends, in which owners were invited to a complimentary stay and the sales representatives took the owners out to dinner and to entertainment, and the following day, the owners attended a sales presentation. [Docs. 377 at 42, 378 at 130-31]. Johnson testified that he also worked nightlines. [Doc. 378 at 131]. Johnson explained that nightlines were to contact guests who had just checked in. [*Id.*]. In addition, Siler testified that he worked off premises returning e-mails and telephone calls from clients. [Doc. 377 at 81].

On cross examination, Woods acknowledged that she received overtime for ten hours on one paycheck. [Doc. 383 at 20, Ex. 1825]. She testified that she was not familiar with nightline and did not participate in nightline. [*Id.* at 20-21]. She stated that there were days in which she did not have a tour. [*Id.* at 21]. She stated that fewer sales representatives where there in the evening than in the daytime hours. [*Id.*]. In addition, she testified that she could not recall the fewest hours that she worked in a week, nor could she testify to the largest number of hours that she worked in a week. [*Id.* at 21-22]. She did not keep a written record of the hours she worked. [*Id.* at 22]. She further testified that she did not make any commissions because she never made a sale during her employment. [*Id.*]. She stated that because she did not make a sale, she was assigned tours in the afternoon. [*Id.*].

On cross examination, Johnson testified that there were times he did not clock in in the mornings and that his clock in times were the same, but the lunches and the clock out times were fictitious. [Doc. 378 at 152-53]. He testified that Wyndham wanted its top performer to work nightlines. [*Id.* at 155]. In addition, he acknowledged that during his deposition, he testified that the slow season began in mid-December as opposed to January. [*Id.* at 155-56].

On cross examination, Siler testified that he complained to his manager one time about the timekeeping policy but that his manager stated, "It is what it is. We work for commissions." [Doc. 377 at 84-85]. He continued that no one wanted to "make a big stink about it." [*Id.*]. He stated that he worked on average about twenty to thirty hours in January and February and fifty to sixty hours per week in the other months. [*Id.* at 95]. He stated that if he did travel, it would have been in January and February and he added two days off to his already scheduled two days off. [*Id.*]. He assumed his recorded time in January and February was accurate. [*Id.* at 96-99]. He also stated that he took lunches in January and February but did not lunch breaks during the other months. [*Id.* at 100]. He does not have a personal record of his hours. [*Id.* at 102].

All three Plaintiffs testified that they signed a number of Wyndham's forms, including the Salesperson Agreement, Employee Handbook, and Acknowledgment of Time Keeping and Overtime Policy. [Ex. 4263, 4245, 4253, 4250, 4254, 4255, 4257, 4258, 3811A-E, 441, 443, 448, 4438, 4439]. Finally, they all acknowledged their earnings as indicated on their W2 Statements. [Ex. 4266, 3817, 4448].

The Court observes that Defendants did not call Jackie Wallace, David Bill, or Bryce Berkompas to rebut the above testimony.

### d.    Crossing

There were four Plaintiffs who stated that they worked exclusively at the Crossing during the Recovery Period: Brenda Davis, David Nelon, James Shannon Abbott, and Bobby Stallings.[17] The Court will also include Michael Pierce, Sr.'s testimony and Danny Chappell's testimony in this section because, as explained above, they spent a majority of time during the Recovery Period at the Crossing.

---

[17] Nelon's testimony is summarized above, and the Court will not repeat it here.

During the Recovery Period, Chappell worked as an In-House Sales Representative, Bobby Stallings worked as a Discovery Sales Representative, Brenda Davis worked as an In-House Sales Representative, Shannon Abbott worked as an In-House Sales Representative, and Michael Pierce, Sr., worked as a Front-Line Sales Representative.[18] [Docs. 383 at 30; 389 at 10, 43; 384 at 50; 392 at 214, 218]. Abbott currently works for Wyndham in California. [Doc. 384 at 49].

All five Plaintiffs testified that their managers told them that they could not reflect more than forty hours on their timecard. [Docs. 389 at 10, 50; 384 at 61; 392 at 245; 383 at 34]. Specifically, Chappell testified that if he was close to forty hours, his manager directed to him clock out or if he was busy, his manager would clock out for him. [Doc. 383 at 35]. His manager directed him to sign a Punch Form, and if he did not sign it, he would not be assigned a tour. [Id. at 35-36]. Stallings testified that his manager, Rosemary Meyers, instructed the sales representatives to clock out for lunch and stay clocked out during the next tour. [Doc. 389 at 11]. This happened a few times per week. [Id.]. Davis testified that her first manager, Cory Burkhartt, told his team that he had "repeat offenders" and that he was tired of having to doctor sales representatives' time. [Id. at 50]. Burkhartt reminded the sales representatives not to be clocked in for over forty hours. [Id.]. Davis stated that she had similar conversations with all of her managers. [Id.]. For example, Davis testified that another manager, Susan Middleton, specifically told her (Davis) to clock out while she was working and that Middleton would interrupt Davis during presentations and direct her to clock out. [Id. at 51]. Davis continued that she would excuse herself and go clock out and then continue the presentation. [Id.]. Middleton warned that if sales representatives' hours were not under forty, they would be reprimanded, meaning that they would

---

[18] Michael Pierce, Sr., testified that he worked as an In-House Sales Representative at the Crossing toward the end of his employment in approximately July 2014. [Doc. 392 at 241].

not receive a tour. [*Id*. at 52-53]. Davis stated that she began setting an alarm on her telephone to remind herself to clock out. [*Id*. at 52].

Abbott explained that in 2008, sales representatives were not required to clock in and out but in February 2009, Wyndham used time clocks. [Doc. 384 at 70]. He continued that his managers, including Kyle Smith, John Geissberger, Susan Middleton, Russ Cooper, Stefanos Kambanellos, and Lisa Jarvis, all made it clear that sales representatives could not reflect over forty hours on their timecard. [*Id*. at 71]. He was instructed to clock out but continue working. [*Id*. at 72]. He stated that his managers explained that timekeeping was just a nuisance for legal purposes and that sales representatives were paid by taking a client. [*Id*. at 74]. Finally, Pierce, Sr., testified that all of his managers instructed him not to clock in for more than forty hours and that he clocked out while he was on tours. [Doc. 392 at 245-246].

Chappell testified that his managers told him not to worry about clocking out that they would take care of that for him. [Doc. 383 at 40]. He explained that if he was going to be at Wyndham for ten hours, managers clocked him out after lunch. [*Id*. at 36]. He continued that it was standard operating procedure for managers to enter time and that managers walked around with three ring binders that contained Punch Forms. [*Id*. at 41]. Chappell stated his manager, Susan Middleton, presented Punch Forms in the morning before tours and that if sales representatives did not sign them, they would not receive a tour. [*Id*. at 35-36] He further stated that David Nelon presented Punch Forms on Wednesdays or Thursdays and that sales representatives signed them all at one time. [*Id*. at 47]. In addition, Chappell testified that sometimes he did not even sign the Punch Forms and his managers signed them for him. [Id. at 41]. He stated that he did not typically take a lunch break and that managers would also clock him

out for lunch breaks that he did not take.  [*Id*. at 45].  He testified that he also signed blank Punch Forms.  [*Id*. at 46].

Davis testified that it was her responsibility to ensure she did not record more than forty hours and that if she forgot, she was called out in meetings and was required to complete and sign a form.  [Doc. 389 at 54-55].  She testified that Wyndham required her timecards to show a lunch break, despite not taking a lunch break.  [*Id*. at 70].  She explained that she could count on one hand how many lunch breaks she took during her employment and that when her stomach growled, she clocked out.  [*Id*.].

Stallings testified that he talked to his manager, Rosemary Meyers, about his hours, but that she never wanted his timecards to show more than forty hours, which meant that he had to clock out early many times.  [Doc. 389 at 18].  His manager directed him to not clock back in after lunch.  [*Id*.].  He also explained that Meyers brought him blank forms to sign.  [*Id*.].  He was not sure what the forms were actually called and stated that Meyers did not share the information on the forms.  [*Id*. at 18-19].

Abbott testified that his managers made sure that he did not reflect over forty hours on his timecard.  [Doc. 384 at 71].  He stated that he was told to clock out when he was not on tour, although he was not allowed to leave the building in case a tour was scheduled.  [*Id*. at 73].  He stated that people were constantly checking in, so sales representative needed to be there.  [*Id*.].

Pierce, Sr., testified that he was given Punch Forms for a couple of weeks at a time to sign.  [Doc. 392 at 270].  He testified that his managers frequently changed his time.  [*Id*.].  He stated that they would add lunch breaks that he did not take.  [*Id*.]  In addition, he testified that the explanations provided on the Punch Forms were not accurate.  [*Id*. at 271].  He continued that he

signed blank and inaccurate Punch Forms because if he refused, he would not be given a tour. [*Id.* at 279].

Further, Chappell testified that Wyndham never told him that overtime could not be recouped. [Doc. 383 at 37]. Davis stated that she did not receive any training on the overtime policy. [Doc. 389 at 47-48]. Stallings testified that he was not aware that he could receive overtime pay for hours worked over forty. [Doc. 389 at 17]. Abbott stated that he was never told that he had been reclassified as an hourly employee. [Doc. 384 at 72]. Pierce, Sr., testified that he was never told that he was a non-exempt hourly employee. [Doc. 392 at 244].

All five Plaintiffs testified that the time on their time detail and/or timecards was not accurate. [Docs. 389 at 22-23, 55; 384 at 75; 392 at 287; 383 at 44-45] For instance, Chappell testified that according to his time detail, he averaged twenty-seven hours per week, which he referred to as "ludicrous." [Doc. 383 at 44, Ex. 1902]. He stated that it also showed two to three hours per day, which is a joke because working two to three hours per day was not feasible. [*Id.* at 44-45, Ex. 1902]. In addition, Chappell testified that he knew his timecards were changed because when time had been changed in WynTime, a small box appeared where the time was changed. [*Id.* at 46]. He stated that only managers had access to WynTime. [*Id.*, Ex. 1902]. He testified that a number of signatures and/or initials were not his on his timecards. [*Id.* at 48, Ex. 1902]. He also testified to a number of days that he was not clocked in but closed on a contract. [*Id.* at 56, Ex. 3236].

Stallings testified that his time detail was not accurate because it showed such few hours and that he worked more than what was reflected. [Doc. 389 at 22-23, Ex. 412]. For example, he stated that October, or "Rocktober," was the busiest time of the year, but the hours from October 9, 2012, to October 23, 2012, do not look right at all. [*Id.* at 23-24]. He further testified that he

would not have clocked in at 9:59 a.m., 10:01 a.m., or 9:57 a.m., because the morning meetings were mandatory. [*Id.* at 24-25, Ex. 412]. Stallings further stated that as a Discovery Sales Representative, his primary goal was to close contracts and that he recalled closing contracts while he was not clocked in. [*Id.* at 28, Ex. 3236].

Davis testified that her time detail did not accurately reflect the hours she worked. [Doc. 389 at 56-57, Ex. 365]. She explained that she never clocked out at 12:00 p.m., 1:00 p.m., or even 5:00 p.m. [*Id.* at 56, Ex. 365]. She stated that she worked beyond those hours and that she did not take two days off a week. [*Id.* at 56-57, Ex. 365]. In addition, she testified that the hours on her earnings statements were not accurate. [*Id.* at 59, Ex. 113]. She further stated that some of the signatures on the timecards were not her signatures. [*Id.* at 72-73, Ex. 1912]. She continued that she absolutely worked more hours than the average number of hours reflected on her pay stubs, which was 25.609. [*Id.* at 76, Ex. 3245]. She stated that her managers fixed her time on the computer and that it was no secret that time was altered. [*Id.*]. Davis testified that she told John Geissberger that she would work for Wyndham for a year. [*Id.* at 45]. She stated that she stayed for the year that she promised but that she could not take it any longer because the hours were horrendous. [*Id.*]. Finally, she testified that she closed contracts while not on the clock. [*Id.* at 83, Ex. 3236].

Abbott testified that the time reflected on his timecards was not even close and that his timecards show exceptionally low hours. [Doc. 384 at 75]. He stated that his timecards and Punch Forms show a consistent forgery of his signatures and initials and that the timekeeping was completely off. [*Id.* at 86]. He estimated that over sixty documents had been forged. [*Id.*, Ex. 1881B, 1881D-AA]. In addition, he testified that there were numerous timecards/Punch Forms that were not signed or initialed by anyone. [*Id.* at 94, Ex. 1881C]. One of his timecards showed

that he worked two hours the entire week, and Abbott stated that it occurred in July, which is the busiest travel month of the year. [*Id*. at 96, Ex. 1881D]. Another timecard in April showed 3.25 hours for the entire week, and he stated that because it was Easter week, he would have been very busy. [*Id.* at 99, Ex. 1881I]. In addition, he stated that it took him an hour to drive to work so that he would not have worked 1.5 hours per day as shown on the May 1, 2011 timecard. [*Id.* at 100, Ex. 1881J]. He further testified that every year, he left on December 31 for Florida and that he stayed there for two months until February. [*Id.* at 102]. He stated that his timecards during that period, which reflected that he worked, could not be accurate because he was in Florida when they were signed. [*Id.* at 102-103, Ex. 1881L, 1881M, 1881Q, 1881S, 1881U].[19] Abbott testified that there were times when sales representatives were scheduled to work six-ones and that he would also work on his day off. [*Id.* at 77, 144]. He stated that in June 2012, John Geissberger sent an email canceling all existing vacation and placed the sales representatives on six-ones through September 2012. [*Id.* at 76]. He further explained that October was referred to as "Rocktober" and that during this month, he worked every day about twelve to fourteen hours. [*Id.* at 78]. He later explained that if a sales representative received a hero tour, he/she would come in the following day to take the hero tour even if it was the sales representatives' day off. [*Id.* at 139-140].

Pierce, Sr., also testified that his time detail were not correct. [Doc. 392 at 286-288, Ex. 392-A, 1488-B]. He explained that some of the signatures on his timecards were not his signatures.

---

[19] With respect to Exhibit 1881Q, the top portion of the timecard states that he worked 12 p.m. to 4 p.m., each day for four days for a total of 16 hours. On the bottom portion of the timecard, it states that he worked a total of 36 hours. Abbott stated the inconsistency resulted when managers made adjustments after the cut-off period to do so. [Doc. 384 at 112-13].

[*Id.* at 274].[20]  For example, he testified that during March 25, 2011, through March 31, 2011, he would not have clocked out at 1:00 p.m., every day, nor would he have worked for three hours over a five-day time span.  [*Id.* at 275-75].  He continued that with respect to his timecard dated April 29, 2011, to May 5, 2011, he signed it at the bottom but did not write, "+6," in the middle of the timecard.  [*Id.* at 275].  He continued that this was probably an instance where he complained about the "numerous times on [his] time clocks" and that the next day he would be called into the human resource office to discuss this issue with Kristen.  [*Id.* at 275].  Kristen told Pierce, Sr., "You're not going to be paid for anything over forty hours."  [*Id.* at 275].  She then made whatever adjustments she needed, and Pierce, Sr., was called to the vice president's office or Dave Labelle talked to Pierce, Sr.  [*Id.* at 275].  LaBelle told Pierce, Sr., that he needed "to carry on."  [*Id.* at 276].  When asked about the hours reflected in a June earnings statement, Pierce, Sr., stated that he would have absolutely worked more than the hours reflected.  [*Id.* at 278, Ex. 20C].  He continued that he was required to sign blank or inaccurate Punch Forms and that if he refused, he would not receive a tour.  [*Id.* at 279].  Pierce, Sr., testified that the hours on his timecards and earnings statements were not correct.  [*Id.* at 277-303, Ex. 20C, 1488F-1488BB].  In addition, the hours on his earnings statements did not match the hours on his timecard.  [*Id.* at 282-83; 285-286, Ex. 20E; Ex. 20A, 1488K].  Further, his hours on his time detail did not match his timecard.  [*Id.* at 287-88].  He explained that his timecard reflected nine hours on October 29 but that his time detail reflected zero hours for the same.  [*Id.* at 286-87].  He explained that the small boxes on most of his timecards meant that the timecards had been edited.  [*Id.* at 289].  He testified that he closed contracts while he was not clocked in.  [*Id.* at 305; Ex. 3236].

---

[20] The Court observes that several of his timecards were generated when Pierce, Sr., worked in Nashville.  *See* [Ex. 1488-B].

Pierce, Sr., also testified to receiving an email dated June 27, 2013, from Bryce Berkompas, stating as follows:

> Hello Everyone,
>
> To everyone on this list that is hourly, you are currently working an amount of hours that will not let you carry any benefits.
>
> The magic number is 30 hours per week to carry and maintain benefits. Some of you are averaging 27 hours and other are averaging 8 hours per week. If you want to know what your average is please respond back to just me on this email, not everyone so I can let you know.
>
> This is all about time management!! It is absolutely imperative that you pay more attention to your time clock.
>
> If you have any questions please let me know.

[Doc. 393 at 11, Ex. 925]. Pierce, Sr., testified that he learned that Terry McGlothin had cancer and had to come back to work. [*Id.* at 12]. He continued that the sales representatives were averaging twenty-seven hours or less and that the email was to let them know that the magic number to carry any benefits was thirty hours. [*Id.*]. During this time, Berkompas was the Director of Sales for Front-Lines Sales Representatives. [*Id.* at 13]. Pierce, Sr., testified that he wanted to confirm his own hours because he was talking to surgeons about having back surgery during the off-season. [*Id.* at 15]. Pierce, Sr., sent an email to Carla Ogle asking for his average number of hours, but Ogle did not respond. [*Id.* at 15-16]. Pierce, Sr., discussed his concerns with Tammie Smith, who was with human resources. [*Id.* at 16-17]. He was later called to a meeting with human resources; Berkompas; and Kyle Smith, the Vice President. [*Id.* at 18]. The human resource representative inquired as to who directed him to work while not clocked in and Pierce, Sr., stated every manager, including Berkompas, which Berkompas denied. [*Id.*]. The human resource representative accused Pierce Sr., of breaking the law. [*Id.* at 19]. Subsequently, Dave

LaBelle visited the site and told Pierce, Sr., "Listen, you don't want to get involved in any of this. You don't want to get involved in a lawsuit." [*Id.* at 22-23]. LaBelle stated that with respect to Pierce, Sr.'s surgery, the vice president had the ability to overwrite the thirty hours. [*Id.* at 23].

All five Plaintiffs testified to the average number of hours that they worked. Chappell testified that he worked approximately 65 hours per week. [Doc. 383 at 39]. Stallings testified that he worked at least 61 hours per week.[21] [Doc. 389 at 19-20]. Davis testified that she worked approximately 60 to 70 hours per week. [*Id.* at 59]. Abbott estimated that he worked 65 to 70 hours per week. [Doc. 384 at 125]. Pierce, Sr., testified that he averaged about 60 hours per week and that his co-workers worked the same amount of hours. [Doc. 392 at 246-48]. In addition, he spent 10 to 15 hours performing work away from the site. [*Id.* at 263].

Stallings and Davis testified that the mandatory sales meeting began at 8:00 a.m. [Docs. 389 at 14; 60]. Davis testified that a sales representative was put on overage if he/she missed the mandatory meeting. [*Id.* at 61]. Davis stated that after the meeting, the tours started. [*Id.*]. Chappell testified that sales representatives were not allowed to leave the property in case a tour came up. [Doc. 383 at 40]. Stallings testified that in between tours, he made telephone calls and completed paperwork. [Doc. 389 at 16]. Davis stated that if she was not with a client, she made follow-up telephone calls and that most sales representatives worked throughout the day. [*Id.* at 66]. Abbott testified that he conducted tours in the morning and continuances in the afternoon. [Doc. 384 at 128]. He stated that they were not allowed to leave the property in between tours. [*Id.* at 73]. Abbott stated that Wyndham had what was called a power line for tours, meaning sales representatives were assigned tours based on his/her production. [*Id.* at 126]. This process started

---

[21] Stallings testified that he averaged at least fifty-five hours per week but that his average did not include the work that he did from home, which was about six hours each week. [Doc. 389 at 19-20].

at 8:00 a.m., and then the line was cut every day at approximately 2:00 p.m., which was the check-in period for VIPs. [*Id.*]. At that point, Wyndham shifted into the nightline process. [*Id.*]. Nightline was not official until 4:00 p.m., but Wyndham wanted someone to take a tour as soon as guests checked in. [*Id.*]. Stallings and Davis testified that sales representatives were required to stay throughout the closing of a contract. [Doc. 389 at 15, 77-78]. Pierce, Sr., testified that with respect to Discovery Sales Representatives, they were required to stay until after the closing in case the deal was canceled so that they could attempt to sell a discovery package. [Doc. 392 at 255-256].

Chappell, Abbott, and Davis testified that they participated in nightlines. [Docs. 389 at 89; 384 at 130; 383 at 39]. Abbott stated that the official nightline process was from 4:00 to 7:00 p.m., but that he consistently took tours up until 10:00 p.m., to 11:00 p.m. [Doc. 384 at 130]. Chappell, Davis, Abbott, and Pierce, Sr., also testified that they participated in dinner parties or party weekends. [Docs. 384 at 132; 389 at 71; 392 at 249-250; Doc. 383 at 39]. All five Plaintiffs testified that they worked from home. [Docs. 392 at 260-261; 389 at 20, 66; 384 at 125; 383 at 39].

Abbott and Pierce, Sr., testified to a number of changes after the lawsuit was filed. [Docs. 393 at 24; 384 at 142]. For instance, they testified that sales representatives began using podium presentations instead of visiting units. [Docs. 393 at 60; 384 at 142]. This led to more group presentations. [Docs. 384 at 143; 393 at 60-61]. They also testified that Wyndham prohibited six-ones. [Docs. 393 at 175; 384 at 144]. Sales representatives were also prohibited from providing customers with their cell phone numbers. [Docs. 393 at 175-176; 384 at 144]. Abbott also testified that Wyndham, for the most part, stopped nightline and that when Wyndham had nightline, it was only one or two times a week. [Doc. 384 at 142-43].

On cross examination, Chappell testified that he was paid some overtime during the time he worked for Wyndham. [Doc. 383 at 59]. He also testified that he had no firsthand knowledge of how other locations operated other than the Crossing and the Glade. [*Id.* at 67]. Stallings testified that January and February were considered the slower season. [Doc. 389 at 34]. He also testified that he did not have any knowledge of the other sites' operations in Tennessee and that he did not pay attention to when other sales representatives clocked in. [*Id.* at 37]. In addition, Stallings testified that he always clocked in about 8:00 a.m. [*Id.* at 31]. He further testified that he took a leave of absence from December 21, 2010, to February 28, 2011, for his open heart surgery. [*Id.* at 35]. He stated that Front-Line Sales Representatives brought him tours and not In-House Sales Representatives. [*Id.* at 37].

Davis testified on cross examination that not all sales representatives participated in nightline or dinner parties and that a sales representative had to have a high volume per guest before they could participate in nightline or dinner parties. [*Id.* at 89-90]. Further, Pierce, Sr., testified that eleven of his earnings statements reflected hours above forty. [*Id.* at 43-46, Ex. 5055A]. Each Plaintiff identified their earnings as reflected on their W-2 statements. [Ex. 3349, 3563, 4300, 4487, 5059]. Finally, Plaintiffs testified that they signed a number of Wyndham's forms, including the Salesperson Agreement, Employee Handbook, and Acknowledgment of Time Keeping and Overtime Policy. [Ex. 3443A-H, 4295A-E, 4481A-E, 4481H, 4326, 3553, 3561, 3560, 5053A-I].

The Court observes that Defendants did not call Rosemary Meyers, Corey Burkhartt, Susan Middleton, John Geissberger, Stefanos Kambellos, Lisa Jarvis, Dave LaBelle, Bryce Berkompas to rebut the above testimony.

### e.    Crossing and Lodge

As mentioned above, there were a number of Plaintiffs who testified that they worked at both the Crossing and the Lodge during the Recovery Period: Craig Thrift, who worked as an In-House Sales Representative;[22] Rebecca Slone, who worked as an In-House Sales Representative; James Dodson, who worked as an In-House Sales Representative;[23] Claudia Bogardus, who worked as a RCI Sales Representative;[24] Belinda Drew, who worked as an In-House Sales Representative and as a Front-Line Sales Representative; Perry MaGee, who worked as an In-House Sales Representative; Kisa Abbott, who worked as an In-House Sales Representative; Brett Williamson, who worked as an In-House Sales Representative; Bryan Tesh, who worked as an In-House Sales Representative and as a Front-Line Sales Representative; Thomas Garrett, who worked as an In-House Sales Representative; Russell Cooper, who worked as an In-House Sales Representative and as an In-House Sales Manager; James Campbell, who worked as a Front-Line Sales Representative and as an In-House Sales Representative; and Jesse Pierce,  who worked as an In-House Sales Representative.[25]

---

[22] The Court observes that Thrift spent a majority of the time during the Recovery Period at the Lodge and only spent a few months at the Crossing.

[23] The Court observes that Dodson began his employment in May 2013, just a few months before the Recovery Period ended.

[24] The Court understands that RCI is part of the in-house sales department.  RCI Sales Representatives sell to guests that are not members, but they are guests of existing Wyndham owners.  [Doc. 378 at 174].

[25] The Court observes that Pierce spent a majority of time during the Recovery Period at the Crossing and only spent a few months at the Lodge.

Abbott, Tesh, and Garrett testified that in January 2009, Wyndham began using time clocks. [Docs. 383 at 81; 389 at 113; 392 at 44-45].[26] Pierce explained that in early 2009, Wyndham began providing a minimum wage advance and that the compensation was 100% commissions. [Doc. 393 at 193-94]. Abbott explained that when Wyndham introduced time clocks, Brad Berkompas, the Vice President of Operations, conducted a staff meeting and explained that if the sales representatives were clocked in for thirty-two hours, they had to talk with their managers so that the sales representative could be monitored. [Doc. 383 at 81].[27] Tesh testified that when the time clocks were introduced, Wyndham had two different policies: one policy on paper (which was over a prior lawsuit) and the other policy was not to reflect more than forty hours. [Doc. 389 at 115].

All Plaintiffs testified that their managers stated that they were not allowed to record more than forty hours on their timecards, despite working more than forty hours. Specifically, Slone testified that her manager, David Fowler, stated that she was going to get Fowler fired if she kept showing more than forty hours on her timecard. [Doc. 376 at 176]. She testified that another manager, Susan Middleton, also told her that her timecard could not reflect more than forty hours. [Id. at 175-76]. Bogardus was told by her supervisor, Daryl Kracker, that she needed to reduce her hours because she recorded too much. [Doc. 378 at 168]. Bogardus began tracking her hours and sending them to Kracker and that when she recorded her hours, they were "above 50, 60 hours, but they weren't the 60 hours every week. Sometimes it was 60, 65, 60, 65. It was well over 45 hours." [Id. at 168-69]. She testified that Lisa Jarvis and Kracker told her that Wyndham did not

---

[26] Garrett testified that Wyndham began using time clocks in January or February 2009. [Doc. 392 at 44-45].

[27] The Court believes his actual name is Bryce Berkompas, not Brad Berkompas.

pay overtime. [*Id.* at 177]. She met with Lisa Jarvis, who was with human resources, and eventually John Geissberger, about her overtime hours, but she was never paid. [*Id.* at 177-84].

Abbott testified that she was encouraged to record minimum hours so that she was not working on borrowed money. [Doc. 383 at 84]. She stated that her manager, Stefanos Kambanellos, made her "stay low on the clock" and reminded her that the more hours recorded, the more money she had to pay back. [*Id.* at 88]. Williamson testified that his manager, David Fowler, told him to watch his timecard and testified that his other manager, Susan Middleton, was a "WynTime Nazi." [Doc. 386 at 81-83]. Garrett testified that his manager, Bernie Reid, instructed him to not report more than forty hours. [Doc. 392 at 46]. Cooper testified that as a sales representative, he was instructed to clock out but continue working. [Doc. 393 at 99]. He testified that when he was a sales manager, he does not recall instructing sales representatives to not record over forty hours. [*Id.*]. He continued that he knew some Plaintiffs testified to that fact and that he cannot dispute their testimony. [*Id.*]. Campbell testified that John Geissberger told the entire staff not to show forty hours on their timecards and that he made this statement frequently. [Doc. 392 at 161]. Pierce testified that he accidentally clocked in over forty hours and that he had a meeting with Jim Acee, Bryce Berkompas, and Jerry Prosise and was "ripped a new one" for reporting over forty hours. [Doc. 393 at 113-14].

All Plaintiffs testified that their managers adjusted their timecards. Tesh stated that when David Nelon was promoted as a manager, he (Nelon) asked Tesh to help him edit timecards. [Doc. 389 at 118]. He testified that Nelon liked selling and not sitting behind a computer. [*Id.*]. Tesh stated that it began with Nelon, but then every manager provided him his/her credentials to access WynTime. [*Id.* at 126]. He testified that he even edited Nelon's timecard and that John Geissberger knew that Tesh edited timecards because they discussed it. [*Id.*]. He continued that

53

he edited his own hours in WynTime at the direction of his colleagues and that he honestly did not realize that his actions were wrong. [*Id.* at 125]. He explained, "We weren't being paid on that is what I was being told. It was being taken back, so it didn't matter." [*Id.*]. He stated that it started with Nelon, but then he began editing time for Dale Heil, Dallas Smith, Carla Ogle, Devon Brown, and some for Stefanos Kambanellos and David Fowler. [*Id.* at 128]. He edited time at the Crossing and the Lodge and later explained, "[T]here wasn't a manager that didn't do it. To work there, you did it." [*Id.* at 137, 140, 142]. He stated that he saw Susan Middleton edit timecards, and that he also edited timecards for Chuck Fine and Larry Whaley, who were senior managers of in-house sales. [*Id.* at 142-43]. He explained that he had the managers' logins. [*Id.* at 132]. He was also given emails from senior managers, such as Dottie Justice and Lisa Jarvis. [*Id.* at 132-33]. Dottie Justice was the head of human resources in the southeast region. [*Id.* at 133]. Lisa Jarvis was a senior manager of the in-house department. [*Id.*].

Tesh testified that in WynTime, managers had access to all the sales representatives' time on site and that managers helped each other by reminding one another that a sales representative needed a break or that a sales representative was approaching forty hours. [*Id.* at 130-31]. Tesh testified that he altered time daily. [*Id.* at 144]. He explained that when he made edits in WynTime, it showed that an edit was made on that specific time. [*Id.* at 145]. With respect to how he changed time, he stated that he changed the end time, he added a break, or made someone not there that day. He continued that he was also required to input the reason for the change in the computer and that the standard reason, about 99% of the time, was "missing punch." [*Id.*]. He testified that there was a written form that had to match the change that was made on the computer. [*Id.* at 145-46]. He handed this form to the sales representatives, and the sales representatives initialed and signed the WynTime computer-generated form, and managers signed it at the bottom. [*Id.* at 146].

He continued that often the managers would sign blank forms and that it was his job to make sure everyone filled it in. [*Id.*]. He printed the payroll from WynTime for the individual that week and attached the payroll to the Punch Form, which he then provided to the manager so that the manager could place the forms in a binder. [*Id.*]. Tesh continued that 90 percent of the time, the edits he made in WynTime were to reduce hours. [*Id.* at 147].

Tesh testified that had a certain style to making edits. He stated that management told him that he needed to make edits look legitimate. [*Id.* at 149-50]. He stated that for instance, many of the edits on Exhibit 1870A were perfect entries of clock in times of 8:00 a.m., and clock out times of 1:00 p.m., and clock back in times at 1:30 p.m., which were not realistic. [*Id.*]. He stated that he did not make the edits on Exhibit 1870A. [*Id.*].

Cooper testified that when he was an In-House Sales Manager, he adjusted timecards upon the instruction of Lisa Jarvis and John Geissberger. [Doc. 392 at 100]. They told him to make sure that no one was clocked in for more than forty hours and to make sure everyone had a break during the day. [*Id.* at 102].

All Plaintiffs testified that the hours on their timecards and/or time detail and/or earnings statements were not accurate and that many of the signatures and/or initials on the Punch Forms were forgeries. Specifically, Plaintiffs testified that the following timecards and/or time detail and/or earnings statements were not accurate and that many of the signatures and/or initials on the Punch Forms were forgeries:

- Craig Thrift: Exhibits 1491A-M; 1491P-S

- Rebecca Slone: Exhibit 1605

- James Dodson: Exhibit 47

- Claudia Bogardus: Exhibits 420, 2014, 2014B-D, 619[28]

- Belinda Drew: Exhibits 1501, 1919A, 1919B, 1500

- Perry MaGee: Exhibits 384, 1825, 2069

- Kisa Abbott: Exhibits 1882, 1882A-I, 280

- Brett Williamson: Exhibits 214, 512, 1871A-O

- Bryan Tesh: Exhibits 1870B-D

- Thomas Garrett: Exhibits 1627A-G, 155

- Russell Cooper: Exhibits 406, 595, 1907A, 560A

- James Campbell: Exhibits 363, 83, 1857

- Jesse Pierce: Exhibits 1482, 1482A-J, 19A-G

Thrift testified that once it became readily apparent that he would be working a minimum of sixty hours each week, his manager, Andy Payne, began taking care of his time. [Doc. 377 at 161]. Thrift stated that he never clocked himself in or out after the middle of September 2011. [*Id.*]. Pierce testified that his manager, Dale Heil, clocked him in and out. [Doc. 393 at 119]. Pierce gave Heil his ID number and Pierce observed Heil clocking him (Pierce) in and out. [*Id.*]. In addition, all Plaintiffs, except Tesh, testified that they closed contracts while they were not clocked in. *See* [Ex. 3236].[29]

---

[28] Bogardus testified that she signed blank Punch Forms. The Court observes that both Bogardus's and her manager's signatures on the Punch Forms dated April 13, 2013, April 14, 2013, April 15, 2013, April 18, 2013, April 21, 2013, April 23, 2013, April 24, 201[3], April 28, 2013, April 29, 2013, April 30, 2013, May 5, 2013, and May 13, 2013, are unusually identical. For instance, when comparing all twelve Punch Forms, all the signatures are located at the exact place on the signature lines.

[29] The Court observes that although Tesh did not specifically testify that he closed contracts while he was not clocked in, Plaintiffs submitted an "Off-the-Clock Study" [Ex. 3236], which shows that he closed approximately four contracts when his timecard reflected zero hours on the days that the contracts were closed.

With respect to the average number of hours worked during a workweek, the Plaintiffs testified as follows:

- Craig Thrift:  65 hours

- Rebecca Slone: 60 hours

- James Dodson: 60 to 65 hours

- Claudia Bogardus: 60 to 65 hours

- Belinda Drew: 65 hours (as an In-House and Front-Line Sales Representative)

- Perry MaGee: 72-74 hours[30]

- Kisa Abbott:  65 hours

- Brett Williamson: 60 plus hours

- Bryan Tesh: 65 hours to upper 80s

- Thomas Garrett: 60 to 70 hours

- Russell Cooper: 76 to 87 hours[31]

- James Campbell:  70 hours

- Jesse Pierce: 80 hours[32]

All Plaintiffs, except Drew, testified that they worked six days per week, which was commonly referred to as "six-ones," and that sometimes they would work seven days per week.

---

[30] MaGee testified that he averaged 65 hours per week but that average did not include the 7 to 9 hours that he worked from home each week.  [Doc. 384 at 286-88].

[31] Cooper testified that he worked on average 70 to 75 hours per week but that average did not include the 6 to 12 hours that he worked off premises.  [Doc. 392 at 108, 113].

[32] Pierce testified that his "extremely conservative" estimate was 65 hours plus but that did not include the 15 hours per week of off-site work.  [Doc. 393 at 124, 127].

Specifically, Pierce identified an email, dated June 7, 2012, written by John Geissberger that was forwarded to him from Andy Payne, stating as follows:

> All,
>
> Effective immediately, all vacation time that has been submitted or is currently requested off through 9/30/12 has been **cancelled.** All reps and managers will work 6-1 till the end of 9/30/12, no time off will [be] allowed till then.
>
> If you have any questions or concerns, please let me know.

[Doc. 393 at 145-46, Ex. 1144].

All Plaintiffs, except Thrift and Campbell, testified that they worked nightlines. *See* [Doc. 417-1]. All Plaintiffs, except Slone, Tesh, and Williamson, testified to performing work after leaving the premises, such as answering emails and/or telephone calls. *See* [*Id.*]. All Plaintiffs, except Bogardus, testified that it was very rare to take an uninterrupted lunch break. Specifically, several Plaintiffs, including Dodson, Drew, Abbott, Williamson, Garrett, and Cooper, testified that they did not take a lunch, although they were directed to show a lunch break on their timecards. Further, Dodson, Garrett, Pierce, Slone, Tesh, and Williamson testified that they attended party weekends and/or dinner parties. *See* [Doc. 417-1].

Finally, Pierce, Garrett, Tesh, and Dodson stated that after the lawsuit was filed, Wyndham implemented certain changes. For example, Pierce stated that nightline was eliminated, and Tesh stated that Wyndham cutback on nightlines. [Docs. 389 at 176-77; 393 at 175]. Pierce, Garrett, and Dodson testified that Wyndham prohibited sales representatives from giving their cell phone numbers to clients. [Docs. 392 at 71; 393 at 175-76]. In addition, Pierce, Garrett, Tesh, and Dodson stated that Wyndham began conducting sales presentations in large groups ("podium presentations") instead of visiting individual units. [Docs. 389 at 175-76; 392 at 70; 393 at 174-75]. Further, Pierce and Garrett stated that "six-ones" was eliminated. [Docs. 392 at 70, 393 at

175].  Finally, Pierce stated that the net operating income decreased and that he heard Matt Chodak and Kyle Smith discuss that the net operating income had decreased after the above changes.  [Doc. 393. at 176-77].

On cross examination, Thrift testified that only one sales representative had to be present during closing, but the back ender could not leave the property.  [Doc. 376 at 26].  He testified that there are less tours than there are sales representatives and that the people at the bottom of the line would not get a tour, which "generally speaking" are the representatives who are not very good sales people.  [*Id.* at 31].  In addition, Thrift testified that Mike Pierce was an exception to the normal salesperson's schedule because he would take about two days off a week and would miss about one day of work every two weeks.  [*Id.* at 29].  Thrift stated that he may have testified in his deposition that another sales representative, Tiffany Nelon, took two or three weeks of vacation every year.  [*Id.* at 29-30].

Thrift stated that he received overtime for the period ending October 25, 2012, in the amount of .5 hours.  [*Id.* at 39].  He further testified that his earnings statement for November 8, 2012, showed that he was paid $3.45 in overtime.  [*Id.* at 41].  When asked whether he received overtime for the period ending August 15, 2013, he testified that he did not work a single day that week because he was suspended in July 2013 and never returned to work.  [*Id.* at 42-43].  He stated that it appeared someone was clocking him in when he was not there because at that time, he was either suspended or terminated.   [*Id.*].

On cross examination, Drew testified that she recognized her signature on a Leave of Absence form, stating that she took a leave of absence from January 13, 2012, to February 11, 2012.  [Doc. 384 at 234-35, Ex. 3641B].  She testified that she was not gone for that amount of time. [*Id*. at 236].   She acknowledged, however, that her earning statements showed that she

received short-term disability for the period ending January 26, 2012, through February 16, 2012. [*Id.* at 236-39, Ex. 1500]. She continued that she did not recall taking a leave of absence in July and August 2012, but identified her name on a document stating that she took a leave of absence from July 10, 2012, to August 20, 2012. [*Id.* at 239-40, Ex. 3641C]. She further testified that no one ever clocked her in or out and that Wyndham was pretty serious about not allowing others to clock a sales representative in or out. [*Id.* at 243].

In addition, on cross examination, Drew testified that she worked one dinner party and that she could not recall if she was paid for her time working the dinner party. [*Id.* at 243-44]. She identified a Punch Form, showing time from 6:00 p.m. to 9:00 p.m., for a dinner party, [*Id.* at 245, Ex. 1919], wherein time was added to her timecard; however, she testified that the signature on the timecard was not hers. [*Id.* at 245-46]. Drew did not recall testifying at her deposition that no one instructed her to clock out for lunch and continue working but admitted that is what she testified to during her deposition. [*Id.* at 250].

On cross examination, Williamson testified that he did not know the maximum, nor the minimum, number of hours that he worked in a week. [Doc. 386 at 148]. Williamson acknowledged that during his deposition, he stated that he played the role as a discovery sales representative when he/she was busy and that it was the weakest job in the company and that he did it for laughter. [*Id.* at 138]. He testified that he played the discovery representative role unofficially when he surveyed customers or took gifts to them but that he did not sell guests a discovery package. [*Id.* at 139]. In addition, Williamson testified that depending on the person, a Front-Line Sales Representative's job was not as hard as an In-House Sales Representatives' job because upgrading an owner is more difficult than selling to a new owner. [*Id.* at 139-40]. He

also stated in his deposition that both Front-Line Sales Representatives and In-House Sales Representatives had the same amount of tours each day. [*Id.* at 140-42].

On cross examination, Cooper testified that he supervised Randy Bonnette and Sean Jeter and that they did record some overtime. [Doc. 392 at 123-126, Ex. 4536A, 4894A]. Cooper stated that he was not sure how sales representatives operated and how tours were ran at the other locations (Glade and Nashville). [Doc. 392 at 126]. Cooper stated that on rare occasions, he left at 4:00 p.m. to 5:00 p.m., and that he did not know how many hours other employees worked. [*Id.* at 131-32]. He testified that when he gave his estimate of 70 to 75 hours during direct examination, he did not include the time worked away from Wyndham. [*Id.* at 133]. He acknowledged that he testified differently during his deposition and that in his deposition, he stated his 70 to 75 hour estimate included all work performed for Wyndham. [*Id.* at 133-34]. He also acknowledged that in his deposition, he testified that he never told anyone to clock out and continue working so that the timecards would not show more than forty hours. [*Id.* at 135]. Cooper also identified an email written by Lisa Jarvis, wherein Jarvis lists a number of topics that were discussed in a meeting with the managers held on February 13, 2013. [*Id.* at 136-37, Ex. 3524]. In the email, Jarvis states that one of the topics at the meeting was to make "sure sales representatives are clocked in when working at all times." [*Id.* at 137, Ex. 3524]. He further acknowledged that he testified in his deposition that there were some sales representatives who did not care when they arrived to work or if they arrived at all. [*Id.* at 192].

On cross examination, Tesh testified he did not work from September 24, 2013, to November 4, 2013, for knee surgery. [Doc. 389 at 193]. In addition, Tesh testified that he was denied FMLA leave for his wife's illness but that Bryce Berkompas, the head of the In-House

Sales Representatives, told him to take whatever time he needed, which was in January 2014. [*Id.* at 193-94].

Further, on cross examination, the following Plaintiffs stated that they did not make a complaint to the Department of Labor, human resources, or by calling the hotline: Thrift, Garrett, and Campbell. [Docs. 376 at 9-10; 392 at 198; 393 at 84]. Pierce explained that he did not complain in 2010 to human resources or to the Department of Labor, or call the hotline to complain about the timekeeping policies. [Doc. 393 at 191-92]. Pierce stated that he complained to John Geissberger about not qualifying for benefits. [*Id.* at 192]. Further, Thrift, Williamson, and Tesh testified that they did not keep a diary, log, or journal of the hours that they worked. [Docs. 377 at 16-17; 389 at 194; 386 at 148].

MaGee and Dodson acknowledged a few times that they were paid overtime. [Ex. 1825, 147]. Further, several Plaintiffs testified that January and February were the slow season, including Thrift, Dodson, MaGee, Williamson, Cooper, and Campbell. [Docs. 376 at 22-23; 378 at 116-17; 386 at 137; 384 at 319; 393 at 199; 393 at 131]. Williamson testified that in January, February, and March, he worked the least amount of hours compared to other months. [Doc. 386 at 137]. Campbell stated that there were more tours in May through December than January through April. [Doc. 392 at 199].

In addition, Dodson, Bogardus, and Campbell testified the number of tours varied. [Docs. 378 at 114-15; 384 at 35, Doc. 392 at 199-200]. Campbell stated that the number of tours varied depending on the season. [Doc. 392 at 199-200]. Dodson testified that there were days where he had one tour. [Doc. 392 at 115]. Bogardus, Drew, and MaGee testified that there were days that they and/or other sales representatives did not have any tours. [Doc. 384 at 36, 248, 319]. In

addition, Drew testified that the time spent with customers varied, and MaGee testified to the same, comparing it to the time lawyers spend on different cases. [Docs. 384 at 246-47; 384 at 323].

Further, Drew testified that hours varied and that she was not aware of how many hours other sales representatives worked. [Doc. 384 at 246, 254-55]. Campbell acknowledged that he did not have firsthand knowledge about the operations or tours at the other locations (Nashville and Glade). [Doc. 392 at 198].

Bogardus testified that she was not required to shadow other sales representatives but that she was told it was within her best interest to make sales. [Doc. 384 at 31]. MaGee admitted that in his deposition, he testified that he would be speculating if he tried to guess how much time he spent on calls with customers. [Doc. 384 at 306-07]. In addition, MaGee testified that not all sales representative worked nightline. [*Id.* at 323].

Abbott testified that generally she left between 5:00 p.m., and 8:00 p.m. [Doc. 383 at 133]. Further, she stated that it was very rare that she left at 2:00 p.m., and that the only time that a 2:00 p.m., leaving period would have occurred was in January or February. [*Id.*]. She stated that it is potentially true that she only worked nightlines on the weekends and acknowledged that in her deposition, she testified it was only on the weekends or holidays. [*Id.* at 135-36]. She stated that in the off season, she worked about eight hour days and that she took that into account when determining her average. [*Id.* at 137]. She stated that her duties and responsibilities were different than Front-Lines Sales Representatives. [*Id.* at 139]. She explained that the only differences between them was the type of clients. [*Id.* at 140].

Slone stated that she was given corrective actions for failing to maintain volume per guests but explained that a sales representative could receive these and then turn around and be at the top of the power line. [Ex. 1606]. Bogardus also testified to receiving corrective actions. [Doc. 384

at 32-33, Ex. 3368G-H]. Garrett testified that he was suspended for seven days in January 2011 for creating a disturbance. [Doc. 392 at 88, Ex. 4774J].

Finally, Plaintiffs were able to identify their signatures on a number of Wyndham policies. [Ex 4386A, 4396, 4402, 1606,[33] 3368A-E, 3641A, 3660, 3655, 3894B, 3906, 3905A, 3894C, 5285A, 5309, 5350, 5204A-F,[34] 4774A-I, 3508A-C, 3521, 3518, 3519, 3430A-C, 3416, 3417, 3413, 3414, 3415, 4441A-J]. Several Plaintiffs also testified to their earnings as reflected on their W2 statements. [Ex. 4391, 4275, 3647A, 5291, 5209, 4780, 3514, 4117].

The Court observes that Defendants did not call Bryce Berkompas, David Fowler, Susan Middleton, Daryl Kracker, Lisa Jarvis, John Geissberger, Stefanos Kambanellos, Bernie Reid, Jim Acee, Jerry Prosise, Andy Payne, or Dale Heil to rebut the above testimony. The testimony regarding these individuals was not impeached. The Court further notes that Plaintiffs submitted deposition designations for David Fowler, [Doc. 414-8], and Defendants submitted counter-designations. [Doc. 423-2].

## B.     Defendants' Evidence

Defendants presented the testimony of nine witnesses during the trial in this matter. The Court will summarize their testimony below.

### 1.     Greg Christian

Greg Christian ("Christian") testified that he is still employed at Wyndham and that he has worked for Wyndham for approximately seventeen years. [Doc. 395 at 15]. He testified that he

---

[33] Slone was questioned about these policies on direct examination.

[34] Exhibit 5204E is an email regarding Wyndham's wage and hour policy dated January 27, 2009. [Ex. 389 at 190-91]. The Court notes that on direct examination Tesh testified that the signatures on other Wyndham documents were not his signatures and that they were forgeries. [Doc. 389 at 167-69, Ex. 615B-H].

has worked at various locations during his tenure with Wyndham but that during the Recovery Period, he worked at the Crossing as an In-House Sales Representative.  [*Id.* at 15, 18-19].

Christian testified that the sales meeting began at 7:30 a.m., and that he and Michael Pierce, Sr., were exempt from the sales meetings because they were Legends.  [*Id.* at 24].  Christian testified that he started his tour at 8:00 a.m.  [*Id.*].  He stated that the next tour rounds were at 10:30 a.m., and 1:30 p.m.  [*Id.*].  He testified that a tour that resulted in a sale would take about two to three hours from tour to sale.  [*Id.*].  He testified that he worked five days per week, and sometimes he worked six days a week, if he needed to work or wanted to work.  [*Id.* at 26].  He continued that at the most, he averaged 25 to 30 hours per week.  [*Id.*].

Christian stated that he left work when he was finished with his tours, unless someone asked him to stay.  [*Id.* at 26-27].  In addition, he left for lunch quite often.  [*Id.* at 27].  He explained that he lived ten minutes from the resort so he often had lunch at his house.  [*Id.*].  He stated that Legends have much more freedom.  [*Id.* at 27-28].  He continued that he did not participate in nightline tours or party weekends and that not all sales representatives attended party weekends.  [*Id.* at 30-31].

Christian testified that no one ever instructed him to clock out and continue working and that no one ever told him to misrepresent his time.  [*Id.* at 32].  He testified that he clocked in when he began work and clocked out when he left, for the most part.  [*Id.*].  He explained that there were some times he did not clock in or out because he was not perfect.  [*Id.*].  When he forgot, he completed a Punch Form and signed it.  [*Id.* at 32-33].  He stated that the Punch Form accurately reflected his time.  [*Id.* at 33].

Christian stated that Pierce, Sr., did not work sixty hours per week.  [*Id.*].  He stated that if he or Pierce, Sr., were selling a timeshare, they would be there until 4:00 p.m. or 5:00 p.m.  [*Id.*].

He stated that the day is typically over at 3:00 p.m., to 5:00 p.m. [*Id.* at 33-34]. He testified that January and February were "dead" and that sales representatives went weeks without tours. [*Id.* at 34]. He continued that many sales representatives took their vacations in the winter because nothing was happening. [*Id.* at 34-35]. He testified that he and Pierce, Sr., were both hunters and that they left Wyndham during the winter. [*Id.* at 34]. He stated that the testimony regarding an average of sixty hours per week was fabricated. [*Id.* at 39]. He explained that he was not stating that Jesse Pierce did not work such hours but not everyone else. [*Id.* at 39-40]. He stated that the number of tours on a typical day affected sales representatives' hours. [*Id.* at 46].

With respect to Discovery Sales Representatives, Christian testified that they did not arrive early and that they arrived after the tour rounds. [*Id.* at 47]. He stated that they arrived at 9:00 a.m., and left work around 1:00 p.m., to 3:00 p.m. [*Id.*]. He continued that only one Discovery Sales Representative stayed behind until all the clients were gone. [*Id.*]. Further, Christian identified his time detail and testified that even if he clocked in at certain times, his hours would not be over forty per week. [*Id.* at 48-58, Ex. 6548].

On cross examination, Christian testified that he was good about clocking in and out. [*Id.* at 61]. He testified that a manager never completed a fraudulent Punch Form for him. [*Id.* at 62-63]. He continued that Front-Lines Sale Representatives were required to report to work at 7:30 a.m., for the meeting and that if they missed the meeting, they were placed on overage. [*Id.* at 64-65]. "Overage" means that they were moved to the bottom on the line with respect to receiving a tour. [*Id.* at 65]. He explained that if he came in late, he would miss his tour, which was not good. [*Id.* at 67-68]. He continued that it was rare for him to arrive at work late. [*Id.* at 68]. When asked why he punched in late three times in January 2011, he explained that it was the off-season. [*Id.* at 70]. He continued that he did not work long hours in June or July and that only the mornings

were busy.  [*Id.* at 74].  He stated that he worked mornings all year long.  [*Id.* at 76].  When asked why his time detail reflected that he clocked in at 11:32 a.m., 11:40 a.m., 2:50 p.m., 11:30 a.m., and 10:17 a.m., and then out at 11:55 a.m., he stated that he probably forgot to clock in those times. [*Id.* at 76-78].  When asked why his time detail in June showed that he worked between 1.75 to 4.5 hours for certain days, he stated that the hours do not accurately reflect the actual hours and that "you have to add the morning hours in there.  Like, if I clocked in at 11:00 or whatever time, I'm sure it's there in the morning round.  So you have to add those hours back in."   [*Id.* at 81]. When asked why many of his clock in and out times were on the precise hour (e.g., 11:00 a.m., 12:00 p.m., 1:00 p.m.), he testified, "Because to be that much of a coincidence tells me we had a form we would sign in, and like, if we missed a punch, we'd write it in and write out time out." [*Id.* at 87].

Christian further testified that he does not think managers edited time to insert lunch breaks because that was a fireable offense.  [*Id.* at 98].  In addition, he stated that the quality assurance department usually took thirty minutes to an hour and a half.  [*Id.* at 106].  When asked why there were thirty-three days showing that he produced contracts but was not clocked in during those days, he testified, "I guess I didn't clock in those days."  [*Id.* at 121, Ex. 3250].

## 2.    Jeanie Willis

Jeanie Willis ("Willis") testified that she is currently employed by Wyndham and has worked for Wyndham for over twenty-eight years.  [Doc. 395 at 149].  She stated that her current position is payroll manager and she has worked in that position since before 2011.  [*Id.*].  She works in the cooperate office in Orlando, Florida.  [*Id.*]  She oversees a team of payroll specialists, who process sales representatives' and managers' commissions.  [*Id.*].  During the Recovery

Period, she was the payroll manager, and she supervised payroll for Tennessee sales representatives. [*Id.* at 149-50].

Willis testified that she was familiar with the salesperson agreements that Wyndham enters into with its sales representatives. [*Id.* at 152, Ex. 4649B]. She stated that such agreements provide that commissions are paid in accordance with the "calculating payroll for sales commission employees" document. [*Id.* at 152-53, Ex. 3301]. She explained that all sales representatives were required to record their punches in WynTime and that those (draw) hours were paid at their minimum wage rate. [*Id.* at 153]. Pay periods began on Friday and ended on Thursday. [*Id.*]. Sales representatives' "draw" hours or any "draw" overtime was paid on the following Thursday. [*Id.* at 153-54]. She stated that she was familiar with the company policy to accurately report all time that was worked. [*Id.* at 154].

Willis continued that on an earnings statement, there was an entry called "comm draw reg," which means "commission draw regular," referring to regular draw hours. [*Id.* at 155, Ex. 1687]. The phrase "sales rep inc." means "sales representative incentive." [*Id.* at 155]. This was a monthly bonus that was paid. [*Id.*]. Further, "sales rep comm," means "sales representative commission." [*Id.* at 156]. This was the commission that was paid on a contract. [*Id.*]. She further testified that "LTD imputed inc," means "long term disability imputed income." [*Id.*]. She stated that it was a benefit paid for by Wyndham and that it was placed on the earnings statement as imputed income so that they could be taxed on that amount. [*Id.*].

Willis testified that there could be circumstances where an earnings statement showed hours that actually fell within more than one pay period. [*Id.* at 158]. For instance, she explained that on one earnings statement, [Ex. 1687], it reflected 48 hours, but the earnings statement does not indicate that there was overtime paid. [*Id.* at 157]. She stated that if there was a historical edit

that was made to a prior timecard to correct the prior timecard, those hours would be included in the current cycle hours and that the hours were added together and reflected on the earnings statement when they were paid. [*Id.* at 157-58]. Thus, she explained that if there was a correction that was made to a time for a pay period that had already closed, those hours would appear on a future earnings statement. [*Id.* at 158]. She stated that if an employee worked more than forty hours within any workweek, he/she was paid overtime. [*Id.*].

She testified that she was familiar with Punch Forms. [*Id.*]. She stated that, for example, on one Punch Form, it showed edits for the dates of August 19 through August 23, with an in punch of 8:00 a.m., and an out punch of 3:00 p.m., for each day. [*Id.* at 159, Ex. 4654A]. The explanation for the edit was that "Worldwide ID was not working," meaning an employee's identification number. [*Id.* at 159-60]. She understood this explanation to mean that the time clock did not allow the person to clock in for some reason. [*Id.* at 160]. The Punch Form was used to make corrections to the sales representative's time. [*Id.*]. On another Punch Form, she testified that it showed seven hours were added for five days as historical edits. [*Id.* at 160-61, Ex. 1690]. If the historical edits were not made, the sales representative would not have been paid for those 35 hours. [*Id.* at 161]. In reviewing the earnings statement [Ex. 1687] with the Punch Form, [Ex. 1690], she testified that the sales representative worked 35 hours in one week and 13 hours in another week and that was why his earnings statement showed 48 hours but no overtime. [*Id.* at 161].

Willis testified that if an employee worked more than forty hours in a week, he/she received overtime on the draw payment. [*Id.* at 162]. She explained that with respect to any overtime hours worked in that pay period, Friday through Thursday, the sales representative received time and half at his/her minimum wage rate. [*Id.*]. She stated that on the earnings statement, the "comm

draw OT," or "commission draw overtime," means the overtime on the regular draw payment. [*Id.* at 163]. With respect to paying commissions, sales representatives were keyed to the contract into a selling representatives function and that with each contract, there was a net volume associated with the contract. [*Id.* at 164]. Based upon the sales representative's commission plan that he/she was assigned, she calculated the net volume multiplied by the commission rate and that equaled the commission on the particular contract. [*Id.*].

Willis explained that if a sales representative worked overtime, the system calculated the commission overtime premium, which was the halftime on the commission based on the date of sale and whatever the overtime hours were worked that week. [*Id.*]. She stated that in calculating overtime commissions, the hours that the sales representatives worked that week were taken into account to calculate overtime. [*Id.* at 164-65]. She further explained that the hours that were in WynTime were interfaced to the commission payroll system. [*Id.* at 165]. The commission system stored those hours per pay period. [*Id.*]. When the system calculated the commission overtime premium, it reviewed the date of sale, the hours and the overtime hours that were worked, and then calculated the commission overtime premium. [*Id.*]. WynTime is the Kronos timekeeping system that records all the sales representatives' clock in and clock out punches. [*Id.* at 165]. She continued that once the pay period closes, she extracted the hours from WynTime, which were then sent to the commission payroll system where they were stored so that the commission system can calculate the overtime premium. [*Id.* at 165-66].

Willis stated that sales representatives were paid weekly, every Thursday, and that commissions were usually paid two weeks in arrears according to the payroll calendar. [*Id.* at 166]. She stated, for instance, the pay period was Friday to Thursday, and the following Thursday

was when the sales representative received the commission on his/her check, and the calculation of the commission overtime premium. [*Id.*].

She stated that on a sales commission statement, [Ex. 1638], commission and overtime commission appeared under the "qualified commission" section. [*Id.* at 167]. She explained on this particular sales commission statement, [Ex. 1638], there were two contracts listed. The base rate column showed the commission rate that was paid. [*Id.*]. In addition, the commission column showed the commission that was paid on the contract. She stated that the system calculated the overtime rate and the overtime amount. [*Id.*]. The commission and the overtime amount were added by the system to show the total earnings for each contract. [*Id.*]. The system used the number of hours worked by sales representatives by pay period to calculate the overtime on commissions. [*Id.*]. The sales commission statements were provided to the sales representatives. [*Id.*]. She stated that the "calculating payroll for sales commission employee" document, [Ex. 3301], described how overtime was calculated on commissions. She further testified that "qualified bonus" on the sales commission statements were the contracts that qualified for the monthly bonus. [*Id.* at 169].

Willis testified that each compensation plan had a set of bonus hurdles that sales representatives needed to reach in order to qualify for the monthly bonus. [*Id.*]. Bonus hurdles were certain amounts in volume of sales that had to be reached in order to qualify for bonuses. [*Id.* at 170]. Overtime was also calculated on the bonuses in the same manner as the commissions were calculated. [*Id.*]. The commission system reviewed the contract date for each contract that received a bonus, reviewed the hours that were stored for that workweek, and then reviewed the overtime hours worked. [*Id.*]. The system then calculated the bonus overtime. [*Id.*]. The bonus

overtime was the halftime premium based on the overtime hours worked that week. [*Id.* at 170-71].

Willis continued that on the earnings statement, "comm OT prem" means the "commission overtime premium." [*Id.* at 171-72]. This was the halftime calculated by the commission payroll system for any overtime paid on the commissions or bonuses. [*Id.*]. She stated that sales representatives had access to their earnings statements. [*Id.* at 172].

On cross examination, Willis testified that the contract date was the date that the contract was sold and that the sale date was the full down payment date. [*Id.* at 175]. The contract date was the date that the system used to calculate any overtime that was paid on the commission. [*Id.* at 176]. If Wyndham received the full down payment on the date of the sale, then the dates matched. [*Id.* at 176-77]. If the full down payment came in later or if it was a pender contract (a sale that had been pending some time), the sale date could be a later date than the actual contract date. [*Id.* at 177].

With respect to the director of sales, vice presidents, and regional directors at the four Tennessee locations, they received a base salary, and Willis believed that the net operating income ("NOI") was an incentive. [*Id.* at 179]. NOI was at least one component. [*Id.*]. She continued that the time entries into WynTime could be adjusted until they became final. [*Id.* at 182]. The site administrator and the payroll team in Orlando had access to edit the timecards. [*Id.*]. She explained that access to edit timecards varied by site. [*Id.*]. Once timecards were closed, edits could be made, but they were entered as historical edits. [*Id.* at 182-83]. The payroll team in Orlando could make historical edits, along with the site administrator, based on his/her WynTime access. [*Id.* at 183]. With respect to whether sales managers could make historical edits, she testified, it depended on their access. [*Id.*]. Willis testified that she could not recall the names of

the site administrators at all four Tennessee locations but that she remembered Amanda Hill was the payroll contact for the Smoky Mountains. [*Id.*]. Willis stated that clocking in and out was the extent of a sales representative's access to Wyntime. [*Id.* at 185-86].

Willis explained that the small box on a timecard meant that there was a comment attached to the time. [*Id.* at 189]. The small box does not necessarily mean that the entries were changed. [*Id.*]. She explained that in WynTime with any punch, a comment could be made. [*Id.*]. She continued that if a punch was made, someone could attach a comment to that punch, meaning that it was a missed punch or one of the other various comments that were in WynTime. [*Id.*]. She continued, however, that comments were not required on punches. [*Id.*].

Willis testified that neither she, nor her team, performed an audit or analysis of the Punch Forms or the adjusted time entries to ensure accuracy or compliance with company policies. [*Id.* at 190]. She stated that when the payroll team received a Punch Form, there were usually signatures on it, meaning that someone else had already approved those edits. [*Id.*]. She stated that she was not aware that sales representatives took the position that Wyndham changed their time entries after they were entered to avoid paying overtime. [*Id.* at 190]. She continued that the payroll department processed thousands of documents and that they process such documents using the data that was entered into the system. [*Id.* at 190-91]. She explained that the payroll department assumed the data was accurate because the individuals in the payroll department were not there at the site. [*Id.* at 191]. She stated that she assumed the time records were accurate. [*Id.*]. She testified that the payroll team did not authorize changes to timecards and that they only processed timecards based upon the hours that were recorded. [*Id.* at 204-05]. She further testified that if the payroll team received a request for a change, it requested a Punch Form. [*Id.* at 204-05]. She stated that she did not recall Kristen Creson ever expressing concerns to her or her team

about altering timecards in Nashville and that she had not heard that sales representatives complained that they worked while not clocked in and that management shaved their time entries. [*Id.* at 206-07].

Upon questioning by the Court, Willis testified that she assumed that the hours recorded were accurate but that she did not know if the hours recorded were accurate. [*Id.* at 209-10]. She explained that the payroll team was responsible for paying the hours and that it was not responsible for the shifts that the sales representatives worked. [*Id.* at 212]. Willis also explained that "sales TO" means commission paid on a TO function. [*Id.* at 213]. She continued that when a sales representative was sitting at the table with a customer and was able to finalize a contract, usually a senior sales representatives or a sales manager would take over, and the senior sales representative or the sales manager would receive a commission for that TO function based upon his/her commission plan. [*Id.*]. "Sales TO" were reported on the commission statement. [*Id.* at 214]. She further explained that "management commission" was the sales manager's commission, and the sales manager could get an override on his/her team's sales. [*Id.* at 214].

### 3.      Dale Topping

Dale Topping ("Topping") testified that he is currently employed at Wyndham and that he began his employment with Wyndham in September 2012. [Doc. 397 at 15]. He has worked as a Front-Line Sales Representative throughout his employment with Wyndham. [*Id.* at 16].

Topping testified that he clocked in and out every day. [*Id.* at 17]. He stated that he usually arrived to work at 7:45 a.m., before the meetings. [*Id.*]. He stated that tours came in waves: morning, noon, and afternoon. [*Id.* at 19]. He stated that the number of waves varied and that sometimes there was no afternoon wave. [*Id.* at 20]. He continued that if he did not make a sale, he had no additional responsibilities and turned the customers over to the Discovery Sales

Representatives. [*Id.* at 21]. He stated that the closing process took fifteen minutes to an hour and that he walked his customers out to their car. [*Id.* at 21-22]. Topping testified that he typically worked 30 to 35 hours a week and that he had never worked more than fifty hours a week. [*Id.* at 23].

Topping testified that had sales involving customers that were called "be-backs." [*Id.* at 29]. The term "be-back" refers to a guest who was interested in purchasing and completed many of the preliminary closing documents for the contracts department, but he/she had to come back the day, or "be back" tomorrow to complete the sale. [*Id.*]. He explained that typically the guest had a show to attend. [*Id.* at 29-30]. In a be-back situation, Topping stated that the guest's partially-completed paperwork was pushed off until the end of the day, whenever the contracts department was caught up. [*Id.* at 30]. When the contract was generated, it was not necessary for the buyer to be present. [*Id*. at 30-31] In addition, Topping testified that he was familiar with a situation called "come good." [*Id.* at 32]. He explained that a "come good" means that a guest completed the documents but that the deal would not "come good" until the payment was entered. [*Id.*]. He continued that, for example, if a spouse also wanted to enter the contract, the guest would leave with the documents and the deal would come good when the signed documents returned. [*Id.*]. The contracts department generated a contract at some point but the buyer, nor the sales representative, needed to be physically present at the time the contract was generated. [*Id.* at 33]. Topping explained another scenario called a "mail-out." [*Id.* at 35]. A "mail-out" means that a sales representative spoke with a prospective client and mailed the documents out to the client to complete and send back. [*Id.*]. He stated that with respect to a mail-out transaction, it typically took a week, but it could take longer. [*Id*. at 36]. Finally, he was also familiar with a "blow out,"

which means the client started the closing process but did not proceed with the completed transaction. [*Id*. at 33-34]

Topping testified that with respect to generating a contract while he was not clocked in, it could have been a be-back or blow out situation or a missed punch.[*Id*. at 39, Ex. 6549A].  In addition, he stated that in any event, if time was added with respect to the contracts that were generated while he was not clocked in, he still would not have worked over forty hours for that week. [*Id*. at 43, 48, 52, 56, 60, 64, 66].  He testified that no manager ever said that he could not record all his hours and that he recorded his time.  [*Id*. at 77].  Finally, he testified that he worked five days per week.  [*Id*. at 78]

On cross examination, Topping testified that there were some circumstances in which sales representatives did not have morning meetings.  [*Id*. at 85-86]. He testified that June, July, and October (or "Rocktober") were the highest volume months. [*Id*. at 88].  With respect to his time detail, he testified that he typically initiated Punch Forms and that the time that he provided could have been incorrect because he was not concerned about the exact number.  [*Id*. at 90-94, Ex. 6549].  He further testified that the transaction date is the date that he submitted the contract to be printed.  [*Id.* at 104-105, Ex. 6549A].

### 4.     Eric Mitchem

The Court will briefly summarize the testimony of Eric Mitchem, Ph.D., since his Expert Report, detailing his opinions, was filed as an exhibit.  [Ex. 3336].

Dr. Mitchem testified that when a sample does not reflect the characteristics of a population, then it has error or bias, which simply mean that the information gathered from the sample is not the same as the information that prevails in the entire population.  [Doc. 397 at 134-35].   There are three categories of error or bias that raises concerns: (1) sampling error, meaning

that it is unclear if the sample accurately reflects the population; (2) non-sampling error, which means drawing conclusions about a larger group from a subset that was not constructed using commonly-accepted principles; and (3) measurement error, which means that the measurement is not precise. [*Id.* at 135].

He testified that the way in which Plaintiffs chose the 47 members of their representative sample was not in accordance with standards, statistical and scientific practices. [*Id.* at 138-39]. He explained that the 47 selected sample representative class members were not randomly selected from the larger class of Plaintiffs because the larger class of class members did not have an equal chance of being selected. [*Id.* at 139-40]. If individuals who were once in the sample are no longer in the sample, then selection bias can occur. [*Id.* at 140]. For example, if a class member who was chosen for the sample decides that he/she does not want to testify, there are concerns that the reason he/she does not want to testify is that he/she does not have much to say about off-the-clock hours. [*Id.* at 140-41]. On the other hand, an individual who worked a lot of time and feels that he/she worked many hours off the clock, may want to testify. [*Id.* at 141]. When asked if selecting other individuals to testify as people drop out raises any issues, Dr. Mitchem testified that if they are replaced by random, he would be fairly confident in the result but not if they were chosen for convenience. [*Id.* at 141]. He concluded that he does not have confidence that Plaintiffs' sample reasonably reflects the larger population. [*Id.* at 141-42]. He further concluded that a sample of 18 who testified live or by deposition out of the original 47 members would create a sampling error that is larger. [*Id.* at 147].

Dr. Mitchem testified that after reviewing the data for the number of hours recorded on a weekly basis, it was clear that there was a large amount of variation in work hours. [*Id.* at 154]. He stated that because the number of hours varied so greatly, the conclusion drawn from the sample

could potentially be inaccurate if applied as representative of the entire class. [*Id.* at 154-56]. He continued that sales representatives' hours varied depending on the number of tours, whether they attended a dinner party, whether they made a sale that day or week, and whether they had to call customers. [*Id.* at 155]. He stated that he relied on the hours that the sales representatives recorded. [*Id.* at 156, Ex. 3336]. He testified that given the differences in the number of hours that existed from week to week and from person to person and the differences that exist in the additional hours that were not recorded, a small sample may lead to a conclusion that is not a reasonably accurate portrayal of the larger group. [*Id.* at 158].

Dr. Mitchem testified that if there were a sample of 47 individuals and 46 individual testimonies were the same, the Court would not need to hear from the remaining person if the 47 individuals were chosen at random. [*Id.* at 159]. He testified to the same if the Court had only heard from half of them. [*Id.*]. Dr. Mitchem testified that this is adjusting the size of the sample based on the information learned from the sample, and that at some point, the Court could reasonably and confidently determine that what it has heard from the smaller sample is an accurate reflection of the larger population. [*Id.* at 160]. Dr. Mitchem continued, however, that this is true if the sample that the Court heard from was constructed in an unbiased, scientific way. [*Id.*].

Dr. Mitchem testified that Plaintiffs worked in several different roles, had different duties, the number of hours worked varied, and the potentially number of off-the-clock hours varied by position. [*Id.* at 164]. In addition, Dr. Mitchem stated that the data showed that the recorded hours worked varied substantially from location to location and that the differences between the recorded hours at each of the locations was not likely to have occurred by chance. [*Id.* at 167]. He explained that there was something about each location that affected the number of hours recorded. [*Id.* at 168]. Further, he described the differences in annual earnings and stated that it is reasonable to

conclude that given the very different level of earnings, these individuals were not working the same number of hours. [*Id.* at 170].

Dr. Mitchem stated that it is common to take a sample because measuring the entire population is simply too costly. [*Id.* at 173]. He continued that it is possible to estimate the size of the sample needed in order to draw a reasonably accurate inference about the larger population. [*Id.* at 172-73]. One of the key pieces of information that is needed, however, is how much variation exists in whatever is being measured. [*Id.* at 173-74]. In order to determine variation, a pilot study could be conducted or some other reasonable measurement of the variation could be used. [*Id.* at 174-75]. He further explained that in his report, he used the variation in recorded hours as an estimate for the expected amount of variation in off-the-clock hours that Plaintiffs who were sampled intended to testify. [*Id.* at 175]. He explained that the average number of recorded hours was 24.7 hours and that the standard deviation in the number of hours worked per week was 10.5 hours. [*Id.*]. He testified, "So if we used the recorded hours as an estimate for the likely variation in off-the-clock- time or total work time – 10.5 hours is the estimate of the standard deviation –then we would need to sample, scientifically and randomly, 150 of the original 164 plaintiffs in this case in order to get an estimate from the sample that we could conclude within a two-and-a-half percent margin of error that the average off-the-clock time is consistent with the average off-the-clock time for the entire class." [*Id.* at 176]. He further testified that a less precise estimate, but staying within a margin of error of five percent of the average, would be to use a sample of 119 out of the 164. [*Id.*]. He further explained his findings in paragraph 40 of his report. [*Id.* at 177-84].

On cross examination, Dr. Mitchem acknowledged that some of his findings are based on the time records and the recorded number of hours. [*Id.* at 186]. He stated that his conclusions

drawn from the time records are about the recorded time with the understanding that the issue at hand in this case is how much additional time Plaintiffs did or did not work. [*Id.*]. Dr. Mitchem testified that his conclusion is that in trying to draw an inference about the entire class of Plaintiffs using a subset, the subset does not accurately reflect the larger group. [*Id.* at 201].

The Court questioned Dr. Mitchem as follows: "So if one person enters 20 hours for one group of people and another group of people enter 30, but all of them worked 50, then the people that recorded 20, they worked 30 hours off the clock." [*Id.* at 204]. Dr. Mitchem agreed that was correct. The Court continued, "And the people that recorded 30, they worked 20 hours off the clock." [*Id.*]. Dr. Mitchem agreed that was correct. [*Id.*]. The Court stated, "But at the same time, they all worked 50; so they all worked the same amount of overtime." [*Id.*]. Dr. Mitchem agreed that, under the Court's hypothetical, that was also correct. [*Id.*].

Further, Dr. Mitchem testified that he was not aware that one sales representative may be entitled to fifteen percent of a deal whereas another sales representative may only be entitled to eight percent of the deal. [*Id.* at 207]. He further testified that he had never heard of split commissions. [*Id.*]. He stated that it was reasonable to assume that someone who made ten times as much as another person, who was supposedly similarly situated, worked more hours. [*Id.* at 210]. He further stated that given the variation of the data, and the relatively small size of the class, sampling should not have been used. [*Id.* at 214].

### 5. Elizabeth Matthews

Elizabeth Matthews ("Matthews") testified that she is currently employed by Wyndham and that she has worked for Wyndham for approximately eleven years. [Doc. 397 at 233]. During the Recovery Period, she worked at both the Lodge and the Crossing as an In-House Sales Representative. [*Id.* at 235]

Matthews testified that the work day began with the morning meeting at 8:00 a.m. [*Id*. at 238]. Tours started at 8:30 a.m. [*Id.* at 238]. She stated that sales representatives were allowed to leave in between tours, but she would check with the coordinator to determine where she was on the tour line. [*Id* at 239-240]. She stated that she had lunch, got her hair done, got her nails done, and ate lunch with her children in between tours. [*Id*. at 240]. She stated that other sales representatives left the facility in between tours and that was normal. [*Id*.]. She stated that she took lunch every day. [*Id*.]. She continued that her normal hours were from 8:00 a.m., to 2:00 p.m., or 3:00 p.m. [*Id*. at 241] She testified that she never worked pasted 5:15 p.m., unless it was a holiday weekend because she picked her children up from school. [*Id.*]

Matthews continued that the goal was to schedule a continuance every day, but if sales representatives did not have continuances, Wyndham would cut the line and sales representatives could leave. [*Id.* at 242-243]. She stated that tours could last from five minutes to two hours. [*Id*. at 243]. Matthews testified that she absolutely completed paperwork on one day and closed the contract the next day. [*Id*. at 253-254]

Matthews testified that in January and February, everyone is on vacation and that President's Club also occurred during that time. [*Id.* at 249]. She explained that the only busy times were on Valentine's Day and President's Day. [*Id.*]. She stated that the hours worked at the Crossing were similar to the hours worked at the Lodge, except there were more nightlines at the Crossing. [*Id*. at 256-258]. She stated that nightlines occurred four times a year at the Lodge and approximately eight to nine times at the Crossing. [*Id*. at 258]. She stated that 90% of the time, she worked five days, maybe six days, per week. [*Id*. at 261] She continued that at the Lodge, she worked 27 to 35 hours per week and that at the Crossing, she may have worked more hours. [*Id*. at 262]. She testified that she did not work less than other sales representatives and that she

may have worked harder. [*Id*.]. She continued that Wyndham also held dinner parties, which were special marketing events. [*Id*. at 266]. She stated that the dinner would last approximately an hour and a half and that the sales representative also ate breakfast with the guests. [*Id.*] She stated that sometimes a sales representative attended dinner parties two or three times per month and that sometimes a sales representative would not attend a dinner party for several months. [*Id*. at 266-267]. She explained that attending a dinner party was a privilege and that the top producers or sales representatives with the highest volume per guest were the individuals who attended. [*Id*. at 267].

Matthews continued that there were sales representatives that were difficult to find during the day. [*Id.*]. She explained that "skating" is when a sales representative left without checking out. She stated that Brett Williamson was notorious for skating and that when she called him, he would state that he was in Morristown at his dad's car lot or at the grocery store. [*Id*.] She stated that his nickname was "Heely," referring to the tennis shoes with the wheels because skating meant that a sales representative left early. [*Id*. at 269] She testified that Williamson never worked past 2:00 p.m. [*Id.*] She also testified that Cammie Palmer left without checking out. [*Id*. at 267].

Matthew testified that out of the 316 contracts she closed, 254 contracts were time stamped before 3:30 p.m., and only 26 after 5:00 p.m. [*Id*. at 275-77, Ex. 376A]. She continued that over half of the 26 contracts occurred on a holiday weekend. [*Id*. at 276-277, Ex. 376A]. When asked why she would have clocked out while the contract was being generated, she testified to situations where she turned in the paperwork to the contracts department and left for lunch while the contracts department finished typing the paperwork. [*Id*. at 279-280] She continued that even assuming she closed contracts while not clocked in, the hours worked would not put her in an overtime situation. [*Id*. at 284-87].

Matthews testified that she rarely worked overtime and that no one instructed her to miss punches. [*Id.* at 288-89]. She stated that she was put on overage when she did not clock in and out. [*Id.* at 289]. She explained that if she missed clocking in or out, she reported it to her manager and told her manager the time. [*Id.* at 64]  Her manager provided her a Punch Form, and she initialed and signed the Punch Form. [*Id.*]  She also stated that her manager asked for her time and that the manager logged into the computer system to enter the time that she arrived and left. [*Id.* at 265]  She also signed the box where the time was entered, and she signed the bottom of the computer printout. [*Id.*]  She stated that she was a habitual offender and that John Geissberger gave her corrective actions for having to complete Punch Forms. [*Id.* at 264].

On cross examination, Matthews testified that the morning meeting began at 8:00 a.m., but that Legends or sales representatives who were invited to attend President's Club were not required to attend morning meetings. [*Id.* at 295]. She stated that she attended occasionally but that all others had to attend or they were placed on overage. [*Id.* at 297].  Matthews continued that while sales representatives waited on a tour, they were clocked in. [*Id.* at 299]  She stated that at one point, her manager, David Fowler, stated that sales representatives could not work over forty hours but that he did not state to record less hours and work more. [*Id.* at 319-320].  She explained that if she still had work to do but was approaching forty hours, she continued working and received over forty hours. [*Id.* at 321].

Matthews testified that most closings occur on the same day as the tour. [Doc. 401 at 17]. She explained that the phrase "keeping them in the ether" means trying to close contracts on the same day of the pitch, while the pitch was still fresh. [*Id.* at 17-18].  She testified that it was her practice to allow customers to leave and come back later and that it was not company policy to try to make the customer stay while he/she was in the ether. [*Id.* at 18].  When asked why in October

she clocked in several times after the first wave of tours, she stated that she was not required to be present during the first wave because she was a Legend and that she elected to miss the first round of tours. [*Id*. at 51-52]. When asked why she missed a punch almost every single day for six months, she testified that she was told by her managers that if she completed a Punch Form, it was fine. [*Id.* at 52-53]. When asked about closing a contract while she was not clocked in, Matthews testified her front-ender, Cammie, could have worked that day, ran the tour, and closed the deal without her (Matthews). [*Id*. at 55-57].

Matthews testified that she was familiar with the term, "Rocktober." [*Id*. at 40-41]. She also stated that there was, "Yesvember." [*Id*. at 41]. Matthews described herself as a "workhorse." [*Id*. at 42]. When asked about her time detail reflecting a total of 97.25 hours in October 2010, working 22 days, and thus averaging 4.4 hours per day, she stated that it was correct. [*Id.* at 41-42, Ex. 3262]. When counsel stated that there were 1,109 missed punch entries during the Recovery Period, she stated that she would have no reason to disagree with that number. [*Id*. at 48]. She continued that clocking in and out was not important to her because of the draw and that Wyndham took it back the next week. [*Id*. at 49]. She testified that she believed her recorded hours accurately reflected the hours that she worked at Wyndham. [*Id*. at 63]. Matthews also testified that she was familiar with hero tours, which were tours assigned based on volume and that if a sales representative was assigned a hero tour on his/her scheduled day off, he/she would come in on his/her day off. [*Id*. at 67-68]. She continued that it was not her practice to come in for her hero tour because she was number one on the power line. [*Id*. at 68]. Finally, Matthews could not recall how much she made at Wyndham for 2010-2013. [*Id.* at 46] She stated that in 2012, she made less than $500,000.00 but could not recall the amount. [*Id*. at 47].

### 6.    Greg Minor

Greg Minor ("Minor") testified that he currently works for Wyndham as the Project Director of Sales and Marketing at the Glade.  [Doc. 401 at 101-102].  He explained that his position is the equivalent to the vice president at the other sites.  [*Id.* at 102].  He stated that he began his employment with Wyndham in January 2012 as a Front-Line Sales Representative in Nashville.  [*Id.* at 103].  In September 2012, he became the Front-Line Sales Manager in Nashville.  [*Id.*].  He served in that role for less than a year and then became the In-House Sales Manager until January 2014.  [*Id.* at 105].  He later worked as the senior Sales Manager for Front-Line and In-House Sales Representatives.  [*Id.*].

Minor testified that he received notification of the lawsuit but that he did not join because he believed his recorded hours were fairly accurate. [*Id.* at 104].  He stated that based on his training, he understood that he would receive overtime based on the number of hours that he worked and was clocked in.  [*Id.* at 109-110].

Minor continued that when he worked in Nashville as a sales representative, he normally arrived between 7:45 a.m. and 8:00 a.m., and that other sales representatives arrived at the same time.  [*Id.* at 112].  He stated that he clocked in and then attended the sales meeting.  [*Id.* at 112-113].  After the sales meeting, sales representatives broke up into their teams to meet with their managers.  [*Id.* at 113].  The first tour occurred at approximately 8:30 a.m., and the next tour occurred at approximately 9:30 a.m.  [*Id.*].  Afterwards, the sales representatives reported to their managers whether they were able to schedule a continuance.  [*Id.*].  He continued that at that point, if he did not have a guest coming in for an extended period of time, he would take his break and later clock back in to either run tours or work the back end of other tours.  [*Id.*].  He stated that tours resulting in a sale could last from three to four hours.  [*Id.* at 116].  He explained that he left

work anywhere from 1:00 p.m., to 5:00 p.m., and that it was very rare to leave after 5:00 p.m. [*Id.* at 115-116]. On average, as a sales representative, he worked between 30 to 35 hours per week. [*Id.* at 120]. He stated that some weeks, he worked over forty hours per week and that other weeks, he worked under thirty hours per week. [*Id.* at 120-121]. He testified that no one ever told him to record less than forty hours. [*Id.* at 121]. He stated that he probably did not record all of his hours that he worked. [*Id.*]. He explained that there could be times where he was able to make a deal, but the guests left to eat lunch and they returned just for the closing. [*Id.*]. He continued that he saw them when they were done with their closing and that he walked them out. [*Id.*]. In addition, he recalled a time where he made a deal and the following day, which was his day off, the owner had questions, so he came into the office to talk to the owner. [*Id.*]. He stated that his discussion with the owner was probably less than twenty minutes. [*Id.* at 121-122].

Minor testified that he was never told that sales representatives could not show more than forty hours on their timecard. [*Id.* at 122]. He stated that sales managers were told to run a smart and effective business with the team. [*Id.* at 123]. He explained that, for example, if there was an extremely underperforming sales representative, and he/she still had a day left in the workweek but already had 38 or 39 hours for the workweek, the sales manager gave the underperforming sales representative the next day off. [*Id.* at 123-124].

Minor testified that most closings in Nashville occurred around lunchtime from 11:00 a.m., to 2:00 p.m. [*Id.* at 127]. He stated that closings can take fifteen minutes to over an hour. [*Id.*]. Closings could occur later in the day. [*Id.*]. He explained that clients could have something booked for the day and when they returned, the paperwork would be ready for them. [*Id.* at 128]. The sales representative did not always stay on the property during the time he/she was waiting for the client to come back to close. [*Id.*]. He also testified that it was possible that someone else

handled the closing. [*Id.*]. He explained that there were also occasions where he came back for the closing but forgot to clock in. [*Id.* at 129].

Minor testified that Punch Forms were used for missed punches, when people forgot to clock in, or for off-site events, such as party weekends and dinner parties. [*Id.* at 136]. He explained that with respect to party weekends in Nashville, guests would check-in and the sales representatives met them for dinner. [*Id.*]. The following day, guests attended a Predator's game or visited the Grand Ole Opry. On the third day, guests attended breakfast and a sales presentation with the sales representative. [*Id.*]. He explained that Punch Forms were used for off-site events because there were no time clocks. [*Id.* at 137]. When completing Punch Forms, Minor testified that he received the information with respect to the clock in and out times from the sales representative and that he would challenge the sales representative "if there was something [he] was fuzzy about." [*Id.*]. For instance, he explained that if a sales representative stated that he/she took a lunch break at a specific time, but Minor saw him/her working at that time, he would challenge the sales representative and ask for the correct time. [*Id.* at 138]. He had no knowledge of Punch Forms being used to change a sales representatives' time so that the timecard would show that the sales representative worked less than forty hours. [*Id.*]. He testified that he never used a Punch Form to make it look as though a sales representative worked less than forty hours when he/she had actually worked more than forty hours. [*Id.* at 138-139].

Minor continued that not all sales representatives worked party weekends. [*Id.* at 139]. He also testified that in order to increase transaction retention, Wyndham began taking owners to breakfast. [*Id.* at 140]. He explained that if a sales representative closed a transaction on Monday, the following day, the sales representative would attend breakfast with the owner. [*Id.*]. If it was

a split deal, the sales representative with the better rapport attended the breakfast with the guest. [*Id.* at 141].

He continued that he never clocked anyone in or out and that he did not observe any manager clocking individuals in or out. [*Id.* at 142]. He stated that in Nashville, most sales representatives had fewer than three or four closings per week. [*Id.* at 143]. He stated that he was on the sales floor every day that he worked and that he was able to observe other sales representatives arrive at work and depart from work. [*Id.* at 145]. He testified to the following individuals' average hours of work each week:

- Chad Breece: 25 to 30 hours. Minor stated that they were peers and were sales representatives at the same time. Minor testified that some weeks Breece worked more than the above hours and that some weeks he worked less than the above hours.

- Corey Shoen: 30 to 35 hours. Minor testified that they were both Front-Line Sales Representatives and that when Minor became a manager, Shoen was on Minor's team. Minor continued that Shoen was one of the top performers and that he (Minor) and Shoen worked similar hours.

- Jasyntha Cornwell: 20 to 25 hours. Minor testified that she was a sales representative for a short time and then became a Discovery Sales Representative. He continued that her start time was 10:00 a.m., because she did not talk to guests until their sales presentation was finished. There was no need for her to arrive at work at 8:00 a.m. He continued that she worked from 10:00 a.m., to approximately 2:00 p.m., or 2:30 p.m., because she had to pick up her child.

- James Feener: 30 hours. Minor testified that Feener was a Front-Line Sales Representative for a short period of time but that Feener left the company. Feener had one or maybe one and a half transactions per week.

- Nakia Hatchett: 28 to 30 hours. Minor stated that she was an In-House Sales Representative and that she was really good at the front end of the sales process but not necessarily good at the closing part of the process. Minor stated that Hatchett was excessively busy in the morning and would often times run tour

units for other people. He continued that she spent her mornings hooking and setting tours for other sales representatives and that she was finished by 1:00 p.m.

- Camille Meadows: 25 hours. Minor stated that Meadows was on his team and that she was probably the most difficult to manage from a time standpoint. He explained that she arrived to work at the "skin of her teeth," if not ten or fifteen minutes late on a regular basis. In addition, Minor stated that she was the first one to leave.

- James Meadows: 25 to 30 hours. Minor testified that Meadows was an extremely talented sales representative that could have a deal down in less than an hour. Minor testified that there was an incentive called "write and ride," meaning if a sales representative received a deal, he/she "could ride out for the day," thus leaving whenever he/she wanted. Minor stated that there were numerous times where Meadows went to a unit at 8:30 a.m., and came back with a credit card. Sometimes, Meadows left at 10:00 a.m.

- Randy Navarro: 30 hours per week. Minor stated that Navarro stayed at the bottom of the rotation for the majority of his tenure. Minor continued that there were times that Navarro finished working and he just sat around and listened and observed other tables. Minor testified that this action drove his hours to about 30 per week. Minor continued that Navarro's average hours as indicated on his pay stubs, 29.8541, was very accurate. [Ex. 3245].

- Emily Rasnick: 25 to 28 hours. Minor testified that Rasnick was on a different team but that she was really good at the front end part of the process. He continued that multiple people gave Rasnick their tours, so she was finished by 10:30 a.m., 11:00 a.m.

- Kristen Harrington: 35 to 38 hours. Minor testified that they were on the same sales team and had the same sales manager. He stated that Harrington's parents were timeshare owners of the company, so she had firsthand experience and helped other sales representatives. Minor stated that there were weeks that she may have worked over 40 hours.

- Jerry White: 30 to 35 hours. Minor testified that White was a sales representative on another team. He stated that White came from the car business and that he was used to

exceptionally long hours. Minor continued that White was not effective in the units and that he only received two or three appointments each week. Back enders helped White on his appointments. Minor testified what White hung out on the property all the time, smoking cigarettes and that Minor's average (above) included the time that White was hanging around the property. Minor testified that the average number of hours as reflected on White's pay stubs, 34.4221, was in line with what Minor personally observed. [Ex. 3245].

[*Id.* at 146-54].

On cross examination, Minor testified that every month the sales managers and the marketing department held a site launch meeting or a commitment meeting. [*Id.* at 161]. Minor stated that he attended six meetings out of the twelve meetings each year. [*Id.*]. He stated that overtime was discussed during the meetings as part of the overhead summary. [*Id.* at 162]. He continued that Kristen Creson, Dave LaBelle, and Matt Chodak attended the meetings. [*Id.* at 163]. He stated that he never heard them state that they wanted sales representative to not work overtime. [*Id.*]. Minor testified that there were conversations about time management, meaning that if a sales representative was underperforming, then he/she did not need to come in because the sales representative was not adding value if he/she worked an additional day. [*Id.*]. He stated that he never heard Creson state that she altered entries in WynTime. [*Id.* at 163-164].

As a sales manager, he received regular emails from Creson about once a week or seven to eight times per week. [*Id.* at 171]. Creson's emails provided the weekly total hours for sales representatives, she included information about sales representatives who had recorded zero hours for the week, and she included information about no lunch breaks being recorded. [*Id.* at 172-173]. He stated that he used the information to have conversations with the sales representatives and to ask them why a lunch break was not taken. [*Id.* at 173-174]. In addition, he stated that the purpose of the emails was to determine the hours of the sales representative who had not added

any value that week and to decide whether to bring him/her in for another day.  [*Id.*].  He explained that the emails gave the managers the ability to make business decisions.  [*Id.* at 174].  With respect to sales representative who recorded zero hours for the week, he would determine if the sales representative was on vacation so that he could mark it in WynTime, or whether there was an error with WynTime, or whether the sales representative just forgot to clock in.  [*Id.*].  He stated that he made changes in WynTime for his team if, for example, the sales representative did not clock in in the morning or for party weekend hours, or lunch breaks, and so forth.  [*Id.* at 174-175].  Minor testified that he was never told to doctor timecards and that he never doctored timecards.  [*Id.* at 175].  He testified that he cannot state that other managers did not doctor timecards.  [*Id.*].

Minor continued that his Punch Forms were used to make legitimate changes.  [*Id.* at 165].  In addition, he stated that there were times Punch Forms were used to add hours.  [*Id.* at 166].  Creson brought Punch Forms to the sales managers.  [*Id.* at 177].  He explained that the sales representatives had to sign the Punch Form before changes were made in WynTime.  [*Id.*].

He stated that about 90% of the time, he was able to take a lunch break.  [*Id.* at 167].  He stated that his lunches were about thirty to forty minutes. [*Id.* at 168].  When asked about his time detail that showed twenty-four punch-in times at precisely 7:30 a.m., or 8:00 a.m., and twenty-seven days that showed punch-in and out times precisely on the hour and half hour, Minor testified that he was not sure if that was an inserted punch or a manual punch from the wall clock.  [*Id.* at 180, Ex. 3270].  When asked why his lunch breaks occurred precisely on the hour or half-hour, he explained that he was in training and that a majority of the training was captured by using manual Punch Forms and that the trainees left for lunch at the same time.  [*Id.* at 185-87, Ex. 3270A].  When asked about generating contracts while not clocked in, he explained that once the quality assurance department had the documents, he was finished with the owners because they were with

the quality assurance team. [*Id.* at 200-201]. He continued that the only time he worked after that point was to walk the guest out, which took five to ten minutes. [*Id.* at 201, Ex. 3271]. When asked why he recorded zero hours on days that a contract was generated, he explained that he visited the units but booked the continuances on days that he did not work. [*Id.* at 205, Ex. 3271]. He further testified that with respect to Exhibit 3271, each date on the sale date corresponds with the date on the transaction date with the exception of July 9, 2012. [*Id.* at 209, Ex. 3271]. He stated that the sale date is the date that the contract went through the closing officer. [*Id.* at 209]. Finally, he testified that he received an email dated October 18, 2013, from Matt Chodak about performing random audits of WynTime. [*Id.* at 206, Ex. 3271].

### 7.     Bobby Cummings

Bobby Cummings ("Cummings") testified that he currently works for Wyndham at the Island in Pigeon Forge and that he has worked for Wyndham for thirteen years. [Doc. 401 at 212-13]. Previously, he worked at the Lodge as a Front-Line Sales Manager and as a Discovery Sales Representative. [*Id.* at 213]. As a Discovery Representative, he sold one-time packages and made commissions. [*Id.* at 213-14].

Cummings continued that he typically arrived at work at 10:00 a.m., and that he worked about four to six hours per day on average. [*Id.* at 216]. He stated that he did not perform work before or after he clocked in. [*Id.*]. He stated that if he worked over six hours, he was given a thirty minute lunch break. [*Id.*]. He worked five days per week. [*Id.*]

He stated that the tour waves occurred at 9:00 a.m., or 9:30 a.m., 11:00 a.m., and 2:30 p.m., depending on the site. [*Id.* at 217]. He stated that there were four Discovery Sales Representatives at the Lodge and that whoever sold the previous day was the first to receive a tour. [*Id.* at 218]. He stated that Discovery Sales Representatives did not attend a morning meeting. [*Id.* at 224].

Cummings testified that he did not provide customers with his personal telephone number. [*Id.*]. He testified that he was the last one to leave because his sales pitch happened after the tours. [*Id.* at 226]. He stated that in the discovery sales department, there were certain times of the year that were busier than others, including summer, Rocktober, Christmas, spring break, and holidays. He stated that January and February were slower. [*Id.* at 218]. Cummings testified that the other Discovery Sales Representatives who worked with him did not come in earlier or stay later than him. [*Id.* at 228-29].

He stated that his time detail was consistent with the time that he clocked in and out each day. [*Id.* at 220-21, Ex. 6550]. He stated that as a Discovery Sales Representative, he worked between 20 to 30 hours each week. [*Id.* at 221]. He stated that he was never asked to sign a Punch Form that did not accurately reflect his time. [*Id.* at 22-23]. He stated that he did not work more than forty hours. [*Id.* at 224]. He continued that if a sales representative worked while not clocked in, he/she was written up and terminated. [*Id.* at 225]. He stated that as a Front-Line Sales Manager, he had access to WynTime and that he used Punch Forms to correct time when the time clock did not enter an arrival time. [*Id.* at 230]. He stated that he did not use Punch Forms to misrepresent time. [*Id.* at 231]. He attended Learning Classes, where it was explained that anyone who worked needed to be clocked in and that if an individual worked six hours, he/she had to have a lunch break. [*Id.* at 232]. In addition, the Learnings Classes taught him that if an individual worked from home, he/she needed to record that time and turn it in to be paid. [*Id.*]. He stated that sales representatives did not work at home and that they were lazy. [*Id.*].

Cummings testified that a "mail-out" occurred when a sales representative wrote a deal, but the client did not have the money, so the check was postdated and the deal was typed and signed. [*Id.*]. When it was turned in, then the deal became good. [*Id.*]. This is also called a "come-

good" situation. [*Id.*]. In addition, he testified that the term, "be back" means that a customer leaves and comes back to make a decision on whether to purchase. [*Id.* at 234].

Cummings testified that he never used a Punch Form to misrepresent Dale Topping's time. [*Id.* at 235]. He stated that when he was the Front-Line Sales Manager, he observed the work habits of the Front-Line Sales Representatives and that he was there before they arrived and after they departed. [*Id.* at 236]. He testified that they were not required to perform any work before or after work. [*Id.*]. He never instructed them to clock out and continue working. In addition, he stated that he never instructed Belinda Drew or Roy Neuenschwander to clock out and continue working. [*Id.* at 236-38]. He continued that he never asked a sales representative to remain clocked out while waiting for a tour and that sales representatives were allowed to leave the property if not on tour. [*Id.* at 238]. He continued that he never told Front-Line Sales Representatives to clock out because they were close to forty hours and continue to work and that he never instructed them to stay clocked out after their lunch break. [*Id.* at 238-39]. He was not aware of any other manager who used a Punch Form to misrepresent time. [*Id.* at 239]. He stated that he managed the following individuals and observed that they typically clocked in at 8:00 a.m., worked four to six hours, five days per week: Ruth Blanton, Eric Hayward, Roy Neuenschwander, Jeff Shepard, Carl Patty, and Brandon Ellis.[35] [*Id.* at 239-42].

On cross examination, Cummings explained that as a Discovery Sales Representative, his responsibilities were to pick up any deals or prospects from the Front-Line Sales Representatives and the In-House Sales Representatives, which occurred occasionally. [*Id.* at 244]. He stated that less than one percent of his sales were mail outs. [*Id.* at 251].

---

[35] Cummings testified that Eric Hayward left a little earlier because he had to pick up his child. [Doc. 401 at 240].

Cummings stated that he knew Amanda Hill and that she was another vice president, similar to a secretarial administrator. [*Id.* at 255]. Hill made sure everyone was paid on their deals. She also trained the managers on WynTime. [*Id.* at 256]. He recalled receiving emails from Hill. On one email, Hill told Cummings to change Blanton's time from 2:16 a.m., to 2:16 p.m. [*Id.* at 259-60]. When asked about another email Hill sent to him, he explained that he had a problem child that could not clock in and out correctly. [*Id.* at 265, Ex. 3278]. He continued that this particular sales representative attended party weekends without clocking in and out and that he (Cummings) wrote on the Punch Form, "PW," which means "party weekend." [*Id.* at 265, Ex. 3277]. He testified that Hill sent him emails to let him know that someone did not get a break, or that someone did not punch out, or someone made an incorrect punch, such as punching in at a.m. instead of p.m. [*Id.* at 269].

### 8. Kyle Smith

Kyle Smith testified that he currently works for Wyndham in Branson, Missouri, as the Director of Sales for In-House Sales Representatives. [Doc. 426 at 9]. He has been employed with Wyndham since 1994. [*Id.*]. He moved to Tennessee in March 2012, and his first position in Tennessee was the Vice President of Sales and Marketing. [*Id.* at 10]. He stayed in this position until June 2014. [*Id.*].

Smith testified that he received a report from Jesse Pierce in Fall 2013 that he was working while not clocked in. [*Id.* at 12]. Smith stated that Pierce requested a private meeting with him to share information on why employees were disgruntled and during that meeting, he mentioned working while not clocked in. [*Id.* at 12, 15]. Pierce stated that Smith needed to be aware that there were many people who were not happy and that Smith could lose some employees and that one former employee, Craig Thrift, was suing Wyndham over WynTime. [*Id.* at 15]. Smith asked

why, and Pierce stated that people were working while not clocked in. [*Id.*]. Pierce admitted that he had been working while not clocked in and that he (Pierce) made a general assumption that others were not clocking in while at work. [*Id.*]. Smith instructed Pierce that clocking in was part of his duties as an employee. [*Id.* at 15-16]. Pierce reported that past leaders stated that it was ok to not clock in and work. [*Id.* at 16]. Smith responded that he did not believe Pierce. [*Id.*]. Smith continued that prior to this meeting, he had no reason to believe employees were working while not clocked in. [*Id.* at 16-17].

Smith stated that after the meeting, he met with Dottie Justice to report the information. [*Id.* at 17]. He also pushed the information to his superior, Dave LaBelle, who was over Tennessee at that time. [*Id.*]. Smith also requested that Dottie Justice perform a sample audit of five Front-Line Sales Representatives and five In-House Sales Representatives to determine whether Pierce's report was accurate. [*Id.*]. The audit showed that people were taking tours and that they were not clocked in. [*Id.*]. He stated that he partnered with Dottie Justice and that they began a communication campaign about expectations of reporting time correctly. [*Id.* at 18]. He stated that they used three-ringer binders to keep track of missed punches. [*Id.*]. In addition, there was an on premise report that was kept at the front desk reception and that sales representatives who were not clocked in would not receive a tour. [*Id.*]. He stated that the above actions were put into place immediately after Pierce's report. [*Id.*]. In addition, he testified that the changes did not affect his income. [*Id.* at 36].

Smith testified that prior to the meeting with Pierce, the company policy was if an individual was at work, training, attending tours, waiting, he/she was supposed to be clocked in. [*Id.* at 19]. Smith stated that this policy was clear to the sales representatives because it was communicated to them. [*Id.*]. Smith explained that once the above changes were made, he

received push back because sales representatives did not like the change. [*Id.* at 19-20]. Smith continued that sales representatives never liked the draw because they were commissioned employees, not hourly employees. [*Id.* at 20].

Smith testified that anytime a sales representative was off the premises conducting business, he/she should have completed a form to capture the time worked. [*Id.* at 21-22]. Smith stated this form was used for party weekends and for worked performed at home. [*Id.* at 22]. He stated that the practice in Tennessee was to follow up with customers, using company email, personal email, landlines, and personal cell phone numbers. [*Id.*]. He stated that later Wyndham determined that sales representative should not communicate via personal cell phone because former employees would then have access to customers' personal identification information. [*Id.* at 23].

Smith testified that the busiest time was from spring break in March until December 10. [*Id.* at 26-27]. He stated that the slowest times were mid-December through mid-March, with a few exceptions, such as the week between Christmas and New Year's Day and Valentine's Day. [*Id.* at 27]. He also testified that November was a strong month and was referred to as "Yesvember." [*Id.*].

Smith testified that a "be ready" means that an owner has agreed to make a purchase, but the customer leaves the premises for personal reasons or activities and then arrives later, or the following day, to go through the documents. [*Id.* at 28]. Neither the customer, nor the sales representative, was required to be present when the contract was generated in the contracts department. [*Id.*]. Smith testified that a "come good" situation occurred when a contract became good later, after the down payment had been satisfied. [*Id.* at 28-29]. The sale was finalized when the contract became good. [*Id.* at 29]. Neither the sales representative, nor the client, was needed

when the deal became good. [*Id.*]. In addition, Smith testified that a "be back" meant that a customer had not committed to the sale and that he/she would come back at a later time to re-continue, reconvene, and discuss the sale further before making a decision to purchase. [*Id.*]. He testified that there were also times where a contract was prepared but the deal was not finalized. [*Id.* at 29-30]. He further testified that the phrase "walk out or mail out," simply means that there was a hold on documents or all the parties were not present to sign the documents. [*Id.* at 30]. The documents were then mailed out and the deal does not become good until all the paperwork had been signed. [*Id.*]. Smith testified that neither the sales representative, nor the guest, was required to be present when the contract was printed. [*Id.* at 30-31].

Smith testified that he never used, or instructed anyone else to use, a Punch Form to misrepresent time. [*Id.* at 33]. In addition, he testified that he never told sales representatives to not be clocked in for more than forty hours, and his superiors did not instruct sales representatives to misrepresent time worked. [*Id.* at 34]. Smith stated that overtime did not affect the net operating income because he was given a budget that included overtime as an item. [*Id.* at 36].

On cross examination, Smith testified that he rarely worked Saturdays because he went to the lake on the weekends. [*Id.* at 42]. He stated that Wyndham paid overtime when it was reported and when the sales representative earned that amount of time. [*Id.* at 54]. He continued that Wyndham rarely ran into an overtime situation but that Wyndham never tried to restrict overtime. [*Id.*].

Smith identified an email dated September 24, 2012, from Amanda Hill to Smith and several others, including managers, stating that individuals had missed punches that needed to be corrected. [*Id.* at 55, Ex. 1233]. In addition, the email stated that six individuals reported zero hours, and Smith explained that information was used to make sure those sales representatives

were out sick or on vacation. [*Id.* at 56-57, Ex. 1233]. Smith was asked why Lisa Jarvis responded to the email, "OVERTIME is not acceptable!" and that "All the reps with overtime hours will be receiving written coaching notes. Managers, are you monitoring their time?" [*Id.* at 58]. He explained that Wyndham's policy was that if a sales representative was going to work overtime, he/she was supposed to report it to the manager and that if the sales representative failed to report, he/she received a coaching note. [*Id.*, Ex. 1233]. Smith testified to similar emails. [*Id.* at 59, Ex. 1102, 842, 800A].

Smith identified another email, dated August 16, 2013, from Amanda Hill to Smith and others, including managers, regarding representatives who reported working zero hours. [*Id.* at 60, Ex. 798A]. The email continued, "The following reps were missing a break. The system will forever show this missing punch." [*Id.*, Ex. 798A]. Smith explained that this means that the sales representative did not take a meal break once they worked over six hours in a day. [*Id.*]. In addition, Smith identified an email from Kevin Covington, a senior manager, who stated, "The following reps had overtime reported. This will cost us!" [*Id.* at 61, Ex. 798A]. Lisa Jarvis responded, "We are on a 6/1. So it is not a surprise. I told John yesterday managers need to monitor this better." [*Id.* at 61-62, Ex. 798A]. Smith explained that it appeared Lisa Jarvis was communicating that people worked overtime without communicating overtime to their team leaders. [*Id.* at 62]. He stated that overtime does not cut into the net operating income because Wyndham budgeted for overtime. [*Id.*]. He explained the reference to "6/1" means working six days and taking one day off and that per the email, it appeared that In-House Sales Representatives worked six days. [*Id.*].

Smith also identified an email dated September 24, 2012, from Dave LaBelle to Smith and others, including managers, regarding a Department of Labor Audit in Panama City. [*Id.* at 63,

Ex. 1206].    Later, Lisa Jarvis sent an email, which Smith did not receive, stating "How Craig wrote deals this week but according to the clock wasn't here will be a mystery to the auditors!" [*Id.* at 65, Ex. 1206].  Smith stated that Lisa Jarvis was referring to Craig Thrift and that according to the email, Thrift did not record his hours for the entire week.  [*Id.* at 65-66].  He stated that not all of Wyndham knew that Thrift worked off the clock and that Smith stated that he did not know at this point.  [*Id.* at 66].  He agreed, however, that at this point, senior managers and managers knew that Thrift was working off the clock.  [*Id.* at 66-67].  Smith testified that Dave LaBelle requested that his sites conduct a mock audit in the event his sites have an audit from the Department of Labor.  [*Id.* at 76-77].  Darryl Langlais reported the results of the mock audit in an email dated October 17, 2012, which stated that the missed punch report for September was 501 pages.  [*Id.* at 77, Ex. 1140].

Smith identified another email dated June 27, 2013, from Bryce Berkompas to Tammie Smith.  Berkompas copied Dottie Justice and Kyle Smith to the email, which states:

> I receive[d] a list of all the FL reps that are currently averaging hours they are working to be less than what allows them to carry benefits, and I have sent an email to everyone of those reps and copied all the managers so everyone is aware of how BIG of a deal it is to pay more attention to time management.

[*Id.* at 67-68, Ex. 690].  Smith stated that Berkompas was the Director of Front-Lines Sales at that time.  Tammie Smith was a Human Resource Analysis, and Dottie Justice was the Human Resource Manager.  [*Id.*].  At that point, Dottie Justice was over the Tennessee sites and some sites in North Carolina.  [*Id.* at 68].  Smith explained that the email was referring to a time period after the off-season where some sales representatives were averaging below 30 hours and that Berkompas was making them aware that the sales representatives would be part-time employees.

[*Id.* at 69-70]. Smith stated that the sales representatives were leaving early from work. [*Id.* at 70].

Smith testified to another audit involving WynTime. [*Id.* at 86, Ex. 762]. This audit showed that in October 2013, there were 1,265 punch edits for the month for 15 sales representatives. [*Id.* at 87, Ex. 762]. Smith explained that when someone missed a punch and continued throughout the day, each time is an edit. [*Id.* at 88]. He continued that there may only be one missed punch, but it reflected multiple missed punches throughout the day. [*Id.*]. Smith testified that the audit confirmed that lunch breaks were not being taken and that sales representatives were working through their lunch breaks. [*Id.* at 89-90].

Finally, Smith testified that John Geissberger sent an email dated July 11, 2012, explaining that both representatives must stay for closing and that any representative not on site will be placed on overage. [*Id.* at 91, Ex. 1131].[36] Smith testified that staying during closing was more of a practice rather than a policy because if the client had a question during the closing and the question could not be clarified, the transaction could be lost. [*Id.* at 92]. He admitted that staying during closing was "best practice" and that Wyndham preferred that both sales representatives attended the closing. [*Id.*]. Smith continued that the sales representative who did not stay during a closing was placed on overage, meaning that he/she would not receive a tour until all other sales representatives received a tour. [*Id.* at 93]. He stated that there was period of time that both sales representatives were not required to stay for the closing. [*Id.* at 85].

---

[36] The Court observes that the email chain also includes on page two that sales were causing issues during closing: "During closing, reps are talkative when QA is covering information, slouching and over-relaxed body language and occasionally texting during closing." [Ex. 1131].

### 9. Connie McGlothin

Connie McGlothin ("McGlothin") testified that she is currently employed at Wyndham as a sales trainer. [Doc. 426 at 102].  She testified that she started at Fairfield in April 1989.  She was a sales person until 1991 when the company went through a reorganization.  [*Id*. at 103]  She returned in 1999 when the office was opened in Sevierville as a Front-Line Sales Manager and stayed until 2003. [*Id*.]  She came back in April 2010 as a Front-Line Sales Manager. [*Id*.]  She served as a Front-Line Sales Manager at both the Crossing and the Lodge during the Recovery Period. [*Id*. at 104]

McGlothin testified that as a Sales Manager, she was the first to arrive at work and the last person to leave. [*Id*. at 108].  She stated that the tour waves occurred at 8:00 a.m., or 8:30 a.m.; 12:00 p.m., or 12:30 p.m.; and if there was a third round, it began at approximately 3:00 p.m., or 3:30 p.m. [*Id*. at 109].  The third round tour did not always occur.  [*Id*.]  She continued that if a sales representative was not on tour, he/she took a break or prepared for the next round. [*Id*. at 111]  If the sales representative elected to take a break, then McGlothin told him/her to leave and get out of the office and not to be seen.  [*Id*.].  She explained that she did not want people to request the sales representative's help while he/she was on break. [*Id*. at 111-112].  She explained that tours were assigned using the power line—the top-ranked sales representatives received the first tour. [*Id*. at 110-111].  She continued that the sales representatives who sold the previous day go out on the tour first.  [*Id*. at 111].  A front-line sales tour without a sale took approximately 120 minutes on average.  [*Id*. at 112-113].  She explained that the length of the tour varied on the tour type.  [*Id*. at 113].  McGlothin continued that if a guest was staying in-house, it was difficult to get him/her to come to the office for two hours because the guest was already familiar with Wyndham and the guest did not need the whole two-hour tour. [*Id*.]  If the tour resulted in a sale, McGlothin

testified that it took an additional couple of hours.  [*Id*. at 114].  She continued that if there were more sales occurring, a closing may take a little bit longer because the contract had to be processed through quality assurance.  [*Id*.]  McGlothin testified that she typically left work at 5:00 p.m., or 6:00 p.m.  [*Id*. at 120].

McGlothin stated that nightline was a sales line that took clients at night versus during the day.  [*Id*. at 119-120].  She testified that she did not think that front-line ever had nightline.  [*Id*. at 123-124].  With respect to Punch Forms, she testified that they were used every time a sales representative missed a punch.  [*Id*. at 124-125].  If a sales representative forgot to clock in, or clock out for lunch, or clock back in for lunch, or if he/she left the building and forgot to clock out, a form had to be completed for every missed punch.  [*Id*. at 125-127].  In addition, an Off-Site Work Premises form was used to record the time for party weekends or work away from the office and that this form was similar to a Punch Form.  [*Id*. at 125].  She stated that she completed Punch Forms daily and that she checked WynTime every day.  [*Id*. at 126].  She made sure that when someone left on break that he/she clocked out and that when he/she returned, he/she was not working while not clocked in.  [*Id*.].  If a sales representative was caught working while not clocked in, he/she had to complete a Punch Form and let McGlothin know the correct times.  [*Id*.].  McGlothin explained that she tried to get everyone in the habit of clocking in when they arrived at work.  [*Id*.].  McGlothin stated that she completed Punch Forms throughout the day and that sometimes she would complete multiple Punch Forms on one person throughout the day. [*Id*. at 127].  She stated that she never used Punch Forms to reduce hours so that the hours would be under forty and that she was not aware of any other managers using the Punch Form in such a manner. [*Id*. at 128].

With respect to party weekends, McGlothin explained that not all sales representatives participated. [*Id*.] Typically, the very best sales representatives attended party weekends because Wyndham wanted sales. [*Id*. at 128-129]. Party weekends could be "prospect weekends," where Wyndham catered to new owners or owners who owned discovery packages, or "owner party weekends," where Wyndham brought in existing owners. [*Id*. at 129]. Guests arrived on Friday and met the sales representative at 6:00 p.m. [*Id*.]. The guests and the sales representative ate dinner and attended a show, which ended around 8:00 p.m., or 8:30 p.m. [*Id*.]. On Sunday, the guests and sales representatives ate breakfast together and then the guests went to the sales center. [*Id*.]. During party weekends, if a sales representative was in the office, he/she clocked in, but if he/she was not in the office, the sales representative completed a Punch Form. [*Id*. at 130].

McGlothin testified that she was able to gauge how many hours a week sales representatives worked. [*Id*. at 133]. She testified as follows:

- Shirley Benedict: She was a Discovery Sales Representative, who averaged about 30 hours per week.

- Stephen Bowery: On a busy week, he worked about 28 to 30 hours per week. She stated that he was able to sell quickly and that he had another business and liked to leave at 2:00 p.m.

- Stacy Caldwell: On a busy week, he worked 30 hours per week. She stated that he was on the RCI team and that he was a seasoned representative, so he left early. In addition, he liked to play golf in the afternoons.

- James Campbell: He worked 25 to 30 hours per week. He worked with existing owners who were not staying at the properties, so he talked with one client and could be finished for the day.

- Craig Carson: He worked 30 to 35 hours per week and that her estimate was given him the benefit of the doubt because he did a good job.

- Sarah Christy: She worked 25, 28, to 30 hours per week at the maximum. McGlothin testified that her work habits were not the best.

- Russ Cooper: He worked 28 to 30 hours per week. She testified that he worked as a RCI Sales Representative, so he worked with in-house guests.

- Amy Dennis: She worked 25 to 30 hours a week at the maximum. McGlothin stated that Dennis worked for Wyndham for a short time and that she left at 3:00 p.m., or 3:30 p.m., because she drove home to Johnson City, Tennessee.

- Robin Dickerson: She worked no more than 30 hours per week. McGlothin stated that Dickerson was an In-House Sales Representative and that they worked less than Front-Line Sales Representative because In-House Sales Representatives' clients met in the morning because they were on vacation.

- Clark English: He worked 30 to 35 hours a week at the office. McGlothin testified that he did not sell very much and that when he did not make a sale, he clocked out and went home.

- Randy Finley: He worked 35 hours a week. McGlothin testified that Finely was a good sales representative and that on some days, he stayed after a sale to assist McGlothin.

- James Gallighugh: He worked 25 to 30 hours per week. She testified that he was a RCI Sales Representative and that they generally worked less.

- Edwin Garret: He averaged 28 to 30 hours per week and that her estimate "is on the high side." McGlothin testified that he had health problems and that he could not work a full schedule because of his doctor's appointments. She continued that she was not certain if he ever sold anything.

- David Goodall: He worked 30 to 35 hours per week at the maximum. McGlothin stated that Goodall was not the best or the worse sales representative.

- Pamela Haley: She worked 25 to 30 hours per week. McGlothin testified that Haley worked for Wyndham for a short amount of time and that she was at the bottom of the power line.

- Stacy Heaton: On average, she worked from 8:00 a.m. to 2:00 p.m.

- Dale Heil: He worked the same hours as Stacy Heaton. He was in a wheelchair and had serious health issues lingering from a car accident. He had somewhat of a scaled-down schedule.

- Twila Higgins: She was on the top of the power line for most of the time, so she took a tour early in the morning. After she finished with her guests, she took a break and helped others close on their deals.

- Sean Jeter: He worked 30 to 35 hours per week.

- Peter Landers: He came into work at 8:00 a.m., and left at 1:00 p.m., or 2:00 p.m. He worked as a RCI Sales Representative.

- Karl Lewenski: He came into work at 8:00 a.m., but finished by 3:30 p.m., which is a late day for him. He worked as a RCI Sales Representative.

- Chris Maples: He worked 20 to 25 hours per week, which was a long, hard week for him because he was lazy and difficult to manage.

- Melissa Monday: She worked 30 to 35 hours per week. She was a good sales representative, and if she was not closing a deal, she helped other sales representatives with their closings.

- Heather Myrick: She came in at 8:00 a.m., and left at 2:00 p.m.

- Paul Naumoff: He worked 30 to 35 hours per week. He was a Discovery Sales Representative, and they did not come in to 10:00 a.m., or 10:30 a.m.

- David Nelon: He worked 25 to 30 hours per week. Nelon was not the best or the worse sales representative.

- Patrick Neuenschwander: He came in at 8:00 a.m., or 8:30 a.m., and left around 3:00 p.m., or 3:30 p.m. He was a RCI Sales Representative. He was an average sales person.

- Trent Pierce: He came in at 8:00 a.m., or 8:30 a.m., and finished by 2:00 p.m., or 3:00 p.m.

- Mike Pierce, Sr.: He worked 25 to 30 hours per week. McGlothin testified that he had a good deal because he did not have to attend the meetings and he clocked in right when his tour began. He was very good, and sometimes if he did not have any clients, he would

call the night before and state that he was not coming in to work. She explained that if he came in at 9:00 a.m., he finished at noon or 1:00 p.m. In addition, she testified that he was building a home at the time, and she vividly remembered her boss calling Pierce, Sr., stating that he needed to report to work because a client was there. She stated that she would text Pierce, Sr., requesting for his help and that he would be gone.

- Mike Pierce, Jr.: He worked 25 hours a week. McGlothin testified that Pierce, Jr., was difficult and that she had to speak with his father about it. He would not report to work or reported late to work, and McGlothin could not get him to clock in. When he clocked out, McGlothin could not get him to clock back in. He had many Punch Forms.

- Richard Rang: He worked 25 to 30 hours per week. He worked as a RCI Sales Representative.

- James Reid: He worked 30 hours a week at the maximum. McGlothin stated that Reid had bad work habits, such as arriving late. He did not sell very much, and he did not follow up with the clients.

- Leo Shalhoup: He worked 30 hours a week at the maximum. He was near the bottom of the power line.

- Tony Siler: He met with his client in the morning or afternoon, but he was finished by 1:00 p.m., 2:00 p.m., or 3:00 p.m., similar to other RCI Sales Representatives.

- Rebecca Slone: She worked 20 to 25 hours per week. She was an attorney, and she maintained her practice while working for Wyndham. McGlothin sent her to in-house sales because they work fewer hours. She did not dedicate time to Wyndham.

- Bobby Stallings: He worked 30 hours per week. In addition, he had health issues and was on a scaled-back schedule. She stated that he was maybe in his seventies, and that the boss allowed staggered hours because there were a few people in that department that were elderly.

- Bryan Tesh: He worked about 30 to 35 hours per week. McGlothin testified that his child had serious health issues and that he had to take time off to be with his child. McGlothin testified that she remembered stating that she had not seen him at work for five days. He also had another business remodeling and that he sold little to

none as a sales representative. She continued that she would turn out the lights but that he was still on his computer and he was not performing Wyndham's work because he did not have any clients.

- Gary Thorn: He came in at 8:00 a.m., or 8:30 a.m., and finished at 3:00 p.m., or 3:30 p.m., every day, and that was if he stayed with McGlothin for training. He sold little to none as a sales representative.

- Mark Turner: He worked 30 hours a week. He was a good sales representative. If he did not have any tours, he stayed to help close deals, which was called a back ender.

- Jamie Waits: She worked an average of 25 to 30 hours per week because she was in-house and they work fewer hours.

- Brett Williamson: He worked 25 to 30 hours a week but that estimate was "pushing it." McGlothin stated that he had a difficult time reporting to work and that once he arrived, McGlothin had a hard time keeping him there. She explained that he also worked at his family car dealership. He also liked to play golf and that he would come to work dressed for the golf course. He also had to complete many Punch Forms because he forgot to clock in and out. McGlothin stated that he was hard to manage. McGlothin stated that she believed he lost his job because he would leave if he did not receive a tour in the morning. He did not work for Wyndham very long.

- Jaxon Wirgau: He worked 35 hours a week on average.

- Angela Woods: She may have worked 35 hours per week. McGlothin stated that it was hard for her to remember Woods. Woods realized that the job was not for her because she was meek and soft spoken.

- Jason Yocum: He worked 30 to 35 hours per week. She stated that when she first met Yocum, he stated that his wife was an attorney. Later, he stated that his wife was an orthopedic surgeon, and then later, stated that his wife was a pediatrician. McGlothin started micromanaging Yocum because she wondered what he was telling the clients. She also had to chase him down to clock in and out and that she had to complete three or four Punch Forms for him every day. He was very difficult to manage, and she believed he did not like working for a woman.

[*Id.* at 133-197].[37]

McGlothin testified that there was no policy that sales representatives worked more than forty hours but did not record more than forty hours. [*Id.* at 116]. She stated that she never disciplined or reprimanded a sales representative under her supervision for clocking in for more than forty hours a week. [*Id.* at 117]. McGlothin testified that she did not observe any sales representatives working while not clocked in. [*Id.*]. She stated that she never instructed a sales representative to clock out and continue working. [*Id.* at 118].

Finally, McGlothin testified that a podium presentation is a group presentation conducted by a professional trained speaker. [*Id.* at 120]. She testified that she believed Wyndham started using podium presentations as opposed to one-on-one visits with customers and that podium presentations helped deliver a consistent message. [*Id.* at 120-22]. She explained that podium presentations allowed sales representatives to observe non-verbal buying queues. [*Id.* at 122].

On cross examination, McGlothin testified that she does not recall if she ever disciplined Yocum for completing Punch Forms. [*Id.* at 198]. She agreed that it was reasonable to assume that she did not discipline him since there was nothing in his personnel file regarding discipline. [*Id.*] When asked why Yocum had two Punch Forms for October 28, 2011, showing different in and out times, and that the second Punch Form was signed on January 6, 2012, she stated that someone made a mistake. [*Id.* at 201-204, Ex. 3278, 3280]. She explained that Yocum wrote the

---

[37] The Court observes that the parties filed deposition designations and counter-depositions of the following non-testifying Plaintiffs: Craig Carson, Robin Dickerson, Stacy Heaton, Patrick Neuenschwander, Richard Rang, Leo Shalhoup, Gary Thorn, and Jason Yocum. Dickerson testified that she averaged 58 hours per week; Heaton testified that she worked 65 hours per week; Neuenschwander testified that he averaged 67.5 hours per week; Rang testified that he worked 70 hours per week; and Shalhoup testified that he averaged 55 hours per week. *See* [Doc. 417-5]. Carson and Yocum were not asked about their average hours worked per week. [*Id.*]. Gary Thorn testified, "Average for the six months? Probably 50. 55 to 55." [Doc. 421-32 at 3]. Plaintiffs did not counter-designate Gary Thorn's testimony. [Doc. 413-1 at 2].

wrong date on one of them and that because there are two Punch Forms dated October 28, one of those dates was wrong.  [*Id*. at 201, 204].

McGlothin testified that a sales manager was required to be present when a sales representative made a sale.  [*Id*. at 207].  When asked what was the latest time she stayed for a closing, she stated that she would be "totally guessing" but 9:00 p.m., or 10:00 p.m., would be a late night.  [*Id*. at 208].  She explained that if a tour occurred at 3:30 p.m., that tour lasts until 5:30 p.m.  [*Id*.].  With a couple of hours of negotiation and getting the customer in and out of closing, that would be about 8:30 p.m., 9:30 p.m., or 10:00 p.m.  [*Id*.].  She explained that as a manager, she also had reports to finish, emails to answer, and busy work that she could not do during the day.  [*Id*. at 209].  Once the sales representatives leave, she completed quite a bit of paperwork.  [*Id*.].   She identified an email dated April 17, 2012, that she wrote to several managers and directors of sales, explaining that she missed the recruiting dinner because she was closing a sale until 10:00 p.m.  [*Id*. at 211-212, Ex. 3281].  She explained that she sent the email because it was usual for her to be at the office that late.  [*Id*. at 212].

McGlothin identified another email dated March 4, 2013, from Amanda Hill to McGlothin and other sales managers, that identified sales representative who had overtime.  [*Id*. at 216, Ex. 3281].  McGlothin explained that it was important for Hill to advise who had overtime because it was standard operating procedure.  [*Id*. at 216].  She stated that the sales representatives were instructed to let their managers know if they were approaching overtime but that if they went into overtime, they were paid.  [*Id*. at 217].

McGlothin testified that James Campbell's testimony that McGlothin instructed the sales representatives to record less than forty hours was not true.  [*Id*. at 222-223].  She stated that Campbell was never on her team and that they had never been in a meeting together.  [*Id*. at 223].

She also stated that Jason Yocum, Angela Woods, and Patrick Neuenschwander were not telling the truth about recording less than forty hours. [*Id*. at 223-224].

McGlothin testified that she attended President's Club, meaning that she did a great job, which was based on sales volume. [*Id*. at 230]. To be invited to President's Club as a sales manager, she had to have approximately four million dollars in sales. [*Id*. at 231]. She stated that she was not aware if the sales representatives, who she testified to above, performed work after they left for the day. [*Id*. at 231-232]. She stated that all the sales representative above clocked out to take a break. [*Id*. 232-233]. She stated that she was not aware if Russ Cooper closed forty-two deals after 3:00 p.m. [*Id*. at 239]. When asked if she was aware Robin Dickerson closed thirty deals after 2:00 p.m., McGlothin testified that Dickerson worked there for quite a while and that she may have closed that many deals after 2:00 p.m. [*Id*. at 239-240]. She was not aware that James Campbell closed 101 deals after 12:00 p.m. [*Id*. at 240]. She explained that printing a contract did not mean that was when the deal closed. [*Id*. at 242]. She stated closing the next morning was not a rare occurrence and that for in-house, next day continuances were typical because the clients were busy. [*Id.*]. She stated that just because a contract was printed does not mean that was when the deal went into closing. [*Id.*].

## III. ANALYSIS

The Court will begin with an overview of the FLSA and then turn to its findings of fact and conclusions of law. The Court will also address Defendants' Motion for Partial Findings and Conclusions Regarding Representative Evidence [Doc. 403].

### A. Overview

Pursuant to the FLSA, an employer generally must compensate an employee "at a rate not less than one and one-half times the regular rate at which he is employed" for work exceeding

forty hours per week. 29 U.S.C. § 207(a)(1). As explained by the Sixth Circuit, "Congress passed the FLSA with broad remedial intent." *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (citing *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 509-11, 515 (1950)). Further, the Sixth Circuit has stated that "[c]ourts interpreting the FLSA must consider Congress's remedial purpose." *Id.* (citing *Lilley v. BTM Corp.*, 958 F.2d 746, 750, n. 1 (6th Cir. 1992)).

The FLSA authorizes collective actions "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Unlike class actions under Federal Rule of Civil Procedure 23, participants in a collective action must consent in writing. *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). Although the FLSA does not define "similarly situated," the Sixth Circuit has articulated three factors that courts should consider: (1) factual and employment settings; (2) the different defenses to which plaintiffs may be subject on an individual basis; and (3) the degree of fairness and procedural impact of certifying the action as a collective action. *O'Brien v. Ed Donnelly Enters., Inc.,* 575 F.3d 567, 584 (6th Cir. 2009), *abrogated on other grounds by* Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016). As mentioned above, the Court has already determined that Plaintiffs were similarly situated and allowed this case to proceed as a collective action. [Doc. 362].

Plaintiffs who bring claims under the FLSA for unpaid overtime compensation must establish that they performed work for which they were not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688-87 (1946), *superseded by statute on other grounds*, Portal-Portal Act of 1947; *see also O'Brien*, 575 F.3d at 602 (plaintiffs must "prove by a preponderance of evidence that [they] performed work for which [they were] not properly compensated") (other quotations omitted). The Supreme Court has cautioned, however, that the "remedial nature of this statute and the great public policy which it embodies . . . militate against

making that burden an impossible hurdle for the employee." *Mt. Clemens Pottery,* 328 U.S. at 687. This is simply because under the FLSA, it is the employer's responsibility to keep proper records, and employees "seldom keep such records themselves." *Id.*

The Supreme Court as further explained that when an "employer has kept proper and accurate records[,] the employee may easily discharge his burden by securing the production of those records." *Id.* Other the other hand, if the records are inaccurate or inadequate, "and the employee cannot offer convincing substitutes, . . . [t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Id.* The Court reasoned, "Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act." *Id.* The Court continued:

> In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.
>
> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11 (c) of the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances. Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that

> the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

*Id.* at 688 (other citations omitted). The approach announced in *Mt. Clemens Pottery* has been repeatedly utilized within the Sixth Circuit. *Monroe v. FTS USA, LLC*, 860 F.3d 389 (2017), *petition for cert. filed* (U.S. Oct. 31, 2017) (No. 17-637); *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468 (6th Cir. 1999); *Baden-Winterwood v. Life Time Fitness, Inc.*, 729 F. Supp.2d 965 (S.D. Ohio 2010).

The Court observes, however, that "*Mt. Clemens Pottery* and its progeny do not lessen the standard of proof for showing that a FLSA violation occurred." *O'Brien,* 575 F.3d at 602. Instead, "*Mt. Clemens Pottery* gives a FLSA plaintiff an easier way to show what his or her damages are" when an employer's records are inaccurate. *Id.* In this circumstance, a plaintiff is not required "to prove every minute of uncompensated work. Rather, [he or] she can estimate her damages, shifting the burden to the employer." *Id.* "If the employer cannot negate the estimate, then the 'court may award damages to the employee, even though the result be only approximate.'" *Id.* (quoting *Mt. Clemens Pottery*, 328 U.S. at 688).

Further, § 216(b) of the FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Such damages are "compensation, not a penalty or punishment." *Elwell v. University Hospitals Home*

*Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (quoting *McClanahan v. Matthews*, 440 F.2d 320, 322 (6th Cir. 1971)) (other quotations omitted). The court, however, has the discretion not to award liquidated damages to a prevailing plaintiff if "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938." *Elwell*, 276 F.3d at 840 (quoting 29 U.S.C. § 260). Courts have referred to employer's burden as "substantial" because it requires "proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict." *Id.* (quoting *McClanahan*, 440 F.2d at 322) (emphasis in *Elwell*). "In the absence of such proof, however, a district court has no power or discretion to reduce an employer's liability of the equivalent of double unpaid wages." *Id.* (quoting *McClanahan*, 440 F.2d at 322).

Finally, the FLSA has a two-year statute of limitations for non-willful violations and a three-year statute of limitations for willful violations. 29 U.S.C. § 255(a). The Supreme Court has defined "willfulness" in this context to require that the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (citing *Trans World Airlines, Inc., v. Thurston*, 469 U.S. 111 (1985)).

With the above analysis in mind, the Court will now turn to the present facts.

### B.    Findings of Fact and Conclusions of Law

After consideration of the witnesses' credibility, the admitted exhibits, and the admitted depositions, the Court finds as follows:

Plaintiffs and Opt-In Plaintiffs are 156 current and former Sales Representatives who worked during the Recovery Period at one or more of the four Tennessee resorts owned and operated by Defendants: (1) Lodge, (2) Crossing, (3) Glade, and (4) Nashville. Defendants divided its sales force into three groups: (1) Front-Line Sales Representatives; (2) In-House Sales Representatives; and (3) Discovery Sales Representatives.[38] Despite the different titles, the job duties and responsibilities of the sales force were similar. Specifically, the Sales Representatives sold ownership interests or trial packages to prospective owners and existing owners. Front-Line Sales Representatives attempted to sell ownership interests to prospective owners who did not already have an ownership interest. In-House Sales Representatives attempted to sell additional ownership interests to existing owners. Discovery Sales Representatives attempted to sell prospective owners a trial package.

At all four locations, Sales Representatives' compensation was the same: they were paid on commissions with a minimum wage advance that was recouped from commissions. Further, Wyndham's four Tennessee resorts had common management structures and utilized the same practices and procedures for timekeeping and compensation.

In January 2009, Wyndham reclassified Plaintiffs from exempt employees to non-exempt employees and began using time clocks to record time. As mentioned above, Sales Representatives received commissions and minimum wage, but the minimum wage was later recouped if the Sales Representative made a sale. Wyndham maintained several written policies regarding how Sales Representatives were supposed to be paid, and Plaintiffs signed Wyndham's written policies. For example, the Sales Person Agreement (Non-California) explained how

---

[38] The Court will refer to all three groups collectively as "Sales Representatives."

commissions were structured. In addition, Plaintiffs signed Wyndham's Timekeeping and Overtime Policy, which provided as follows:

> The Company requires that each non-exempt employee accurately accounts for all time they have worked. All non-exempt employees must accurately record the time they began and end their work, as well as the beginning and ending time of each unpaid meal period. They must also record the beginning and ending time of any split shift or departure from work for personal reasons. In addition, your manager must approve all overtime work before it performed. Paid Time Off such as sick days, holiday, and vacation days will not be toward hours worked from overtime calculations. The Company is required to and will pay all overtime to non-exempt employees. "Comp" time is not provided. All overtime, approval or unapproved, must be paid. It is the employees' responsibility to verify the accuracy of their submitted time records.
>
> All clock punches will be rounded to the nearest quarter hour. When corrections or modifications are made to the time record, the employee and manager must verify the accuracy of the changes. You may not alter, falsify, or tamper with time records, or clock or sign another employee in or out. Such conduct will result in corrective action, up to and including termination.

In addition to the above language, the Timekeeping and Overtime Policy stated that meal periods must be taken if an employee is scheduled to work five of more hours. The policy continued that supervisors/managers would schedule the meal periods and that employees would be relieved of all active responsibilities and restrictions during meal periods and would not be compensated for that time. The policy stated that meal periods must be for at least thirty minutes. Finally, the policy explained that employees were given rest periods in the middle of their work periods but because the time was counted and paid as time worked, employees must not be absent from their work areas beyond the allotted rest period time.

While Wyndham maintained written policies regarding overtime and employees' responsibility to record all hours worked, the Court finds that Wyndham did not follow such policies. The Court finds that in 2009, when Wyndham reclassified its employees to nonexempt,

upper management at all four locations in Tennessee became concerned that overtime would affect each site's net operating income. Overtime pay affected upper management's compensation because the compensation plan included a component for a net operating income bonus. Because overtime pay affected the net operating income, Wyndham began violating its own written policies with respect to recording all hours and paying overtime compensation. In fact, the overwhelming evidence establishes a consistent practice of prohibiting Sales Representatives from recording overtime and managers doctoring timecards to prevent overtime compensation.

These two practices were implemented by requiring Sales Representatives to work off the clock and requiring Sales Representatives to sign inaccurate Punch Forms after managers altered their timecards (or risk being placed on overage). Many times managers simply forged Punch Forms. In furtherance of Wyndham's unwritten policy to not record overtime, Sales Representatives (1) clocked out when not on tour but were still working, (2) clocked out for lunch breaks, despite not taking a lunch break, (3) clocked out before working nightline, if approaching overtime; and (4) did not accurately record time spent working party weekends and/or dinner parties. The Court also finds that Plaintiffs worked from home and did not record such hours, despite their managers having knowledge of such work. *See also* [Ex. 1024] (email from Matt Chodak stating to complete home work every night). Furthermore, the Court finds that Sales Representatives were lulled into believing that underreporting actual hours did not mean anything financially because the hours would only be credited as hours at minimum wage, and therefore, recouped from their commissions. They were never told that they were entitled to overtime based on their commission amounts.

In particular, the Court finds Plaintiffs and Plaintiffs' witness (Kristen Creson), who testified that managers edited timecards, highly credible on this issue, especially in light of the

documentary evidence and managers' own admission that they did in fact doctor timecards. For instance, Kristen Creson, a non-party to this action, testified that as the administration manager in Nashville, she was directed to doctor timecards. She described how she made illegitimate edits to the Sales Representatives' timecards using WynTime. She was instructed to make such edits by Dave LaBelle, the site Vice President and later promoted to the area Vice President, and the Directors of Sales, Jerry Prosise and Mike Carneal. Importantly, her testimony was consistent with the ways Plaintiffs described the edits on their timecards and how they were required to sign Punch Forms that did not accurately reflect the time that they worked. Further, she testified that 90% of her edits were not legitimate and were made to keep Sales Representatives' hours under forty.

Creson also attended monthly meetings with the department heads and the site vice president, where she would bring doctored timecards to explain to the sales managers that she needed signatures on the doctored timecards. When she grew tired of being the "middle man," she passed this responsibility onto the sales managers. She sent emails on Tuesdays, Wednesdays, and Thursdays to the sales managers identifying sales representatives' time that needed to be edited. These emails were also sent to the regional administrative directors, Corey Miller and Mellissa Camper. Further, she even attended a meeting in Florida, with the administrative directors at the Glade and at the Smokies, wherein they discussed and shared how to doctor timecards. As noted above, Defendants did not even cross examine Creson, let alone impeach her testimony, nor did they call as witnesses those against whom she made such damning claims.

The Court also finds David Nelon's testimony regarding how he made illegitimate edits credible. During the Recovery Period, Nelon was a manager and an In-House Sales Representative at the Crossing. Nelon testified that he logged on to the computer and adjusted sales

119

representatives' time every Thursday before timecards were turned in on Friday mornings. He knew that sales representatives were working more than forty hours, but he was instructed by management, such as John Geissberger, to adjust the timecards. In fact, he identified several emails from Amanda Hill requesting permission from Jim Acee and John Geissberger to approve edits, which they approved within minutes. [Ex. 930]. These emails from Hill were similar to the emails that Creson described that she sent to sales managers. Nelon even testified to examples where he clocked an employee in at 5:00 p.m., and then later realized the employee was close to forty hours, so he clocked him out at 5:12 p.m. [Ex. 1619A]. He testified to similar situations of altering time cards. [Ex. 1619B, 1619C, 1622A, 1622B]. His cross examination did not impeach his primary testimony at all, nor were any witnesses called to impugn his testimony.

The Court further finds the testimony of Jeff Cross, a manager at the Glade, also credible. He instructed his sales representatives to clock out and continue working. When questioned why he gave them these instructions, he stated that the sales representatives had to pay the money back and that overtime affected the net operating income. He explained that he also received emails from his Human Resource Representative, Camille Combs, which included information about sales representatives' timecard entries, including whether they were missing a punch, whether they were approaching thirty-two hours, or whether they had made a sale while they were not clocked in. Again, these emails were similar to the emails described by Creson, who was located in Nashville, and the emails sent by Hill, who was located at the Smokies. While Bryan Tesh was not a manager, he testified that he helped Nelon make edits in WynTime and that 90% of the edits he made were to reduce hours. He further went into detail on how he made edits in WynTime. For instance, Tesh described that when he made an edit in WynTime, a small box appeared reflecting an edit had been made. He further described that when he made a change in WynTime,

he had to ensure the written form matched the change made in WynTime.  With respect to this written form, he obtained the signature of the specific sales representative and the manager.  He continued that often managers would sign blank forms and that it was his job to ensure everyone completed the form.   His description of this process is consistent with the Plaintiffs' testimony regarding signing inaccurate and/or blank Punch Forms and the other managers' testimony regarding how they altered timecards.   Moreover, defense witness, Connie McGlothin, testified that when she turned out the lights, Tesh was still on his computer.  She claimed he was not performing work for Wyndham because he did not have any clients, but the Court finds that he was editing timecards as he explained in detail.

As mentioned above, the Court finds Plaintiffs performed work while not clocked in and for which they were not properly compensated.   In further support of the Court's finding, Kyle Smith, a defense witness, stated that Wyndham performed several audits (one of which he requested  based on Plaintiff Jesse Pierce's claims that sales representatives were working off the clock) that showed that sales representatives were working while not clocked in.[39]  Additionally,

_____

[39] The Court also observes that in Kyle Smith's deposition, he was questioned about an email from Dave LaBelle to Smith and others dated October 31, 2013, a week after this lawsuit was filed.  [Doc. 414-10].  The email references a visit from Karen Case.  [*Id.*]  Smith testified that Karen Case was the Human Resource partner for the South Region and that as a result of her visit, John Geissberger, Dave Fowler, and Dottie Justice were terminated.  [*Id.*].  He further testified that all the other managers were given a written warning to keep better WynTime records for sales representatives.  [*Id.* at 53].  Further, Defendants' 30(b)(6) witness, Laurie Saltman-Kovatch, also testified that Karen Case terminated John Geissberger, Dave Fowler, and Dottie Justice.  [Doc. 414-7 at 39].  In addition, Fowler stated in his deposition that he was terminated "because of the prior violation due to the time clock situation."  [Doc. 414-8 at 23].  Given Plaintiffs' serious allegations against Geissberger, Fowler, and Justice, the Court wanted to hear their testimony, but Defendants never called them as witnesses.  The Court was surprised to discover, in a deposition designation as opposed to at trial, that they had in fact been terminated.  However, this immediate termination only serves to corroborate and confirm Plaintiffs' evidence and particularly the testimony of Creson and Nelon.  Plaintiffs submitted portions of Fowler's deposition with respect to his termination, [Doc. 414-8], and Defendants filed counter-designations.  [Doc. 423-8].  However, the Court notes that Dottie Justice, John Geissberger, and David Fowler were listed on Defendants' witness list [Doc. 312] but were not called to testify.

an earlier audit in 2012 established Sales Representatives were not recording their time accurately. [Doc. 414-9 at 30-33].[40][41] Kyle Smith testified that on October 17, 2012, Darryl Langlais reported the results of the audit to Smith and several others. [Ex. 1140]. Langlais reported, "Though the team is doing well at documenting missed punches, the missed punch report for the month of September was 501 pages." [Ex. 1140].

The Court further finds that Wyndham's policy of prohibiting its Sales Representatives from recording overtime, despite working overtime, turned on its head in 2013 when two events occurred. First, several sales representatives discovered that another sales representative, Terry McGlothin, was not deemed eligible for medical benefits/leave because his timecards did not reflect sufficient hours worked. Plaintiffs, including Michael Pierce, Sr., began questioning the accuracy of their time records, given that they worked well more than thirty hours a week. Second, two employees complained about working while not clocked in, Jesse Pierce and Josh Carr. [Doc. 414-9 at 34]. Specifically, Jesse Pierce met with Kyle Smith over several issues and the fact that sales representatives were not recording all the time that they worked was mentioned. As previously noted, Smith acknowledged that afterwards Dottie Justice performed a sample audit, which showed that sales representatives were working while not clocked in. Further, Laurie Saltman-Kovatch testified in her deposition that she partnered with Karen Case to perform an

---

[40] The Court observes that it appears the 2012 audit was triggered because an audit was being conducted in Panama City by the Department of Labor. Kyle Smith testified that Dave LaBelle wanted to conduct a mock audit in case the Department of Labor investigated the other sites. [Doc. 426 at 76].

[41] Defense counsel objected to Plaintiff's counsel question, stating "it's outside the scope of what the judge as allowed." [Doc. 414-9 at 33]. The Court finds the objection overruled as the question is relevant to the issues and allegations against Wyndham.

investigation into Carr's complaints. [Doc. 414-9 at 36, 38]. Their audit resulted in the termination of Dottie Justice, John Geissberger, and David Fowler. [*Id.*].

Around the time the 2013 audits were occurring, Susan Middleton, a sales manager at the Crossing, sent an email from her Wyndham email account to her personal email account on October 12, 2013, that states as follows:

> Spoke with Tammie in HR on or about October 7th about wyntime. I informed her that we had been doing this wrong all along. I told her that we were always told that the reps could not have over 40 hours. Also, I told her that we were told to put in a break if the employees had over 5.75 hours in one shift. I always did my Wyntime how I was taught by my senior leadership team. We were always told that it didn't matter because they had to pay the money back anyway. I was concerned after the meeting we had in early September as to most of our processes, and I had started doing it different since then. I used to fill out the forms for the reps with whatever time I had put in and had them sign it. I never worried about hours on the PAW or nightline because, once again, I had always been told that they had to pay back the money anyways. I explained to her that I was fearful for my job because everyone was saying that any wrong doings were the managers fault because we are the ones who approved Wyntime.

> For the week ending 10/10/13, I repeatedly asked my senior manager, Lisa Jarvis, if I should let reps continuing working even though they were going into overtime. She said yes.

> I was informed on wed, 10/8 that Elizabeth Knox and Emily Rasnick were being transferred to the waterpark. John had repeatedly promised that he would not break up my team or move anyone until after November. Feeling like it would be related to my visit with Tammie, I sent him a text that day asking if this was done because I had gone to HR over Wyntime. He didn't respond. The 2 reps that were transferred were no where near the quality of the two they moved off my team. Quite honestly, it did feel like retaliation.

> On Thursday, the 10th

[Ex. 1275]. [42]   Middleton's email (being from another one of Defendants' managers) further supports the Court's finding that Sales Representatives were prohibited from recording more than forty hours despite working more than forty hours and that managers were editing timecards.

The Court further finds Wyndham's time records are grossly inaccurate and support Plaintiffs' claim that they were performing work while not clocked in.   Furtherance, there were voluminous records showing that Punch Forms and timecards were forged and/or unsigned.   Some managers even brought Sales Representatives, such as Cheij, Johnson, Siler, Chappell, Stallings, Bogardus, and Jesse Pierce, blank Punch Forms to sign.[43]   If the Sales Representatives did not sign the Punch Forms, they were placed on overage, which is a form of discipline.   There were numerous emails, which were sent weekly and prior to the pay period closing, instructing sales managers to edit time records.   The Court further notes that in 2012, Lisa Jarvis sent an email stating, "How Craig wrote deals this week but according to the clock wasn't here will be a mystery to the auditors!"  [Ex. 1206].   Further, Thrift testified that his manager began clocking him in and out, which was supported by the fact that someone continued to fictitiously clock him in and out when he was not even working at Wyndham.

Further, the Court observes that the average number of hours reflected on the timecards during the Recovery Period is incredibly low.   [Ex. 3245].   For instance, Jesse Pierce averaged 26.9531 hours per week according to his time records during the Recovery Period, despite him

---

[42]   The Court notes that the parties agreed that in lieu of Susan Middleton testifying at trial as part of Plaintiffs' rebuttal proof, Plaintiffs would submit Exhibit 1275, the October 12, 2013 email from Susan Middleton's Wyndham email address to her personal email address.  [Doc. 426 at 253-54].  The Court also notes that the email does not continue after, "On Thursday, the 10th," and that the Court did not correct any grammatical errors in the email. The Court notes that Defendants never called Susan Middleton, nor Tammie Smith in human resources as witnesses.

[43]   *See infra* note 28.

being one of the highest earners. Greg Christian, a defense witness, even described Jesse Pierce as a "workaholic." Further, and to highlight a few examples of such inaccuracies and that the time on the timecards were just "made up", Amanda Hill, the commissions analyst, sent an email requesting permission to add 8 a.m. to 5 p.m., for five days on Jesse Pierce's timecard because there were no hours recorded that week. [Ex. 930]. Geissberger responded within seven minutes, "Approved." [Ex. 930]. Further, in another email from Hill dated October 21, 2010, to John Geissberger and Jim Acee, Hill requests their approval to fix a number of sales representatives' timecards, including their approval to insert breaks for certain sales representatives. [Ex. 937].[44]

In addition, many Plaintiffs, and several defense witnesses, testified that they were familiar with the term "Rocktober," which is one the busiest months at Wyndham. Despite being one of the busiest months, however, James Shannon Abbott's timecards show that he worked a total of 17 hours from September 30, 2011, to October 6, 2011, and 16.25 hours from October 7, 2011, to October 13, 2011. [Ex. 1881]. Several of Jesse Pierce's timecards for September to October 2011 show as follows: 12.75 hours for September 2, 2011, to September 8, 2011, [Ex. 1482C]; and 18.5 hours for October 7, 2011, to October 13, 2011, [Ex. 1482D]. Craig Thrift's timecards show: 29 hours for September 30, 2011, to October 6, 2011;[45] 31.25 hours for October 7, 2011, through October 13, 2011; 22 hours for October 14, 2011, to October 20, 2011; 33 hours from October 22, 2011, to October 27, 2011;[46] and 18.25 hours from October 28, 2011, to November 3,

---

[44] The parties stipulated to Exhibit 937 in lieu of Amanda Hill testifying at trial. [Doc. 426 at 254].

[45] The Court observes that there are two timecards from September 20, 2011, to October 6, 2011. Both timecards reflect 29 hours for the week and show the same clock in and out times; however, the signatures and initials on the timecards are different. [Ex. 1491].

[46] This timecard is a bit odd. Thrift's other timecards begin with Friday and end on Thursday. This timecard begins on Saturday, October 22, 2011, and ends on Friday, November 4,

2011. [Ex. 1491]. These are but examples and was used because these sales representatives were among the highest compensated sales representatives (Abbott averaged greater than $450,000 year from 2010 to 2013; Pierce averaged greater than $700,000 a year in 2010 to 2013; Thrift averaged greater than $500,000 a year in 2011 to 2013; and Garrett averaged greater than $275,000 per year in 2011 to 2013).

Thomas Garret's timecards show as follows: 16.25 hours September 30, 2011, to October 6, 2011; 25.75 hours from October 7, 2011, to October 13, 2011; 22.5 hours from October 14, 2011, to October 20, 2011; 32.25 hours from October 22, 2011, to October 27, 2011;[47] and 30.75 hours for October 28, 2011, to November 3, 2011. [Ex. 1627].

It is hard to imagine that these hard working, high earners worked these few hours in the most productive month, yet earned the six-figure incomes they did. Finally, all Plaintiffs testified that they were not allowed to record over forty hours on their timecards, despite working more than forty hours, and that their managers edited the time on their timecards.

Further, all Plaintiffs testified that they worked while they were not clocked in. They clocked out in between tours despite working, they clocked out for lunch despite not taking a lunch break, they did not clock in for party weekends, dinner parties, or nightline if they were approaching forty hours, and they closed contracts while not clocked in. With respect to closing contracts, Plaintiffs submitted documentary evidence showing that many Plaintiffs, and defense witnesses, were working on the clock while closing a contract. [Ex. 3236]. With respect to closing a contract while not clocked in, Defendants were able to rebut only a few of these entries by

---

2011. Neither the timecard before it, nor the timecard after it, shows Friday, October 21, 2011. [Ex. 1491].

[47] *See infra* note 46. This timecard is also missing Friday, October 21, 2011.

explaining that the transactional date and sale date "could" be different, but for a large majority of these entries, the transaction and sale dates are the same. [Ex. 3236].

Accordingly, based on the above findings of fact and the analysis of the FLSA, the Court concludes that Wyndham violated the FLSA by prohibiting Sales Representatives from recording or recovering overtime, despite working overtime, and by instructing sales managers to edit timecards to misrepresent the time that Sales Representatives worked to achieve that result.

The Court further finds that Wyndham knew that it was violating the FLSA because upper management instructed sales managers to edit timecards and to make sure that Sales Representatives did not record overtime. Specifically, the Court finds that not only did management know about the FLSA violations, but management was also involved in violating the FLSA at all four Tennessee locations. All Plaintiffs testified that their managers instructed them to record less than forty hours despite working more than forty hours. Managers acknowledged that they edited timecards and were told to do so by site vice presidents, directors of sales, and/or human resource officers. Further, it appears this was done to increase the income/bonuses of upper management, but whatever the reason, it was a violation of the law.

Because Wyndham knew and even participated in the FLSA violations, the Court finds it appropriate to assess liquidated damages. Defendants have not shown that the failure to obey the law was in good faith and predicated on reasonable grounds. To the contrary, all they offered were current employees who testified <u>they</u> did not do such things, but those supervisors accused of such did not testify as noted herein.

Further, because the Court finds that Defendants' actions were willful, the Court also finds that the three-year statute of limitations is applicable in this case.

The Court finds the testimony to the contrary not credible. For instance, Defendants attempted to rebut Plaintiffs' testimony by emphasizing that Plaintiffs did in fact receive overtime on several paychecks. However, the overtime hours that were emphasized during cross examinations were only occasional and not substantial, handpicked by Defendants out of thousands of records, and did not occur regularly. Further, Defendants' position is weakened by Defendants' emails regarding overtime and changes made to timecards. For example, an email dated August 16, 2013, from Amanda Hill to Kyle Smith and other managers, states, "The following reps had overtime reported. This will cost us!" [Ex. 798A]. Kyle Smith attempts to explain this and other emails were not found credible by the Court. In another email dated, September 24, 2012, Lisa Jarvis, the Senior In-House Manager, states:

> Craig has no hours??? He needs to fill out a time card for the week on a missed punch form. Stef you know how big of an issue this is. Fill these sheets out, get them signed and bring them to John before you go home today. OVERTIME is not acceptable! All the reps with overtime will be receiving coaching notes. Managers are you monitoring their time?

[Ex. 1233].

Further, the Court finds that Defendants' witnesses' testimony regarding off-the-clock work was questionable. For example, on cross examination, Greg Christian was asked why he was not clocked in for the 98 contracts, out of the 237, that he closed. [Ex. 3250]. He testified that Wyndham would not approve that and that "it is what it is." [Doc. 395 at 123]. He further explained that he missed those punches. On direct examination, he testified that he worked mornings in June and July, and his explanation as to why he did not clock in until mid-morning or afternoon was that he simply forgot. [Ex. 6548].

The Court did not find Greg Christian's testimony particularly credible. He is still currently employed at Wyndham and despite him being a top earner and a "Legend," he claimed he started

work at 7:30 a.m., and was done by 12:30 p.m., and thus worked only 25 to 30 hours per week. This would mean that he never did an afternoon tour, nor stayed for closings. From his testimony, it appears he did both but was not on the clock, as per the Plaintiffs' testimony. He also testified that he was good at clocking in and keeping accurate records, but the cross examination impeached such testimony. Christian also testified that he was a Legend, giving him more freedom, and his experience was different than others. Further, he denied that managers did what managers admitted doing, and the proof was consistent that other non-testifying managers doctored time. Further, the managers' testimony was consistent with the other proof in this case

There were similar deficiencies in Defendants' other witnesses. For instance, Elizabeth Matthews described herself as a "workhorse," yet in October 2010, she recorded on average of 4.4 hours per day. [Ex. 3262]. This means, at best, the undersigned and Matthews do not share the same understanding as a "workhorse," or at worse, Matthews was simply not telling the truth. Further, on direct examination, Matthews testified that her normal work hours were only from 8:00 a.m., to 2:00 p.m., to 3:00 p.m. On cross examination, however, when asked why in October, she clocked in after the first tour wave, she testified that she elected to miss the first round of tours. Such testimony is inconsistent with her direct examination, and the Court finds it to be not credible. Further, the Court finds her testimony that her recorded time was accurate is unrealistic and incredible in light of the fact that Matthews legitimately missed a punch almost every day for a period of six months, had 1,109 missed punches, and her admission that she was a habitual offender at not clocking in. She also testified that everyone was on vacation in January and February, which is obviously not credible.

With respect to Dale Topping's testimony, the Court finds that he is a current Wyndham employee, and most of his testimony was an explanation regarding procedure but not very relevant

to the issues. His testimony regarding generating a contract while he was not clocked in not credible. He explained that he may not have been clocked in because it was a be-back, a blowout situation, or a missed punch and that in any event, even if he was given additional time, it would not put him in an overtime situation. The Court finds his explanation doubtful. For instance, on October 10, 2013, a contract was printed and closed, and he was not clocked in for the entire day. [Ex. 6549A] He testified that he only worked 30 to 35 hours, starting work at 7:45 a.m. This would mean he, like Christian, would have been done by 12:45 p.m., or so. It appears unlikely that he never worked an afternoon tour or completed all his closings so early, which took up to an hour, and after which, he walked the customers out to their cars.

Similar deficiencies exist with respect to Greg Minor's testimony. *See* [Ex. 3271]. Minor is also a current management employee of Wyndham. He testified he arrived between 7:45 a.m., or 8:00 a.m., and left between 1:00 p.m. and 5:00 p.m., but rarely stayed after 5:00 p.m. Yet, he only estimated his average hours at 30 to 35 hours per week. He admitted that he probably did not record all the hours that he worked. He also purported to be able to testify about precise hours worked weekly by almost a dozen sales representatives up to seven years ago.

Further, Connie McGlothin is also a current Wyndham employee. She initially claimed that she was the first to arrive and last to leave work, leaving at 5:00 p.m., to 6:00 p.m. She acknowledged that the first tours began at 8:00 a.m., to 8:30 a.m., and that the last tours began at 3:00 p.m., to 3:30 p.m. She admitted on cross examination that those 3:30 p.m. tours, would last until 5:30 p.m., and the closing would not be over until 8:30 p.m., to 10:00 p.m. She "guessed" that the latest she stayed for a closing was 9:00 p.m., to 10:00 p.m. She also testified that after the sales representatives left, she had lots of paperwork and reports to complete. Thus, it does not seem credible that she left by 5:00 p.m., to 6:00 p.m., on a daily basis. In this regard, the Court

also finds the testimony of Nelon, Pierce, Sr., Siler, Tesh, Slone and Stallings—all sales representatives who worked for her—more credible in their testimony than her. Further, she had inaccurate Punch Forms that she could not adequately explain. [Ex. 3278, 3280]. The Court also finds it unusual that she could recall forty-four sales representatives' average number of hours worked in a workweek up to seven years ago but could not recall if she had ever disciplined Jason Yocum, who she allegedly had to chase down to sign Punch Forms. She agreed that it was reasonable to assume that she had not disciplined him given that there was nothing in his personnel file indicating that she had done so. She also did not know that certain sales representatives closed a substantial number of contracts after 3:00 p.m., (42 by Cooper), after 2:00 p.m. (30 by Dickerson), or after noon (101 by Campbell). Finally, although she testified that sales representatives left earlier, she admitted a late night for a closing could be 9:00 p.m., or 10:00 p.m.

With respect to Bobby Cummings, he is also a current Wyndham employee and was a Discovery Sales Representative. He acknowledged that Discovery Sales Representatives were the last to leave because their pitch came after a tour. He also testified that sales representatives who worked off the clock were fired or written up (which the Court finds not credible) and testified that sales representatives did not work at home as they were all lazy. In light of all the other testimony, the Court finds this not credible either.

Further, the Court finds several statements by Kyle Smith not to be credible. For instance, while Smith claims he did not know that sales representatives were working while not clocked in until the audit, the Court finds this testimony not credible because he was sent various emails from Amanda Hill regarding sales representatives' time. [Ex. 1233, 798A]. The Court finds Smith's claims that he did not know what was occurring implausible, given the documentary evidence in this case. In addition, when asked whether both representatives were required to stay through a

closing, he claimed it was not a policy but instead a "best practice," despite John Geissberg's email stating that it was a requirement. [Ex. 1131]. He did admit that in the Tennessee properties, sales representatives were to follow up with their customers by telephone and email. His testimony, however, regarding the emails referring that overtime "will cost us" and "is not acceptable" is not credible as relating only to prior reporting of overtime.

Further, with respect to Jeanie Willis, another current employee of Wyndham, she was located in Florida and not present on any of the sites. She could not testify as to whether Sales Representatives' timecards were accurate. In fact, when she processed payroll, she assumed the entries in WynTime were accurate, and she never performed an audit of the timecards. She further acknowledged that she did not know if the hours recorded were accurate. The Court finds her testimony was not relevant to the allegations against Wyndham.

The Court further notes that all of Defendants' witnesses are also still employed at Wyndham while testifying on its behalf. Finally, the Court notes that while Plaintiffs signed Wyndham's policies regarding timekeeping and overtime, these policies were not explained to Plaintiffs and that they believed and followed their managers' directions regarding overtime hours and believed what they were told—that is, both their overtime hours and their non-overtime hours were recouped by Wyndham.

The Court must now determine the amount of uncompensated hours worked. The Court observes that its "determination is by necessity imprecise, involving estimates and averages, since Defendant[s] failed to keep records of the precise time Plaintiffs worked." *Baden-Winterwood*, 729 F. Supp. 2d at 991-92. Specifically, Plaintiffs have requested that the Court award 63.66 hours per week for all Plaintiffs. *See* [Doc. 417-5]. While the Court finds Plaintiffs have established that they worked overtime, the Court finds Defendants have somewhat rebutted Plaintiffs' average,

and further finds Plaintiffs' own testimony, albeit only estimates, to be a bit on the high side, and thus, a reduction is warranted.

Plaintiffs testified and the Court finds that virtually all of the Plaintiffs (except Discovery Representatives) regularly began their day by attending a mandatory meeting at approximately 8:00 a.m. Tour waves were scheduled in the morning, around noon, and in the afternoon. Plaintiffs rarely took uninterrupted lunch breaks. If Plaintiffs were not on tour, they were waiting for the next tour, at a continuance, shadowing other sales representatives, or following up with clients but were on the clock at the work premises. The Court notes that there was no set time for Sales Representatives to leave because it ultimately depended on when clients stopped checking in for the evening or whether a client agreed to purchase. Defendants assert that based on their Payment Gateway Data, 84% of the transactions relating to payment for contracts associated with Plaintiffs occurred before 5:00 p.m., and that 63% of the transactions relating to payments for contracts associated with Plaintiffs occurred before 3:00 p.m. [Doc. 420]. Plaintiffs respond that using Defendants' percentages, this means that Plaintiffs were involved in 19,065 contracts during the Recovery Period. Plaintiffs continue that this further means that the payment for 7,054 contracts was received after 3:00 p.m., and that the payment for 3,050 contracts were received at 5:00 p.m. [Doc. 425]. The Court finds that Sales Representatives were expected to, and indeed required, to stay with the customers through closings.

The Court finds that the above numbers do not rebut but confirms Plaintiffs' position that they often stayed late. As Plaintiffs testified, many deals were split between a front ender and back ender and that both sales representatives, per John Geissberger, were required to stay throughout the closing. *See* [Ex. 1046] (email explaining that both representatives must stay through the closing or be placed on overage). In addition, they were also required to walk the client to his/her

car and answer any follow-up questions. Further, the Court notes that not every tour ended in a closing and that closings were not the only duties Sales Representatives performed. For instance, Sales Representatives also participated in nightline, dinner parties, and party weekends. Finally, often times, Sales Representatives performed work when they arrived home such as answering emails and making telephone calls, and the Court finds that although Discovery Representatives often stayed later, in those cases where there was not a sale or closing, they stayed and made their presentation. Thus, while they started later, they often stopped later.

The Court further finds that Plaintiffs often worked five to six days a week. Plaintiffs testified that they were familiar with "six-ones" (i.e., six days on, one day off) and that they worked "six-ones." In fact, an email from John Geissberger canceled all leave requests from June to September and specifically states that the sales representatives were to work "six-ones." [Ex. 1144].

The Court finds, however, that January and February were considered the slow season and that during these months, Plaintiffs did not work as many hours. While a number of Plaintiffs testified that they worked the same amount of hours during the slow season as the busy season, the Court finds otherwise. A number of Plaintiffs acknowledged that January and February were slower and that they did not work as many hours. To highlight a few examples, Tony Siler acknowledged that in January and February, he worked about 20 to 30 hours per week and that his recorded hours were probably accurate during those months. Shannon Abbott testified that he left for Florida every year on December 31 and that he stayed in Florida for two months. Michael Pierce, Sr., testified that he attended President's Club every year and that they were always in January or February. He also testified that he wanted to schedule his back surgery during the "off season." Jesse Pierce also attended President's Club, along with David Nelon. While Pierce

testified that he attended daily meetings during his trips, he did not provide any testimony with respect to how much work he performed during these trips or how long he spent in meetings. Stacy Heaton testified during his deposition that sales representatives had time off in January and February and that they did not work that long because it was the slower season. [Doc. 421-15]. While several Plaintiffs testified that they did road shows, it was not clear to the Court how much work they actually performed or hours they spent working.

Defendants tried to rebut Plaintiffs' testimony because several Plaintiffs testified that they could not recall the most amount of hours or the least amount of hours that they worked in a workweek. Further, the Court observes that in the deposition designations (e.g., Alexander Grimal, Craig Carson, Clayton Dalton, Doug Kyle, Jeanne Swafford, Robin Dickerson, Stacy Heaton, Randolph Navarro), Defendants questioned how many hours were worked in a specific workweek. The fact that Plaintiffs cannot recall the specific amount of hours that they worked in a specific workweek approximately six years ago does not discredit their testimony. In fact, the Court would question such testimony if they were able to recall such specific details without detailed records. Further, the case law previously cited supports the same proposition.

The Court agrees that the Sales Representatives often stayed late, "often" worked greater than forty hours whether on tours, at closings, doing follow-up contact works, nightlines, dinner parties, party weekends, and so forth. But the Court does not find that they "always" or even "regularly" worked as long as some claimed. The Court finds that the January through February time period was slower and Sales Representatives generally worked less hours and took off more then; that there was likely time taken off for trips, vacations, personal matters, medical and family issues. The Court finds there were some very busy days, weeks, and months (i.e., Rocktober, Yesvember, holidays, and summers), but there were also slows days, less tours, and leaving early.

It appears virtually unanimous that most of all the Sales Representatives arrived by 7:30 a.m., to 8:00 a.m., for the start of business (except the Discovery Representatives, who started later but often stayed later due to trying to sell to those who did not buy). When they left, was a function of tours, sales success and contracts to be closed. There was also some work done after they left. Accordingly, the Court has weighed all the evidence, testimony, and exhibits and finds that the reasonable inference to be drawn is that the average number of hours worked were 52 hours per week, meaning that the Sales Representatives are entitled to 12 hours per week of overtime compensation.

### C. Representative Testimony

As mentioned above, Defendants have moved [Doc. 403] this Court for partial findings and conclusions regarding the representative evidence. The Court will first summarize the parties' positions on this Motion and then determine whether the testimony of the Sales Representatives was representative of the non-testifying Sales Representatives.

### 1. Positions of the Parties

Defendants move [Doc. 403] the Court, pursuant to Federal Rule of Civil Procedure 52(c), to find that Plaintiffs failed to carry their burden to show that their trial evidence was representative of the class. Defendants assert that Plaintiffs failed to prove at trial that their small, hand-picked sample of witnesses was sufficiently representative to show class wide liability and damages. Defendants assert that the Court excluded Dwight Steward, Plaintiffs' expert, as a witness but that Plaintiffs did not even follow their own expert's methodology. Defendants assert that, instead, Plaintiffs handpicked a small number of them to testify and then added Plaintiffs who were not part of the original sample. Defendants assert that there was no expert testimony at trial to prove that their sample was reliable or representative. Defendants assert that Plaintiffs ask that the Court

presume without any proof that the testimony of 30 hand-picked trial witnesses are representative of 156 Plaintiffs and that the testimony is scientifically valid and reliable.

Further, Defendants argue that the unrebutted expert evidence at trial showed that Plaintiffs' small, hand-picked sample was not representative. Defendants provide that Dr. Mitchem, through his report and trial testimony, exposed fatal flaws in Plaintiffs' claim that their sample of witnesses was representative and reliable.

In addition, Defendants assert that Plaintiffs' trial witnesses varied significantly from the class to their own sample. Defendants explain that out of 156 Plaintiffs, nineteen worked at the Glade and only seven testified. Further, Defendants state that twenty Plaintiffs worked at the Nashville location but only one of the testifying Plaintiffs worked exclusively at the Nashville location. They state that ninety-seven of the Plaintiffs worked at one or both of the Sevierville locations but twenty out of twenty-five Plaintiffs who testified worked only at the Smokies. They assert that the Smokies Plaintiffs were overrepresented and the Glade and Nashville Plaintiffs were underrepresented at trial. Defendants argue that such differences also extend to the positions held by Plaintiffs. Defendants submit that the Court heard from a disproportionally high number of In-House Sales Representatives from the Smokies who claim to have worked more hours off the clock than any other category of Plaintiffs.

Defendants also argue that Plaintiffs' purported sample provided testimony that was internally inconsistent and irreconcilable. For example, Defendants explain that the amount of time that Plaintiffs claim to have worked each week varied among the Plaintiffs from an average of 50 hours a week to 80 hours a week with tremendous variations in between. In addition, Defendants argue that Plaintiffs also offered different theories of proof relating to working off the clock, which demonstrates that the testimony is not representative. Defendants assert that its

witnesses further show the individualized nature of Plaintiffs' claims and the extensive variation among Sales Representatives' testimony.

Defendants submit that Plaintiffs' testimony was vague and insufficient to prove liability and damages for each member of the collective action. Defendants argue that Plaintiffs' so-called representative evidence would not be admissible in individual lawsuits under *Tyson Foods, Inc., v. Bouaphakeo,* 136 S. Ct. 1036 (2015). Finally, Defendants submit that *Monroe* is different than the present matter.

Plaintiffs respond [Doc. 407] that they called a sufficient number of witnesses. They explain that thirty Plaintiffs testified (live or by deposition), which equals 19.23% of the 156 member class. Plaintiffs claim that they testified about their own personal experiences as well as others; Kristen Creson provided damning testimony about the illegal practices; Bryan Tesh confirmed the widespread practice of altering WynTime records at the Crossing and Lodge; Jeff Cross confirmed that the "higher-ups" sanctioned and endorsed the illegal practices; and Plaintiffs presented documentary evidence on the issue of liability and the inaccuracy of Defendants' time records. Plaintiffs continue that its witnesses were not "hand-picked," but instead, they were either part of a random sample group or the Plaintiffs that Defendants chose to depose, with the exception of Kristen Creson (a non-party). Plaintiffs claim that Defendants' trial proof was the epitome of cherry-picking, since they chose to call only current employees, with the exception of Dr. Mitchem, their expert.

Further, Plaintiffs submit that the proof adequately covered the four Tennessee properties. Plaintiffs state that out of the 156 Plaintiffs, thirty-one worked at the Glade, and that out of these thirty-one, three Plaintiffs testified live (Danny Chappell, Jeffrey Cross, and Jimmy Dixon) and one Plaintiff testified by deposition (Judith McGinty). In addition, Plaintiffs submit that

Defendants designated deposition testimony from four other Plaintiffs who worked at the Glade (Craig Carson, Brandon Evans, Alexander Grimal, and Jeane Swafford). Plaintiffs assert that Defendants focus on the quantity of those testifying while ignoring the quality and expansiveness of their testimony. Plaintiffs continue that in Nashville, thirty out of the 156 Plaintiffs worked in Nashville and that two Nashville Plaintiffs testified at trial (Alana Cheij and Michael Pierce, Sr.), while two others testified by deposition (Mark Kost and Laurie McBride). With respect to Defendants' argument that In-House Sales Representatives were disproportionally represented at trial, Plaintiffs state that Defendants provide no corroboration for Defendants' numbers and that 137 of the 156 Plaintiffs worked as an In-House Sales Representative at some point.

Plaintiffs also argue that their proof was not internally inconsistent and irreconcilable. Plaintiffs claim that Defendants mischaracterize the testimony of Plaintiffs. In addition, Plaintiffs assert that although Defendants attempt to make artificial distinctions regarding the various ways that Plaintiffs testified about working off the clock, Plaintiffs testified to several of the many means utilized by Defendants to achieve its illegal practice of requiring Plaintiffs to work while not clocked in. Plaintiffs continue that Defendants' hand-picked witnesses were not credible.

Plaintiffs state that their proof satisfies, *Mt. Clemens Pottery, O'Brien*, and *Monroe* and that Defendants' remaining arguments are meritless. Finally, they argue that expert proof is not required.

Defendants respond [Doc. 412] that Plaintiffs have failed to demonstrate that the evidence they offered is representative of the class. Further, they assert that Plaintiffs' legal arguments attacking Dr. Mitchem's expert testimony are not based in fact and are not sufficient to satisfy their burden of proof. Finally, Defendants argue that this case is distinguishable from *Monroe*

because in the instant matter there is unrebutted expert testimony that Plaintiffs' evidence is not representative.

### 2. Standard for Representative Testimony

The Court has reviewed both parties' positions and finds Defendants' position not well taken. The Court further finds that the testifying Sales Representatives were representative of the non-testifying Sales Representatives.

As previously explained [Doc. 362], courts within the Sixth Circuit have allowed the use of representative testimony to establish liability and damages. As stated in *Monroe*, "In FLSA cases, the use of representative testimony to establish class-wide liability has long been accepted." 860 F.3d at 408. The court continued, "Our sister circuits overwhelmingly recognize the propriety of using representative testimony to establish a pattern of violations that include similarly situated employees who did not testify." *Id.* The court concluded, "In the face of these consistent precedents, many with fact patterns similar to this case, FTS and UniTek point to no case categorically disapproving of representative testimony to prove employer liability to those in the collective action who do not testify." *Id.* at 409; *see also Morgan v. Family Dollar Store, Inc.*, 551 F.3d 1233 (11th Cir. 2008) ("If anything, the *Mt. Clemens* line of cases affirms the general rule that not all employees have to testify to prove overtime violations.").

The same holds true with damages. Specifically, with respect to damages in a collective action, courts have also allowed representative testimony. *See Monroe,* 860 F.3d at 411 (explaining that the "testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees") (quoting *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F3d 775, 781 (6th Cir. 1995)); *Baden-Winterwood*, 729 F. Supp. 2d at 989-92 ("Relying on *Mt. Clemens Pottery*, courts, including the Sixth Circuit, have uniformly held that damages in FLSA

overtime cases can be proved with testimony from a representative group of plaintiffs."); *Takacs v. Hahn Automotive Corp.*, No. C-3-95-404, 1999 WL 33127976, at *1-3 (S.D. Ohio Jan. 25, 1999) (Based upon *Mt. Clemens Pottery*, courts, including the Sixth Circuit, have uniformly held that damages in an FLSA overtime case can be proved, with testimony from a representative group of plaintiffs, and, thus, without requiring each plaintiff seeking same to testify.").

For example, in *Takacs*, an issue arose as to how the plaintiffs intended to prove damages in a FLSA case. 1999 WL 33127972, at *1. Defendants argued that at least one plaintiff from each location needed to testify. *Id.* Plaintiffs responded that Defendants' suggestion would result in nearly all of them being required to testify. *Id.* The court determined, "There is no magic formula for the number or percentage of plaintiffs who must testify." *Id.* The court relied upon a Second Circuit decision that explained as follows:

> Although [defendant] is correct that most cases resting on representational evidence "involve a fairly small employee population, a limited number of employee positions, and uniform work tasks," *Reich v. Southern Maryland Hosp., Inc.,* 43 F.3d 949, 952 (4th Cir. 1995); *see, e. g., Bel–Loc Diner,* 780 F.2d at 1115 (testimony of 22 employees for DOL supporting award of backpay to group of 98 employees); *Donovan v. Williams Oil Co.,* 717 F.2d 503, 505 (10th Cir. 1983) (testimony of 19 supported award to group of 34); *Donovan v. Burger King Corp.,* 672 F.2d 221, 224–25 (1st Cir. 1982) (testimony of six employees from six restaurants, with stipulations from 20 others, found to support backpay award to 246 employees at 44 restaurants); *Brennan v. General Motors Acceptance Corp.,* 482 F.2d 825, 826, 829 (5th Cir.1973) (testimony of 16, award to 26), there is no bright line formulation that mandates reversal when the sample is below a percentage threshold. It is axiomatic that the weight to be accorded evidence is a function not of quantity but of quality, *DeSisto,* 929 F.2d at 793 (" 'the adequacy of the representative testimony necessarily will be determined in light of the nature of the work involved, the working conditions and relationships, and the detail and credibility of the testimony" ') (quoting, with approval, brief of Secretary of Labor), and that, depending on the nature of the facts to be proved, a very small sample of representational evidence can suffice. *Cf. Mt. Clemens,* 328 U.S. at 690–91 (testimony of 8 of approximately 300

employees, or 2.7% of group, sufficient to establish entitlement to recovery under the FLSA). Our focus is not on the numbers in isolation but on whether the district court could reasonably conclude that there was "sufficient evidence to show the amount and extent of ... [uncompensated] work as a matter of just and reasonable inference." *Id.* at 687.

*Id.* at *2 (quoting *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 67-68 (2d Cir. 1997)). The court determined that plaintiffs may attempt to prove damages with testimony from only four to six members but that they bear the risk of failing to establish that the testifying employees are fairly representative. *Id.*

With the above analysis in mind, the Court will now determine whether the testifying Plaintiffs are fairly representative of those who did not testify so that the Court can reasonably conclude that there was sufficient evidence to show the amount and extent of uncompensated work as a matter or just and reasonable inference. *See Baden-Winterwood*, 729 F. Supp. 2d at 997.

### 3. Findings of Fact and Conclusions of Law

After hearing the evidence in this case, and for the reasons further explained below, the Court finds that the Sales Representatives' testimony is representative of the non-testifying Sales Representatives and is sufficient to show to the Court's satisfaction the extent and amount of uncompensated hours. As an initial matter, the Court observed during the trial that Plaintiffs' testimony was fairly repetitive, as well as the cross examinations of the Plaintiffs. Further, the evidence presented established that the job expectations among the positions were generally uniform. *See Baden-Winterwood*, 729 F. Supp. 2d at 997. For instance, the Sales Representatives' job was to sell. As explained above, the only difference between In-House Sales Representatives, Front-Line Sales Representatives, and Discovery Sales Representatives was to whom they were selling. The Sales Representatives conducted tours in hopes of selling a timeshare or discovery package. Further, the Sales Representatives worked common schedules. They were required to

report to work each morning at approximately 8:00 a.m. for a morning meetings, except Discovery Sales Representatives who stayed later. Afterwards, tours began in the morning, around noon, and in the afternoon. If they were not on tour, they shadowed other Sales Representatives, followed up with clients, or waited on the tours. The Court observes that none of the Plaintiffs had a specific end time because it ultimately depended on customers' actions (i.e., whether Sales Representatives were still discussing sales with customers, whether customers were still checking in, or whether customers had agreed to purchase). However, the Court has taken this into account when determining the average. Further, the Court notes that Sales Representatives were scheduled five days a week but often worked "six-ones." Further, Plaintiffs testified that it was common to come in on their day off to work if they had a continuance or a hero tour scheduled. In addition, all Plaintiffs were paid using the same compensation system—that is, commissions with minimum wage being recouped by Defendants. More importantly, Plaintiffs testified uniformly about the FLSA violations. Specifically, Plaintiffs testified that they could not record more than forty hours, despite working more than forty hours, and that managers edited, falsified, and "doctored" their time records.

Defendants argue that Plaintiffs failed to prove at trial that their small, hand-picked sample of witnesses was sufficiently representative to show class wide liability and damages. Defendants assert that Plaintiffs did not have expert proof to establish their sample was reliable or representative. The Court finds, however, that Defendants' arguments are misplaced. Whether there is sufficient evidence in the record to support a conclusion that can be applied to the collective action is a decision reserved for the undersigned. As previously noted by the Court, if Plaintiffs establish that they are similarly situated and therein chose to rely on a sample at trial, they risk not being able to establish liability and damages on a representative basis. *See Takacs*, 1999 WL

33127976, at *3. Here, the Court finds that Plaintiffs were able to establish liability and damages on a representative basis. Defendants continue that Plaintiffs "ask the Court to presume—without any proof—that the testimony of their 30 hand-picked trial witnesses were representative of 156 opt-in Plaintiffs." [Doc. 404 at 7]. The proof of representativeness, however, was the Plaintiffs' own testimony with respect to their own experiences and what they observed on behalf of others. The Court is satisfied that Plaintiffs have established liability and damages with respect to the non-testifying Sales Representatives. The overall testimony of Plaintiffs' witnesses was so repetitive and consistent on the key issues and that to have heard more witnesses would have only lengthened the already long trial (three weeks). Further, if there were other witnesses who would have testified contrary to these Plaintiffs called, the Defendants were free to call them as witnesses. Their failure to call more witnesses than they did is telling.

Defendants again rely on *Tyson Foods, Inc., v. Bouaphakeo,* 136 S. Ct. 1036 (2015). The Court has already explained why the instant matter is different than *Tyson Food*s, and the Court will not repeat its analysis of *Tyson Foods* herein. *See* [Doc. 363]. Defendants also rely on *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013), stating, "The Seventh Circuit affirmed and rejected the use of 'representative testimony' to prove FLSA violations where the Plaintiffs failed to provide expert statistical analysis to set forth the evidentiary basis for their 'sample' and extrapolation." [Doc. 404 at 9]. As noted by Plaintiffs, however, the Sixth Circuit has expressly stated that *Espenscheid* is at odds with Sixth Circuit precedent:

> Lastly, FTS and UniTek argue that *Espenscheid*—a Seventh Circuit case affirming the decertification of a collective action seeking unpaid overtime—compels decertification here. 705 F.3d at 773. *Espenscheid*, however, is based on Seventh Circuit authority and specifically acknowledges that it is at odds with Sixth Circuit precedent. *Id.* at 772 (citing *O'Brien*, 575 F.3d at 584). Though recognizing the differences between Rule 23 class actions and FLSA collective actions—and admitting that Rule 23 procedures are

absent from the statutory provisions of the FLSA—the Seventh Circuit determined that "there isn't a good reason to have different standards for the certification of the two different types of action." *Id.* This conflicts with our precedent. Explaining that Congress could have but did not import the Rule 23 predominance requirement into the FLSA and that doing so would undermine the remedial purpose of FLSA collective actions, we have refused to equate the FLSA certification standard for collective actions to the more stringent certification standard for class actions under Rule 23. *O'Brien*, 575 F.3d at 584, 585–86.

The difference between the Seventh Circuit's standard for collective actions and our own is the controlling distinction for the issues before us. The facts and posture of *Espenscheid*, however, also distinguish it from this case. There, the district court decertified the collective action before trial, after which the parties settled their claims but appealed the decertification. Reviewing for abuse of discretion, the Seventh Circuit affirmed the district court. The circuit opinion noted that the plaintiffs had recognized the possible need for individualized findings of liability for a class of 2,341 members— nearly 10 times larger than the group here—but "truculently" refused to accept a specific plan for litigation or propose an alternative and failed to specify the other kinds of evidence that they intended to use to supplement the representative testimony. *Espenscheid*, 705 F.3d at 775–76; *see Thompson v. Bruister & Assocs., Inc.*, 967 F.Supp.2d 1204, 1216 (M.D. Tenn. 2013) (holding that *Espenscheid* cannot "conceivably be read as an overall indictment of utilizing a collective action as a vehicle to establish liability in piece-rate cases ... because the Seventh Circuit was presented with little choice but to hold as it did, given the lack of cooperation by plaintiffs' counsel in explaining how they intended to prove up their case"). The opinion additionally references no evidence similar to that supporting the time-shaving policy here. And the proposed, but not agreed-upon, representative sample in *Espenscheid* constituted only 1.8% of the collective action, and the method of selecting the sample was unexplained. *Espenscheid*, 705 F.3d at 774.

*Monroe*, 860 F.3d at 405–06; *see also Biggs v. Quicken Loans, Inc.*, No. 10-cv-11928, 2014 WL 12661985, at *3 n.2 (E.D. Mich. Feb. 19, 2014) (explaining that *Espenscheid* relies on the Seventh Circuit's rule that certification of Rule 23 class actions and § 216 collective actions have identical standards and the Sixth Circuit has held the opposite).

Defendants continue that the unrebutted expert evidence at trial showed that Plaintiffs' small, hand-picked sample was not representative. Defendants assert that Dr. Mitchem described in detail that reasons why the sample did not meet commonly accepted standards of statistical proof and that he exposed fatal flaws in Plaintiffs' claim that their sample witnesses were representative and reliable. Further, Defendants argue that Dr. Mitchem explained that the 47 individuals in Plaintiffs' sample were not random and that Plaintiffs only offered 24 individuals' testimony (nineteen at trial and five by deposition) that were originally part of the sample of 47. Defendants state that six other individuals who were not part of the sample were selected as additional trial witnesses.

As an initial matter, the Court observes that Defendants can hardly complain about Plaintiffs' amount of proof, given that they have objected at every request to effort to try this case fairly and efficiently. Defendants refused to ever propose a fairly representative size or configuration and essentially persisted that every Plaintiff needed to be called and/or testify and that no representative proof would be substantially reliable. Defendants originally agreed that the parties should be limited in the number of depositions taken. [Doc. 203]. Later, in December 2016, Plaintiffs presented their representative sample and Defendants insisted that representative sampling was not appropriate and that discovery should be conducted as to each Plaintiff. The Court limited discovery but granted Defendants leave to request additional discovery should they need it. When Plaintiffs filed their witness list, Defendants objected to additional witnesses, despite the fact that Defendants had deposed many of the additional witnesses.[48] The Court further observes that Defendants identified 206 witnesses on their witness list [Doc. 312] but only called nine witnesses to trial.

---

[48] As the Court made clear in its Order [Doc. 374], the Court would not allow Plaintiffs to call party witnesses that had not been deposed by Defendants.

Further, while Defendants claim that Dr. Mitchem's testimony was unrebutted, the Court finds otherwise. First, the Court did not find Dr. Mitchem's testimony persuasive at all. Dr. Mitchem acknowledged that some of his findings were based on the recorded hours with the understanding that Plaintiffs claimed that they worked more hours. It appeared to the Court that his "some" equaled "most." The variation of the recorded hours is no help to the Court because based on the overwhelming evidence, the recorded hours were not reliable and grossly inaccurate and any testimony based on punches would not be reliable or credible. He also testified that for him, a representative sample would have required 120 to 150 Plaintiffs. He also based his opinions on some unsubstantiated correlation of variances between the inaccurate recorded hours and the expected variation in "off the clock" hours, using such unreliable data (i.e., false, inaccurate, and doctored time records) to determine off the clock hours, which makes no logical, scientific or economic sense, nor did he establish the basis for such a method, nor was it established as reliable or credible. In fact, the evidence supports the fact that managers altered time on a routine basis and basically did whatever was necessary in WynTime to keep hours under forty. In addition, the Court questioned Dr. Mitchem as follows:

The Court: All right. Let me just ask him a couple of question, if you don't mind.

So if you had a sample, let's say, of 47, if 46 people have testified to the same thing, is it your position I still need to hear from the 47th?

The Witness: If the 47 people were chosen at random, then I would say no. But I don't believe that they were.

The Court: Okay. And if they were chosen at random and I've heard from 43 of them and they all say the same thing, do I need to hear from the next four.

The Witness: No.

The Court: If I heard from half of them and they all said the same thing, do I need to hear from the other half?

The Witness: No.

. . . .

The Court: If I heard from a third of them or a fourth of them and they all said the same thing, isn't that the whole point, that you don't have to hear from the rest of them?

The Witness: Yeah. So I think what you're describing is adjusting the size of the sample based on information that you're learning from the sample.

The Court: Right.

The Witness: Right.

The Court: So if I've heard the same thing from everybody, do I need to hear from more?

The Witness: No. At some point you could determine that you are reasonably confident that what you've heard from the smaller sample is an accurate reflection of the larger population.

The Court: Okay.

The Witness: However, again, I just want to point out that that is if the sample that you heard from was constructed in an unbiased scientific way.

[Doc. 397 at 159-60].[49]    The Court finds that from the testimony heard, the undersigned is

reasonably confident that what was heard is an accurate reflection of the larger population. The

---

[49] The Court observes that Dr. Mitchem's testimony was also inconsistent with Defendants' proof. For instance, Dr. Mitchem opined that it was reasonable to conclude that an individual who made more money worked more. [Doc. 397 at 172]. According to Connie McGlothin, Defendants' witness, David Nelon worked 25 to 30 hours each week. During the cross examination of David Nelon, he identified his W2s that showed approximately $200,000 each for 2010 and 2011 and $100,000 each for 2012 and 2013. [Ex. 4037]. McGlothin testified, however, that Bryan Tesh worked approximately 30 to 35 hours each week. During Bryan Tesh's cross examination, he also identified his W2s, which showed *substantially* less earnings than Nelon.

Court has considered that Pierce, Sr., Thomas Garrett, James Abbott, Bryan Tesh, Jeff Cross, and Brett Williamson were not part of Plaintiffs' original sample. For the most part, however, their testimony was consistent with the other Plaintiffs. Further, Defendants deposed these individuals, so their testimony was of no surprise. Finally, as mentioned above, Defendants could have called the remaining Plaintiffs in the Plaintiffs' original sample but chose not to do so. They also chose not to call their own management people, who were accused of causing and now allowing the altering of time records.

Defendants argue that Plaintiffs' purported averages vary and that if their averages are taken as true, some Plaintiffs will be overpaid and some Plaintiffs will be underpaid. Damages in collective actions are not exact, nor could they be given that Defendants did not keep accurate time records. Here, Plaintiffs have specifically requested an average for all Plaintiffs, and taking an average naturally means that some Plaintiffs may be overpaid and some may be underpaid. Regardless, this does not affect Defendants as the amount of overtime remains the same.

Defendants also assert that the use of statistically defective representative testimony to impose liability in this case would deny them due process. The Court, however, finds that Defendants were not denied due process. Defendants were free to challenge the testimony of each witness, which they did through cross examination, and they were allowed to call anyone whom they wanted to call to the stand. Further, Defendants do not explain what defenses that they were not allowed to explore with the collective action.

In addition, Defendants assert that Plaintiffs' trial witnesses varied significantly from the class and from Plaintiffs' sample. Defendants continue that Plaintiffs' proof was unrepresentative

[Ex. 5209]. Thus, if Connie McGlothin's testimony were true, Dr. Mitchem's conclusion would not be accurate.

of all 156 Plaintiffs and that the Smokies and In-House Sales Representatives were overrepresented.

Both parties agree that 156 Plaintiffs are involved in this lawsuit. With respect to the Glade and Nashville locations, the Court observes as follows:

- Out of 156 Plaintiffs, thirty-one Plaintiffs worked at the Glade. Three Plaintiffs from the Glade testified at trial (Danny Chappell, Jeffrey Cross, and Jimmy Dixon) and one testified by deposition (Judith McGinty). In addition, Defendants designated depositions of four other Plaintiffs who worked at the Glade (Craig Carson, Brandon Evans, Alexander Grimal and Jeane Swafford). Thus, the Court had testimony from eight Plaintiffs at the Glade.

- Out of 156 Plaintiffs, thirty Plaintiffs worked at the Nashville location. Two Plaintiffs from Nashville testified at trial (Alana Cheij and Michael Pierce, Sr.) and two others testified by deposition (Mark Kost and Lauie McBride). In addition, Defendants designated and Plaintiffs counter-designated a deposition from one other Plaintiff who worked at the Nashville location (Randolph Navarro). The Court also heard the unrebutted testimony of Kristen Creson, who was in management in Nashville.

While not necessarily dispositive, *see Takacs*, 199 WL 331127976, at *3 (noting that "[a]lthough the Defendant has cited a number of cases in which courts commented that there was testimony from an employee at each location, it has not cited any case in which a court said that such was an absolute requirement"), the Court observes that multiple Plaintiffs from each location and from each sales position testified in this case. With respect to Defendants' argument that In-House Sales Representatives were overrepresented, the Court notes that 137 out of 156 Plaintiffs worked as an In-House Sales Representative at some point, *see* [Doc. 407 at 6], so the fact that more In-House Sales Representatives testified can only be expected. Moreover, the Court finds Defendants' arguments too focused on the quantity of testimony rather than the quality. As mentioned above, there was overwhelming evidence, including testimony and documentary evidence, showing that Sales Representatives were not allowed to record over forty hours despite

working forty hours and that managers doctored timecards to keep Sales Representatives' hours under forty. In fact, three managers located in Nashville, Glade, and the Crossing testified that Sales Representatives worked while not clocked in. In addition, all Sales Representatives testified that they were told that they were not allowed to record more than forty hours.

As emphasized earlier, "[i]t is axiomatic that the weight to be accorded evidence is a function not of quantity but of quality . . . and that, depending on the nature of the facts to be proved, a very small sample of representational evidence can suffice." *Reid*, 121 F.3d at 67-68; *see also Mt. Clemens Pottery*, 382 U.S. at 690-91 (testimony of 8 of approximately 300 employees, or 2.7% of the group, sufficient to establish entitlement to recovery under the FLSA). As further explained by *Reid*, "Our focus is not on the numbers in isolation but on whether the district court could reasonably conclude that there was "sufficient evidence to show the amount and extent of . . . [uncompensated] work as a matter of just and reasonable inference." *Reid*, 121 F.3d at 67-68 (quoting *Mt. Clemens Pottery*, 328 U.S. at 687) (brackets in *Reid*). Here, the Court finds that the evidence was sufficient to show the amount and extent of uncompensated work as a matter of just and reasonable inference and that the testifying Plaintiffs are representative of the non-testifying Plaintiffs.

Defendants continue that the testimony was internally inconsistent and irreconcilable. Defendants emphasize that Plaintiffs' testimony regarding their average number of hours were different and that they offered different theories of proof relating to working off the clock. The Court has already addressed Defendants' arguments regarding Plaintiffs' averages. Further, while Defendants assert that the "[s]uch variation among even their basic theories of recovery is additional evidence of the need to decertify the collective [action]," [Doc. 404 at 19], the Court disagrees. All Plaintiffs testified that they were prohibited from recording over forty hours, despite

working forty hours, and that managers altered their timecards. Moreover, a similar argument was raised in *Monroe*:

> The dissent asserts that FTS Technicians allege "distinct" violations of the FLSA and "define the company-wide 'policy' at such a lofty level of generality that it encompasses *multiple* policies." (Dis. at 418.) The definition of similarly situated does not descend to such a level of granularity. The Supreme Court has warned against such a "narrow, grudging" interpretation of the FLSA and has instructed courts to remember its "remedial and humanitarian" purpose, as have our own cases. *See Tenn. Coal, Iron & R.R. Co.*, 321 U.S. at 597, 64 S. Ct. 698; *Keller*, 781 F.3d at 806; *Herman*, 308 F.3d at 585. Many FLSA cases do focus on a single action, such as the donning and doffing cases that the dissent's reasoning would suggest is the only situation where representative proof would work. But neither the statutory language nor the purposes of FLSA collective actions require a violating policy to be implemented by a singular method. The dissent cites no Sixth Circuit case that would compel employees to bring a separate collective action (or worse, separate individual actions) for unreported work required by an employer before clocking in, and another for work required after clocking out, and another for work required during lunch, and yet another for the employer's alteration of its employees' timesheets. Such a narrow interpretation snubs the purpose of FLSA collective actions.

> The dissent concludes that FTS Technicians' claims do "not do the trick" because a "company-wide 'time-shaving' policy is lawyer talk for a company-wide policy of violating the FLSA." (Dis. at 419.) But FTS Technicians' claims do not depend on "lawyer talk"; they are based on abundant evidence in the record of employer mandated work off the clock. That an employer uses more than one method to implement a company-wide work "off-the-clock" policy does not prevent employees from being similarly situated for purposes of FLSA protection. This is not a new concept to our court or to other courts. In accordance with *O'Brien*, we have approved damages awards to FLSA classes alleging that employers used multiple means to undercompensate for overtime. *See, e.g.*, *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) (approving damages award where employers required employees to work uncompensated time both before *404 and after their scheduled shifts and to report only the scheduled shift hours on their timesheets). Other circuits and district courts have done so as well. *See McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 588 (9th Cir. 1988) (affirming damages award where employees gave varied testimony on the means employer used to underpay

overtime); *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 84 (10th Cir. 1983) (affirming damages award where employer failed to compensate for overtime both before and after work, at different locations); *Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *5 (M.D. Tenn. Sept. 26, 2006) (denying motion to decertify class that alleged employer deprived employees of overtime compensation by requiring them to work off the clock and shaving hours from payroll records).

Like the plaintiffs in *O'Brien*, FTS Technicians' claims are unified by common theories: that FTS executives implemented a single, company-wide time-shaving policy to force all technicians—either through direct orders or pressure and regardless of location or supervisor—to underreport overtime hours worked on their timesheets. *See O'Brien*, 575 F.3d at 584–85; *see also Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973) (affirming finding of uncompensated overtime where employees understated overtime because of pressure brought to bear by immediate supervisors, putting upper management on constructive notice of potential FLSA violations). Based on the record as to FTS Technicians' factual and employment settings, therefore, the district court did not abuse its discretion in finding FTS Technicians similarly situated.

*Monroe*, 860 F.3d 389, 403–04. The Court agrees with the above analysis and finds it applicable to the instant case.

Defendants continue that its witnesses further demonstrate the individual nature of Plaintiffs' claims and the extensive variation among Sales Representative and that the trial testimony of Plaintiffs' witnesses was vague and insufficient. The Court has already addressed the credibility of the parties' witnesses and the sufficiency of Plaintiffs' proof and will not repeat its findings here. Defendants assert that at least six Plaintiffs testified that they did know the hours of other Sales Representatives, but other Plaintiffs were able to testify to such, and as noted above, there is ample evidence that Defendants violated the FLSA.[50] Further, while Defendants argue

---

[50] Defendants name David Nelon as someone who could not testify to other sales representatives' hours; however, Nelon specifically testified that, as a manager, he edited timecards to ensure this his sales representatives' hours remained under forty.

that Plaintiffs spoke in vague generalities and speculated, "[t]he employer cannot be heard to complain that damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA]." *Mt. Clemens Pottery*, 328 U.S. at 768-88.

Finally, Defendants' arguments with respect to *Tyson Foods* and *Monroe* have already been addressed herein. *See also* [Doc. 362]. Defendants assert a few arguments, however, that the Court has not previously addressed. Defendants argue that *Monroe* is not applicable here because the parties in *Monroe* essentially stipulated that the witness sample was representative, there was an abundance of evidence in *Monroe* of a company-wide-time-shaving policy that originated from Defendants' corporate office, and that in *Monroe*, plaintiffs held the same position, compensation plan, and job duties, regardless of location. [Doc. 404 at 23].

The Court disagrees with Defendants' assertions. Here, there was ample evidence that upper management, including sales managers, directors of sales, vice presidents, and human resource officers, knowingly violated the FLSA. Further, the Court finds Plaintiffs are similarly situated in that they had the same job duties, were paid utilizing the same compensation method, and kept track of hours using the same time system, despite their different job titles. Finally, Defendants argue that in *Monroe*, the parties essentially stipulated that the sample was representative. In *Monroe*, defendants agreed to limit discovery to a representative sample of 50 opt-in plaintiffs and to approach the court after discovery regarding a trial plan based on representative proof that would propose a certain number of plaintiffs from the pool that could be called as witnesses. 860 F.3d at 410. After discovery closed, defendants objected to the use of representative proof at trial. *Id.* The Sixth Circuit held, "[T]he district court's denial of that motion is not grounds for reversal at this stage." *Id.*

Here, the parties agreed to limit the number of depositions, and the undersigned adopted the parties' agreement as outlined in the Scheduling Order: "The parties have agreed that the Defendants will be allowed to take up to twenty-four (24) additional depositions." [Doc. 203 at 3]. During the Scheduling Conference, the Court instructed the parties to provide their proposed sample representatives, and the undersigned scheduled a hearing on the sample representation on December 12, 2016. [*Id.*]. Despite agreeing to limit depositions, Defendants argued at the hearing that representative testimony was inappropriate and that they should be allowed to take each Plaintiffs' deposition. The Court limited discovery to Plaintiffs' representative sampling but granted Defendants' leave to request additional discovery beyond the representative list. [Doc. 215]. Defendants subsequently sought leave to take additional depositions of the members in Plaintiffs' sample representation, and the Court granted [Doc. 254] this request. Later, Defendants filed a motion for decertification, wherein the Court reviewed the evidence before it, and the Court determined that Plaintiffs were similarly situated to proceed as a collective action. Defendants' arguments herein do not change the Court's analysis.

Moreover, the Court emphasizes that Defendants deposed all Plaintiffs who testified, and the Court specifically instructed the parties that any Plaintiff who was supposed to testify had to participate in a deposition with Defendants. Finally, Defendants had the opportunity to call other Sales Representatives and other managers, but they simply chose not to do so. *Monroe*, 860 F.3d at 410 (defendants "had the opportunity to call other technicians but chose not to"); *Morgan*, 551 F.3d at 1278 ("Family Dollar cannot validly complain about the number of testifying plaintiffs when . . . Family Dollar itself had the opportunity to present a great deal more testimony from plaintiff store managers, or its own district managers, [but] it chose not to."). Accordingly, the Court finds Defendants' arguments not well taken.

## IV.    CONCLUSION

Accordingly, for the reasons explained above, the Court finds the Plaintiffs performed work for which they were not properly compensated and that the amount and extent of the work performed can be and has been determined as a matter of just and reasonable inference.  The Court finds the Defendants failed to come forward with a credible and precise amount of the work performed and failed to negate the reasonableness of the inference drawn by the Court from all the evidence in this case.  Further, the Court finds that Defendants violated the FLSA by prohibiting Sales Representatives from accurately recording their time and by instructing sales managers to edit timecards to ensure Sales Representatives' timecards did not reflect over forty hours per week. The Court finds that liquidated damages shall be awarded and that the statute of limitations shall be three years.  Further, the Court finds that testifying Sales Representatives fairly represent the non-testifying Sales Representatives.  The Court finds that the Sales Representatives averaged 52 hours each week, during the Recovery Period and as such are entitled to 12 hours of overtime per week.

The Court arrives at its conclusion by considering all of the testimony of all the various witnesses, as well as the exhibits provided.  Obviously, the Court finds some testimony more credible, reasonable, and persuasive than other testimony, and this has been set forth in this opinion.  The Court concludes that the Sales Representatives worked five to six days per week from March to December and something less in January and February.  The Court is mindful that the time records are essentially of no use due to their falsity and inaccuracy.  The Court is also mindful that the estimates of hours of all witnesses were, at best, estimates of hours worked years ago. The Court is also mindful that each witness may have been somewhat biased, high or low, in their respective testimony and estimates on hours worked.  Nonetheless, the Court is comfortable

that based on all the testimony that Sales Representatives averaged 52 hours per week.  This means that they worked an average of 12 hours of overtime per week for the three year Recovery Period.

Finally, the Court observes that following the trial in this matter, the parties agreed that if the Court were to find violations of the FLSA, they would be able to calculate and agree on the appropriate dollar amount of damages in prompt fashion as this task was purely a mathematical function.    At this point, the Court will not enter a monetary Judgment until the parties have reported to the Court on the amount of damages, given the Court's Memorandum Opinion. The Court will thereafter enter a final Judgment reflecting the above findings and the parties' reports on the damage calculation.  The parties shall file a joint status report on the calculation of damages on or before **noon on February 2, 2018**.  If the parties cannot agree, they shall file separate reports on the same explaining their respective proposed calculation by **noon on February 2, 2018**.  The Court will award Plaintiffs reasonable attorney's fees pursuant to 29 U.S.C. § 216(b).  Plaintiffs shall file their motion requesting attorney's fees within thirty days of entry of the final Judgment in this case.

ORDER ACCORDINGLY:

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge