**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

| | | |
|---|---|---|
| JESSE PIERCE and MICHAEL PIERCE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 3:13-cv-00641-DCP |
| WYNDHAM VACATION RESORTS, INC., and WYNDHAM VACATION OWNERSHIP, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPENING BRIEF ON REMAND

Defendants Wyndham Vacation Resorts, Inc. and Wyndham Vacation Ownership, Inc. ("Defendants" or "Wyndham") respectfully submit this opening brief on remand.

## I.   INTRODUCTION

This is a collective action brought by timeshare sales representatives who worked at Wyndham's facilities in Tennessee and who seek to recover overtime pay under the Fair Labor Standards Act ("FLSA"). This matter is currently before the Court on remand from the Sixth Circuit.  On appeal, the Sixth Circuit (1) partially decertified Plaintiffs' collective action, holding that discovery sales employees are not similarly situated to other members of the collective action, (2) vacated Plaintiffs' damages award, (3) remanded to reassess damages for the front-line and in-house sales employees, and (4) affirmed summary judgment against Plaintiff Melissa Evans for failure to disclose her FLSA claim in her bankruptcy proceeding. *See generally Pierce v. Wyndham Vacation Resorts, Inc.,* 922 F.3d 741 (6th Cir. 2019).

Following a status conference on July 11, 2019, the Court ordered the Parties to submit briefs addressing the following three issues: (1) how the discovery employees' claims should be resolved in light of the Sixth Circuit's opinion, (2) how to reassess damages for the front-line and in-house sales employees, and (3) whether Defendants should be permitted to raise the issue of judicial estoppel at this time. (ECF No. 465). This brief addresses each of those issues in turn.

First, the discovery employees should be dismissed without prejudice. This is the well-established remedy that applies when a court finds that members of a collective action are not similarly situated. Any attempt to fashion a subclass and award damages to the discovery employees is unsupported by the trial record and inconsistent with the Sixth Circuit's opinion.

Second, the Court should reassess damages for the front-line and in-house employees using objectively reliable evidence. The length of Plaintiffs' workday depended on the volume of sales tours and whether or not they were successful in making sales. Plaintiffs' "off-the-clock" study contains timestamp data showing exactly when and how often sales contracts were generated during the class period for a sample of 49 Plaintiffs. The Court can use this undisputed data, in conjunction with specific findings made by Judge Shirley, to make just and reasonable inferences regarding the Plaintiffs' hours of work. Wyndham has provided an objective analysis of the data, which supports a finding that Plaintiffs worked, on average, about 42.81 hours per week. The objective data is much more reliable than the Plaintiffs' subjective "estimates" regarding their hours of work, which Judge Shirley found to be not credible after observing live witness testimony and cross-examination during the trial.

Third, the Court should allow Defendants to raise the issue of judicial estoppel against three Opt-in Plaintiffs who failed to disclose their FLSA claims in bankruptcy. The doctrine of judicial estoppel is an equitable doctrine invoked by the Court at its discretion to protect the

integrity of the judicial system. The doctrine is not subject to waiver. Moreover, Defendants did not, and never intended to, waive arguments regarding judicial estoppel.

## II. DISMISSAL OF DISCOVERY EMPLOYEES

On appeal, the Sixth Circuit held that it was an abuse of discretion to certify the discovery employees as part of the collective action. *See Pierce,* 922 F.3d at 746-47. It is well established that when a collective action is decertified, the proper protocol is to dismiss without prejudice the opt-in plaintiffs who are not similarly situated. *Fenley v. Wood Grp. Mustang, Inc.,* 325 F.R.D. 232, 242 (S.D. Ohio 2018) ("If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice.")*; Kutzback v. LMS Intellibound, LLC,* 301 F. Supp. 3d 807, 817 (W.D. Tenn. 2018) (same); *Lindsey v. Tire Discounters, Inc.,* 2017 U.S. Dist. LEXIS 197996, at *15-16 (S.D. Ohio Dec. 1, 2017) (same); *Knispel v. Chrysler Grp. LLC,* 2012 U.S. Dist. LEXIS 21188, at *10 (E.D. Mich. Feb. 21, 2012) (same); *Shabazz v. Asurion Ins. Serv.,* 2008 U.S. Dist. LEXIS 29696, at *6-7 (M.D. Tenn. Apr. 10, 2008) (same); *White v. MPW Indus. Servs.,* 236 F.R.D. 363, 366 (E.D. Tenn. 2006) (same).

Dismissal is also the proper protocol where, as here, the collective action was partially decertified. *See O'Brien v. Ed Donnelly Enters.,* 575 F.3d 567, 586 (6th Cir. 2009) ("[A] district court should examine whether partial decertification is possible . . . . [P]laintiffs who are not similarly situated . . . could be dismissed while keeping intact a partial class."); *Hathaway v. Shawn Jones Masonry,* 2013 U.S. Dist. LEXIS 63374, at *8 (W.D. Ky. May 3, 2013) ("A collective action need not be totally decertified if some members are not similarly situated to the others. Instead, plaintiffs who are not similarly situated can be dismissed while keeping intact the partial class." (cites omitted)); *Bassett v. TVA*, 2013 U.S. Dist. LEXIS 24890, at *26 (W.D. Ky. Feb. 22, 2013) (dismissing without prejudice an opt-in plaintiff who was not similarly situated).

The Court should follow standard protocol and dismiss the Opt-in Plaintiffs who are not similarly situated, i.e. the discovery employees, without prejudice. Thus, each of the following Opt-in Plaintiffs should be dismissed without prejudice: Shirley Benedict, Jasyntha Cornwell, Janice Deibel, William Dzaman, Karl Lewanksi, Paul Naumoff, James W. Reid, George Smith, Karen Smith, and Bobby Stallings. *See* ECF No. 417-9 (Plaintiffs' list of discovery employees).

Defendants expect Plaintiffs to ask this Court to retain the discovery employees, declare them a stand-alone class, and calculate damages for them. However, there is no basis for doing so. Indeed, the Sixth Circuit's remand order does not encompass such an undertaking, stating: "Because the court erred in finding that the discovery employees were similarly situated to the other salespeople and that error infected its hourly average determination, we vacate the damages award and *remand for the court to reassess damages for the in-house and front-line employees*." *Pierce,* 922 F.3d at 749 (emphasis added). Notably absent from the Sixth Circuit's opinion is any instruction to separately reassess damages for the discovery employees.

As to finding a subclass of discovery employees, there is no evidence in the trial record to do so. "[O]nly one of the discovery employee-plaintiffs testified at trial." *Id.* at 746. Further, the lone testifying discovery employee "did not indicate that . . . the discovery salespeople at the other Tennessee locations performed the same functions he did." *Id.* at 746-47. This lack of trial evidence precludes any finding that discovery employees were similarly situated to each other.

The absence of evidence in the trial record also precludes the Court from making factual findings regarding the amount of hours worked by discovery employees. As stated by the Sixth Circuit, "the district court made no factual findings about how often the discovery team members stayed late or how much later they stayed." *Id.* at 747. "The off-the-clock work study, which showed the dates and times of in-house and front-line employees' transactions, does not show

similar data for the discovery employees. *No evidence thus shows how often or at what time discovery salespeople initiated or closed contracts." Id.* at 747 (emphasis added). In light of the Sixth Circuit's pronouncement that the record lacks sufficient evidence to make findings as to the hours of work of discovery employees, this Court should reject Plaintiffs' request to make those findings and instead dismiss the discovery employees from this case without prejudice.

## III.   ASSESSMENT OF DAMAGES FOR IN-HOUSE AND FRONT-LINE EMPLOYEES

### A.  Legal Standard

"An employee who brings suit under [the FLSA] for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686-87 (1946). In the absence of accurate timekeeping records, the employee has the initial burden to show "that he has in fact performed work for which he was improperly compensated" and "the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687. "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688. *Mt. Clemens* did not hold that the employee's testimony must be accepted as true if the time records are inaccurate, as Plaintiffs argued on appeal.

### B.  The Court Should Use Reliable Evidence to Construct a Realistic and Objectively Reasonable Damages Model.

The only appropriate method of determining the number of hours Plaintiffs worked weekly, on average, is by looking to the objective evidence in the trial record. The Court cannot and should not rely on Plaintiffs' conclusory testimony about their hours of work because Judge

Shirley found that their testimony was greatly exaggerated and unreliable. During the bench trial, a handpicked selection of Plaintiffs collectively testified that they had worked an "average" of 63.66 hours per week (23.66 overtime hours per week). (ECF No. 417-5). Plaintiffs' testimony was wildly divergent, ranging from 50 hours per week (Jeanne Swafford and Angela Woods) to 80 hours per week (Laurie McBride and Jesse Pierce). *Id.* After "consideration of the witnesses' credibility" and "weigh[ing] all the evidence," Judge Shirley rejected Plaintiffs' inflated estimates and instead found that Plaintiffs worked an average of 52 hours per week (12 overtime hours per week, or roughly half of the overtime hours they claimed), albeit without explanation of his calculation. (ECF No. 427 at 115, 136).

Judge Shirley clearly concluded that Plaintiffs' testimony was not credible – had he believed them he would have awarded what they claimed. Judge Shirley stated that Plaintiffs' testimony was "only estimates," "a bit on the high side," and that Defendants "rebutted Plaintiffs' average." *Id.* at 132. Judge Shirley determined that Plaintiffs' testimony was not credible for several reasons. First, Judge Shirley found that Plaintiffs exaggerated the frequency of after-hours work. *See id.* at 135 ("[T]he Court does not find that they 'always' or even 'regularly' worked as long as some claimed."). Second, Judge Shirley found that Plaintiffs exaggerated how busy they were with sales tours and the time of day that they left work. *See id.* at 135 ("The Court finds there were some very busy days, weeks, and months (i.e., Rocktober, Yesvember, holidays, and summers), but there were also slows days, less tours, and leaving early."). Third, Judge Shirley found that Plaintiffs exaggerated their hours regarding the slow season. *Id.* at 134 ("The Court finds, however, that January and February were considered the slow season and that during these months, Plaintiffs did not work as many hours. While a number of Plaintiffs testified that they worked the same amount of hours during the slow season

as the busy season, the Court finds otherwise."); *id.* at 135 (noting that, in addition to working less hours, Plaintiffs also "took off more . . . for trips, vacations, personal matters, medical and family issues"). Fourth, Judge Shirley noted that Plaintiffs' testimony was questionable in light of their ability to remember and estimate at trial (in 2017) how many hours they worked during the recovery period (2010-2013). *See id.* at 156 ("The Court is also mindful that the estimates of hours of all witnesses were, at best, estimates of hours worked years ago."). Finally, Judge Shirley artfully acknowledged that Plaintiffs were biased due to their financial motive to obtain more damages. *See id.* at 156 ("The Court is also mindful that each witness may have been somewhat biased, high or low, in their respective testimony and estimates on hours worked.").

Judge Shirley had the benefit of seeing the witnesses live and found the Plaintiffs' testimony to be incredible. Given that, it would be error to rely on Plaintiffs' oral testimony to create a damages model.[1]

In the absence of reliable testimony by Plaintiffs, the Court must construct a damages model using objective evidence showing Plaintiffs' hours of work. One factor that was common among the in-house and front-line sales representatives was that the sales process dictated their hours of work. The morning sales meeting dictated when the day started. Tour flow, and success or lack thereof in making a sale, throughout the day dictated when and for how long a sales representative worked. For example, if the last round of tours was at 2:00 p.m. and there were not enough tours to go around, the 'line would be cut' and sales representatives who did not get

---

[1] Any proposed award of damages that uses Plaintiffs' own trial testimony and fails to factor in Judge Shirley's credibility determinations and substantial reduction of hours would be contrary to the record. The reassessment of damages must be informed by the credibility determinations made by Judge Shirley after seeing live testimony and cross-examinations. To ignore this evidence and the resulting credibility determinations on a cold record would violate Defendants' Due Process rights. *See Pierce,* 922 F.3d at 749 (finding that Defendants' Due Process rights were not violated only because Defendants were able to cross-examine Plaintiffs, present individualized defenses, and call witnesses that contradicted Plaintiffs).

tours could leave at that time. Sales representatives who got tours but were unable to convert those tours to sales might finish the day by 3:30 p.m. and go home, and then the fortunate sales representatives who got tours and converted those final tours into sales might finish by 5:00 p.m. before going home.  In all these situations, it was the sale of timeshare interests that dictated the work hours.  (*E.g.,* ECF No. 384 at 31 (Bogardus: worked longer hours on days when a sale was made); ECF No. 397 at 87-89 (Topping: more tours resulted in more sales and longer hours)).

As it is undisputed that making sales drove a representative to work longer hours, Wyndham proposes a damages model built on the objective data showing when and how often sales were made.  Plaintiffs' own "off-the-clock study" documents the date and time that sales were made during the class period by a sample of 49 in-house and front-line Plaintiffs.[2]  (*See* Trial Ex. 3236, attached as Exhibit A).  Admittedly, it is the best evidence on the issue of how late Plaintiffs worked.[3] According to Plaintiffs' counsel, "what we have done, Your Honor, is we have taken the tour records, which match up with the person who had the contract, then went to the sale point data to pull out the information on the contract when it was generated.  And then we matched that up with the time records of the sales representatives who were involved in the sale." (ECF No. 369 at 3).  "The sale point data that we used is a database that [Wyndham] exported from [its] system for all the contracts generated at the four Tennessee properties from 2000 – October 2010 to October 31, 2013."  *Id.* at 6.  Plaintiffs did this "for all the deponents, 50 people."  *Id.*  In other words, for the 49 deponents who were in-house and front-line employees, Plaintiffs' "off-the-clock" study reflects the times that every sales contract was generated during

---

[2] Bobby Stallings, a discovery sales employee, was listed in the study but there was no supporting data for him.  As Plaintiffs stated therein: "All his sales were Discovery and the Discovery Contracts are not Date/Time Stamped." (Ex. A at 157).

[3] The Sixth Circuit recognized that the study "showed the dates and times of in-house and front-line employees' transactions."  *Pierce*, 922 F.3d at 747.

the class period.  Plaintiffs used this "study" to show that they worked off the clock, but it can just as readily serve to show the hours that Plaintiffs worked in general.  It is the most credible evidence in the record of any late hours worked by Plaintiffs outside of the normal workday because it reflects the frequency of sales and the actual time that sales contracts were created.

Wyndham proposes a damages model built around an "average" or "model" workday and workweek with adjustments made for time that Plaintiffs worked later because they had sales as reflected in Plaintiffs' off-the-clock study.  Using the off-the-clock study will allow the Court to make factual findings that are informed by objectively reliable data, as opposed to Plaintiffs' non-credible and unrealistic trial testimony.  The following sections explain how a "model" workweek can be constructed using Plaintiffs' off-the-clock study, specific factual findings made by Judge Shirley, and other undisputed objective evidence.

### C.  Plaintiffs' Model Workweek Was Five and a Half Days.

Judge Shirley determined that Plaintiffs worked between five and six days per week. (ECF No. 427 at 134).  Sales representatives were typically scheduled to work five days per week.[4]  But many Plaintiffs testified to working "six-ones" and the occasional seven day week during the busy season.[5]  These busier days were offset by the slower months of January and February in which, as Judge Shirley recognized, Plaintiffs did not work as many hours and some Plaintiffs did not work at all.  (ECF No. 427 at 134).  Using Judge Shirley's findings and Plaintiffs' testimony, it is reasonable to infer that Plaintiffs' average workweek was 5.5 days.

---

[4] ECF No. 376 at 29 (Thrift); ECF No. 377 at 51 (Siler); ECF No. 383 at 17 (Woods).

[5] ECF No. 377 at 51 (Siler), 172-173 (Thrift); ECF No. 378 at 91 (Dodson); ECF No. 383 at 126 (K. Abbott), 171 (Cross); ECF No. 384 at 76-77 (J.S. Abbott), 267-268 (Magee); ECF No. 386 at 133 (Williamson); ECF No. 389 at 153 (Tesh); ECF No. 392 at 193 (Campbell), 285 (M. Pierce, Sr.); ECF No. 413-26 at 15 (Kost); ECF No. 413-27 at 38 (McBride); ECF No. 414-5 at 42-43 (Neuenschwander).

### D. Plaintiffs' Workday Usually Began at 8:00 a.m.

There was general consensus among the testifying Plaintiffs that the workday typically began at 8:00 a.m. with the morning meeting.[6]  Judge Shirley likewise found that sales representatives arrived to work around 8:00 a.m.  (ECF No. 427 at 133 ("Plaintiffs testified and the Court finds that virtually all of the Plaintiffs (except Discovery Representatives) regularly began their day by attending a mandatory meeting at approximately 8:00 a.m.")).  It is worth noting that some senior sales representatives were not required to attend this meeting,[7] and the meeting sometimes started later such as 8:30 a.m. during various times at various locations.[8]  For purposes of constructing a "model" workweek, however, Wyndham will not seek to adjust for those differences and, instead, will credit all Plaintiffs with starting work at <u>8:00 a.m.</u> on average.

### E. Plaintiffs Usually Did Not Work Past 3:00 p.m.

As Plaintiffs testified and Judge Shirley recognized, "none of the Plaintiffs had a specific end time because it ultimately depended on customers' actions."  (ECF No. 427 at 143; *id*. at 133 (finding that end time depended on "when clients stopped checking in" and "whether a client agreed to purchase")).  For several reasons, Defendants submit that the appropriate end time for a workday in which Plaintiffs did not make a sale on the last tour wave is 3:00 p.m.

First, Plaintiffs' off-the-clock study accounts for the variation in end times by showing the times that sales contracts were actually generated.  The timestamp data from the off-the-clock study shows that the vast majority of sales contracts, 68.2%, were generated prior to 3:00 p.m.

---

[6] *E.g.,* ECF No. 377 at 43 (Siler); ECF No. 383 at 200 (Cross); ECF No. 389 at 60 (Davis); ECF No. 413-22 at 30 (Dixon); ECF No. 413-23 at 13 (Evans); ECF No. 416-2 at 20 (Dickerson).

[7] ECF No. 399 at 1 (Chodak Dep. pp. 94:15-95:2; Smith Dep. pp. 143:24-144:9); ECF No. 395 at 24 (Christian regarding himself and M. Pierce, Sr.); ECF No. 397 at 295 (Matthews).

[8] ECF No. 378 at 84 (Dodson); ECF No. 383 at 113 (K. Abbott); ECF No. 389 at 150 (Tesh).

*See* Exhibit B, Aggregate Summary of Sales Timestamps from Plaintiffs' Off-the-Clock Study;[9] *see also* Exhibit C, Individual Summaries of Sales Timestamps from Plaintiffs' Off-the-Clock Study.[10]  In other words, Plaintiffs' off-the-clock study shows that nearly seven out of every ten sales contracts were made before 3:00 p.m.  Plaintiffs testified over and over again that their late hours were driven by late closings.[11]  Thus, when there was not a sale, it stands to reason that a sales representative's day was even shorter.

Relatedly, by viewing this same data in graphic form, it is clear that sales peaked from 12:00 p.m. to 1:00 p.m. and steeply dropped off during the afternoon.  *See* Exhibit D, Chart: Distribution of Sales Throughout the Workday.[12]  Based on this data, it is clear that sales tours predominantly took place in the morning and early afternoon and there were appreciably fewer tours and sales taking place after 3:00 p.m. and, thus, fewer people working; if that were not the case, one would expect to see no drop off in sales numbers.[13]

In addition to the hard data, trial testimony shows that tour flow dictated how long sales representatives worked in the afternoon.  Sales presentations with customers, or "tours" as they are called, were scheduled in tour waves.  Tour wave times varied between front-line and in-house representatives and over time and by location.[14]  But, generally speaking, the record

---

[9] The data summarized in Exhibit B was compiled from Plaintiffs' off-the-clock study.

[10] The data summarized in Exhibit C was compiled from Plaintiffs' off-the-clock study.

[11] *E.g.,* ECF No. 383 at 17, 21 (Woods: when she left around 6:00 p.m., the only reps still there were those with closings); ECF No. 384 at 275-276 (Magee); ECF No. 392 at 51-52 (Garrett), 247-248 (M. Pierce, Sr.); ECF No. 397 at 252 (Matthews: closings prolonged workday).

[12] The data reflected on this graph is the data compiled from Plaintiffs' off-the-clock study.

[13] The data also shows that sales in the evening were extremely rare; there were only 86 total sales after 7:00 p.m., which is just 2.49% of the total sales. *See* Ex. B, Aggregate Summary.

[14] (ECF 376 at 198, 211-212 (Slone [In-House, Smokies]: 2 tour waves, at 9:00 a.m. and afternoon]); ECF No. 386 at 41 (Dixon [In-House, Glade]: tours began at 8:30 a.m.); ECF No. 377 at 43-46 (Siler [Frontline, Smokies]: 3 tour waves at 8:30 a.m., 10:30 a.m., 3:00 p.m., except

supports that there was a morning wave of tours around 8:30 or 9:00 a.m., a second wave of tours around 11:00 a.m. or noon, and a third wave of tours in the early afternoon, but only if there were enough customers signed up to justify a third wave.[15]  Synthesizing what was significantly divergent testimony, and considering the objective data on the timing of sales, it is reasonable to conclude that the last tour wave typically began at 2:00 p.m.[16]

Many times there would not be enough tours to fill a third wave and so Wyndham would "cut the line," meaning that no more tours would be scheduled for the day. (ECF No. 377 at 100 (Siler)).  If a sales representative did not receive a tour on the final wave because the line was cut, then the sales representative was free to leave at that time.  (ECF No. 377 at 100 (Siler); ECF No. 384 at 203 (Drew)).  Plaintiffs' testimony varied as to when the line was cut, with testimony that included it being at 2:00 p.m. (ECF No. 384 at 126 (J.S. Abbott)), 3:00 p.m. (ECF No. 393 at 135 (J. Pierce)), and 3:45 p.m. (ECF No. 384 at 203-204)).  It is reasonable to infer that the average "cut" time was 3:00 p.m., based on the sales data and Plaintiffs' testimony.

For those sales representatives fortunate enough to get a tour on the last wave (which started around 2:00 p.m. on average), most sales tours would not result in a sale and those sales

---

in the slow season, when it was moved up to 1:00 p.m.]; ECF No. 392 at 186 (Campbell [Frontline, Smokies]: tours start at 9:00 a.m.); ECF No. 392 at 252 and ECF No. 426 at 327 (M. Pierce, Sr. [Frontline, Smokies]: 5 tour waves on weekends, 3 tour waves on weekdays, tours at 9:00 a.m., 10:30 a.m., 12:00 p.m., 1:30 p.m., 3:00 p.m.).

[15] *See* ECF No. 427 at 133 (J. Shirley: "Tour waves were scheduled in the morning, around noon, and in the afternoon."); ECF No. 397 at 19 (Topping); ECF No. 426 at 109, 153 (McGlothlin).

[16] *See* Ex. D, Chart: Distribution of Sales Throughout the Workday; ECF No. 397 at 19-20 ECF No. 384 at 126 (J.S. Abbott: tour line ended around 2:00 p.m. every day); ECF No. 386 at 13-14, 26-27, 44 (Dixon: front-line tours stopped being assigned at 2:00 p.m., in-house at 3:00 p.m.); ECF No. 393 at 135-136 (J. Pierce: line was cut at 3:00 p.m.); ECF No. 392 at 252 and ECF No. 426 at 327 (M. Pierce, Sr.: five waves on weekends, three on weekdays, with tours at 9:00 a.m., 10:30 a.m., 12:00 p.m., 1:30 p.m., and 3:00 p.m.); ECF No. 377 at 46, 59 (Siler: last tour at 3:00 p.m. except it was at 1:00 p.m. in slow season); (Topping: last tour at 12:00 or 12:30 p.m., except for peak holiday weekends when it was at 2:30 or 3:00 p.m.); ECF No. 395 at 75 (Christian: last tour was at 12:30 p.m); ECF No. 401 at 245 (Cummings: last tour was at 2:30 p.m.).

tours would last 90-120 minutes on average.  (ECF No. 377 at 47 (Siler); ECF No. 392 at 223 (M. Pierce, Sr.)).  Thus, on days when Plaintiffs received a tour but did not have a sale on the final tour round, they would have left work by 3:30 or 4:00 p.m.  Factoring in the substantial number of sales representatives who would not have gotten a tour at all on the last wave (and who left earlier than 3:00 p.m.), it is reasonable to set 3:00 p.m. as the baseline end of the day for days when no sale was made on the last tour.[17]  The 3:00 p.m. end time is corroborated by the objectively reliable data, which shows that the vast majority of sales (and by inference, sales tours) took place prior to 3:00 p.m.  *See* Exhibit B, Aggregate Summary of Sales Timestamps.

To summarize, the typical workday was from 8:00 a.m. to 3:00 p.m. (seven hours a day), unless a sale was made on the final tour wave.  Since the average workweek was 5.5 days, then sales representatives worked approximately <u>38.5 hours</u> each week (5.5 days * 7 hours), before factoring in late sales.

**F. Accounting for Sales that Took Place After 3:00 p.m., Plaintiffs Worked About One Additional Hour Per Week on Average.**

The timestamp data in Plaintiffs' off-the-clock study shows how often and how late Plaintiffs worked past 3:00 p.m. to close a sale.  This data can be analyzed in conjunction with workweek data to calculate the average amount of time per week spent working late on sales. For example, if a sales representative worked for 100 weeks during the class period and the off-the-clock data shows that he or she completed 300 sales after 3:00 p.m. during that time frame, then we know that he or she completed, on average, three sales per week after 3:00 p.m.

---

[17] This 3:00 p.m. baseline end time is also reasonable because it assumes that sales representatives never took lunch, never went to the doctor, never ran an errand, etc., all of which is contrary to good sense, to the testimony of some Plaintiffs (*See* ECF No. 376 at 25-26 (Thrift), 116-117 (Cheij)), and to Judge Shirley's findings.  *See* ECF No. 427 at 135 ("The Court finds . . . there were also slows days, less tours, and leaving early"; and during the slow season Plaintiffs "took off more . . . for trips, vacations, personal matters, medical and family issues").

Conversely, a sales representative who only completed 50 sales after 3:00 p.m. over the course of 100 weeks, completed, on average, half a sale per week after 3:00 p.m. (i.e. one sale every two weeks after 3:00 p.m.).

Here, Plaintiffs' off-the-clock study shows that there were 1,096 timestamped sales contracts generated after 3:00 p.m. during the class period. *See* Exhibit B, Aggregate Summary of Sales Timestamps. These same Plaintiffs worked a total of 3,172 workweeks during the class period. *See* Exhibit E, Cowart Decl. ¶¶ 4-5 & Ex. 1 thereto (Total Workweeks During the Class Period). Therefore, Plaintiffs' off-the-clock study shows that closings rarely took place after 3:00 p.m. measured per the average sales representative, per week. In fact, considering the data across all 49 Plaintiffs in the study, a closing after 3:00 p.m. only happened about once every three weeks for the average Plaintiff (3,172 weeks / 1,096 closings = 2.89 weeks for every late closing). Stated alternatively, each workweek had approximately .35 late closings on average per plaintiff (1,096 closings / 3,172 weeks = .35 late closings per week).

This is explained by the fact that while some Plaintiffs had a significant number of post-3:00 p.m. closings, most had very few, especially when compared to the number of weeks they worked.[18] For example, Plaintiff Claudia Bogardus had only two sales after 3:00 p.m. over the course of 26 weeks of employment during the class period; Plaintiff Judy McGinty had only 13 late sales in 84 weeks; and Plaintiff Tony Siler had only 13 late sales in 94 weeks. *Compare* Exhibit C, Individual Summaries of Sales Timestamps, *with* Exhibit E, Cowart Decl., Ex. 1 (Total Workweeks During the Class Period).

---

[18] Some Plaintiffs may have worked more, but many worked less. Plaintiffs chose to bring this matter as a collective action and to seek overtime pay based on an average number of hours. They cannot now complain that some members of the class worked more than the average, nor can they seek to 'juice' the numbers by focusing on those select class members. Late sales, measured objectively across the entire class (as they must be), were rare.

14

The amount of additional hours worked on the post-3:00 p.m. closings depends on the time that the sales took place. For example, if the sales representative stayed until 4:00 p.m. for a sale, then that sale would account for one additional hour beyond the baseline end time of 3:00 p.m. If the sales representative stayed until 6:00 p.m. for a sale, then that sale would account for three additional hours per week beyond the baseline end time. Plaintiffs' off-the-clock study provides objective data showing how late Plaintiffs worked and creates a foundation for calculating how many hours were worked past 3:00 p.m., both in total and on average per week.

The timestamp data in Plaintiffs' off-the-clock study is based on the time that a sales contract was generated. (ECF No. 375 at 47). Some Plaintiffs testified that once a contract was generated it could take up to an hour, or even two hours on occasion, to get the contract signed and complete the closing. (ECF No. 377 at 48 (Siler), 141-142 (Thrift); ECF No. 386 at 119-120 (Williamson)). Wyndham contends that those Plaintiffs exaggerated how long it took to complete a closing after generating the sales contract. (ECF No. 397 at 21 (Topping: closings can take 15-60 minutes, including having the contract typed), 251 (Matthews: once the QA officer gets the contract, closing could take 20 minutes to 1 hour); ECF No. 401 at 127 (Minor: from the time they went into the QA office, closings lasted 15-60 minutes).

Nevertheless, Wyndham's damages model will generously assume that sales representatives remained at work for 1-2 hours after the timestamp on the off-the-clock study. For example, Wyndham's model will assume that the sales representative continued working until 5:00 p.m. for any timestamp between 3:00 p.m. and 4:00 p.m. Thus, for a 3:10 p.m. timestamp, the model would assume it took the sales representative an hour and 50 minutes to finish the closing and then credit the sales representative with two additional hours of work beyond 3:00 p.m. For a 3:50 p.m. timestamp, the model would assume it took the sales

representative an hour and 10 minutes to finish the closing and then credit the sales representative with two additional hours of work beyond 3:00 p.m. As shown by these examples, this methodology credits Plaintiffs with anywhere from one to two hours of work after the timestamp to complete the closing.

Accordingly, Wyndham's model allocates additional hours for time spent on closings that would have ended after 3:00 p.m. as follows:

- One additional hour past 3:00 p.m. for every timestamp between 2:00 and 3:00 p.m., on the assumption the sales representative continued working until 4:00 p.m.

- Two additional hours past 3:00 p.m. for every timestamp between 3:00 and 4:00 p.m., on the assumption the sales representative continued working until 5:00 p.m.

- Three additional hours past 3:00 p.m. for every timestamp between 4:00 and 5:00 p.m., on the assumption the sales representative continued working until 6:00 p.m.

- And so on, for each incremental one-hour time range. For the latest time range at issue, the model allocates eleven additional hours past 3:00 p.m. for every timestamp between 12:00 a.m. and 1:00 a.m., on the assumption the sales representative continued working until 2:00 a.m.

Wyndham's model also assumes that Plaintiffs never took a break for dinner.

After allocating these additional hours for each closing that took place after 3:00 p.m., the total number of additional hours worked during the class period by the 49 Plaintiffs in the off-the-clock study can be calculated. This is accomplished by multiplying the number of closings that took place during each one-hour time period by the number of additional work hours allocated for that one-hour time period. For example, there were a total of two timestamps in the 10:00-11:00 p.m. range in Plaintiffs' off-the-clock study and each of those timestamps is assumed to reflect nine additional hours of work, so those two timestamps account for 18 additional hours of work during the class period. As another example, there were 396

timestamps in the 3:00-4:00 p.m. range in the off-the-clock study and each one is assumed to reflect two additional hours of work, for a total of 792 additional hours of work.

Using the timestamp data taken directly from Plaintiffs' own off-the-clock study, Wyndham has performed these calculations for each one-hour time period at issue. *See* Exhibit F, Calculation of Additional Hours Worked for Sales After 3:00 p.m. As shown on the Exhibit, the total sum of additional hours across all of the one-hour time periods after 3:00 p.m. is 4,155. This shows that there were 4,155 additional hours worked while closing sales after 3:00 p.m. during the class period by the 49 Plaintiffs who appeared in the off-the-clock study. These same Plaintiffs worked a total of 3,172 workweeks during the class period. *See* Exhibit E, Cowart Decl., Ex. 1 (Total Workweeks During the Class Period). Using the workweek data, it is relatively simple to calculate the average additional hours worked per week, by dividing the number of additional hours by the number of workweeks. This indisputable data, offered in Plaintiffs' own trial exhibit, shows that the average Plaintiff worked 1.31 hours per week on closings that finished after 3:00 p.m. (4,155 hours / 3,172 weeks).

As discussed above, Wyndham's model gives every sales representative credit for working a baseline workday of 8:00 a.m. to 3:00 p.m. (seven hours) for 5.5 days per week, for a baseline workweek of 38.5 hours. After adding the 1.31 additional hours worked on average per week for sales finished after 3:00 p.m., the average workweek totaled 39.81 hours.

### G. "Nightline" Sales Tours, "Party Weekends," and Offsite Phone Calls Add a Minimal Amount of Time to the Average Workweek.

Some Plaintiffs testified that they spent time making after-hours phone calls and emails to current and prospective timeshare owners. Others, such as Angela Woods and Rebecca Slone, never testified that they made phone calls while off-the-clock. (ECF No. 376 at 158-244; ECF No. 383 at 7-28). To the extent such calls were made, they were primarily with owners during

the rescission period to make sure they did not back out of a contract. (ECF No. 389 at 20 (Stallings); ECF No. 392 at 112 (Cooper); ECF No. 392 at 190 (Campbell)). Therefore, sales representatives would not have any calls to make if they had not recently made a sale. (ECF No. 389 at 33 (Stallings)). Further, if a sales representative anticipated that there would not be any issues, then he or she would leave the client alone and stop calling them during the rescission period. (ECF No. 378 at 83 (Dodson)). The data from Plaintiffs' off-the-clock study shows that, on average, Plaintiffs made only about one sale per week.[19] Therefore, on any given week, a sales representative would have only one or two sales in the rescission period and would only need to call one or two owners per week. The data indicates that Plaintiffs greatly exaggerated their testimony regarding the frequency and length of after-hours calls, just as they exaggerated their testimony on the time spent on late closings.

As to the "nightline" sales tours, the damages model addressed in the preceding sections already accounts for them because it takes into consideration the times that closings occurred, including any that happened in the afternoon or evening following a nightline tour. Likewise, the damages model already accounts for "party weekends" because it credits Plaintiffs with working 5.5 days per week, which necessarily includes a half-day of work on the weekend on average.

Further, nightline tours and party weekends were rare. Nightline was a practice whereby Wyndham would try to schedule guests for tours as they were checking in. (ECF No. 375 at 109 (Nelon)). Several Plaintiffs testified that nightline only occurred once per week on Saturdays or Sundays, which was the check-in date. (ECF No. 378 at 188 (Bogardus); ECF No. 384 at 144

---

[19] The off-the-clock study shows a total of 3,449 sales by 49 plaintiffs during the class period. *See* Ex. B, Aggregate Summary of Sales Timestamps. These same Plaintiffs worked a total of 3,172 weeks during the class period. *See* Ex. E, Cowart Decl., Ex. 1 (Total Workweeks During the Class Period). Therefore, per the off-the-clock study they converted an average of 1.09 sales per week (3,449 sales / 3,172 weeks). While some plaintiffs converted far more sales per week, some had far less and it is the average that matters.

(J.S. Abbott), 205 (Drew); ECF No. 383 at 136 (K. Abbott)). Several Plaintiffs further testified that, typically, only the top performing sales representatives participated in nightline. (ECF No. 378 at 155 (Johnson); ECF No. 384 at 323 (Magee); ECF No. 389 at 90 (Davis); ECF No. 397 at 257-258 (Matthews)). Angela Woods testified that she never did nightline. (ECF No. 383 at 20-21). Wyndham was doing nightlines for only a portion of the recovery period. (ECF No. 384 at 144 (J.S. Abbott)). Nightline is also a misnomer; "nightline" tours typically started around 1:00 or 2:00 in the afternoon. (ECF No. 376 at 219 (Slone); ECF No. 378 at 188 (Bogardus); ECF No. 384 at 126 (J.S. Abbott), 270 (Magee); ECF No. 393 at 135-137 (J. Pierce)).

Plaintiffs testified that party weekends and dinner parties occurred only once or twice a month. (ECF No. 376 at 67 (Cheij: once or twice a month); ECF No. 383 at 180 (Cross: about twice a month); ECF No. 393 at 142 (Pierce: every other week); ECF No. 378 at 131 (Johnson: once per month). Contrary to what the name suggests, these were not full weekend events but only one dinner, which lasted 2-4 hours and sometimes followed by one breakfast that lasted 2-3 hours. (ECF No. 393 at 143-144 (Pierce: dinners lasted 2-3 hours and breakfast two days later about 3 hours); ECF No. 378 at 94-95 (Dodson: same); ECF No. 376 at 67 (Cheij: spanned 1-2 days and lasted several hours each day). Not only were these events infrequent but they were not attended by most Plaintiffs. Party weekends and dinner parties were reserved for the top producing sales representatives. (ECF No. 389 at 89-90 (Davis: "You had to be in the top group to even be allowed to do dinner parties."); ECF No. 426 at 128-129 (McGlothlin: only the very best reps participated in party weekends).

Judge Shirley found that Plaintiffs overstated how often they worked on party weekends, nightline, and offsite calls, *see* ECF No. 427 at 135, so Plaintiffs' testimony on these issues is unreliable. Further, Defendants' model already accounts for nightline and party weekends.

However, if the Court believes the damages model does not sufficiently account for offsite calls or other miscellaneous activities, Defendants propose that it is reasonable to add at most <u>three hours</u> per week to the damages model per Plaintiff. As the model seeks to determine an average number of hours across the class, three additional hours is more than sufficient because only these activities were not universally applicable, the activities were rare and only existed for part of the recovery period, Judge Shirley found that Plaintiffs overstated the time spent on these activities, and the model already accounts for nightlines and party weekends.

## H. Calculation of Monetary Damages

In sum, it is just and reasonable to infer that Plaintiffs worked an average baseline week of 38.5 hours (8:00 a.m. to 3:00 p.m. for 5.5 days), plus an average of 1.31 hours per week on closings after 3:00 p.m., and at most 3 hours per week on peripheral activities, for a total average of <u>42.81 hours per week</u>. This weekly average is reasonable because it is supported by objective, reliable data from Plaintiffs' own trial exhibit. Defendants propose that the Court make a factual finding regarding the average number of hours worked per week, and the Parties can confer regarding the calculation of monetary damages that flows from the weekly average, as was done after the initial trial.

## IV.    LEAVE TO RAISE THE ISSUE OF JUDICIAL ESTOPPEL

During their bankruptcy proceedings, Opt-In Plaintiffs Jeremy Saine, Rachel Taylor, and Sean Jeter each failed to notify the Bankruptcy Court of their FLSA claims in this action (which are assets subject to mandatory disclosure in bankruptcy). Consequently, their FLSA claims are barred by the doctrine of judicial estoppel, and Defendants seek leave to file a Motion for Summary Judgment on that basis.

On March 31, 2017, the Court entered summary judgment against five Opt-in Plaintiffs for failure to disclose their FLSA claims in bankruptcy. *See generally* ECF No. 223. As stated in that opinion, "the doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition." *Id.* at *6 (quotes omitted). "The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self-interest." *Id.* (cites omitted). The Court further described the rationale for invoking judicial estoppel in the context of failing to disclose claims in bankruptcy proceedings:

> [T]he integrity of the bankruptcy system depends on full and honest disclosure by debtors of their assets. The courts will not permit a debtor to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently to assert those claims for his own benefit in a separate proceeding. The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete.

*Id.* at *6-7 (citation omitted). The Court found that all the elements of judicial estoppel were met because Plaintiff Melissa Evans failed to disclose her FLSA claims as assets in her bankruptcy case.[20] *See id.* at *7-15. On appeal, the Sixth Circuit affirmed. *Pierce,* 922 F.3d at 749-50.

After the Sixth Circuit issued its opinion and remanded, Defendants determined that three other Opt-in Plaintiffs similarly failed to disclose their FLSA claims as assets in their respective bankruptcy proceedings. Specifically:

- Plaintiff Jeremy Saine filed a bankruptcy petition on December 28, 2018. *See* Exhibit G, Saine Voluntary Petition for Bankruptcy. In his schedule of assets, he indicated that he was not owed any "unpaid wages" and that he did not have any

---

[20] Plaintiffs did not oppose summary judgment with respect to the other four Opt-in Plaintiffs, and those Plaintiffs' claims were summarily dismissed. *Id.* at *1.

"other contingent and unliquidated claims." *Id.* at 24. On his statement of financial affairs, he failed to disclose the present lawsuit when asked whether he was a party to any lawsuits during the year preceding his bankruptcy filing. *Id.* at 12. These statements were clearly false because Plaintiff Saine filed a consent form to join this action and has been a party to this lawsuit since July 31, 2015. (ECF No. 135-1). His debts were discharged by the Bankruptcy Court on April 30, 2019, Exhibit H (Discharge Order), and his bankruptcy case was dismissed by text order on May 30, 2019.

- Plaintiff Rachael Taylor filed a bankruptcy petition on January 29, 2018. *See* Exhibit I, Taylor Voluntary Petition for Bankruptcy. In her schedule of assets, she indicated that she was not owed any "unpaid wages" and that she did not have any "other contingent and unliquidated claims" aside from a separate lawsuit against the National Fitness Center. *Id.* at 23. On her statement of financial affairs, she failed to disclose the present lawsuit when asked whether she was a party to any lawsuits during the year preceding her bankruptcy filing. *Id.* at 11. These statements were clearly false because Plaintiff Taylor has been a party to this lawsuit since January 13, 2014. (ECF No. 32-1). Her bankruptcy case was dismissed on August 6, 2019. *See* Exhibit J (Order Dismissing Case).

- Plaintiff Sean Jeter filed a bankruptcy petition on May 20, 2014. *See* Exhibit K, Jeter Voluntary Petition for Bankruptcy. In his schedule of assets, he was asked to disclose "contingent and unliquidated claims of any nature," and he marked "None." *Id.* at 22. Likewise, on his statement of financial affairs, he was asked to disclose "all suits … to which the debtor is or was a party within one year" prior to filing the petition, and he marked "None." *Id.* at 11. These statements were clearly false because Plaintiff Jeter has been a party in this case since October 23, 2013. (ECF No. 1-3). His debts were discharged by the Bankruptcy Court on September 8, 2014, Exhibit L (Discharge Order), and his bankruptcy case was dismissed by text order on October 16, 2014.

Plaintiff Saine and Plaintiff Taylor's failure to disclose their FLSA claims is particularly flagrant and disconcerting because: (1) when they filed their bankruptcy actions in 2018, they were clearly on notice that they were required to disclose this lawsuit in bankruptcy, as a result of this Court's Order issued on March 31, 2017; and (2) they obtained a monetary judgment in this lawsuit on February 5, 2018, (ECF No. 429), but they still failed to disclose the lawsuit while their bankruptcy cases were ongoing in 2018 and 2019.

Wyndham respectfully requests leave to more fully brief its judicial estoppel argument and provide supporting case law in a motion for summary judgment. In the Joint Status Report,

Plaintiffs indicated that they wish to wiggle away free from their dishonest disclosures, not based on the merits, but based on a technicality: "It is Plaintiffs' position that leave should not be granted for Defendants to file the motion for summary judgment because Defendants failed to raise this issue in the trial court prior to the matter being tried and appealed and, therefore, have waived this issue." (ECF No. 464 at *2). Plaintiffs' assertion of waiver is unavailing.

Judicial estoppel is not a typical affirmative defense subject to waiver. Rather, it is "an equitable doctrine *invoked by the court at its discretion*" to prevent litigants from taking advantage of the judicial process, for example, by failing to disclose employment claims in a bankruptcy proceeding. *Newman v. Univ. of Dayton,* 751 F. App'x 809, 813 (6th Cir. 2018) (emphasis added) (quotation omitted). The Sixth Circuit has held that the doctrine of judicial estoppel is not subject to waiver, even if the doctrine was not initially raised at the trial court. *DeMarco v. Ohio Decorative Prods.*, *Inc.,* No. 92-2294, 1994 U.S. App. LEXIS 3848, at *24 n.5 (6th Cir. Feb. 25, 1994). In *Demarco,* the plaintiff argued that "defendants have waived their judicial estoppel argument by not raising it in the district court," and cited *Altman v. Altman*, 653 F.2d 755, 757-58 (3d Cir. 1981) for the proposition that judicial estoppel cannot be raised for the first time on appeal. *Demarco,* 1994 U.S. App. LEXIS 3848, at *24 n.5. The Sixth Circuit rejected that argument: "*Altman*, however, is contrary to the overwhelming weight of the authority. Underlying the doctrine of judicial estoppel is the desire to protect the integrity of the judiciary, not individual litigants." *Id.* (citation omitted). "As such, even had defendants not raised the argument on appeal, [the court] could sua sponte consider whether judicial estoppel is appropriate under the facts presented." *Id.*

District courts in this Circuit have likewise rejected arguments that judicial estoppel is subject to waiver. *See Green v. Liberty Ins. Corp.,* 220 F. Supp. 3d 842, 849 (E.D. Mich. 2016)

("Plaintiffs argue that Defendant has waived any judicial estoppel defense by failing to raise it in its answer. But judicial estoppel is not an affirmative defense within the meaning of the federal rules, it is an equitable doctrine invoked by the court at its discretion. Defendant has not waived judicial estoppel — nor could it." (citations omitted)); *Cook v. St. John Health*, No. 10-10016, 2013 U.S. Dist. LEXIS 75044, at *13-15 (E.D. Mich. May 29, 2013) ("[T]he Court rejects Plaintiff's assertion that Defendants waived judicial estoppel as a defense . . . . [T]he Court observes that the doctrine exists to protect the integrity of the court. The purpose trumps any complaint of waiver advanced by Plaintiff.").

Further, waiver is "an intentional relinquishment of a known right." *SEC v. AIC, Inc.,* 2013 U.S. Dist. LEXIS 130249, at *10-11 (E.D. Tenn. Sep. 12, 2013). "[T]he party asserting waiver bears the burden of proving that the party against whom waiver is asserted has, by a course of acts and conduct, or by so neglecting and failing to act, induced a belief that it was the party's intention and purpose to waive." *Franklin Am. Mortg. Co. v. Chi. Fin. Servs.,* 145 F. Supp. 3d 725, 735 (M.D. Tenn. 2015) (citation omitted). Defendants have never intended to waive the right to argue that some claims are barred on the basis of judicial estoppel. To the contrary, Defendants have affirmatively raised this argument by moving for summary judgment against five plaintiffs on March 30, 2016. (ECF No. 171). At that time, Defendants could not have moved on this basis as to Saine or Taylor as those plaintiffs had not yet filed for bankruptcy, and Defendants were not aware of Jeter's filing. There was no intentional waiver.

Plaintiffs' waiver argument is untenable. Defendants respectfully request leave to file a motion for summary judgment against the three Opt-in Plaintiffs who failed to disclose their FLSA claims in bankruptcy. The Court has a duty to protect the integrity of the judicial system and should invoke its discretion to hear the merits of Defendants' judicial estoppel arguments.

## V. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court (1) dismiss the discovery employees without prejudice, (2) assess damages for the in-house and front-line employees using an average workweek of 42.81 hours, and (3) grant Defendants leave to raise the doctrine of judicial estoppel in a motion for summary judgment.

Respectfully submitted,

s/ Craig A. Cowart
Colby S. Morgan, Jr. (TN Bar No. 005556)
Craig A. Cowart (TN Bar No. 017316)
JACKSON LEWIS P.C.
999 Shady Grove Rd., Suite 110
Memphis, TN 38120
Telephone: (901) 462-2600
Facsimile: (901) 462-2626
Email:    colby.morgan@jacksonlewis.com
          craig.cowart@jacksonlewis.com

William J. Anthony (Admitted Pro Hac Vice)
JACKSON LEWIS P.C.
18 Corporate Woods Blvd, 3rd Floor
Albany, NY 12211
Telephone: (518) 649-9643
Facsimile: (518) 427-5956
Email: AnthonyW@jacksonlewis.com

D. Christopher Lauderdale (Admitted Pro Hac Vice)
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
Email: Lauder@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 23rd day of August, 2019, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send an electronic notification of such filing to the following:

> Martin D. Holmes (TN Bar No. 012122)
> Peter F. Klett (TN Bar No. 012688)
> M. Reid Estes, Jr. (TN Bar No. 009043)
> Autumn L. Gentry (Bar No. 20766)
> DICKINSON WRIGHT PLLC
> Fifth Third Center, Suite 800
> 424 Church Street
> Nashville, TN  37219
> Telephone: (615) 244-6538
> Email: mdholmes@dickinsonwright.com
> pklett@dickinsonwright.com
> restes@dickinsonwright.com
> agentry@dickensonwright.com

*ATTORNEYS FOR PLAINTIFFS AND OPT-IN PLAINTIFFS*

s/ Craig A. Cowart
Attorney for Defendants

4821-3464-8480, v. 9