**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| JESSE PIERCE and MICHAEL PIERCE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 3:13-cv-00641-DCP |
| WYNDHAM VACATION RESORTS, INC., and WYNDHAM VACATION OWNERSHIP, INC., | ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE BRIEF ON REMAND

Defendants Wyndham Vacation Resorts, Inc. and Wyndham Vacation Ownership, Inc. ("Defendants" or "Wyndham") respectfully submit this Response to Plaintiffs' Damages Brief on remand. Following a ruling from the Sixth Circuit, which vacated the Court's prior damages award, this Court directed the Parties to submit briefs on how to reassess damages for in-house and front-line sales representatives. (ECF No. 465). Instead of doing that, Plaintiffs used most of their brief to reargue liability, apparently recognizing the need to obfuscate the fact that while Judge Shirley found them credible on liability issues, he did not find them credible with respect to the number of hours they claimed to work. Rather than provide a meaningful and constructive damages model, Plaintiffs reassert the same argument that Judge Shirley rejected and that the Sixth Circuit declined to adopt—that the Court should take Plaintiffs at their word on hours worked and award them everything that they asked for. Such an argument flies in the face of Judge Shirley's

credibility determinations, which were left intact by the Sixth Circuit and which cannot be ignored by the Court.

Wyndham has presented the Court with a reasonable damages model based on Plaintiffs' own off-the-clock study; i.e. based on concrete, objective data. Plaintiffs, in contrast, fail to present the Court with any model to consider. Instead, they fall back on the only evidence that they have to support their outrageous damages demands—their own discredited testimony. Effectively, Plaintiffs have provided the Court with nothing upon which to base a determination of their hours worked as it would be improper for the Court to believe, on a cold record, testimony that Judge Shirley did not believe after having the benefit of seeing roughly a score of Plaintiffs live and hearing weeks of testimony. Wyndham respectfully submits that the Court must reject Plaintiffs' demand for 23.54 hours of overtime per week and, instead, should adopt Wyndham's model and the overtime hours set forth therein.

**A. Judge Shirley Rejected Plaintiffs' Outrageously High Claims of Hours Worked.**

Plaintiffs' brief gives the reader the misleading impression that Judge Shirley found that everything Plaintiffs testified to was credible, but that is not reflected in his Opinion. At no time does Judge Shirley use the word "credible" or any other similar word to describe Plaintiffs' claims as to the 'average' hours they worked, Plaintiffs repetitive use of the word "credible" in their brief notwithstanding.[1] Judge Shirley's credibility findings that favor Plaintiffs relate to liability issues,

---

[1] As to the repeated citation to a finding that Kristin Creson was "highly credible", Ms. Creson was not a Plaintiff and the credibility finding had nothing to do with the Plaintiffs' claims as to their average hours worked; rather, it related to whether Wyndham edited timecards. (ECF No. 427 at 118-119 ("In particular, the Court finds Plaintiffs and Plaintiffs' witness (Kristen Creson), who testified that *managers edited timecards*, highly credible *on this issue*, especially in light of the documentary evidence and managers' own admission that they did in fact doctor timecards.")) (emphasis added)). Similarly, Judge Shirley found that David Nelon was credible on the issue of editing time cards (*id.* at 119) and that Jeff Cross was credible on the issue of instructing employees to clock out and keep working (*id.* at 120).

which explains why Plaintiffs spend so much time focusing on liability in their opening brief. Liability, however, is not at issue on remand.

On the issue presently before the Court, which is how many hours Plaintiffs worked each week, Judge Shirley found Plaintiffs' testimony was not credible. Notably, when Judge Shirley turned to determining how many hours the Plaintiffs worked, he wrote:

> The Court must now determine the amount of uncompensated hours worked. The Court observes that its "determination is by necessity imprecise, involving estimates and averages, since Defendant[s] failed to keep records of the precise time Plaintiffs worked." [citation omitted]. Specifically, Plaintiffs have requested that the Court award 63.66 hours per week for all Plaintiffs. *See* [Doc 417-5]. *While the Court finds Plaintiffs have established they worked overtime, the Court finds that Defendants have somewhat rebutted Plaintiffs' average, and further finds Plaintiffs' own testimony, albeit only estimates, to be a bit on the high side, and, thus, a reduction is warranted.*

(ECF No. 427 at 132-33 (emphasis added)). Thus, the very first finding made by Judge Shirley as to Plaintiffs' hours of work is one that can only be read as a finding that Plaintiffs' testimony on this issue was <u>not</u> credible and not to be believed.

Judge Shirley went on to make additional findings of fact that further explain his determination that Plaintiffs' testimony regarding their hours of work was not credible. Judge Shirley found that:

- Plaintiffs exaggerated the frequency of after-hours work. (*See id.* at 135 ("[T]he Court does not find that they 'always' or even 'regularly' worked as long as some claimed."));

- Plaintiffs exaggerated how busy they were with sales tours and the time of day that they left work. (*See id.* at 135 ("The Court finds there were some very busy days, weeks, and months (i.e., Rocktober, Yesvember, holidays, and summers), but there were also slow days, less tours, and leaving early."));

- Plaintiffs exaggerated their hours regarding the slow season. (*Id.* at 134 ("The Court finds, however, that January and February were considered the slow season and that during these months, Plaintiffs did not work as many hours. While a number of Plaintiffs testified that they worked the same amount of hours during the slow season as the busy season, the Court finds otherwise.")); *id.* at 135 (noting that, in addition to working less hours, Plaintiffs also "took off more . . . for trips, vacations, personal matters, medical and family issues")).

Plaintiffs' discussion in their brief of Judge Shirley's findings with respect to the credibility of Defendants' witnesses is irrelevant. Defendants' damages model is not dependent upon this Court rejecting Judge Shirley's credibility findings. Rather, it is based on acceptance of Judge Shirley's factual finding that Plaintiffs' testimony as to the hours worked was not credible, Plaintiffs' own off-the-clock study, and application of reason that recognizes that the only reasonable interpretation of the fact that sales fell precipitously over the course of the afternoon and evening is that fewer and fewer sales representatives were working. (*See* ECF No. 467 at 5-17). Plaintiffs, on the other hand, are depending on this Court to throw reason out the window and reject Judge Shirley's credibility determination with respect to hours worked. This the Court must not do. Judge Shirley expressly referenced his credibility determinations to support his finding regarding average hours worked per week:

> The Court arrives at its conclusion by considering all of the testimony of all the various witnesses, as well as the exhibits provided. *Obviously, the Court finds some testimony more credible, reasonable, and persuasive than other testimony*, and this has been set forth in this opinion. The Court concludes that the Sales Representatives worked five to six days per week from March to December and something less in January and February. The Court is mindful that the time records are essentially of no use due to their falsity and inaccuracy. *The Court is also mindful that the estimates of hours of all witnesses were, at best, estimates of hours worked years ago. The Court is also mindful that each witness may have been somewhat biased, high or low, in their respective testimony and estimates on hours worked.* Nonetheless, the Court is comfortable that based on all the testimony that

Sales Representatives averaged 52 hours per week. This means that they worked an average of 12 hours of overtime per week for the three year Recovery Period.

(ECF No. 427 at 156-57 (emphasis added)). Plaintiffs cannot pick and choose which credibility findings that they want this Court to follow and which they want the Court to set aside. The reality is that on the question of how many hours Plaintiffs worked each week, Judge Shirley found that Plaintiffs were not credible.

**B. The Court Should Not Disturb Judge Shirley's Determination That Plaintiffs Did Not Testify Credibly Regarding Their Hours of Work.**

One point on which the Parties appear to agree is that the importance of Judge Shirley's having had the opportunity to see and hear the witnesses live cannot be overstated. As Plaintiffs' pointed out in their opening brief:

> "Findings of fact shall not be set aside unless clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). Moreover, when a District Court's findings of fact rest on *credibility determinations*, "Rule 52(a) demands *even greater deference* to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575 (emphasis added) (*citing Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985)); *see also Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1067 (6th Cir. 1994).

(ECF No. 468 at 9). Plaintiffs misapply this standard in two ways, however. First, Plaintiffs ultimately accord deference only to those determinations by Judge Shirley that favor themselves and not to those that do not. Specifically, Plaintiffs disregard and hope to sweep under the rug Judge Shirley's determination that Plaintiffs' claims as to how many hours they worked each week were not believable.

Second, Plaintiffs' assertion that it was clearly erroneous for the Court to find that Defendants "somewhat rebutted" Plaintiffs' claims of average hours worked (ECF No. 468 at 16) rests on the fallacy that Judge Shirley faced a binary choice between wholesale belief of Defendants' witnesses or of Plaintiffs' witnesses. This is not, however, a negligence case in which

5

Judge Shirley had to decide between conflicting testimony as to whether the defendant driver ran through a stop sign or whether she failed to have her lights on. In such a situation, disbelief of one party compels belief of the other as there are only two possibilities – the driver either ran the stop sign or did not; the lights were either on or they were not. Here, Judge Shirley could believe *neither* sides' witnesses as to how many hours were worked and find that the truth lay somewhere in between what each said. Indeed, that is what he found. (*See* ECF No. 427 at 156 (noting the Court was "mindful that each witness may have been biased, high or low, in their respective testimony and estimates on hours worked.")). Not believing Defendants' witnesses that Plaintiffs averaged 25-35 hours a week does not compel belief of Plaintiffs' testimony that they averaged more than 63 hours a week. Certainly, Judge Shirley's disbelieving Plaintiffs' testimony on the number of hours worked is not "clearly erroneous."

## C. There Is Abundant Evidence in the Record Showing that Plaintiffs' Testimony Regarding Their "Average" Hours Was Not Believable.

Plaintiffs presented wildly varying testimony as to the number of hours they claim to have worked each week, ranging from 50 hours per week to as much as 80 hours per week.[2] (ECF No. 468-5). Thus, some Plaintiffs testified that they worked 10 overtime hours per week and other Plaintiffs testified that they worked 30 hours of overtime per week. The fact that Plaintiffs – as a group of "similarly situated" employees – testified so inconsistently regarding their hours of work

---

[2] Plaintiffs' testimony regarding the "average" number of hours they worked per week over the course of several years was not truly an "average" in the mathematical sense. For example, one could say that "for 40 weeks out of the year, I worked 48 hours per week, and for the remaining 12 weeks of the year I worked 30 hours per week, so I averaged about 44 hours per week [40 x 48 (1,920) + 12 x 30 (360) = 2,280/52 = 43.8 hours per week]." Here, Plaintiffs offered no such testimony. Plaintiffs simply estimated or "guessed" at how many hours they believed they worked in a so-called "typical" week during a busy month – as discussed further herein.

is grounds to disbelieve them and find their testimony was mere guesswork. Some of the Plaintiffs admitted as much. (*See* ECF No. 377 at 507 (Plaintiff Craig Thrift stated that his "best guess" would be 65 hours per week); ECF No. 389 at 19, 34-35 (Plaintiff Bobby Stallings admitted that it was "hard to average"); Plfs.' Counter-Designations, ECF No. 413-28, Navarro Dep. at 108 (testifying that he didn't know how many hours he worked but it may have been 40-60 per week, which was "just a guess"); ECF No. 383 at 137 (Plaintiff Kisa Abbott admitted that she was "speculating" regarding her average hours).

Judge Shirley's finding that Plaintiffs did not "'always' or even 'regularly' work[] as long as some claimed" in part because there were "slow days, less tours, and leaving early" and that their claimed average number of hours had to be reduced accordingly (*see* ECF No. 427 at 135-36) is amply supported by the record. First, Plaintiff's own off-the-clock study supports this finding. The timestamp data from the off-the-clock study shows that nearly 70% of sales contracts were generated prior to 3:00 p.m. (*See* ECF No. 467-2, Aggregate Summary of Sales Timestamps from Plaintiffs' Off-the-Clock Study). Sales peaked between noon and 1:00 p.m. and dropped off significantly during afternoon, which shows that less tours and sales were taking place in the afternoon. (*See* ECF No. 467-4, Chart: Distribution of Sales Throughout the Workday). Tours and sales in the evening were a rarity. (*See id*). With respect to the 49 Plaintiffs represented in the off-the-clock study, a closing after 3:00 p.m. only happened about once every three weeks for the average Plaintiff (3,172 weeks / 1,096 closings = 2.89 weeks for every late closing). (*See* ECF No. 467 at 14).

Second, Plaintiffs' testimony regarding how frequently they stayed late, and thus how many hours a week they worked, is completely inconsistent with the objective data in their off-the-clock study. For example:

Case 3:13-cv-00641-DCP   Document 470   Filed 09/20/19   Page 7 of 21   PageID #: 18444

- Belinda Drew testified that she "typically" worked until 6:00 or 8:00 p.m. because her "tours would last until somewhere between 6:00 and 8:00 in the evening." (ECF No. 384 at 202, 206). However, the off-the-clock study shows that she only generated two sales contracts after 5:00 p.m. (ECF Nos. 467-1, 467-3), *over the course of 61 weeks.* (ECF No. 467-5). Drew testified she worked 65 hours a week. (ECF No. 384 at 201).

- James Campbell testified that he "typically" left work so late that "it would be dark" outside. (ECF No. 392 at 188). However, the off-the-clock study shows that he only generated three sales contracts after 6:00 p.m. (ECF Nos. 467-1, 467-3), *over the course of 98 weeks.* (ECF No. 467-5). Campbell testified he worked 70 hours a week. (ECF No. 392 at 192).

- Jesse Pierce testified that "the earliest" he left work was 6:30 or 7:00 p.m. and that he stayed later if he made a sale. (ECF No. 393 at 141.) However, the off-the-clock study shows that he generated only five sales contracts after 6:00 p.m. (ECF Nos. 467-1, 467-3), *over the course of 155 weeks.* (ECF No. 467-5). Thus, on average, he generated a contract after 6:00 p.m. about once every 31 weeks. Pierce testified that he worked 80 hours per week. (ECF No. 393 at 124, 127).

- Mike Pierce Sr. testified that he stayed as late as 11:00 p.m. because of tours "that resulted in a deal." (ECF No. 392 at 247-248). However, the off-the-clock study shows that he never generated a sales contract after 8:00 p.m. and only generated 12 contracts after 5:00 p.m. (ECF Nos. 467-1, 467-3), *over the course three years.* (ECF No. 467-5). Thus, on average, he generated a contract after 5:00 p.m. about once every three months. He testified that he worked 70-75 hours per week. (ECF No. 392 at 246-247, 263).

- Brett Williamson testified that he "would typically leave around 9, 10 o'clock at night" and that sales tours were the reason he worked so late. However, the off-the-clock study shows that he <u>never</u> generated a sales contract after 7:00 p.m. and only generated three contracts after 5:00 p.m. (ECF Nos. 467-1, 467-3), *over the course of 31 weeks.* (ECF No. 467-5). Williamson testified that he worked "60-plus" hours per week, "at least." (ECF No. 386 at 133).

- Claudia Bogardus testified that her weekly "average" was based on her generally leaving at 8:00 or 9:00 p.m. (ECF No. 378 at 190). However, the off-the-clock study shows that she <u>never</u> generated a sales contract after 5:00 p.m. (ECF Nos. 467-1, 467-3). Bogardus testified she worked 60-65 hours a week. (ECF No. 378 at 190).

The objective data from Plaintiffs' own trial exhibit is devastating to the credibility of their testimony regarding how many hours a week they worked. Judge Shirley had ample reason to discredit that testimony, and Plaintiffs' current position – that the Court should award damages based entirely off their testimony – is untenable.

Judge Shirley's finding that Plaintiffs did not work as many hours during the slow season as they claimed, as well as the resulting determination that their average number of hours had to be reduced, is supported by the evidence. (*See* ECF No. 427 at 134-36). For example:

- Tony Siler testified that he worked 20-30 hours per week in January and February. (ECF No. 377 at 83, 94). He also testified it was possible that he worked less than 20 hours per week in those months. (*Id.* at 59).

- Shannon Abbott went on vacation every year to go fishing for two months in January and February. (ECF 384 at 102).

- Perry Magee testified that he worked less hours during slow season; he testified that some employees "at the bottom of the power line" (i.e. with those with weak sales performance) might not get any tours during slow season. (ECF No. 384 at 291-292, 319).

- Russell Cooper testified that he worked less hours at the Crossing and the Lodge during January and February. (ECF No. 392 at 131).

- Craig Thrift testified that there were 2-4 slow weeks in January and February at the Crossing. (ECF No. 377 at 197).

- James Campbell testified that there were less tours in January through April and that "a lot" of sales representatives would go on vacation or apply for unemployment benefits. (ECF No. 392 at 193-194, 199).

- Brett Williamson testified that he worked fewer hours during January, February, and March. (ECF No. 386 at 137).

- Numerous other Plaintiffs testified generally that it was "slow" during January and February and they worked less hours. (*See, e.g.,* ECF No. 383 at 137 (Kisa Abbott); ECF No. 378 at 156 (Lee Johnson); ECF No. 378 at 116-117, 120 (James Dodson); ECF No. 421-15 at 5 (Stacy Heaton).

Plaintiffs' contention that Judge Shirley got it wrong on this particular point is dependent on picking and choosing only the evidence and findings which favor Plaintiffs, and not the record as a whole, as well as on the fundamentally flawed premise that Judge Shirley was required to believe everything favorable that they said. Plaintiffs argue that when they testified regarding their average hours, they "had already taken into account" that they worked fewer hours in January and February. (ECF No. 468 at 17). But only a small handful of Plaintiffs, such as Cooper and Campbell, expressly affirmed that they had accounted for the slow season weeks. (ECF No. 392

at 112, 194). The vast majority of Plaintiffs did <u>not</u> testify that their estimate accounted for the slow season. What's more, Plaintiffs frequently testified based on a "typical" week during a busy month and not based on a mathematical "average" accounting for non-busy, and thus lower-hours, weeks. (*See, e.g.,* Plfs.' Depo. Designations, ECF No. 414-5, Neuenschwander Dep. pp.111-114 (estimating his average using a typical busy day and failing to affirm that he accounted for slow season); ECF No. 378 at 130, 155-156 (same, for Lee Johnson); ECF No. 376 at 85-87 (same, for Alana Cheij); ECF No. 377 at 195 (Craig Thrift stated that his "best guess would be 65 per week on average," explained his "guess" using a typical busy day, and failed to affirm that he had accounted for slow season).

Wyndham also impeached individual Plaintiffs by showing that their testimony at trial was inconsistent with their deposition testimony regarding their hours of work. For example:

- David Nelon testified that he worked 50-60 hours per week at the resort, plus an additional 10-12 hours per week away from the premises, for a total of 60-72 hours per week. (ECF No. 375 at 228-229, 239-240). On cross-examination, however, Nelon admitted that he testified at his deposition to a total of 50-60 hours per week, *inclusive* of after-hours phone calls. (ECF No. 377 at 25-26). Nevertheless, Plaintiffs attribute 67 hours per week for Nelon, rather than the 55 hours per week represented in his conflicting deposition testimony. (ECF No. 468-5).

- Brett Williamson testified at his deposition that he normally worked 8-10 hours a day for 6 days a week, which is 48-60 hours per week. (ECF No. 386 at 148-149). However, Williamson then generously rounded it up to "around 60" hours per week. (*Id.*). At trial, he upped the ante and testified that he typically worked "60-plus" hours per week "at least." (*Id.* at133.)

- Tony Siler testified at his deposition that he worked 60-65 hours per week during the busy months. (ECF No. 421-28 at 2.) At trial, he testified that he worked only 50-60 hours per week during the busy months. (ECF 377 at 83.)

- Russell Cooper admitted at trial that he "testified differently" at his deposition regarding his hours of work. (ECF No. 392 at 134.)

- Perry Magee testified at trial that he knew how many hours per week that he spent on after-hours calls with customers, but he admitted at his deposition that he would have to speculate as to how many hours he spent on after-hours calls. (ECF No. 384 at 305-06.)

Plaintiffs' effort in their brief to suggest that there was no basis in the record upon which Judge Shirley could reduce their claimed hours plainly fails. As shown above, there was significant evidence upon which to determine Plaintiffs' testimony was not credible with respect to their claimed average weekly hours. Given the foregoing and given that Judge Shirley had the opportunity to judge Plaintiffs' credibility by observing their facial expressions and hearing the tone in their voice as they testified, it would be clear error to disregard his finding that Plaintiffs did not credibly testify about their average hours worked.

**D.  *Mt. Clemens* Does Not Require The Court To Accept Plaintiffs' Thoroughly Rejected Estimates Of Their Work Hours.**

Plaintiffs argue that they met their burden under *Mt. Clemens*, Wyndham did not, and so the Court has no option but to give them everything they are asking for. This argument rests on two fundamentally flawed premises: first, that Defendants did not meet their burden in this case; and second, that if a defendant does not meet its burden under *Mt. Clemens,* a court may not assess the credibility of the plaintiff's claims as to hours worked but, instead, must accept their claims as true.

The Sixth Circuit has summarized the *Mt. Clemens* framework as follows:

> "[W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work  as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687. . . . Once the employees satisfy their relaxed burden for establishing the extent of uncompensated work, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed **or** with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens*, 328 U.S. at 687-88.

*Monroe v. FTS USA, LLC*, 860 F.3d 389, 398-399 (emphasis added).  Applying this framework, Judge Shirley concluded that Plaintiffs demonstrated that they worked overtime but that Wyndham had shown that Plaintiffs did not work as much overtime as they were claiming: "Specifically, Plaintiffs have requested that the Court award 63.66 hours per week for all Plaintiffs. *See* [Doc. 417-5]. While the Court finds Plaintiffs have established that they worked overtime, *the Court finds Defendants have somewhat rebutted Plaintiffs' average*, and further finds Plaintiffs' own testimony, albeit only estimates, to be a bit on the high side, and thus, a reduction is warranted." (ECF No. 427 at 132-33 (emphasis added)).  Defendants met their burden by somewhat rebutting; i.e. by "negativing" Plaintiffs' claimed hours.[3]

Plaintiffs' argument further depends on the unsupportable assertion that the Court, having disbelieved Defendants as to the hours worked, must believe Plaintiffs' claims as to the hours worked.  As discussed in Section B, *supra,* the Court is not faced with such a binary choice. Moreover, as the Sixth Circuit's Pattern Jury Instructions explain, the factfinder is "free to believe

---

[3] To the extent that Plaintiffs argue that Judge Shirley should have found that Plaintiffs worked all the hours they testified to working (regardless of whether he found their testimony on this point to be credible) because he found that Wyndham failed to show the precise amount of work that Plaintiffs performed, *Mt. Clemens* does not support that argument as the employer's burden is in the disjunctive – provide evidence of the precise hours worked **or** provide evidence that negatives the reasonableness of plaintiffs' claimed hours. *Mt. Clemens*, 328 U.S. at 687-88.

everything that a witness said, or only part of it, or none of it at all." 6ᵀᴴ CIR. PATTERN CRIM. JURY INSTR. § 1.07 (further explaining that whether a witness's testimony is "contradicted by other evidence" is just one of many factors relevant to credibility); *see also* 11ᵀᴴ CIR. PATTERN CIV. JURY INSTR. § 3.4 ("You should decide whether you believe what each witness had to say . . . . In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter."). It was absolutely within the province of Judge Shirley to believe Plaintiffs on liability questions but not on the number of hours they claimed they worked.

Further, requiring the Court to blindly accept Plaintiffs' claimed hours is inconsistent with the Supreme Court's recent application of *Mt. Clemens*: "Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury. Reasonable minds may differ as to whether the average time [plaintiffs' expert] calculated is probative as to the time actually worked by each employee. Resolving that question, however, is the near-exclusive province of the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016).

Judge Shirley sat in the role of the jury during the bench trial in this case, weighed the credibility of the witnesses, and significantly reduced the number of hours Plaintiffs claimed to have worked based on his assessment of their credibility. (ECF No. 427 at 150-156). Judge Shirley did what the Sixth Circuit in *O'Brien* instructed he should do under *Mt. Clemens*: "If the employer cannot negate the estimate, then the 'court may award damages to the employee, even though the result be only approximate.'" *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 602-603 (6th Cir. 2009) (quoting *Mt. Clemens*). Judge Shirley found that Wyndham had "somewhat rebutted" Plaintiffs' average number of hours worked and he awarded an approximate number as damages based on the evidence presented.

Plaintiffs fail to cite any authority to support their "winner-takes-all" construction of *Mt. Clemens.* This is not surprising because that illogical interpretation of *Mt. Clemens* has not been adopted by courts in the Sixth Circuit. For example, in *Bauer v. Singh*, several of the named plaintiffs claimed, as Plaintiffs did here, to have worked a certain number of average overtime hours every week while the company's time records reflected no overtime. *Bauer v. Singh*, 2010 U.S. Dist. LEXIS 128952, at *5-6 (S.D. Ohio Dec. 7, 2010). Even though the court agreed that the company's time records were not accurate, it did not enter judgment for the plaintiffs based on the number of hours they claim to have worked. *Id.* at *23. Applying *Mt. Clemens*, the court stated, "Defendants have produced some evidence rebutting Bauer's estimates, albeit not record 'evidence of the precise amount of work performed,' that tends to negate any 'reasonableness of the inference' that could be drawn from Bauer's testimony. In other words, the posture of the evidence, including credibility concerns, is such that genuine issues of material fact remain that are only appropriate for determination by the finder of fact." *Id.* at *28 (quoting *Mt. Clemens*, 328 U.S. at 686-87). Likewise, in this case, Plaintiffs are not entitled to recover whatever they say they should recover based on their testimony because Defendants somewhat rebutted Plaintiffs' claimed hours and Judge Shirley had significant credibility concerns regarding their testimony.

Wyndham agrees with Plaintiffs that Judge Shirley failed to explain how he calculated an average of 52 hours per week. Consequently, Wyndham has proposed its own damages model that considers both Judge Shirley's credibility findings and objectively reliable evidence (the off-the-clock study data) showing how often and how late Plaintiffs stayed late for closing sales. (*See* ECF No. 467 at 5-17). Wyndham's model accounts for other work-related activity both by providing a 'bump' of three extra hours per week, as well as by crediting each plaintiff with working 5.5 days a week even though Judge Shirley found only that Plaintiffs "often" worked 5-6

days a week, not that they always did or even averaged doing so. (*See id.* at 9, 17-20). Defendants also did not deduct from the 5.5 days a week even though Judge Shirley found Plaintiffs worked "something less" than 5-6 days a week in January and February (ECF No. 427 at 156); rather, Defendants applied 5.5 days a week for the entire year. This methodology offers the Court a more reasonable means of calculating an average number of hours worked per week. By contrast, Plaintiffs offer their self-serving estimates of the hours that they worked which Judge Shirley plainly found did not match up with reality and rejected in awarding them significantly fewer hours than they claimed. It would be clear error to disregard Judge Shirley's credibility determinations on a cold record, adopt Plaintiffs' unprecedented "winner-takes-all" interpretation of *Mt. Clemens*, and use Plaintiffs' discredited testimony as the sole basis for a damages award.

## E. Plaintiffs' Arguments Regarding Discovery Employees Are Unfounded and Inconsistent with the Sixth Circuit's Controlling Opinion.

Although Plaintiffs concede that only one discovery employee testified at trial, Plaintiffs argue that the Court should enter an award of damages for all discovery employees. (ECF No. 458 at 18-20). In doing so, Plaintiffs blatantly disregard the limits of the remand instruction issued by the Sixth Circuit: "Because the [trial] court erred in finding that the discovery employees were similarly situated to the other salespeople and that error infected its hourly average determination, we vacate the damages award and *remand for the court to reassess damages for the in-house and front-line employees.*" *Pierce v. Wyndham Vacation Resorts, Inc.,* 922 F.3d 741, 749 (6th Cir. 2019) (emphasis added). Likewise, Plaintiffs conveniently ignore the Sixth Circuit's discussion and holding that there was insufficient evidence in the trial record regarding the hours of work of discovery employees. *See id.* at 746-47.

Since the substance of the Sixth Circuit's Opinion is highly unfavorable to them, Plaintiffs cherry-pick a single quote from the Opinion and try to manipulate it to justify their desired result. In its Opinion, the Sixth Circuit stated: "At the least, the court should have created a separate subclass for the discovery employees." *Id.* at 747. Plaintiffs then try to use that quote as the basis to belatedly fashion a subclass (after the trial has already concluded) and award damages to discovery employees. Yet, if Plaintiffs wanted to pursue a subclass of discovery employees they "should have" moved the Court to certify a subclass before the case was tried and they "should have" presented adequate evidence at trial that would have supported a subclass.[4] They did not do so. Further, the Sixth Circuit's point that a subclass "should have" been created in the past is not equivalent to an instruction that the District Court "must now" create a subclass on remand irrespective of whether there is evidence in the record to support creation of a subclass. Essentially, Plaintiffs ask this Court to stretch the meaning of the Sixth Circuit's quote about a subclass and then expand the scope of the remand instruction – which is limited to front-line and in-house employees in very plain terms.

Moreover, looking to the substantive context of the Sixth Circuit's Opinion surrounding the quote at issue reveals that the trial record contains insufficient evidence to retroactively create a subclass and award damages to discovery employees. Specifically, the Sixth Circuit stated:

---

[4] Whether subclasses may be created is an issue that is "properly addressed at the second stage" of the collective action certification process. *Thompson v. Bruister & Assocs.,* 967 F. Supp. 2d 1204, 1221 (M.D. Tenn. 2013) (quotation omitted). At the very latest, proposed subclasses must be addressed during the trial planning process, so that there is adequate representative evidence at trial that would allow a factfinder to make determinations specific to each subclass. *See O'Connor v. Uber Techs.*, 2015 U.S. Dist. LEXIS 116482, at *52 n.13 (N.D. Cal. Sep. 1, 2015); *Wilson v. Navika Capital Grp., LLC,* 2014 U.S. Dist. LEXIS 7181, at *53-54 (S.D. Tex. Jan. 17, 2014); *Espenscheid v. DirectSat USA, LLC,* 2011 U.S. Dist. LEXIS 56062, at *8-9 (W.D. Wis. May 23, 2011); *Wilks v. Pep Boys,* No. 3:02-cv-837, 2006 U.S. Dist. LEXIS 69537, at *22-23 (M.D. Tenn. Sep. 26, 2006). Here, Plaintiffs never moved to certify a subclass of Discovery employees and never submitted a trial plan with subclasses.

"Only one of the discovery employee-plaintiffs testified at trial, and he did not indicate that discovery employees participated in party weekends, that Wyndham required the discovery team to work six days a week, *or that the discovery sales-people at the other Tennessee locations performed the same functions he did*, all in contrast to the consistent testimony from the in-house and front-line employees." *Pierce,* 922 F.3d at 746-47 (emphasis added). The trial record does not contain the evidence to support a determination that the discovery employees are similarly situated *to each other,* a finding which would be required to form a subclass.

As to damages, the record likewise contains insufficient evidence. The Sixth Circuit stated: "the district court made no factual findings about how often the discovery team members stayed late or how much later they stayed. The off-the-clock work study, which showed the dates and times of in-house and front-line employees' transactions, does not show similar data for the discovery employees. *No evidence thus shows how often or at what time discovery salespeople initiated or closed contracts." Id.* at 747 (emphasis added).

Plaintiffs nevertheless ask the Court to find that all discovery employees worked an average of 61 hours per week – based on the testimony of a single employee, Bobby Stallings. In doing so, Plaintiffs mischaracterize Judge Shirley's Opinion by stating that "the District Court found that Mr. Stallings worked at least 61 hours per week on average." (ECF No. 468 at 20). In reality, however, Judge Shirley merely summarized that "Stallings *testified* that he worked at least 61 hours per week." (ECF No. 427 at 48 (emphasis added)). Judge Shirley did not make any factual finding that Stallings *in fact* worked 61 hours per week. To the contrary, Judge Shirley treated all discovery employees as similarly situated to the front-line and in-house employees and concluded that they all worked 52 hours per week on average. (ECF No. 427 at 136). As the Sixth Circuit held, it was an abuse of discretion to treat the discovery employees as similarly situated to the

frontline and in-house sales employees and "the district court made no factual findings" regarding their hours of work. *Pierce,* 922 F.3d at 747, 749.

In arguing their position that the Court can now make findings regarding the hours of work of a subclass of discovery employees, Plaintiffs even directly dispute the validity of the Sixth Circuit's Opinion. Plaintiffs acknowledge that "the Sixth Circuit held that Discovery Sales Representatives started later than those working Front Line or In House because [they] did not attend the mandatory morning meeting." (ECF No. 468 at 19); *see also Pierce,* 922 F.3d at 747 ("the discovery team started later than the in-house and front-line teams"). Yet, Plaintiffs then cavalierly claim that "the Sixth Circuit's conclusion is not supported by the record." (ECF No. 468 at 19). Needless to say, this argument is dead on arrival, since "when a case has been remanded by an appellate court, the trial court is bound to proceed in accordance with the mandate and law of the case as established by the appellate court." *Goldberg v. Maloney,* 692 F.3d 534, 538 (6th Cir. 2012) (quotation omitted); *accord Stryker Corp. v. TIG Ins. Co.,* No. 1:05-cv-51, 2014 U.S. Dist. LEXIS 5119, at *3-4 (W.D. Mich. Jan. 15, 2014); *see also Campbell v. United States,* 592 F.2d 309, 312 (6th Cir. 1979) (holding that a party who believes that the Court of Appeals "has rendered a decision which inadvertently overlooks critical facts which make its decision incorrect or unjust" must seek a rehearing under Rule 40 of the Federal Rules of Appellate Procedure and that litigants "may not ignore this rule and its time limitations by then turning to the district court and asking it" to revisit the decision of the appellate court). The Court should reject Plaintiffs' invitation to flaunt the controlling Opinion that the Sixth Circuit issued in this case.

The record is devoid of evidence that would allow the Court to create a subclass and award damages to discovery employees. Such relief would be fundamentally inconsistent with the Sixth Circuit's determinations on appeal. Instead, the Court should follow well-established precedent

19

and dismiss the discovery employees without prejudice because they are not similarly situated to the front-line and in-house employees who remain in the collective action. (*See* ECF No. 467 at 3 (collecting case law stating that proper remedy is dismissal without prejudice)).

### F. Conclusion

For all the reasons set forth above, it would be clear error to award Plaintiffs damages based on their own discredited testimony. The Court should adopt Defendants' damages model, which is based on Judge Shirley's factual findings, objectively reliable data, and reason. In addition, the Court should dismiss the Discovery employees because that is the proper remedy and the relief sought by Plaintiffs for those employees is unsupported by evidence and inconsistent with the Sixth Circuit's Opinion.

Respectfully submitted,

s/ Craig A. Cowart
Colby S. Morgan, Jr. (TN Bar No. 005556)
Craig A. Cowart (TN Bar No. 017316)
JACKSON LEWIS P.C.
999 Shady Grove Rd., Suite 110
Memphis, TN 38120
Telephone: (901) 462-2600
Facsimile: (901) 462-2626
Email:       colby.morgan@jacksonlewis.com
             craig.cowart@jacksonlewis.com

William J. Anthony (Admitted Pro Hac Vice)
JACKSON LEWIS P.C.
18 Corporate Woods Blvd, 3rd Floor
Albany, NY 12211
Telephone: (518) 649-9643
Facsimile: (518) 427-5956
Email: AnthonyW@jacksonlewis.com

D. Christopher Lauderdale (Admitted Pro Hac Vice)
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
Email: Lauder@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 20th day of September, 2019, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send an electronic notification of such filing to the following:

Martin D. Holmes (TN Bar No. 012122)
Peter F. Klett (TN Bar No. 012688)
M. Reid Estes, Jr. (TN Bar No. 009043)
Autumn L. Gentry (Bar No. 20766)
DICKINSON WRIGHT PLLC
Fifth Third Center, Suite 800
424 Church Street
Nashville, TN 37219
Telephone: (615) 244-6538
Email: mdholmes@dickinsonwright.com
       pklett@dickinsonwright.com
       restes@dickinsonwright.com
       agentry@dickensonwright.com

*ATTORNEYS FOR PLAINTIFFS AND OPT-IN PLAINTIFFS*

s/ Craig A. Cowart
Attorney for Defendants

4825-9822-2757, v. 5